# EXHIBIT 7

## Part 1



May 9, 2024

**BY EMAIL**

Jomaire A. Crawford
Quinn Emanuel Urquhart & Sullivan, LLP
51 Madison Ave., 22nd Floor
New York, NY 10010
jomairecrawford@quinnemanuel.com
(212) 849-7000

**Re:    Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action, *Medical Properties Trust, Inc. v. Viceroy Research LLC, et al.*, No. 23-cv-408 (N.D. Ala.) (the "Alabama Proceeding")**

Dear Counsel:

On behalf of Cheyne Capital US L.P. ("Cheyne Capital US"), enclosed please find Responses and Objections to Medical Properties Trust, Inc.'s ("MPT") Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action, dated April 9, 2024 (the "Subpoena").  Notwithstanding service of these Responses and Objections, Cheyne Capital US demands that you immediately withdraw the Subpoena, which is both overbroad and has been served for the improper purpose of harassing Cheyne Capital US.  Cheyne Capital US had no involvement whatsoever in any of the events underlying the Alabama Proceeding and, as your Subpoena makes clear, MPT plainly is attempting to access the files of a UK entity (Cheyne Capital Management (UK) LLP) by issuing the Subpoena on a US entity, even though that entity is not even directly related to the UK entity whose documents MPT seeks. Worse still, MPT's harassing actions appear calculated to try to circumvent the Hague Convention and the English legal system, which correspondence from MPT to the UK entity acknowledges must be used in order to obtain any documents from Cheyne Capital Management (UK) LLP.

Given these substantial issues with your Subpoena, we expect to receive correspondence from you no later than May 10th, acknowledging that you will withdraw your Subpoena.  If we do not hear from you by that time, we intend to move to quash the Subpoena and will seek fees and costs in connection with any such action since, among other things, the Subpoena is baseless and improper and fails to meet all applicable legal standards.

Sincerely,

/s/ *Shireen Barday*

**Shireen Barday**
Pallas Partners (US) LLP

Enclosed:    Responses & Objections

T: +1 (212) 970 2300
W: pallasllp.com
75 Rockefeller Plaza, New York, NY 10019

Pallas Partners (US) LLP is a Delaware limited liability partnership registered to do business in the State of New York.

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**

---

MEDICAL PROPERTIES TRUST, INC.

             Plaintiff,

    v.

VICEROY RESEARCH LLC; FRASER JOHN
PERRING; GABRIEL BERNARDE; and
AIDAN LAU

           Defendants

Case No. 2:23-CV-00408-RDP

---

### RESPONDENT CHEYNE CAPITAL US, L.P.'S RESPONSES AND OBJECTIONS TO PLAINTIFF MEDICAL PROPERTIES TRUST, INC.'S SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

Pursuant to Rules 26 and 45 of the Federal Rules of Civil Procedure, Cheyne Capital US, L.P. ("Cheyne Capital US"), by and through its undersigned counsel, responds and objects to the Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (the "Subpoena"; each request therein, a "Request" and, collectively, the "Requests"), dated April 9, 2024, propounded by Medical Properties Trust, Inc. ("Plaintiff") in connection with the above-captioned Action, as follows.

### GENERAL OBJECTIONS

Cheyne Capital US asserts the following general objections, which are hereby incorporated into each of the Specific Objections and Responses set forth below:

1.    These responses and objections ("Responses") represent Cheyne Capital US's reasonable effort to identify responsive information and documents in its possession, custody or

control (if any).  Cheyne Capital US reserves the right to amend or supplement these Responses in accordance with the Federal Rules of Civil Procedure, the Federal Rules of Evidence, the Local Rules of the Southern District of New York, and any other applicable law or applicable rule (collectively, the "Rules").

2.      These Responses are solely on behalf of Cheyne Capital US, headquartered in New York and formed in Delaware, and are not on behalf of any affiliates or non-U.S. Cheyne entities. These Responses are served solely for the limited purpose of responding to the Subpoena, and not for any other litigation or business purpose.  By serving these Responses, Cheyne Capital US does not consent to the jurisdiction of any court and does not waive any of its rights.

3.      Cheyne Capital US objects to the Subpoena as an improper and unlawful attempt to circumvent the Hague Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters, as adopted and implemented in the United States of America at 18 U.S.C. § 1781 (the "Hague Convention").  On January 18, 2024, the United States District Court for the Northern District of Alabama issued a "Request for International Judicial Assistance Pursuant to the Hague Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters" on the ground that "it would further the interests of justice to obtain documents in the possession of non-party Cheyne Capital Management (UK) LLP" (the "Letter Rogatory)."  On March 6, 2024, Plaintiff contacted a different entity, Cheyne Capital UK Ltd. (though referring in its letter to "Cheyne Capital Management ('Cheyne Capital')"), regarding the Letter Rogatory.  In that communication, annexed hereto as **Exhibit A**, Plaintiff stated that it intended to file the so-called Intended Hague Application to obtain an English Court order to seek discovery from "Cheyne Capital," without being clear that was Cheyne Capital UK Ltd. or Cheyne Capital Management (UK) LLP, the only subject of the Letter Rogatory.  As of the date hereof, it is believed the Plaintiff has not obtained any English Court order and instead has determined to

circumvent the English law process by attempting to obtain what is in fact foreign discovery through Cheyne Capital US, a domestic company.  Cheyne Capital US objects to the Subpoena as harassing in that it is an improper and unlawful attempt by Plaintiff to avoid the expense and burden of pursuing the discovery it seeks through the proper legal channels by making an end run around the English court system.

4.      Cheyne Capital US has made reasonable efforts to respond to each Request as Cheyne Capital US understands and interprets that Request.  Should Plaintiff subsequently assert any different interpretation of any Request, Cheyne Capital US reserves the right to amend or supplement its Responses.

5.      Cheyne Capital US objects to the Requests, including the definitions and instructions contained therein, to the extent they purport to impose obligations different from or greater than those imposed by the Rules.  For the purposes of the responses, Cheyne Capital US will respond to the Requests in accordance with the Rules.  Cheyne Capital US does not agree to undertake any obligations beyond those required by applicable law and/or rules.

6.      Cheyne Capital US objects to the Subpoena, including the definitions and instructions, on the grounds that it will impose an unwarranted, substantial, and costly burden on Cheyne Capital US, and the Subpoena is vague, ambiguous, overly broad, unduly burdensome, and unlikely to lead to the discovery of admissible evidence.

7.      Cheyne Capital US objects to the Subpoena, including the definitions and instructions, on the grounds that the Requests do not identify the documents sought with reasonable particularity.

8.      Cheyne Capital US objects to the Requests, including the definitions and instructions, to the extent they demand "all" or "any" documents and communications "concerning" a particular subject, because such demands are inherently overbroad, unduly

3

burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Cheyne Capital US will apply a good-faith definition of these terms.

9.      Cheyne Capital US objects to the Requests, including the definitions and instructions contained therein, to the extent they call for the production of documents and communications that are not maintained in the ordinary course of business and are not reasonably retrievable at reasonable expense.  Cheyne Capital US further objects to the Requests to the extent they purport to require Cheyne Capital US to perform anything more than a reasonable and diligent search for documents and communications where responsive documents and communications would reasonably be expected to be found.

10.      Cheyne Capital US objects to the Requests, including the definitions and instructions, to the extent that they call for documents or information that does not exist, or documents or information outside Cheyne Capital US's possession, custody or control.  To the extent Cheyne Capital US responds to any Request, such response is by and on behalf of Cheyne Capital US and shall be limited to information currently available to Cheyne Capital US. Furthermore, any such response is not intended as a representation that such documents and communications exist or that such documents and communications are or could be in the possession, custody or control of Cheyne Capital US.

11.      Cheyne Capital US objects to the Requests, including the definitions and instructions, to the extent they seek information that is already within Plaintiff's possession, custody or control or that is more appropriately sought from other parties or non-parties to whom discovery requests may be directed.

12.      Cheyne Capital US objects to the Requests, including the definitions and instructions contained therein, to the extent they seek information that is publicly available, within

Plaintiff's possession, or otherwise available to Plaintiff from another source that is more convenient, less burdensome, or less expensive.

13.     Cheyne Capital US objects to the Requests, including the definitions and instructions contained therein, to the extent they are vague or ambiguous and therefore require subjective judgment on the part of Cheyne Capital US as to what information is requested. Notwithstanding this objection, Cheyne Capital US will respond to each Request (unless otherwise objected to) based upon Cheyne Capital US's understanding of what Plaintiff has requested, endeavoring to interpret the language of each Request, definition, or instruction, as applicable, in accordance with its commonly understood plain meaning to the extent feasible.

14.     Cheyne Capital US objects to the Requests insofar as they seek production or disclosure of information subject to the conciliation privilege, attorney-client privilege, work product doctrine, the European Union's General Data Protection Regulation ("EU GDPR"), the United Kingdom's General Data Protection Regulation ("UK GDPR"), the German Federal Data Protection Act (Bundesdatenschutzgesetz or "BDSG"), or any other applicable privilege, protection, or immunity.  Inadvertent disclosure of any documents or other information that is protected by attorney-client privilege, work product doctrine, EU GDPR, UK GDPR, BDSG, or other applicable privilege, protection, or immunity is not intended to be and shall not operate as a waiver of any claim of privilege, protection, or immunity, whether in whole or in part, nor is any such inadvertent disclosure intended to be nor shall it constitute, a waiver of the right to object to any use of such information contained therein.

15.     Cheyne Capital US objects to the Subpoena, including the definitions and instructions, to the extent it seeks the production of information or documents subject to any third-party confidentiality or nondisclosure agreement to which Cheyne Capital US is a party.  To the

extent production of such information or documents would violate any such agreement, contract, or court order, Cheyne Capital US will not produce such information or documents.

16.     Cheyne Capital US objects to producing documents or communications, if any, until an appropriate, mutually agreed upon protective order can be entered ensuring appropriate confidentiality and other reasonable protections such as a provision relating to the treatment of inadvertently produced documents and communications protective by attorney-client privilege, work product doctrine, EU GDPR, UK GDPR, BDSG, or any other applicable privilege, rule, doctrine or immunity, whether created by statute or common law.

17.     Cheyne Capital US objects to the Subpoena, including the definitions and instructions, on the grounds that it contains or is predicated on legal or factual assumptions that are incorrect.

18.     Cheyne Capital US objects to the Subpoena, including the definitions and instructions, on the grounds that it purports to require Cheyne Capital US to produce information in a format other than that in which it is ordinarily kept by Cheyne Capital US.

19.     Cheyne Capital US objects to the Subpoena, including the definitions and instructions, to the extent it seeks to impose an obligation to identify or search for documents or information at any location other than locations at which they would be expected to be stored in the ordinary course of business.

20.     By responding to any Request, Cheyne Capital US does not adopt Plaintiff's definitions of words and phrases contained in these Requests.  Cheyne Capital US objects to words and phrases to the extent they are undefined and/or inconsistent with (a) the ordinary and customary meaning of such words and phrases and/or (b) the rules governing the permissible scope of discovery.

21.     Cheyne Capital US objects to the Requests, including the definitions and instructions contained therein, to the extent they call for information that is not relevant to the subject matter of this action, not relevant to any party's claims or defenses in *Medical Properties Trust, Inc. v. Viceroy Research LLC et al.*, Civil Action No. 2:23-CV-00408-RDP (N.D. Ala.) (the "Alabama Proceeding"), or not proportional to the needs of the case.  Cheyne Capital US further objects to the Requests to the extent they call for information that is not relevant to the subject matter of the Alabama Proceeding or not relevant to any party's claims or defenses in the Alabama Proceeding.

22.     Cheyne Capital US objects to the Subpoena, including the definitions and instructions, to the extent it seeks documents or information for use in any proceeding other than the Alabama Proceeding.

23.     Cheyne Capital US objects to the Subpoena, including the definitions and instructions, to the extent it seeks documents or information that are not proportional in light of the scope of the Alabama Proceeding.

24.     Cheyne Capital US objects to the Requests, including the definitions and instructions contained therein, to the extent they assume disputed facts, state legal conclusions, or purport to characterize facts.  Cheyne Capital US's responses or objections to any Request should not be taken as an admission that Cheyne Capital US accepts or admits any such "facts," legal conclusions, or characterizations set forth or assumed by such Requests.  Cheyne Capital US objects to the Requests, including the definitions and instructions contained therein, to the extent they purport to require the disclosure of information that Cheyne Capital US is restricted from disclosing by law or by contract.  Cheyne Capital US further objects to the Requests to the extent they require the production of documents and communications reflecting trade secrets and/or

proprietary business information or documents and communications that would impinge on privacy rights of non-parties.

25.     Cheyne Capital US's responses and objections are based solely upon information presently known to Cheyne Capital US.  Cheyne Capital US has investigated whether additional information responsive to the Requests exists; thus, Cheyne Capital US reserves the right to modify, supplement, add to or amend its responses and objections to the Requests in the event it acquires additional responsive documents, and otherwise to the extent required or permitted by applicable law.

26.     Any response stating that Cheyne Capital US will produce responsive documents does not indicate that such documents in fact exist, but only that Cheyne Capital US will produce such responsive, non-privileged documents in its possession, custody or control as may be located after a reasonable, good faith search.

27.     The applicable foregoing General Objections are incorporated into each of the Specific Responses and Objections that follow.  The assertion of the same, similar, or additional objections and specific objections to an individual Request, or the failure to assert any additional objection to an individual Request, shall not be construed as a waiver of any objection by Cheyne Capital US.

## OBJECTIONS TO DEFINITIONS

1.     Cheyne Capital US objects to each and every one of the "Definitions" to the extent that they are vague, deviate from, conflict with, impose a greater obligation on Cheyne Capital US than the Rules, or are not used in the actual text of the Requests.

2.     Cheyne Capital US objects to the definitions of the words "Action" and "Complaint" and on the grounds that their definitions are vague and ambiguous and fail to identify with requisite specificity the operative matter to which they purport to refer.

3.     Cheyne Capital US objects to the definition of "Communication" on the grounds that the definition is overbroad, unduly burdensome, vague, and ambiguous, in that the definition includes "the transmittal of information (in the form of facts, ideas, inquiries, queries, data, or otherwise)," and purports to demand documents and communications subject to applicable privileges, including the attorney-client privilege or work product doctrine, EU GDPR, UK GDPR, BDSG or any other privilege and immunity.  Further, Cheyne Capital US objects to the definition of "Communication" to the extent it purports to require Cheyne Capital US to identify, search for, review, or produce documents and communications not in Cheyne Capital US's possession, custody, or control and on the grounds that it is overbroad and unduly burdensome.

4.     Cheyne Capital US objects to the definition of "Cheyne Capital" as vague, ambiguous, overbroad, unduly burdensome, and not reasonably calculated to lead to discovery of admissible information in that the definition includes not only Cheyne Capital US, but "any of its divisions, subsidiaries, parents or affiliates, or other entities from whom Cheyne Capital US, L.P. has the practical ability to obtain the documents requested herein," and "each of their respective employees, partners, associates, shareholders, officers, directors, and agents and all other Persons acting or purporting to act on their behalf," regardless of their relationship to the allegations, claims, or defenses in the Alabama Proceeding.

5.     Cheyne Capital US objects to the definition of "Defendant" or "Defendants" as overbroad, unduly burdensome, vague, ambiguous and not reasonably calculated to lead to discovery of admissible information in that the definition includes not only "Persons named as defendants in the Complaint" but also "all Persons acting or purporting to act on their behalf," regardless of their relationship to the allegations, claims or defenses in the Alabama Proceeding.

6.     Cheyne Capital US objects to the definition of "Concerning" on the grounds that it is overbroad, unduly burdensome, vague, and ambiguous and purports to impose burdens that are greater than, more burdensome than, or inconsistent with the obligations imposed by the Rules.

7.     Cheyne Capital US objections to the definition of "Document" or "Documents" on the grounds that it is overbroad, unduly burdensome, vague, and ambiguous and purports to impose burdens that are greater than, more burdensome than, or inconsistent with the obligations imposed by the Rules.  Cheyne Capital US further objects to the definition of "Document" as overly broad and unduly burdensome in that it seeks information not relevant to the Alabama Proceeding and for which the burden and expense of locating and producing is not proportional to the needs of the Alabama Proceeding.

8.     Cheyne Capital US objections to the definition of "ESI" on the grounds that it is overbroad, unduly burdensome, vague, and ambiguous and purports to impose burdens that are greater than, more burdensome than, or inconsistent with the obligations imposed by the Rules and not proportional to the needs of the Alabama Proceeding.

9.     Cheyne Capital US objects to the definitions of "Hedgeye" and "MPT" as vague, ambiguous, overbroad, unduly burdensome, and not reasonably calculated to lead to discovery of admissible information in that the definitions includes not only "Hedgeye" and "MPT" but also "any of" either's "divisions, subsidiaries, or affiliates, together with each of their respective employees, partners, associates, shareholders, officers, directors, and agents and any other person or entity acting or purporting to act on their behalf," regardless of their relationship to the allegations, claims, or defenses in the Alabama Proceeding.  Cheyne Capital US further objects to the definition of "MPT" as vague, ambiguous, overbroad, unduly burdensome, and not reasonably calculated to lead to discovery of admissible information in that the definition also includes "individually and collectively" MPT Securities.

10.   Cheyne Capital US objects to the definition of "MPT Securities" as vague, ambiguous, overbroad, unduly burdensome, and not reasonably calculated to lead to discovery of admissible information in that the definition purports to include not only common stock traded under the ticker symbol MPW but also "any options, swaps, hedges, or derivative instruments related thereto."

11.   Cheyne Capital US objects to the definition of "Person" and "Persons" as overbroad, unduly burdensome, vague, ambiguous and not reasonably calculated to lead to discovery of admissible information in that the definition purports to include "any individual, corporation, partnership, firm, association, government agency, or other organization recognizable at law" as well as "its agents, employees and representatives."

12.   Cheyne Capital US objects to the definition of "Reports" as overbroad, unduly burdensome, vague, ambiguous and not reasonably calculated to lead to discovery of admissible information in that it purports to cover "all documents authored or published by any Person concerning MPT," including other unspecified "written materials" and regardless of the relationship of the content of any such document to the allegations, claims or defenses in the Alabama Proceeding.

13.   Cheyne Capital US objects to the definition of "Transaction" as overbroad, unduly burdensome, vague, ambiguous and not reasonably calculated to lead to discovery of admissible information in that the definition purports to incorporate by reference the definition of MPT Security.

14.   Cheyne Capital US objects to the definition of "Tweet" as overbroad, unduly burdensome, vague, ambiguous and not reasonably calculated to lead to discovery of admissible information in that the definition includes the undefined term "Retweets" as well as "replies."

15.    Cheyne Capital US objects to the definition of "You," "Your," and "Yours" on the grounds that it is vague, ambiguous, overbroad, unduly burdensome, and not reasonably calculated to lead to discovery of admissible information in that the definition includes not only Cheyne Capital US and "any of its divisions, subsidiaries, parents, or affiliates, or other entities from whom Cheyne Capital US, L.P. has the practical ability to obtain the documents requested herein" but also "each of their respective employees, partners, associates, shareholders, officers, directors, members, and agents, and all other Persons acting or purporting to act on their behalf," regardless of their relationship to the allegations, claims, or defenses in *Medical Properties Trust, Inc. v. Viceroy Research LLC et al.*, Civil Action No. 2:23-CV-00408-RDP (N.D. Ala.).  Further, Cheyne Capital US objects to this Definition to the extent it purports to seek documents and communications relating to persons or entities other than Cheyne Capital US and/or that are not directly controlled by Cheyne Capital US, and to the extent it purports to seek documents and communications that are not in Cheyne Capital US's possession, custody, or control. Further, Cheyne Capital US objects to this Definition to the extent it purports to seek documents and communications that are in possession or control of any foreign (non-U.S.) Cheyne Capital US parent or affiliate.

16.    Cheyne Capital US objects to the definition of "including" on the grounds that it is overbroad, unduly burdensome, vague, and ambiguous and purports to impose burdens that are greater than, more burdensome than, or inconsistent with the obligations imposed by the Rules.

17.    Cheyne Capital US objects to the definition of "and" and "all" as vague, ambiguous, overly broad and unduly burdensome to the extent they are to be construed "either disjunctively or conjunctively" and purports to impose burdens that are greater than, more burdensome than, or inconsistent with the obligations imposed by the Rules.

18.   Cheyne Capital US objects to the definition of "any" and "each" as vague, ambiguous, overly broad and unduly burdensome to the extent they are to be construed as referring to "'each' and 'every'" and purports to impose burdens that are greater than, more burdensome than, or inconsistent with the obligations imposed by the Rules.

19.   Cheyne Capital US objects to the definition contained in Paragraph 20 of the Subpoena on the ground that it is vague, ambiguous, overly broad and unduly burdensome in that it is not a definition but instead is an instruction and further requires that all "singular" words "include the plural and vice versa" and purports to impose burdens that are greater than, more burdensome than, or inconsistent with the obligations imposed by the Rules.

20.   Cheyne Capital US objects to the definitions contained in Paragraph 21 of the Subpoena on the ground that they are vague, ambiguous, overly broad and unduly burdensome in that they are not definitions but instead are instructions and require "concerning," "regarding," "relating to," and/or "related to" to "be read and applied as interchangeable" and otherwise to "be construed in the broadest sense" possible and purports to impose burdens that are greater than, more burdensome than, or inconsistent with the obligations imposed by the Rules.

## **OBJECTIONS TO INSTRUCTIONS**

1.   Cheyne Capital US objects to each and every one of the "Instructions," including without limitation the unnumbered preamble, to the extent that they are vague, deviate from, conflict with, or impose greater obligations on Cheyne Capital US than the Rules.  Cheyne Capital US further objects to each and every one of the "Instructions" to the extent that they purport to demand documents and communications subject to applicable privileges, including the attorney-client privilege or work product doctrine, EU GDPR, UK GDPR, BDSG or any other privilege and immunity.  Cheyne Capital US does not agree to undertake any obligations beyond those required by the Rules.

13

2.   Cheyne Capital US objects to Instruction No. 1 as unduly broad, overly burdensome, not proportional to the needs of the Alabama Proceeding and not relevant to any party's claims or defense in the Alabama Proceeding.

3.   Cheyne Capital US objections to Instruction No. 8 to the extent it requires Cheyne Capital US to produce a privilege log with information beyond what is required under the Rules.

### SPECIFIC RESPONSES AND OBJECTIONS

In addition to the foregoing General Objections, which apply to each Request as if set forth fully below, Cheyne Capital US makes the following Specific Responses and Objections.

### REQUEST NO. 1

Documents and Communications related to any Defendant, or any Person working on behalf of or in concert with any Defendant. For the avoidance of doubt, this Request encompasses:

A.   Documents or Communications sent to, or received from, any Defendant, including but not limited to communications exchanged pursuant to any agreement between You and any Defendant;

B.   Documents and Communications concerning any payments made to, or received from, any Defendant, or any Person working on behalf of or in concert with any Defendant; and

C.   Documents and Communications concerning contracts, memoranda of understanding, letters of intent, confidentiality agreements, non-disclosure agreements, profit-, risk-, loss-, or cost-sharing agreements, or other agreements or draft agreements of any kind, whether written or oral, between You and any Defendant, or any Person working on behalf of or in concert with any Defendant.

### RESPONSE TO REQUEST NO. 1

Cheyne Capital US objections to this Request as harassing, overly broad, unduly burdensome, and not proportional to the needs of the Alabama Proceeding as it asks for all "Documents and Communications related to any Defendant, or any Person working on behalf of or in concert with any Defendant," when a subset would suffice.  Cheyne Capital US also objects

14

to this Request because it calls for the production of documents and communications that are irrelevant to the claims, defenses, or subject matter of the Alabama Proceeding. Cheyne Capital US further objects to this Request as vague and ambiguous to the extent it includes terms, such as "contracts, memoranda of understanding, letters of intent, confidentiality agreements, non-disclosure agreements, profit-, risk-, loss-, or cost-sharing agreements, or other agreements or draft agreements of any kind, whether written or oral," that are undefined and subject to multiple interpretations. Cheyne Capital US further objects to this Request to the extent it seeks documents protected by the attorney-client or work-product privileges, or any other applicable privilege, immunity, or exemption. Cheyne Capital US objects to the Request as harassing to the extent it improperly seeks documents from Cheyne Capital US that are located abroad and subject to the Letter Rogatory issued by the United States District Court for the Northern District of Alabama and legal process of the English courts and should be pursued, if at all, through those means.

Cheyne Capital US further objects to this Request to the extent it seeks materials equally available to Plaintiff through other sources, and better obtained from those sources, including the parties to the Alabama Proceeding. *Breaking Media, Inc. v. Jowers*, 2021 WL 1299108, at *7 (S.D.N.Y. Apr. 7, 2021) (quashing nonparty subpoena because the issuing parties failed to take reasonable steps to obtain the requested information through other sources); *Bernstein v. Cengage Learning, Inc.*, 2022 WL 20053732, at *5 (S.D.N.Y. Sept. 8, 2022) (quashing nonparty subpoena where issuing parties could have obtained the requested information by deposing a key witness or following up on the opposing party's objections to their discovery request). Subject to and without waiving the foregoing, Cheyne Capital US will not produce documents in response to this Request.

**REQUEST NO. 2**

Documents and Communications relating to MPT or MPT Securities. For the avoidance of doubt, this Request encompasses:

A. Documents and communications concerning any communications, interactions, discussions, or meetings between You and any other Person(s) concerning MPT, including, without limitation, communications between You and Hedgeye Risk Management, LLC, Robert Simone (Hedgeye), Keith McCullough (Hedgeye), Matthew Pascale (formerly of Point 72 Asset Management), Richard Mortell (Third Coast Real Estate Capital), Edwin Dorsey (Bear Cave), Greg Gillespie (formerly of Tacet Global Limited), Nick Helsby, Romaine Beurr, Jacques Griesel, Brian Spegele (The Wall Street Journal), Jonathan Weil (The Wall Street Journal), Laura Benitez (Bloomberg), Charlie Conchie, Moe Tkacik (The American Prospect), Teri Buhl (Buhl Reports), David Lindsay (The Shift), Aurelia Seidlhofer (Reorg), Claude Risner (Debtwire), or Peter Shalson;

B. Documents and Communications concerning contracts, memoranda of understanding, letters of intent, confidentiality agreements, non-disclosure agreements, profit-, risk-, loss-, or cost-sharing agreements, or other agreements or draft agreements of any kind, whether written or oral, between You and any other Person, including without limitation the Persons listed in Request No. 2 above, concerning MPT;

C. A11 Documents and Communications concerning or relating to any payments or other consideration paid by You to any other Person, whether actual or potential, in exchange for or in connection with the creation or dissemination of Tweets, Reports, statements, or other material concerning MPT;

D. Documents and Communications related to the value of MPT Securities and any recommendation to purchase, sell, or short-sell MPT Securities;

E. Documents and Communications related to any Reports or other public statements concerning MPT, including Documents and Communications regarding any decision to create or publish any Report, Tweet, or other public statement concerning MPT, and any records of or related to any meetings concerning the foregoing; and

F. Documents and Communications concerning any Transaction in MPT Securities by You or Any Person acting on behalf of You, including any short sales of MPT Securities.

**RESPONSE TO REQUEST NO. 2**

Cheyne Capital US objections to this Request as harassing, overly broad, unduly burdensome, and not proportional to the needs of the Alabama Proceeding as it asks for all "Documents and Communications relating to MPT or MPT Securities," when a subset would suffice. Cheyne Capital US also objects to this Request because it calls for the production of

documents and communications that are irrelevant to the claims, defenses, or subject matter of the Alabama Proceeding.  Cheyne Capital US further objects to this Request as vague and ambiguous to the extent it includes terms, such as "Bear Cave," "Bloomberg" and "The Shift," that are undefined and subject to multiple interpretations.  Cheyne Capital US further objects to this Request to the extent it seeks documents protected by the attorney-client or work-product privileges, or any other applicable privilege, immunity, or exemption.  Cheyne Capital US objects to the Request as harassing to the extent it improperly seeks documents from Cheyne Capital US that are located abroad and subject to the Letter Rogatory issued by the United States District Court for the Northern District of Alabama and legal process of the English courts and should be pursued, if any all, through those means.

Cheyne Capital US further objects to this Request to the extent it seeks materials equally available to Plaintiff through other sources, and better obtained from those sources, including the parties to the Alabama Proceeding.  *Breaking Media, Inc. v. Jowers*, 2021 WL 1299108, at *7 (S.D.N.Y. Apr. 7, 2021) (quashing nonparty subpoena because the issuing parties failed to take reasonable steps to obtain the requested information through other sources); *Bernstein v. Cengage Learning, Inc.*, 2022 WL 20053732, at *5 (S.D.N.Y. Sept. 8, 2022) (quashing nonparty subpoena where issuing parties could have obtained the requested information by deposing a key witness or following up on the opposing party's objections to their discovery request).  Subject to and without waiving the foregoing, Cheyne Capital US will not produce documents in response to this Request.

17

Dated: May 9, 2024
New York, New York

                                                PALLAS PARTNERS (US) LLP

By:     */s/  Shireen Barday*
           Shireen Barday
           75 Rockefeller Plaza
           New York, New York 10019
           Telephone: (212) 970-2300
           Shireen.barday@pallasllp.com

           *Attorneys for Cheyne Capital US, L.P.*

quinn emanuel trial lawyers | london

90 High Holborn, London WC1V 6LJ, United Kingdom | TEL +44 20 7653 2000  FAX +44 20 7653 2100

WRITER'S DIRECT DIAL NO.
**+44 20 7653 2290**

WRITER'S INTERNET ADDRESS
**paulbaker@quinnemanuel.com**

6 March 2024

<u>VIA E-MAIL</u> (PETER.HEAD@CHEYNECAPITAL.COM)

Peter Head
Chief Compliance Offer
Cheyne Capital UK Ltd. ("**Cheyne Capital**")
Stornoway House
13 Cleveland Row
London, SW1A 1DH
United Kingdom

Our ref: 11732-00001
Your ref:

<u>**Re: Document Requests to Cheyne Capital**</u>

Dear Sir,

1.      We represent Medical Properties Trust, Inc. ("**MPT**"). We write in respect of production of documents by Cheyne Capital Management ("**Cheyne Capital**") in connection with a U.S. court proceeding currently pending before the Honorable R. David Proctor, federal district court judge, in the case captioned *Medical Properties Trust, Inc. v. Viceroy Research LLC et al.*, No. 23-cv-408 (N.D. Ala., filed March 30, 2023) (the "**U.S. Proceeding**").

2.      On 18 January 2024, Judge Proctor issued a letter of request in the U.S. Proceeding, addressed to the English Court, concerning production of documents in Cheyne Capital's possession, pursuant to the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters Dated March 18, 1970 (the "**Request**"). The Request contains details of documents sought to be produced by Cheyne Capital (the "**Document Production Requests**"), which documents would be evidence for direct use in, and

quinn emanuel urquhart & sullivan uk llp

ABU DHABI | ATLANTA | AUSTIN | BEIJING | BERLIN | BOSTON | BRUSSELS | CHICAGO | DALLAS | DOHA | HAMBURG | HONG KONG | HOUSTON |
LONDON | LOS ANGELES | MANNHEIM | MIAMI | MUNICH | NEUILLY-LA DEFENSE | NEW YORK | PARIS | PERTH | RIYADH | SALT LAKE CITY |
SAN FRANCISCO | SEATTLE | SHANGHAI | SILICON VALLEY | STUTTGART | SYDNEY | TOKYO | WASHINGTON, DC | WILMINGTON | ZURICH

Quinn Emanuel Urquhart & Sullivan UK LLP is a limited liability  partnership registered in England and Wales (with registered  number OC337278)
and is authorised and regulated by the Solicitors Regulation Authority.  A list of members and their professional qualifications is open to inspection at
our registered office, 90 High Holborn, London WC1V 6LJ, United Kingdom.

relevant to, issues for trial in the U.S. Proceeding.  MPT intends shortly to file an application with the English Court for an order requiring Cheyne Capital to comply with the Document Production Requests pursuant to section 2 of the Evidence (Proceedings in Other Jurisdictions) Act 1975 (the "**Intended Hague Application**").  A signed copy of the Request is enclosed as **Attachment A**.

3.      Before making the Intended Hague Application, in an effort to save time, costs, and court resources, MPT invites Cheyne Capital to co-operate with MPT by (1) confirming the existence and scope of documents in its possession, custody, or control that respond to the Document Production Requests, (2) agreeing in principle voluntarily to provide copies of such documents to MPT, and (3) voluntarily producing as a matter of urgency a subset of such documents within two weeks, with further production to follow as necessary.

4.      By way of background, MPT is a U.S.-based real estate investment trust that acquires, develops, and invests in community healthcare facilities across the United States and internationally.  MPT is a publicly traded company on the New York Stock Exchange.  In the U.S. Proceeding, MPT is suing Viceroy Research LLC and three of its principals—Fraser John Perring, Gabriel Bernarde, and Aidan Lau (together with Viceroy Research LLC, "**Viceroy**")—for numerous civil claims, including defamation, tortious interference, and civil conspiracy.  MPT's claims arise from a "short-and-distort" attack that Viceroy has mounted and continues to pursue against MPT.  In summary, MPT asserts that Viceroy has knowingly or recklessly published false, misleading, and defamatory statements about MPT in an effort to drive down the price of MPT's stock, thereby allowing Viceroy and its co-conspirators to profit off their short positions in MPT.  For your convenience, a copy of the complaint in this action (the "**Complaint**") is attached hereto as **Attachment B**.

5.      After Judge Proctor denied all aspects of Viceroy's motions to dismiss MPT's Complaint, the U.S. Proceeding is now at the stage of discovery. During discovery, Viceroy has disclosed the existence of its agreement with Cheyne Capital (the "**Agreement**") by which Cheyne Capital pays Viceroy a monthly sum in exchange for Viceroy's research on various companies. We note that the Agreement, which Viceroy has since produced to MPT, also gives Viceroy the right to share in any profits that Cheyne Capital earns from its short positions in these companies. Viceroy has indicated that this Agreement covers Viceroy's research on MPT, and that Cheyne Capital has taken a short position in MPT.

6.      In light of these disclosures, MPT applied to Judge Proctor for the Request to be issued, to compel (if necessary) the production by Cheyne Capital of documents responsive to the Document Production Requests.  After argument, Judge Proctor held that the documents sought are relevant to Viceroy's state of mind in publishing research about MPT and therefore relevant to the issues at trial in the U.S. Proceeding.

7.    MPT is preparing to file the Intended Hague Application. At a high level, the documents of which MPT seeks disclosure most urgently are the documents and communications exchanged between Cheyne Capital and Viceroy pursuant to the Agreement (including earlier and later iterations of the Agreement) during the relevant period (which we have defined as 1 January 2022 to present) (the "**Urgent Documents**"). Given the Agreement's express reference to such communications—which are, after all, the subject and purpose of the Agreement—MPT is confident that the Document Production Requests set out in the Request (and, in particular, the Urgent Documents) satisfy the tests of being a specific, clearly defined group of documents and which are known to exist. We accordingly invite Cheyne Capital:

7.1    To confirm, to the best of its knowledge, details of the documents that respond to the Document Production Requests;

7.2    To agree in principle to provide voluntarily to MPT copies of the documents which respond to the Document Production Requests within a reasonable time period and in any event by Wednesday, 20 March 2024; and

7.3    To agree to provide copies of the Urgent Documents forthwith and in any event by Wednesday, 20 March 2024.

8.    If Cheyne Capital refuses these reasonable requests, then MPT reserves the right to apply to Court for an Order compelling Cheyne Capital to comply with the Document Production Requests pursuant to the Intended Hague Application, further or alternatively as pre-action disclosure pursuant to Civil Procedure Rule 31.16.  However, we are hopeful that the need to incur the time, cost, and court resources of any such application can be saved by reasonable voluntary cooperation between the parties. To that end, if Cheyne Capital has genuine concerns as to the scope, method, and timing of disclosure of documents in its possession that respond to the Document Production Requests, MPT is prepared to engage in good faith discussions with Cheyne Capital to endeavour to meet those concerns, with a view to reaching agreement on disclosure without the need to trouble the Court.

9.    Given discovery in the U.S. Proceeding is expected to close on 1 May 2024, we request a response to the above, either way, **as soon as possible and in any event by Wednesday, 13 March 2024**.

10.    All of MPT's rights, as against Cheyne Capital and generally, are reserved.

Yours faithfully,

**QUINN EMANUEL URQUHART & SULLIVAN UK LLP**

**Enc**: Letter of Request, Complaint

**CC:** Sunil Buddhavarapu (Sunil.Buddhavarapu@Cheynecapital.com)

FILED

2024 Jan-18 PM 04:04
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

MEDICAL PROPERTIES TRUST, INC.,

     Plaintiff,

     v.

VICEROY RESEARCH LLC; FRASER
JOHN PERRING; GABRIEL BERNARDE;
and AIDAN LAU,

     Defendants.

Civil Action No. 2:23-CV-00408-RDP

## REQUEST FOR INTERNATIONAL JUDICIAL ASSISTANCE PURSUANT TO THE HAGUE CONVENTION OF 18 MARCH 1970 ON THE TAKING OF EVIDENCE ABROAD IN CIVIL OR COMMERCIAL MATTERS

The United States District Court for the Northern District of Alabama ("Northern District") hereby presents its compliments to the appropriate judicial authority of the United Kingdom for assistance in obtaining evidence to be used in proceedings before this Court in the above-captioned matter. This request is made pursuant to and in conformity with the Hague Convention of 18 March 1970 On the Taking of Evidence Abroad in Civil or Commercial Matters, as adopted and implemented in the United States of America at 28 U.S.C. § 1781 ("Hague Convention"). The Northern District is a court of law and equity which properly has jurisdiction over this proceeding pursuant to 28 U.S.C. § 1332.

This Court has determined that it would further the interests of justice to obtain documents in the possession of non-party Cheyne Capital Management (UK) LLP ("Cheyne Capital"), an entity residing within your jurisdiction at Stornoway House, 13 Cleveland Row, London SW1A 1DH.

This is an action alleging defamation, civil conspiracy, tortious interference with contractual or business relations, private nuisance, and unjust enrichment arising from the Defendants' public dissemination of critical research reports and other statements about Plaintiff Medical Properties Trust, Inc. ("MPT" or "Plaintiff"). One of the Defendants (Fraser Perring) has disclosed that he has an agreement with Cheyne Capital whereby he receives $30,000 a month (shared equally with the other Defendants Gabriel Bernarde and Aidan Lau) in exchange for sharing the Defendants' research (published or unpublished) with Cheyne Capital. The agreement also gives Mr. Perring the right to 15% of the profits, if any, that Cheyne Capital makes on short sales of MPT securities.[1] Mr. Perring has stated that he believes Cheyne Capital has engaged in short sales of MPT securities.

This Court considers that the evidence sought is directly relevant to issues of fact and law that may influence the final determination of the existence, non-existence, and/or extent of any liability in this matter. This request is made with the understanding that it will in no way require any person to commit any offense, or undergo a broader form of inquiry than they would if the litigation were conducted in the United Kingdom.

This Court, therefore, and in conformity with Article 3 of the Hague Convention, respectfully requests that you, in furtherance of justice by proper and usual process of your court, cause Cheyne Capital to produce the documents listed in Exhibit 1. The Northern District stands

---

[1] To sell a stock "short" is to bet its price will fall. To place the bet, the short-seller borrows the stock from a broker, sells it, and retains the proceeds—all with a plan to buy replacement shares back later at a lower price. If the bet is right, and the stock price declines, the short-seller can count as profit the difference between the price he was able to get before the drop and what he had to pay later to buy the replacement shares for the broker (that is, to "close out" the short position). *See* Complaint ¶ 30, *Medical Properties Trust, Inc. v. Viceroy Research et al.*, No. 2:23-cv-00408-NAD (N.D. Ala., filed March 30, 2023).

ready to provide similar judicial assistance to judicial authorities in the United Kingdom when required.

Finally, this Court requests from the judicial authority of the United Kingdom that this Letter of Request and its exhibits, and the Declaration of Jomaire A. Crawford dated December 11, 2023, and its exhibits be closed to public inspection to the maximum extent permitted by your laws because they will be subject to the protective order in this case.

THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ALABAMA THEREFORE MAKES THE FOLLOWING REQUEST:

1.     **Sender**

The Honorable R. David Proctor
United States District Judge
United States District Court for the Northern District of Alabama
Hugo L. Black United States Courthouse
1729 5th Avenue North
Birmingham, AL 35203
United States of America

2.     **Central Authority of the Requested State**

The Senior Master of the King's Bench Division
The High Court of England and Wales
For the attention of the Foreign Process Section
Room E16
Royal Courts of Justice
Strand
LONDON WC2A 2LL
United Kingdom

3.     **Person to whom the executed request is to be returned**

The Honorable R. David Proctor
United States District Judge
United States District Court for the Northern District of Alabama
Hugo L. Black United States Courthouse
1729 5th Avenue North
Birmingham, AL 35203
United States of America

and

Jomaire A. Crawford
Quinn Emanuel Urquhart & Sullivan LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
United States of America

4.     **Specification of the date by which the requesting authority requires receipt of the response to the Request for International Judicial Assistance ("Request for Assistance")**

The requesting authority would greatly appreciate a response to the Request for Assistance within 21 days or as soon thereafter as is practicable.

5.

    **a.**     **Requesting Judicial Authority**

        United States District Court for the Northern District of Alabama
        Hugo L. Black United States Courthouse
        1729 5th Avenue North
        Birmingham, AL 35203
        United States of America

    **b.**     **To the competent authority of**

        United Kingdom

    **c.**     **Name of the case and any identifying number**

        *Medical Properties Trust, Inc. v. Viceroy Research et al.*, No. 2:23-cv-00408-NAD (N.D. Ala., filed March 30, 2023)

6.     **Names and addresses of the parties and their representatives**

    **a.**     **Plaintiffs**

        Medical Properties Trust, Inc.

    **b.**     **Names and addresses of Plaintiffs' representatives**

        Corey Worcester
        Jomaire A. Crawford
        Quinn Emanuel Urquhart & Sullivan, LLP
        51 Madison Avenue, 22nd Floor,
        New York, New York 10010

        William Savitt
        Sarah K. Eddy
        Nathaniel Cullerton
        Adabelle U. Ekechukwu
        Charles M Melman
        Wachtell, Lipton, Rosen & Katz
        51 West 52nd Street
        New York, NY 10019
        Tel: 212-403-1000

        Michael L. Bell
        Wesley B. Gilchrist
        Lightfoot, Franklin & White LLC
        The Clark Building

400 20th Street North
Birmingham, AL 35203
Tel: 205-581-0700

*Counsel for Plaintiff Medical Properties Trust, Inc.*

**c.      Defendants**

Viceroy Research LLC; Fraser Perring; Gabriel Bernarde; Aidan Lau

**d.      Names and addresses of Defendants' representatives**

Richard M. Elias
ELIAS LLC
231 S. Bemiston, Suite 800
St. Louis, MO 63105
314-391-6824
relias@eliasllc.com

*Counsel for Defendants Viceroy Research LLC; Fraser Perring; Gabriel Bernarde; Aidan Lau*

**7.**

**a.      Nature and purpose of the proceedings:**

The Plaintiff in this case alleges that Defendants Viceroy Research LLC, Fraser Perring, Gabriel Bernarde, Aidan Lau ("Defendants") violated MPT's rights under Alabama law by publishing a series of false and defamatory research reports and other public statements concerning MPT for the purpose of driving down MPT's stock price. A copy of Plaintiff's Complaint dated March 30, 2023 ("Complaint") is attached as Exhibit 2 hereto. The nature of the action is summarized at Complaint ¶¶ 1-9. Plaintiff seeks damages and other relief for injury caused by Defendants' defamation, civil conspiracy, and other illegal conduct. Complaint at 43-44.

**b.      Summary of Complaint**

Plaintiff MPT is an Alabama-based real estate investment trust ("REIT") that acquires, develops, and invests in community healthcare facilities across the United States and

internationally. *Id.* ¶ 10. Defendants operate a self-described "financial research" firm that publishes negative content about public companies whose shares they have sold short. *Id.* ¶ 11.

On January 26, 2023, Viceroy published its first report attacking MPT, titled "Medical Properties (dis)Trust." *Id.* ¶ 41. Viceroy admitted in its January 26 report and on Twitter that "Viceroy Research is short $MPW." *Id.* In the weeks and months that followed, Defendants continued to publish a steady stream of defamatory statements about MPT, including in supplemental research reports and on social media platforms. *Id.* ¶¶ 41-73. The Defendants falsely accused MPT of, among other things, engaging in revenue round-tripping with tenants, having an executive compensation structure that incentivizes revenue round-tripping, concealing material information about its relationship with a key tenant, and even criminal wrongdoing. *Id.* On March 30, 2023, MPT filed its Complaint, asserting five claims against Defendants under Alabama law: (i) defamation, (ii) civil conspiracy, (iii) tortious interference with contractual or business relations, (iv) private nuisance, and (v) unjust enrichment. *Id.* ¶¶ 91-120.

### c.   Summary of defense

Defendants moved to dismiss Plaintiff's claims on various legal grounds, including lack of personal jurisdiction and supposed failure to state a claim for relief. Defendants argued, among other things, that their statements about MPT were protected opinion under the First Amendment to the United States Constitution, and that MPT had not alleged that Defendants acted with the requisite mental state. The Court denied Defendants' motions to dismiss in their entirety.

**8.**

### a. Evidence to be obtained

This Court respectfully requests that the appropriate judicial authority in the United Kingdom cause the appropriate orders to be issued to direct Cheyne Capital to produce the documents listed in Exhibit 1, which are to be used in proceedings in the above-captioned matter.

### b. Purpose of the evidence or judicial act sought

To prosecute its claims, MPT must prove, among other things, that the Defendants acted with a culpable mental state in publishing their reports about MPT. *See, e.g., Wal-Mart Stores, Inc. v. Smitherman*, 872 So. 2d 833, 840 (Ala. 2003) (requiring defamation plaintiff to prove "fault amounting at least to negligence on the part of the defendant") (internal quotation omitted). One fact that courts have found relevant to establishing a culpable mental state is motive—including profit motive. *See, e.g., Farmland Partners Inc. v. Rota Fortunae*, No. 18-CV-02351-KLM, 2020 WL 12574993, at *22 (D. Colo. May 15, 2020). Counsel for Plaintiff has represented and furnished sufficient evidence to satisfy this Court that Cheyne Capital has documents relevant to the matters at issue in these proceedings. As set forth below, the evidence sought by MPT relates to matters in question. Because Cheyne Capital resides outside the Subpoena power of this Court, and therefore cannot be compelled to testify at trial, MPT seeks the production of documents in Cheyne Capital's possession to support its claims.

In its Complaint, MPT alleged that Defendants recklessly misrepresented facts about MPT for profit and conspired with others "who share their economic interest in trashing MPT." *See, e.g.*, Complaint ¶¶ 44, 77-80, 96. MPT based this allegation on, among other things, a judicial finding from a previous legal action that the Defendants had published a disparaging report against a South African bank pursuant to a retainer and profit-sharing agreement with a hedge fund. *Id.*

¶¶ 37-40. MPT served discovery requests on the Defendants requesting information about their agreements with third parties related to their research on MPT. Declaration of Jomaire A. Crawford ¶ 3. One of the Defendants (Fraser Perring) disclosed in a discovery response that he has an agreement with Cheyne Capital whereby he receives $30,000 a month (shared equally with the other Defendants) in exchange for sharing the Defendants' research (published or unpublished) with Cheyne Capital. *Id.* The agreement also gives Mr. Perring the right to 15% of the profits, if any, that Cheyne Capital makes on short sales of MPT securities. *Id.* Mr. Perring stated that he believes Cheyne Capital has engaged in short sales of MPT securities. *Id.*

Given that the Defendants, through the profit-sharing agreement with Cheyne Capital, stand to profit off their defamatory statements about MPT, documents in the possession of Cheyne Capital will be important to proving that Mr. Perring and the other Defendants acted recklessly or at least negligently in making false statements about MPT, which is actionable as defamation under Alabama law. *See Wal-Mart Stores, Inc.,* 872 So. 2d at 840. The documents will provide MPT with necessary insight into the Defendants' knowledge of the accuracy or falsity of their "research" pertaining to MPT. The requested documents will further provide evidence of Defendants' intent in publishing and disseminating their purported "research" to third parties; that is, the requested documents will help MPT ascertain the fact that Defendants sought to implement and capitalize on their short-and-distort scheme by entering into profit-sharing agreements with other investors who shorted MPT based on their purported "research." Thus, the requested documents are relevant to claims and allegations in this case.

Although some of the documents in Cheyne Capital's possession may also be in the possession of Defendants, there are likely to be other relevant documents that are not within Defendants' possession, including Cheyne Capital's internal communications regarding matters

relevant to Plaintiff's claims.  Moreover, Defendants have to date produced no communications

with Cheyne Capital, despite having been requested to do so.  Because Cheyne Capital is likely to

have relevant documents and communications that Plaintiff cannot otherwise obtain in the

underlying proceeding, Plaintiff must obtain these documents and communications through a

Letter of Request.

**9.     Identity of any person to be examined**

> Cheyne Capital Management (UK) LLP
> Stornoway House 13
> Cleveland Row, London
> SW1A 1DH
> United Kingdom

> **Name and address of witness's counsel**

> Unknown

**10.     Questions to be put to the persons to be examined or statement of the subject-matter about which they are to be examined**

> Omitted

**11.     Documents or other property to be inspected**

> See Exhibit 1.

**12.     Any requirement that the evidence be given on oath or affirmation and any special form to be used**

> Omitted

**13. Special methods or procedure to be followed**

The production of documents shall comply with the Federal Rules of Civil Procedure,

except to the extent that any such procedure is incompatible with United Kingdom law.  Exhibit

A sets forth instructions for complying with the document requests.

**14.     Request for notification of the time and place for the execution of the Request and identity and address of any person to be notified**

Jomaire A. Crawford
Quinn Emanuel Urquhart & Sullivan, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
United States of America
jomairecrawford@quinnemanuel.com
(212) 849-7581

Counsel for MPT will promptly send notice to counsel for all parties to the action.

**15. Request for attendance or participation of judicial personnel of the requesting authority at the execution of the Letter of Request**

Omitted

**16. Specification of privilege or duty to refuse to produce documents under law of the State of origin**

Neither this request for international judicial assistance, the transmission of documents pursuant to The Hague Convention, shall waive, or be deemed or argued to have waived, the attorney-client privilege, the work product doctrine, or any other privileges, rights, protections, or prohibitions that may apply to that evidence under the laws of the United Kingdom, the United States of America, or the State of Alabama, including the privilege against self-incrimination under the Fifth Amendment of the U.S. Constitution.

Cheyne Capital's production of documents will not be oppressive. In addition, documents that Cheyne Capital produces will be produced under the terms of the protective order and, therefore, will be given confidential treatment in connection with this litigation.

**17. The fees and costs incurred which are reimbursable under the second paragraph of Article 14 or under Article 26 of the Convention will be borne by**

Plaintiff.

11

Date of Request: _18 Jan 2024_
Signature and Seal of the Requesting Authority: R. ⊃ Kd
U.S. District Judge

# EXHIBIT 1

**EXHIBIT 1**

**DEFINITIONS**

As used below, the following terms shall have the following meanings:

1. "Action" shall mean *Medical Properties Trust, Inc. v. Viceroy Research LLC, et al.*, Case No. 2:23-cv-00408-RDP (N.D. Ala., filed March 30, 2023).

2. "Communication" shall refer to the transmittal of information (in the form of facts, ideas, inquiries, queries, data, or otherwise) by any means of transmission, regardless of whether the transmittal was initiated or received by an individual or a system. Means of transmission include, but are not limited to, face-to-face conversations, postal or other physical mail, email, text message, instant message (such as iMessage, WhatsApp, Slack, Signal, Telegram, and Threema), messages or public posts on websites, social media platforms (such as Twitter Direct Messages), voicemail, telephone, videoconference or webcast systems (such as Zoom or WebEx) or facsimile.

3. "Cheyne Capital" shall mean Cheyne Capital Management (UK) LLP and any of its divisions, subsidiaries, or affiliates, together with each of their respective employees, partners, associates, shareholders, officers, directors, and agents, and all other Persons acting or purporting to act on their behalf.

4. "Complaint" shall mean the Complaint, dated March 30, 2023, filed by MPT against Defendants in the Action.

5. "Defendant" or "Defendants" shall mean the Persons named as defendants in the Complaint, together with all Persons acting or purporting to act on their behalf.

6. "Document" or "Documents" shall have the broadest meaning permitted under applicable law and shall include, without limitation, the original and all non-identical copies of any handwritten, printed, typed, recorded, or other graphic material, or ESI (as defined below), of any kind and nature, including all drafts and transcriptions thereof, however produced or

reproduced, and including but not limited to accounting materials, accounts, agreements, analyses, appointment books, books of account, calendars, catalogs, checks, Communications (as defined herein), computer data, computer disks, contracts, correspondence, date books, diaries, diskettes, drawings, email messages, faxes, guidelines, instructions, interoffice communications, invoices, letters, logs, manuals, memoranda, minutes, notes, opinions, payments, plans, receipts, records, regulations, reports, sound recordings, statements, studies, surveys, timesheets, vouchers, word processing materials (however stored or maintained), and all other means by which information is stored for retrieval in fixed form.

7.     "ESI" means information that is stored in an electronic format, regardless of the media or whether it is in the original format in which it was created, and that is retrievable in perceivable form and includes but is not limited to metadata, system data, deleted data, and fragmented data.

8.     "Hedgeye" shall mean, individually and collectively, Hedgeye Risk Management, LLC and any of its divisions, subsidiaries or affiliates, together with each of their respective employees, partners, associates, shareholders, officers, directors, and agents, and all other Persons acting or purporting to act on their behalf.

9.     "MPT" shall mean, individually and collectively, (i) Medical Properties Trust, Inc. and any of its divisions, subsidiaries or affiliates, together with each of their respective current and former employees, partners, associates, shareholders, officers, directors, and agents, and all other Persons acting or purporting to act on their behalf; and (ii) MPT Securities.

10.     "MPT Securities" shall mean the common stock of MPT traded on the New York Stock Exchange under the ticker symbol "MPW," along with any options, swaps, hedges, or derivative instruments related thereto.

11.     "Person" or "Persons" shall mean any individual, corporation, partnership, firm, association, government agency, or other organization recognizable at law, together with its agents, employees, and representatives.

12.     "Reports" (each individually a "Report") shall mean all documents authored or published by any Person concerning MPT, including without limitation presentations, research reports, newsletters, blog posts, articles, or other written materials.

13.     "Transaction" shall mean any purchase or sale (including short sales or the purchase or sale of any put, call, straddle, option, swap, hedge, or derivative), acquisition, disposition, conversion, transfer, or loan of any MPT Security.

14.     "Tweet" shall mean a post made on the "X" platform (formerly known as "Twitter"), including Retweets or replies.

15.     "Twitter" shall mean the social media platform (currently known as "X") operated by X Corp.

16.     The terms "You" or "Your" shall mean Cheyne Capital and any of its divisions, subsidiaries or affiliates, together with each of their respective employees, partners, associates, shareholders, officers, directors, members, and agents, and all other Persons acting or purporting to act on their behalf.

17.     The terms "concerning," "regarding," "relating to," and/or "related to" shall each be read and applied as interchangeable and shall each be construed in the broadest sense to mean referring to, describing, evidencing, memorializing, concerning, regarding, with regard to, relating to, referring to, pertaining to, containing, analyzing, evaluating, studying, recording, reflecting, reporting on, commenting on, reviewed in connection or in conjunction with, setting forth, contradicting, refuting, and considering, in whole or in part.

3

## INSTRUCTIONS

The following instructions shall apply to the Document Requests contained herein. The Requests call for the production of all responsive Documents that are in Your possession, custody, or control, wherever located, regardless of whether they are possessed directly by You or any of Your agents, representatives, employees, accountants, attorneys, or other Persons acting or purporting to act on Your behalf.

1.     Unless otherwise specified, the time period covered by these Requests is January 1, 2022 through the present.

2.     A Request for a Document shall be deemed to include a request for any non-identical copies or drafts of the Document, as well as all transmittal sheets, cover letters, exhibits, enclosures, or attachments to the Document, in addition to the Document itself. Any Document described herein is to be produced in its original file folder, with all labels or similar markings intact, and with the name of the Person from whose file it was produced.

3.     You must respond to each Request separately and fully, unless it is objected to, in which event the reasons for the objection should be specifically and separately stated. If You object to part of a Request, You must produce all Documents and Communications responsive to the part of the Request to which You did not object.

4.     If it is not possible to produce any Document called for by a Request, or if any part of a Request is objected to, the reasons for the failure to produce the Documents or the objection should be stated specifically as to all grounds.

5.     If a Document responsive to any Request is no longer in Your possession, custody, or control, give a description of the Document, state what disposition was made of the Document and the date of such disposition, and identify all Persons having knowledge of the Document's contents.

4

6. If any Document responsive to any Request has been destroyed, give a description of the Document, set forth the contents of the Document, the location of any copies of the Document, the date of the Document's destruction, and the name of the Person who destroyed the Document or ordered or authorized its destruction.

7. If any portion of any Document is responsive to any Request, the entire Document must be produced.

8. If You claim any form of privilege or protection or other reason, whether based on statute or otherwise, as a ground for not producing requested Documents, You shall furnish a privilege log identifying each Document or Communication for which the privilege or protection is claimed in compliance with applicable law and/or such other parameters as may be agreed between the parties.

9. Requests are not intended to limit or modify other Requests and should not be interpreted as limiting or modifying other Requests.

10. If You contend that any Request is overly broad and/or unduly burdensome, identify all aspects of the Request that are overly broad or unduly burdensome and produce the Documents that are not subject to this contention.

11. If there are no Documents or Communications responsive to any particular Request or subpart thereof, You shall state so in writing.

12. For any responsive Documents or Communications stored in electronic format, including email and text messages, You will produce those Documents or Communications in searchable electronic format (*e.g.*, single-page .TIFF format with corresponding Document-level extracted text files and OCR text files, each named by the Bates number assigned to the first page) by secure electronic transmission (*e.g.*, SFTP site) or on CD-ROMs, DVD-ROMs, portable or

external hard drives, or other widely-used electronic or optical storage media. All images will be produced as single page .TIFF images, black and white, Group IV and 300 dpi with a Concordance Image (formerly Opticon) style .OPT load file. All color images will be provided in JPEG format where color images are necessary to understand the Document. All Microsoft Excel, PowerPoint, and similar spreadsheet or presentation files will be produced in native format. Furthermore, for all native files that are produced, a corresponding placeholder TIFF image will be produced that bears the same Bates assigned to the native file, has all associated metadata, and indicates that the "File has been produced in native format." All responsive electronic Documents and Communications will be produced with sufficient metadata to convey where these items begin and end (including attachments), the original file name, and the original timestamps and attributes. All metadata will be provided in a delimited data field (with file extension .DAT), delimited using the Concordance style delimiters, and including the following metadata fields: "BEGBATES", "ENDBATES", "BEGATTACH", "ENDATTACH", "FAMILY-DATE/TIME", "ALL CUSTODIANS", "To", "From", "CC", "BCC", "Subject", "Sent Date/Time", "Author", "Title", "File Name", "File Extension", "Redacted", "TextPath", "NativePath", "MD5HASH", "Received Date/Time", "File Size", and "Confidentiality". To the extent that SMS or chat-based Communications are responsive to these Requests, MPT will meet and confer with You regarding the appropriate production specifications and metadata for such Communications.

13.     None of the Definitions or Requests set forth herein shall be construed as an admission relating to the existence of any evidence, to the relevance or admissibility of any evidence, or to the truth or accuracy of any statement or characterization in the Definition or Request.

6

## REQUESTS FOR PRODUCTION OF DOCUMENTS

### REQUEST NO. 1

Documents and Communications related to any Defendant, or any Person working on behalf of or in concert with any Defendant. For the avoidance of doubt, this Request encompasses:

    A.    Documents or Communications sent to, or received from, any Defendant;

    B.    Documents and Communications concerning any payments made to, or received from, any Defendant, or any Person working on behalf of or in concert with any Defendant; and

    C.    Documents and Communications concerning contracts, memoranda of understanding, letters of intent, confidentiality agreements, non-disclosure agreements, profit-, risk-, loss-, or cost-sharing agreements, or other agreements or draft agreements of any kind, whether written or oral, between You and any Defendant, or any Person working on behalf of or in concert with any Defendant.

### REQUEST NO. 2

Documents and Communications relating to MPT or MPT Securities. For the avoidance of doubt, this Request encompasses:

    A.    Documents and communications concerning any communications, interactions, discussions, or meetings between You and any other Person(s) concerning MPT, including, without limitation, communications between You and Hedgeye Risk Management, LLC, Robert Simone (Hedgeye), Keith McCullough (Hedgeye), Matthew Pascale (formerly of Point 72 Asset Management), Richard Mortell (Third Coast Real Estate Capital), Edwin Dorsey (Bear Cave), Greg Gillespie (formerly of Tacet Global Limited), Nick Helsby, Romaine Beurr, Jacques Griesel, Brian Spegele (The Wall Street Journal), Jonathan Weil (The Wall Street Journal), Laura Benitez (Bloomberg), Charlie Conchie, Moe Tkacik (The American Prospect), Teri Buhl (Buhl Reports), David Lindsay (The Shift), Aurelia Seidlhofer (Reorg), Claude Risner (Debtwire), or Peter Shalson;

    B.    Documents and Communications concerning contracts, memoranda of understanding, letters of intent, confidentiality agreements, non-disclosure agreements, profit-, risk-, loss-, or cost-sharing agreements, or other agreements or draft agreements of any kind, whether written or oral, between You and any other Person, including without limitation the Persons listed in Request No. 2 above, concerning MPT;

    C.    All Documents and Communications concerning or relating to any payments or other consideration paid by You to any other Person, whether actual or potential, in

exchange for or in connection with the creation or dissemination of Tweets, Reports, statements, or other material concerning MPT;

D.   Documents and Communications related to the value of MPT Securities and any recommendation to purchase, sell, or short-sell MPT Securities;

E.   Documents and Communications related to any Reports or other public statements concerning MPT, including Documents and Communications regarding any decision to create or publish any Report, Tweet, or other public statement concerning MPT, and any records of or related to any meetings concerning the foregoing; and

F.   Documents and Communications concerning any Transaction in MPT Securities by You or any Person acting on behalf of You, including any short sales of MPT Securities.

FILED

2023 Mar-30 PM 03:10
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

---

MEDICAL PROPERTIES TRUST, INC.,

Plaintiff,

-v.-

VICEROY RESEARCH LLC; FRASER JOHN
PERRING; GABRIEL BERNARDE; and
AIDAN LAU,

Defendants.

---

Civil Action No. _____

## COMPLAINT

Plaintiff Medical Properties Trust, Inc. ("MPT" or the "Company"), by and through its undersigned counsel, alleges, upon knowledge as to itself and its own acts and upon information and belief as to all other matters, as follows:

### NATURE OF THE ACTION

1.　　This action arises from a campaign to defame, injure, and drive down the stock price of MPT, one of Alabama's largest public companies and its largest real estate investment trust ("REIT").

2.　　Defendant Viceroy Research LLC ("Viceroy") and its members, Defendants Fraser John Perring, Gabriel Bernarde, and Aidan Lau, are in the

business of mounting serial short-and-distort attacks against public companies. MPT is their latest victim.

3.     The playbook for these attacks is simple:  Take a short position in a stock or partner with someone who has one, publish false "research" critical of the target company, amplify the false claims on social media, and then reap a profit—either directly, from the stock price drop you bet on and then caused, or indirectly, by collecting payments from other market players who profited on the drop.

4.     Perring—a self-proclaimed "Grand Poobah" of short-sellers—entered the distortion game after British regulators revoked his social work license upon finding that he had lied and fabricated evidence.  Perring founded Viceroy with Bernarde and Lau in 2016, and the firm has become notorious for short-and-distort schemes.  In 2021, for example, a South African regulator fined Viceroy's members millions of dollars for spreading false and misleading claims about a South African bank on behalf of a hedge fund that was trying to drive down the bank's stock price.  Defendants escaped justice, however, when a tribunal vacated the penalty for a jurisdictional defect.

5.     Short-selling is not illegal in the United States, and criticism of public companies is integral to our capital markets.  Nor is it illegal to couple short-selling with criticism of a target company, provided the speaker does not deliberately or recklessly misrepresent facts for profit.  But Viceroy does not play by the rules.

And for months, the firm, its members, and their cohorts have been spreading malicious falsehoods about MPT.

6.    In late January 2023, Viceroy announced that it held a short position in MPT and simultaneously published the first of 14 "reports" on the Company it would issue in a steady stream over the ensuing weeks.  The thrust of most of these reports is that MPT purportedly engages in illegal "round-trip" transactions by "overpaying" owners of hospital properties and leasing those properties back to the sellers, who then operate the hospitals and return the "overpayments" to MPT in the form of rent.  The reports also accuse MPT executives of engaging in "fraud" and juicing their own compensation.

7.    Meanwhile, on Twitter—using the hashtags "#fraud" and "#ponzi scheme"—Perring has pumped Viceroy's false claims while urging investors to dump MPT stock, accusing MPT of "involvement in #Corruption" and "scamming investors," and promising his tens of thousands of followers that MPT's "employees will go to prison."

8.    These accusations are malicious fiction, concocted to manipulate the market and to drive profits from short-selling.  As outrageous as they are, Defendants' falsehoods have influenced the market and caused serious harm to MPT.  Since Viceroy began its attacks, MPT's stock price is down over 35 percent, a potential counterparty has pulled away from of a commercial transaction, and

MPT has had to increase physical security at its Birmingham headquarters. Several analysts who follow MPT have observed the impact that the short attack has had on the stock.  Recently, a prominent REIT analysis firm observed that "an investigative investment research firm focused on short selling"—*i.e.*, Viceroy— had "contributed to the sell-off" in MPT's shares with a series of "negative notes."

9.      Sometimes charlatans spread their lies to no effect.  That, unfortunately, is not the case here.  MPT brings this action to stop Defendants repeating their lies, to recover damages for the harm caused by those lies, and to compel Defendants to disgorge the ill-gotten gains earned on the back of those lies.

**THE PARTIES**

10.     Plaintiff MPT is a REIT that acquires, develops, and invests in community healthcare facilities across the United States and internationally.  Since its founding in 2003, MPT has been incorporated under the laws of Maryland and has maintained its headquarters and principal place of business in Alabama.

11.     Defendant Viceroy Research LLC is a self-described "financial research" firm that publishes negative content about public companies whose shares it has sold short.  Viceroy is a limited liability company organized in Delaware.  Its co-founders are Defendants Fraser John Perring, Gabriel Bernarde, and Aidan Lau, who are also, on information and belief, its members.  On information and belief, Viceroy has no headquarters or employees, observes few if

any corporate formalities, and exists solely to shield its owners from personal liability for their short-and-distort schemes.  Because there is no genuine separation or distinction between Viceroy and its members, Viceroy's limited liability structure does not shield Perring, Bernarde, and Lau from personal liability for Viceroy's tortious and unlawful actions.

12.     Defendant Fraser John Perring is, on information and belief, a citizen and resident of the United Kingdom.

13.     Defendant Gabriel Bernarde is, on information and belief, a citizen and resident of Australia.

14.     Defendant Aidan Lau is, on information and belief, a citizen of France and a resident of Australia.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is complete diversity between the parties and the amount in controversy exceeds $75,000.

16.     Venue is proper in this district under 28 U.S.C. § 1391 because a substantial portion of the events giving rise to this action occurred in the Northern District of Alabama.

17.     The Court has personal jurisdiction over all Defendants because the conduct giving rise to this action involved substantial contacts with the State of

Alabama. Such contacts include, among other things: expressly and intentionally directing defamatory statements at MPT and its Alabama-based personnel; expressly and intentionally directing communications at an Alabama audience, including by communicating with known Alabama residents; and expressly and intentionally making defamatory accusations of fraud which purportedly occurred in Alabama. Defendants knew, at all relevant times, that MPT maintains its principal place of business in Alabama and that MPT would suffer the harmful effects of Defendants' conduct in Alabama. And MPT did, in fact, suffer such harmful effects in Alabama.

## FACTUAL ALLEGATIONS

### A.    MPT's history and business

18.    MPT was founded in 2003 by Edward K. Aldag, Jr., R. Steven Hamner, and Emmett E. McLean. Aldag serves as MPT's Chief Executive Officer, Hamner as Chief Financial Officer, and McLean as Chief Operating Officer.

19.    Since July 2005, MPT has been publicly traded on the New York Stock Exchange under the ticker symbol "MPW."

20.    MPT's primary business is to acquire and develop healthcare facilities like hospitals and lease them to operating companies under long-term net leases. Net leases require tenants to bear most of the costs associated with the properties,

including maintenance. MPT often partners with hospital operators in acquiring facilities: MPT buys the real estate, the operator buys the operations, and MPT then leases the real estate to the operator. Most of MPT's leased assets are wholly owned by MPT. Some are owned through joint ventures with partners who share the Company's view that healthcare facilities are integral to community infrastructure.

21. On occasion, MPT funds capital expenditures in connection with an acquisition—where, for example, significant improvements will be needed to operate successfully for the long term. MPT also sometimes funds the development of new facilities with a plan to lease to an operator-tenant upon completion. In both cases—upfront capital investment and new development—the funds that MPT contributes are added to the lease base and thus reflected in the rent the tenant pays over time.

22. A typical MPT lease provides for a term of at least 15 years with a series of shorter renewal options, rent set at a fixed percentage of the lease base, and an annual escalator pegged to inflation.

23. MPT has other financial arrangements with healthcare operators. Sometimes, instead of buying real estate and leasing it to an operator, MPT makes a mortgage loan secured by the operator's own real estate. MPT also sometimes

invests directly in operators in exchange for a profit or equity interest that provides for certain minority rights and protections and enhances MPT's overall return.

24.    At the core of all these financial arrangements is an overriding goal to make sound investments in hospital real estate that will generate steady, long-term returns for MPT's investors.  Achieving that goal requires underwriting real estate investments that are attractive to hospital operators, so that if a given operator is unable to continue paying rent then a replacement operator can readily assume the lease.  Among the characteristics MPT looks for in evaluating hospital real estate are:  (1) good physical quality reflecting a history of maintenance and improvements; (2) location in a strong market, with measurable patient demand growth, sustainable reimbursement sources, and features that attract a dedicated workforce; (3) a geographic environment in which the operator is likely to hold a strong competitive position; and (4) facility-level operations with strong EBITDARM (earnings before interest, taxes, depreciation, amortization, rent, and management fees) coverage of lease payments.  A medical facility meeting these criteria is in all likelihood the product of true community need—meaning that its success is not dependent on a given operator, and it has strong potential to generate steady returns even if an operator encounters financial difficulty.

25.    MPT's underwriting model has been tested and proved.  In 2022, for example, private equity firm Macquarie Asset Management ("Macquarie")

acquired as part of a 50/50 partnership with MPT a portfolio of eight Massachusetts hospitals for a total purchase price of about $1.7 billion. The transaction validated MPT's original underwriting: MPT had purchased these eight hospitals (plus a ninth) from hospital operator Steward Health Care System LLC ("Steward") in 2016 and 2018 for a combined cost of approximately $1.3 billion, and had then leased the premises to Steward as operator. The properties had performed as hoped, yielding approximately $475 million in income for MPT from 2016 to 2022, and then were sold at a healthy profit.

26. The model has been stress-tested too, again with success. In October 2022, for example, operator-tenant Pipeline Health System, LLC ("Pipeline"), which leases and operates several MPT-owned hospitals in Los Angeles, California, suffered losses connected to its operations in Chicago (with which MPT had no involvement) and filed for Chapter 11 bankruptcy. This was a contingency for which MPT had planned. Consistent with MPT's model, the underwriting for the L.A. hospitals had focused on the strength of the individual facilities, and the master lease MPT had executed mitigated the risk to the Company in the event of the operator-tenant's bankruptcy. In February 2023, Pipeline emerged with a plan of reorganization pursuant to which it will continue as operator of the L.A. hospitals and pay all rent accrued during the bankruptcy period. To date, Pipeline has already repaid MPT for all rent that was outstanding as of December 31, 2022,

along with what was due for January and February 2023.  Approximately 30% of the remaining rent in 2023 will be deferred for a period, but will be paid in full with interest in 2024.

27.     With investments in 444 facilities—427 of which are leased to 55 tenants—and revenues exceeding $1.5 billion in 2022, MPT is one of the largest REITs in the healthcare sector and among the largest publicly traded companies in Alabama, where the majority of its employees are based.

28.     As a public company, MPT is required to have its annual financial statements audited by an independent public accounting firm. PricewaterhouseCoopers LLP ("PwC") has served as MPT's independent auditor since 2008.

29.      Every year from 2008 to the present, PwC has issued an unqualified opinion that MPT's financial statements "present fairly, in all material respects, the financial position of" the Company and "the results of its operations and its cash flows" for the relevant periods in conformity with generally accepted accounting principles.

### B.    Short-and-distort campaigns

30.     To sell a stock "short" is to bet its price will fall.  To place the bet, the short-seller borrows the stock from a broker, sells it, and retains the proceeds—all with a plan to buy replacement shares back later at a lower price.  If the bet is right,

and the stock price declines, the short-seller can count as profit the difference between the price he was able to get before the drop and what he had to pay later to buy the replacement shares for the broker (that is, to "close out" the short position). Because a stock's price can never fall below $0, the short-seller's potential gains are capped at the proceeds from his initial sale. But because there is no limit to how high a stock price can rise, and because a short-seller must eventually close out his position, the potential losses are uncapped. Short-sellers, in other words, face unlimited downside risk.

31.    As a result, some short-sellers choose to load the dice: By publishing, funding, or otherwise promoting false and misleading information about the companies they bet against, short-sellers can drive down those companies' stock prices and generate profit for themselves. Investment analysts without short positions but who recommended that their readers short a company might also join in to preserve their reputations and maximize subscription dollars.

32.    Short-selling is legal in this country. Publishing false information to maximize profits and artificially shield against losses from short-selling is not. These "short-and-distort" campaigns are recognized by the U.S. Securities and Exchange Commission as a form of illegal market manipulation.[1]

---

[1] *See* Short Position and Short Activity Reporting by Institutional Investment Managers, 87 Fed. Reg. 14950, 14991-92 (Mar. 16, 2022) (to be codified at 17 C.F.R. pts. 240, 242, and 249).

### C. Viceroy and Perring's documented history of dishonesty and fabrication

33.     Before crowning himself a "Grand Poobah" of short-selling, Perring was a social worker in Lincolnshire County, England.  He resigned after the Health Professions Council, a public regulatory body for social workers in the United Kingdom, investigated his failure to notify a young child's aunt and uncle before recommending that the child be put up for adoption—a recommendation that, had it been accepted, would have had "extreme" consequences for the child.[2]  The Council found that Perring subsequently "created false records" to "cover up" "his significant failure," and then threatened to refer his manager to the police when confronted.[3]  Ultimately, the Council determined that Perring had engaged in "deliberate, persistent and dishonest conduct," and created the "significant" potential for "serious harm."[4]  Concluding that Perring's "outright dishonesty would be regarded as such by right thinking members of society," and "in view of the seriousness of the case," the Council found Perring unfit to practice and stripped him of his license.[5]

34.     Following the revocation of his social work license, Perring published market commentary on a Blogspot website, and eventually began a research

---

[2] Fraser John Perring (Health Professions Council Feb. 3, 2014), https://ffj-online.org/wp-content/uploads/2019/10/FP-HCPTS-Record-.pdf.
[3] *Id.* ¶¶ 40, 55, 65, 67, 72, 79.
[4] *Id.* ¶¶ 40, 50, 79, 81.
[5] *Id.* ¶¶ 41, 74.

partnership with an investor named Matthew Earl.  In an interview with The

Foundation for Financial Journalism (the "FFJ"), an independent nonprofit, Earl

accused Perring of plagiarizing research, impersonating professional contacts, and

proposing an insider trading scheme.  *See* Roddy Boyd, *Fraser Perring:*

*Chronicles of Deceit, Part I*, The Found. for Fin. Journalism (Nov. 4, 2019).[6]

(When asked about the insider trading allegation, Perring replied:  "I don't

comment on anecdotes."[7])  The FFJ's investigation also found that Perring

pretended to live in an apartment he did not own and fabricated a friendship with

an imaginary wealthy friend who Perring's acquaintances never got to see.[8]  The

FFJ concluded that "lying became central to how [Perring] operated

professionally."[9]

35.     Perring formed Viceroy in 2016 when, according to Viceroy's

website, he "was introduced to Bernarde and Lau by a mutual contact who

recommended he collaborate with the young Australians."[10]  Bernarde and Lau,

like Perring, have no institutional investment experience.  Yet in 2018, a prominent

short-seller noted, next to a smiling Bernarde, that Bernarde is "the brains behind

Viceroy Research."

---

[6] https://ffj-online.org/2019/11/04/fraser-perring-chronicles-of-deceit-part-one/.

[7] *Id.*

[8] *Id.*

[9] *Id.*

[10] *About Viceroy Research*, Viceroy Research, https://viceroyresearch.org/about/ (last visited Mar. 19, 2023).

36. Viceroy's business consists of taking short positions in public companies and then disseminating negative information about those companies through public reports and social media posts in order to drive down the price of the companies' stock. Viceroy typically publishes numerous reports on the companies it attacks—at times, multiple reports per week.

37. In January 2018, Viceroy trained its sights on Capitec, a South African bank, calling the institution "[a] wolf in sheep's clothing" and a "loan shark . . . masquerading as a community microfinance provider."[11] Within a day, Capitec's stock price had declined by about 25 percent.[12]

38. Viceroy's report and its ensuing six-month campaign against Capitec triggered an investigation by South Africa's financial regulators. The Financial Sector Conduct Authority ("FSCA") fined Viceroy's members 50 million Rand (about $2.8 million today) for having "made a concerted effort to publish . . . false, misleading and deceptive [statements] regarding material facts" and having demonstrated "no interest in setting the record straight" when "presented with clear explanations for why their statements had been false."[13] The Authority also noted

---

[11] *Capitec – A wolf in sheep's clothing*, Viceroy Research (Jan. 30, 2018), https://viceroyresearch.org/2018/01/30/capitec-a-wolf-in-sheeps-clothing.

[12] Tiisetso Motsoeneng & Nqobile Dludla, *South Africa's Capitec falls 25 pct after report by Viceroy Research*, Reuters (Jan. 30, 2018 7:23 AM), https://reuters.com/article/ozabs-us-capitec-accounts-idAFKBN1FJ1MW-OZABS.

[13] Financial Sector Conduct Authority, Administrative Penalty Order in Terms of Section 167 of the Financial Sector Regulation Act 9 of 2017 ¶¶ 4.4.2, 4.4.5 (Sept. 8, 2021),

that it "had to enlist the assistance of a foreign regulator to compel a representative of [Viceroy] to be questioned under oath."[14]

39.     All the while, Viceroy had been doing a hedge fund's bidding.  South Africa's Financial Services Tribunal found that Viceroy had agreed to "assist [the hedge fund] in shorting securities in any chosen company" for "a monthly retainer" of $10,000 and a cut of the profits from the hedge fund's trades.[15]  Viceroy produced its false report "under th[is] agreement" and earned an estimated $744,000 from the short-and-distort conspiracy.[16]

40.     Ultimately, none of Defendants were held to account for the Capitec short-and-distort scheme because the Financial Services Tribunal concluded—without disturbing the lower tribunal's findings of fact—that the FSCA lacked personal jurisdiction over the perpetrators.[17]

---

https://www.fsca.co.za/Enforcement-Matters/Documents/Penalty%20Order-DMA403.pdf?csf=1&e=6TXqCH.

[14] *Id.* ¶ 4.2.

[15] Financial Services Tribunal, In re: Viceroy Research Partnership LLC, et al. (Nov. 16, 2022) ¶ 23, https://www.fsca.co.za/Enforcement-Matters/Publications%20and%20Documents/Decision%20-%20Viceroy%20Research%20Partnership%20LLC%20v%20FSCA%20and%20Others.pdf.

[16] *Id.* ¶ 24.

[17] *Id.* ¶ 58.

## D.    Defendants' short attack on MPT

41.    On January 26, 2023, Viceroy published its first "report" attacking MPT, titled "Medical Properties (dis)Trust."  Viceroy admitted in its January 26 report and on Twitter that "Viceroy Research is short $MPW."

42.    The same day, Viceroy, Perring, and Bernarde all used their Twitter accounts to promote the report and launch a vitriolic social media campaign against MPT.  To drive home the defamatory accusations against MPT, Perring tagged his posts using the hashtag "#fraud."  Over the ensuing weeks and months, Viceroy published many more reports, at regular intervals, all promoted through the same concerted campaign.  The total count as of this filing is 14 reports purporting to show the results of "research" on various aspects of MPT's business.[18]  And Defendants have worked with other self-described "researchers" motivated to drive down MPT's stock price to promote and amplify their reports.

43.    Defendants purport in these reports—and in a February 2, 2023 letter to PwC they posted on Twitter[19]—to analyze and find wanting the accounting treatment MPT has applied in its financial statements.  They do this in the face of the auditor's unbroken chain of unqualified opinions as to those financial statements.

---

[18] *See* Exhibit 1 hereto.
[19] *See* Exhibit 2 hereto.

44.     Market commentators are free to offer critical opinions about MPT, and some of the vitriol and nonsense Defendants have spewed in their reports and related social media commentary falls within the wide berth granted by the First Amendment.  But an unconscionably large amount of it does not.  In an effort to drive profits for themselves, Defendants have engaged in a coordinated campaign to disseminate false, misleading, and defamatory statements about MPT, all with knowledge or reckless disregard of the statements' falsity.

45.     The most blatant and inflammatory of these statements fall into four categories: (1) false accusations of revenue "round-tripping"; (2) false characterizations of MPT's executive compensation formula; (3) false accusations of lying about dealings with operator-tenant Steward; and (4) false accusations of fraud and criminal activity.

46.     **Allegations of revenue "round-tripping."**  In accounting, "round-tripping" or a "round robin" scheme refer to inflation of revenue through no-profit transactions.  In such a scheme, a party engages in an uneconomic transaction as a way to provide funds to a counterparty.  The counterparty later sends those same funds back in a second transaction to be recorded as revenue by the original party. This inflates revenue because the counterparty would not have engaged in the transaction or would not have paid the same price without the uneconomic cash infusion.

47. Defendants' statements about MPT abound with false accusations that the Company has engaged in revenue round-tripping with tenants. In its very first tweet about MPT on January 26, 2023, Viceroy claimed that MPT's "[r]ent is round-tripped via 'fake' purchases of massively inflated assets." In the opening sentence of its report released the same day, Viceroy wrote that MPT "has engaged in billions of dollars of uncommercial transactions with its tenants and their management teams in order to mask a pervasive revenue round-robin scheme and / or theft." Viceroy went on to claim that "MPW has engaged in billions of dollars of uncommercial sale-leaseback transactions," and "MPW appear to constantly overpay for fire sale assets, sometimes by as much as 10x, which in-turn allow debt-crippled tenants to meet their financial rent obligations as and when they fall due in the short term."

48. On February 1, 2023, in response to a "JP Morgan analyst" who supposedly criticized "[his] report," Bernarde tweeted that "[p]ooling uncreditworthy tenants into a REIT and capitalizing a rent round-robin scheme really does make the tenants appear more credit worthy."

49.     Viceroy claimed to have evidence supporting its accusations.  In its February 2, 2023 letter to PwC posted to Twitter, Viceroy wrote:

> - MPW and most of its major tenants enjoy a mutually parasitic relationship. We have evidenced over $2b, net, of uncommercial cash outflows capitalized in MPW's balance sheet and round tripped to MPW by counterparties: its tenants.

> - Viceroy Research have highlighted numerous uncommercial transactions which substantiate our belief that MPW round-trips revenues. Round-tripped revenues provide no economic substance, and is disqualified per ASC 606.

50.     These statements are false, misleading, and defamatory.  MPT does not engage in revenue round-tripping, and Viceroy has no "evidence" to "substantiate" its claim.  As discussed above, MPT's core business model for 20 years has been to underwrite healthcare real estate in accordance with well-tested criteria, and lease its properties to operators under terms and conditions that are designed to generate a steady rate of return on MPT's investment.  The commercial logic of this model—its ability to generate a profit—has been validated time and again, as have the protections that MPT has put in place to guard against tenant-operators' financial vulnerability.  MPT sometimes funds capital improvements as part of its acquisitions and developments, in which case the amount of the funding is built into the lease base.  There is no "round-tripping" of cash to operator-tenants, who in most cases—including most of the exemplar transactions Viceroy seizes upon but then misrepresents—are not even the recipients of the acquisition or development funds.  MPT's financial statements are subject to independent

financial audit every year, and the auditor has always issued an unqualified opinion.

51.    Indeed, the very transactions Viceroy cites as "evidence" for its claims prove the claims are false.  On February 1, 2023, for example, the day before posting its PwC letter, Viceroy published "MPW Case Study – Neuropsychiatric Hospitals," in which it claimed that MPT's commitment of $27.5 million to build a hospital near Houston, Texas was "completely unfathomable" because "the cost of development and market value of the land was combined [sic] total of $9.1m," meaning MPT had "overpaid for the [hospital] facility by 3x." Viceroy concluded its report by "reiterat[ing] our belief that MPW engages in pervasive revenue round-tripping schemes."

52.    These statements are false, misleading, and defamatory.  The very premise of a round-trip transaction—that the party to whom the funds flowed is the one returning them—is missing here, because virtually all of MPT's $27.5 million investment was paid *not* to the operator-tenant (NeuroPsychiatric Hospitals) but to the developer and former owner of the real estate (Medistar Gemini, LLC or "Medistar"), along with contractors, architects, suppliers, and other third parties. The fact that Medistar developed the facility is plain from the sources Viceroy displayed in its "report."  Viceroy therefore knew its round-tripping allegation was

false, or at the very least published that allegation with reckless disregard for its falsity.

53.     And Defendants' "overpayment" thesis rests on a deliberate or reckless distortion of conventional real estate valuation principles, which prescribe that the value of a leased property is based largely on the underlying cash flows of the lease—not on the cost of buying and developing the land.  In this case, MPT earns $2.3 million per year (plus an annual inflation adjustment) over a 20-year term—far outstripping the cost of acquisition and development.  This was an entirely commercial transaction.

54.     Viceroy levels the same "round-tripping" charge against many of MPT's major transactions going back several years, including:  MPT's 2016 and 2018 acquisition of Massachusetts hospitals from Steward, discussed above; MPT's 2017 acquisition with Steward of 11 hospitals owned by IASIS Healthcare Corporation; MPT's 2021 acquisition of 35 Priory Group Ltd. behavioral health facilities in the United Kingdom; and MPT's 2021 acquisition with Steward of five South Florida hospitals from Tenet Healthcare Corporation.  Not one of these transactions was "uncommercial" or involved "round-tripping" of revenue to operator-tenants.  In each case, as with the NeuroPsychiatric Hospitals transaction, the acquisition proceeds went to the seller of the real estate, whose identities MPT publicly disclosed.  In only one such case—the 2016 acquisition of Massachusetts

hospitals—was the seller (Steward, then controlled by Cerberus Capital Management, L.P.) also the operator, and in that case the proceeds were directed to a distribution to shareholders, retirement of existing debt, and payment of taxes and fees associated with the transaction. As discussed above, moreover, the economics of the Massachusetts portfolio transaction were more than validated by the 2022 acquisition of the bulk of the portfolio by the Macquarie partnership, which—as was publicly disclosed—valued the portfolio at approximately $1.7 billion for eight of the nine hospitals MPT had acquired for approximately $1.3 billion in 2016 and 2018. Viceroy's allegation of a "pervasive revenue round-robin scheme and / or theft" is fiction, disseminated with knowledge, or at least reckless disregard, of its falsity.

55. **Allegations regarding executive compensation.** In an attempt to support its defamatory "round-tripping" assertions, Viceroy also stated in its Twitter-published letter to PwC that MPT's executive compensation program "encourage[s] an aggressive, acquire-at-any-cost policy which ultimately aligns with a revenue round-tripping model." In its January 26, 2023 report, Viceroy claimed that because "acquisitions" are a factor in the calculation of MPT's incentive compensation for its executives, management "has consistently scraped the bottom of the barrel in its search for new properties and new tenants." "All these transactions will qualify executives for bonuses," Viceroy proclaimed. In

conjunction with this report, Viceroy tweeted that the incentive compensation

formula was "aligned with fraud" and did not "disincentivize bad behavior":



56.     These statements are false, misleading, and defamatory.  Not all of

MPT's transactions "qualify executives for bonuses."  Instead, and as MPT has

repeatedly disclosed, after total acquisition value exceeds a certain threshold,

which management well surpassed in 2020 and 2021, executives receive *no*

incremental credit for new acquisitions under that metric.  The Company thus

executed billions of dollars of acquisitions that did not affect the "acquisitions"

component of the compensation formula at all.  That was plain to see in MPT's last

two annual proxy statements, both publicly on file with the SEC.

57.     Moreover, poorly performing acquisitions negatively affect other

compensation inputs, like funds from operations and total shareholder return.

Thus, MPT's executives would risk their own pay if they "consistently scraped the

bottom of the barrel" to "acquire at any cost."  MPT's proxy statements clearly

disclose the Company's use of these metrics.  They also show overwhelming

shareholder support for MPT's executive compensation program: over 92 percent

approval in each of the last five years.[20]  Viceroy knowingly or at least recklessly disregarded that information.

58.  **Allegations of concealment concerning Steward**.  As MPT has disclosed publicly for years, it has extensive dealings with operator-tenant Steward, the largest private physician-led healthcare network in the United States. In addition to leasing hospital properties to Steward, MPT has acquired a direct equity stake of just under 10 percent in Steward, and made loans to Steward that MPT believed created substantial upside potential for the Company and its investors.  Although MPT investors have benefited enormously from these dealings with Steward over the years, MPT has sought to diversify its portfolio and reduce its relative exposure to Steward, and has made that known to investors on earnings calls.

59.  Yet Defendants, in an effort to prop up their short attack, have accused MPT of lying about its connections to Steward.  In particular, they have released a series of reports claiming that MPT is deliberately concealing a secret ownership in certain Steward-connected hospitals in Malta.  These are falsehoods, ginned up to try to undercut investor and public confidence in MPT and harm the Company.

---

[20] Med. Props. Tr., Inc., Proxy Statement (Schedule 14A) 41 (Apr. 28, 2022).

60.     In 2020, MPT and members of Steward's management, including Steward CEO Ralph de la Torre, formed a joint venture called Manolete Health LLC to develop international opportunities.  MPT holds 49% of Manolete Health LLC, and Steward's management holds the other 51% through an investment vehicle that also has "Manolete" in its name.  Steward itself has no interest in the joint venture, which is between MPT and the individual Steward managers who formed the investment vehicle.

61.     To fund the venture, MPT made a $205 million loan to Manolete Health LLC, secured by Steward's management's equity in Steward.  Per multiple MPT securities filings since Q3 2020, Manolete Health LLC used the $205 million in part to purchase "the rights and existing assets related to all present and future international opportunities previously owned by Steward."

62.     Manolete Health LLC has acquired four Colombian hospitals.  It also made an unsecured loan of €1.1 million to an entity controlled by Steward's management—and in which neither MPT nor Manolete Health LLC holds an interest—to facilitate the purchase by *that* entity of Steward Health Care International ("SHCI").  SHCI, in turn, owns hospital concessions in Malta.  Although MPT and Manolete Health LLC have considered investing in Malta hospitals and other properties, they have not done so.  Neither entity has an ownership interest in SHCI's Malta hospital concessions.

63.     Defendants have made numerous false, misleading, and defamatory statements about this joint venture.  In its January 26 report, Viceroy claimed that MPT "paid $205m for 3 hospitals worth $27m in Malta" that were purportedly "under investigation for corruption":



64.     These statements are false, misleading, and defamatory.  Steward did not get a "windfall" of $205 million from MPT; it received payment, through Manolete Health LLC, for what had been its rights and existing assets related to international opportunities.  This was fully disclosed contemporaneously.  Nor did MPT get any hospitals in Malta.

65.     Viceroy has repeated and embellished the Malta falsehood, with four reports dedicated to it:  "MPW Case Study – Steward International," published February 8, 2023; "MPW Case Study – Steward International Pt. 2," published February 13, 2023; "MPW Case Study – Steward International Pt. 3," published February 17, 2023; and "MPW & SHCI – A Den of Thieves," published March 3, 2023.  In the February 8 report and accompanying tweets, Viceroy even invented

an organizational chart that showed MPT as an owner of "Steward Malta" and

made various accusations of fraud:



66. On February 24, Viceroy tweeted: "BREAKING: The Malta Courts

have annuled [sic] Steward Health Care International's Malta Hospital concession.

Steward International is an $MPW subsidiary. Judge claims Steward International

committed fraud." The same day, Perring retweeted Viceroy's post and added:

"As $MPW's crooked subsidiary tried to hide its links with @Steward (US) &

#MPW, expect arrests. If the Bond Market thinks these assets are fully backed

after the #RoundTripping & #Fraud, they've got another thing coming."

67. In its March 3 report—another report dedicated to spreading

falsehoods related to Steward and Malta—Viceroy wrote: "Throughout our

investigation into SHCI, it has maintained that it has no relationships and is not owned by MPW or SHCS. This is the biggest lie of all." Viceroy cited as evidence that "MPW is written into SHCI subsidiary by-laws as a member of the Manolete group on entities. Texas local franchise filings show MPW is a shareholder of Manolete. MPW has a subsidiary listed in its annual report with the Manolete name."

68. On March 17, in its latest report, Viceroy continued to falsely associate MPT with Malta, writing: "MPW has not marked down its investment in its Maltese international joint venture with Steward despite multiple public issues around this concession. Recently a Maltese court has revoked the joint venture's concession and ordered the hospitals returned to the state and opined that Steward Health Care International fraudulently obtained the concession."

69. These statements are all false, misleading, and defamatory. As set forth above, and as SHCI stated publicly over a year ago on February 1, 2022, MPT has no ownership of or interest in SHCI. Neither Manolete Health LLC nor MPT has any ownership interest in any Malta property or hospital. To make it appear otherwise, and to make it appear as though MPT has lied to investors, Defendants have deliberately conflated Manolete Health LLC with other entities that MPT does not own.

70.     **Accusations of scamming and fraud, and encouragement of criminal investigations.**  As part of their campaign to artificially depress MPT's stock price, Defendants have coupled their targeted false statements with extravagant accusations of criminal wrongdoing.

71.     Perring, for example, has used Twitter to post a steady barrage of aggrandizing statements about purported wrongdoing by MPT to his tens of thousands of followers on the platform.  For example:

- <u>January 26, 2023</u>:  "$MPW is a fraud."

- <u>February 4, 2023</u>:  "#MPW is verging on the largest US #Healthcare #fraud."

- <u>February 13, 2023</u>:  "What a #Fraudulent piece of _ _ _ _ $MPW @steward are."

- <u>February 13, 2023</u>:  "[T]his fraud is a massive #RoundTripping #Scam & rotten to the core."

- <u>February 15, 2023</u>:  "$MPW, if they tell you the day check your calendar. #Misstatements, #Fraud, #Roundtripping & #Corruption."

- <u>February 15, 2023</u>:  "When will investors realise? We have far from finished with $MPW. Remember these words, its [sic] a #ponzi scheme reliant on #RoundTripping, insane #AFFO, with @Steward & #MPW are

part of an international corruption investigation. #Fraud everywhere...to quote one great man, #ItsAScam."

- <u>February 19, 2023</u>: "$MPW's problems are the shady deals, #Fraud, & involvement in #Corruption while scamming investors with #RoundTripping via @Steward for yrs. With so many investigations going on mgmt must hate knocks at the door."

- <u>February 22, 2023</u>: "$MPW is a #RoundTripping #Fraud & #Steward are bust!"

- <u>February 27, 2023</u>: "$MPW & @Steward are complete #frauds."

- <u>February 28, 2023</u>: "These are bad actors, with fraudulent & deceitful operations."

- <u>February 28, 2023</u>: "When #MPW's mgmt mouths' are moving the odds are they're lying. #Fraud."

72.     Perring has coupled these attacks with repeated promises that MPT executives and employees are headed to prison for "fraud."  For example, on February 1, 2023, Perring tweeted:  "[M]ake no mistake there will be charges here. Its [sic] #Fraud."  On February 27, 2023, Perring tweeted:  "#ItsComing - Class Action Lawyers smell the blood. People are going to prison who are involved eith [sic] $MPW & @Steward. #RoundTripping & #Fraud.  #MPW."  On March 4, 2023, Perring shared screenshots of a conversation with an anonymous purported

whistleblower referring to alleged evidence of "pure genius enron styled fraud."
When questioned two weeks later by a Twitter user about why this supposed
evidence had not been released, Perring deflected:  The documents were under
review, he assured the user, and "$MPW[] [is] where money goes to die &
employees will go to prison."

73.    All of these statements are false, misleading, and defamatory.  A
reasonable reader would understand Perring's assertions to be statements of fact
about MPT's business and management.  MPT is not a "[s]cam," "ponzi scheme,"
or "fraud."  It is not "part of an international corruption investigation."  It is not
engaged in "round tripping."  But because accusing MPT of dishonesty and
corruption, and prejudicing MPT's business, is in Defendants' financial interest,
Defendants have slung this defamatory invective anyway.

74.    **Viceroy's attempts to disclaim liability.**  Viceroy has attempted to
evade liability for its defamatory falsehoods by inserting a blanket disclaimer in
each of its reports—sometimes in the middle, sometimes at the end.  Viceroy
claims, among other things, that its "report has been prepared for educational
purposes only and expresses our opinions," and that nothing in the report should be
construed "as an opinion on the merits or otherwise of any particular investment or
investment strategy."  A similar disclaimer appears on the landing page of
Viceroy's website, viceroyresearch.org.  At various points throughout its reports,

Viceroy similarly tries to couch its slanderous falsehoods as opinions by using qualifiers like "believe" and "appear."

75. The disclaimers are contradicted, however, by Viceroy's boast that its "mission is to sift fact from fiction," which appeared in its January 26, 2023 report:

> **About Viceroy**
>
> Viceroy Research are an investigative financial research group. As global markets become increasingly opaque and complex – and traditional gatekeepers and safeguards often compromised – investors and shareholders are at greater risk than ever of being misled or uninformed by public companies and their promoters and sponsors. Our mission is to sift fact from fiction and encourage greater management accountability through transparency in reporting and disclosure by public companies and overall improve the quality of global capital markets.

76. More fundamentally, the false, misleading, and defamatory statements identified in this Complaint are not "opinions" or "beliefs" but rather statements of purported fact, whose fundamental character cannot be altered by disclaimers.

### E. Defendants' conspiracy with others

77. Defendants have not operated alone in past short-and-distort campaigns. Nor have they here: They have joined forces with others who share their economic interest in trashing MPT.

78. Among those conspiring with Defendants to drive down MPT's stock price is another supposed financial research firm that began bashing MPT even before Viceroy came on the scene. This firm generates revenue from subscriptions, and has acknowledged publicly that its continued profitability turns on whether its predictions about particular stocks pan out.

79.     Defendants and the agents of this co-conspirator firm have parroted one another's language and accusations about MPT, retweeting each other's messages with accompanying words of support, replying within threads, and tagging one another in posts.  Both have accused MPT and its executives of fraud and artificial boosting of executive compensation, and both have even perpetuated false statements about MPT's supposed ownership of Malta hospitals.

80.     In addition to this mutual cooperation with a co-conspirator research firm, Defendants have frequently engaged with other users on Twitter, replying to their comments and even tagging repeat players who share the same interest in baselessly attacking MPT.  Defendants' Twitter feeds evince a sustained and coordinated effort by parties with a mutual financial interest to amplify and legitimize one another through re-tweets, replies, and tags.

**F.     Conduct directed at Alabama**

81.     MPT is headquartered in Birmingham, Alabama, and its executives and employees live and work primarily in Alabama.  Defendants' false and defamatory accusations of fraud and other misdeeds therefore concern MPT's Alabama activities and impugn the honesty and commercial reputation of an Alabama-based company.

82.     Defendants knew that MPT was headquartered in Alabama when they defamed MPT, and therefore could have reasonably expected that MPT would

suffer the effects of their defamatory falsehoods in Alabama. MPT discloses its principal place of business in public securities filings, including its annual Form 10-K, which Defendants repeatedly have cited. And Defendants have admitted they know where MPT is principally located. For example, on January 27, 2023, Viceroy tweeted: "In 2003 HealthSouth executives admitted their involvement in similar accounting #fraud to Medical Properties Trust. Like $MPW they were based in Birmingham Alabama. It ended badly with prison time."

83. Defendants and their co-conspirators have made additional, even more direct and purposeful, contacts with Alabama. Viceroy's defamatory February 2, 2023 letter to PwC, which it posted on Twitter, was addressed to PwC's Birmingham, Alabama office, and in particular to a partner at that firm who resides and works in Alabama. And on February 13 and 14, 2023, a co-conspirator traveled to Alabama for an in-person "diligence" trip concerning MPT.

### G. The significant harm directed at and caused to MPT

84. In the course of smearing MPT for financial gain, Defendants have, at various points, accused MPT of lying to investors, orchestrating international corporate kickback schemes, and generally running a sham business. Defendants have loudly and repeatedly proclaimed that MPT's executives, whom Defendants do not hesitate to name, should be sent to prison for these purported misdeeds.

Unfortunately, lies that are repeated often enough can begin in some people's minds to resemble the truth. This has caused concrete and ongoing harm to MPT.

85. Defendants' defamation has damaged MPT's reputation with potential commercial counterparties. Earlier this month, for example, Steward sought to broker a deal with University Health System, in Bexar County, Texas, involving a hospital owned by MPT. University Health pulled away from the deal, citing one of Viceroy's reports and stating publicly that "our mission and values are not aligned with Medical Properties Trust."[21] A senior public official involved in the deal added that there was "a moral obligation to not do business with entities who have shady financial practices."[22] Such refusal to do business with MPT and Steward, MPT's tenant, was a direct and proximate result of Defendants' defamation.

86. In response, Bernarde, seeing the effects of his defamation in action, did not pass up the opportunity to pile on, tweeting, "Lmfao $MPT @Steward_Int."

---

[21] Madison Iszler, *Gloves off in public battle over who's responsible for future of South Side San Antonio hospital*, San Antonio Express-News (Mar. 6, 2023 7:39 PM), https://www.expressnews.com/business/local/article/texas-vista-med-center-future-university-health-17823230.php.
[22] Madison Iszler, *University Health won't step in to save Texas Vista hospital; it's working to place its patients.*, San Antonio Express-News (Mar. 8, 2023 11:54 AM), https://www.expressnews.com/business/local/article/university-health-texas-vista-medical-center-17825919.php.

87.     On information and belief, Defendants' campaign of defamation has
generated unprecedented negativity from credit rating agencies and bondholders.
MPT personnel have spent significant time responding to rating agencies'
questions about Defendants' reports.  Amid Defendants' constant stream of
defamatory accusations, S&P Global Ratings downgraded MPT's issuer credit
rating from BB+ to BB, a change that increased MPT's cost of borrowing money
and may drive away investors.  Defendants' falsehoods have similarly generated
uncertainty among MPT's bondholders.  One such holder had requested a single
meeting in the 20 years before Viceroy came on the scene—and then three
meetings in the months after Defendants began flooding the market with
defamatory and malicious statements.  While MPT welcomes good-faith scrutiny
from, and dialogue with, its stakeholders, Defendants' falsehoods have required
MPT to divert substantial resources that would otherwise have been used to
advance its business.

88.     Defendants' defamation has also damaged, and continues to damage,
MPT's relationship with its shareholders.  In a recent report, the market research
firm Green Street noted that Viceroy "ha[d] contributed to the sell-off in [MPT's]
share price."  It went on to parrot some of Viceroy's false claims, confirming that
Defendants' coordinated defamation campaign is working exactly as intended, to
MPT's and its investors' detriment.

89.     In addition to defaming MPT as a company, Defendants have also attacked MPT's executives personally.  In particular, Defendants have published disparaging remarks about CEO Ed Aldag in an attempt to damage his reputation. On February 13, 2023, for example, Perring tweeted that "#Fraud & #RoundTripping are the soup du jour for #Aldag & #RDLT," and on March 3, 2023, Perring tweeted that he will "order $MPW when #Aldag gets arrested for $MPW."  Defendants' conduct has encouraged anonymous Twitter users to dox MPT's employees and generated a stressful workplace environment.  MPT has had to incur costs to retain employees and increase physical security at its Birmingham headquarters because of Defendants' actions.

90.     Perring has stated that MPT's stock is worthless.  That is false, but it is Defendants' objective to *make* MPT's stock worthless, and to line their pockets in the process.  Defendants' campaign to defame MPT and drive down MPT's stock price is ongoing, and Defendants have offered no indication that they plan to let up.  Absent swift and permanent injunctive relief, MPT will continue to be irreparably harmed by Defendants' self-interested disregard for the truth.

# CLAIMS FOR RELIEF

## COUNT ONE
## Defamation – Libel
## (Against All Defendants)

91.     The allegations of paragraphs 1 through 90 are repeated as if fully set forth herein.

92.     Defendants authored the written statements attributed to them in paragraphs 1 through 90 (the "Libelous Statements").

93.     Each of the Libelous Statements concerns MPT.

94.     Defendants published the Libelous Statements to third parties.  Such publication occurred on Twitter and on Viceroy's website, viceroyresearch.org.

95.     The Libelous Statements are statements of fact, not opinion, that were made without full and complete disclosure of their underlying factual bases.  The Libelous Statements therefore were reasonably capable of a defamatory meaning and did in fact carry a defamatory meaning.

96.     Defendants made each of the Libelous Statements with knowledge that they were false, or at least with reckless disregard of whether they were false or not.

97.     The Libelous Statements are defamatory and libelous *per se* because they impute dishonesty or corruption to MPT and directly tend to prejudice MPT in its trade or business.

98.     MPT has suffered damages as a direct and proximate result of Defendants' Libelous Statements, and is entitled to an award of compensatory damages in an amount to be proven at trial.

99.     As a result of Defendants' Libelous Statements, MPT has suffered and will continue to suffer irreparable harm.  MPT is therefore entitled to injunctive relief.

**COUNT TWO**
**Civil Conspiracy**
**(Against All Defendants)**

100.    The allegations of paragraphs 1 through 99 are repeated as if fully set forth herein.

101.    From at least on or about January 26, 2023 to the present, Viceroy, Perring, Bernarde, and Lau engaged in concerted action with one another and with third persons, including an investment research firm and its agents, to promote and amplify false and defamatory statements about MPT, including the Libelous Statements.

102.    Defendants also engaged in concerted action to promote and amplify each other's false and defamatory statements about MPT for the purposes of imputing dishonesty or corruption to MPT and of prejudicing MPT in its trade or business.

103.   As a result of Defendants' concerted action with one another and with others, Defendants are jointly and severally liable to MPT for damages in an amount to be proven at trial.

**COUNT THREE**
**Tortious Interference With Contractual or Business Relations**
**(Against All Defendants)**

104.   The allegations of paragraphs 1 through 103 are repeated as if fully set forth herein.

105.   MPT has protectable business relationships with employees, shareholders, bondholders, and prospective operator-tenants.  Defendants, who have written extensively about MPT, are aware of such relationships.

106.   Defendants are strangers to all such relationships.  As short-sellers, Defendants have borrowed and sold MPT's stock and therefore do not own a direct beneficial and/or economic interest in MPT.

107.   Defendants intentionally interfered with MPT's business relationships with employees, shareholders, bondholders, and potential operator-tenants by publishing defamatory falsehoods that impugned the integrity of named employees, cast doubt on MPT's creditworthiness, and accused MPT of unethical and criminal behavior.

108.   As a result of Defendants' tortious interference, MPT has suffered damages in an amount to be proven at trial.

## COUNT FOUR
### Private Nuisance (Ala. Code §§ 6-5-120, 6-5-121)
### (Against All Defendants)

109.   The allegations of paragraphs 1 through 108 are repeated as if fully set forth herein.

110.   Defendants' coordinated campaign of defamation for their own financial gain constitutes a nuisance which has caused significant economic harm to MPT:  It has reduced MPT's stock price, interfered with MPT's relationships with shareholders and bondholders, cost valuable executive time, injured MPT's reputation, and caused MPT to take special financial measures to retain employees. Further, Defendants' persistent threats against MPT's executives and employees have necessitated an increase in security measures, substantially interfering with MPT's reasonable use and enjoyment of its corporate headquarters.

111.   Defendants' interference with MPT's use and enjoyment of its property was substantial, and was, by all accounts, offensive, inconvenient, and unreasonable.

112.   It was eminently foreseeable to Defendants that their actions would impose such harms on MPT and, hence, Defendants owed MPT a duty of care which they then breached.  Defendants' defamatory statements, moreover, directly and proximately caused hurt, inconvenience, and damage to MPT.

113.   Defendants published their respective defamatory statements with knowledge of their falsity, or at least reckless disregard for their truth.  Defendants have disseminated falsehoods about MPT in a constant, coordinated fashion and for the purpose of driving MPT's stock price down and reaping a substantial profit.  Thus, Defendants' conduct is wanton, malicious, and attended by circumstances of aggravation.

114.   As a result of the nuisance created by Defendants, MPT is entitled to injunctive relief, as well as compensatory and punitive damages in an amount to be proven at trial.

## COUNT FIVE
### Unjust Enrichment
### (Against All Defendants)

115.   The allegations of paragraphs 1 through 114 are repeated as if fully set forth herein.

116.    On information and belief, Defendants have profited from the decline in MPT's stock price.  They have obtained profits from their short position in MPT and other financial benefits.  Defendants knowingly accepted and retained these benefits.

117.   These benefits resulted from Defendants' wanton, malicious, and coordinated campaign to defame MPT and manipulate its stock price downward.  Such conduct is inequitable and unconscionable.

118.   The benefits Defendants received were at MPT's expense. Defendants have benefited from the reduction they caused in MPT's enterprise value and the expenditures of time and resources MPT has undertaken in response to Defendants' unconscionable conduct.  Defendants also have benefited at the expense of MPT's shareholders.

119.   MPT reasonably expects that Defendants will compensate MPT for the benefits Defendants have received unjustly and without MPT's consent.  It would be inequitable to allow Defendants to retain their ill-gotten gains, borne of their malicious and illicit short-and-distort scheme.

120.   Therefore, MPT is entitled to an order requiring Defendants to disgorge the benefits by which Defendants were unjustly enriched.  Alternatively, a constructive trust should be imposed upon those benefits, to be forfeited and disposed of pursuant to the Court's instructions.

## PRAYER FOR RELIEF

WHEREFORE, MPT respectfully prays this Court enter an Order:

    a.  Awarding compensatory damages in an amount to be determined at trial;

    b.  Awarding punitive damages in an amount sufficient to punish Defendants for their wrongful conduct and to deter others from committing similar wrongs;

c.  Ordering Defendants to disgorge the benefits by which they were unjustly enriched and/or imposing a constructive trust upon such benefits;

d.  Ordering Defendants to immediately remove all defamatory statements concerning MPT from their social media accounts and website;

e.  Permanently enjoining Defendants' repetition of any defamatory statements concerning MPT;

f.  Awarding MPT its attorneys' fees and costs from prosecuting this action;

g.  Awarding prejudgment interest under Ala. Code § 8-8-10; and

h.  Granting MPT such other and further relief as this Court deems just and appropriate.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims so triable.

Dated:  March 30, 2023

LIGHTFOOT, FRANKLIN & WHITE LLC

OF COUNSEL:

William Savitt (*pro hac vice* to be filed)

Sarah K. Eddy (*pro hac vice* to be filed)

Nathaniel Cullerton (*pro hac vice* to be filed)

Adabelle U. Ekechukwu (*pro hac vice* to be filed)

Sijin Choi (*pro hac vice* to be filed)

Charles M. Melman (*pro hac vice* to be filed)

WACHTELL, LIPTON,

ROSEN & KATZ

51 West 52nd Street

New York, NY 10019

Tel.: (212) 403-1000

Corey Worcester (*pro hac vice* to be filed)

Jomaire A. Crawford (*pro hac vice* to be filed)

QUINN EMANUEL

URQUHART & SULLIVAN, LLP

51 Madison Avenue, 22nd Floor

New York, NY  10010

Tel.: (212) 849-7000

Anthony Bongiorno (*pro hac vice* to be filed)

QUINN EMANUEL

URQUHART & SULLIVAN, LLP

111 Huntington Ave, Suite 520

Boston, MA 02199

Tel.: (617) 712-7100

/s/Michael L. Bell_____

Michael L. Bell

Wesley B. Gilchrist

The Clark Building

400 20th Street North

Birmingham, Alabama 35203

Tel.: (205) 581-0700

*Attorneys for Plaintiff*

DEFENDANTS TO BE SERVED AT THE FOLLOWING ADDRESSES:

Viceroy Research LLC
1201 Orange Street, Suite 600
Wilmington, DE 19801

Fraser John Perring
28 Robins Crescent
Witham St Hughs
United Kingdom LN6 9UU

Gabriel Bernarde
11 Eckersley Court
Blackburn South
Victoria
Australia 3130

Aidan Lau
Unit 205/750 Station Street
Box Hill
Australia 3128

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Medical Properties Trust, Inc. | Viceroy Research LLC; Fraser John Perring; Gabriel Bernarde; and Aidan Lau |
| (b) County of Residence of First Listed Plaintiff __Jefferson County, AL__ <br> *(EXCEPT IN U.S. PLAINTIFF CASES)* | County of Residence of First Listed Defendant __New Castle County, DE__ <br> *(IN U.S. PLAINTIFF CASES ONLY)* <br> NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED. |
| (c) Attorneys *(Firm Name, Address, and Telephone Number)* <br><br> (see attachment) | Attorneys *(If Known)* |

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1 U.S. Government Plaintiff
- [ ] 2 U.S. Government Defendant
- [ ] 3 Federal Question *(U.S. Government Not a Party)*
- [x] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [x] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [x] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110 Insurance <br> [ ] 120 Marine <br> [ ] 130 Miller Act <br> [ ] 140 Negotiable Instrument <br> [ ] 150 Recovery of Overpayment & Enforcement of Judgment <br> [ ] 151 Medicare Act <br> [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans) <br> [ ] 153 Recovery of Overpayment of Veteran's Benefits <br> [ ] 160 Stockholders' Suits <br> [ ] 190 Other Contract <br> [ ] 195 Contract Product Liability <br> [ ] 196 Franchise | **PERSONAL INJURY** <br> [ ] 310 Airplane <br> [ ] 315 Airplane Product Liability <br> [x] 320 Assault, Libel & Slander <br> [ ] 330 Federal Employers' Liability <br> [ ] 340 Marine <br> [ ] 345 Marine Product Liability <br> [ ] 350 Motor Vehicle <br> [ ] 355 Motor Vehicle Product Liability <br> [ ] 360 Other Personal Injury <br> [ ] 362 Personal Injury - Medical Malpractice | **PERSONAL INJURY** <br> [ ] 365 Personal Injury - Product Liability <br> [ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability <br> [ ] 368 Asbestos Personal Injury Product Liability <br> **PERSONAL PROPERTY** <br> [ ] 370 Other Fraud <br> [ ] 371 Truth in Lending <br> [ ] 380 Other Personal Property Damage <br> [ ] 385 Property Damage Product Liability | [ ] 625 Drug Related Seizure of Property 21 USC 881 <br> [ ] 690 Other | [ ] 422 Appeal 28 USC 158 <br> [ ] 423 Withdrawal 28 USC 157 <br> **INTELLECTUAL PROPERTY RIGHTS** <br> [ ] 820 Copyrights <br> [ ] 830 Patent <br> [ ] 835 Patent - Abbreviated New Drug Application <br> [ ] 840 Trademark <br> [ ] 880 Defend Trade Secrets Act of 2016 | [ ] 375 False Claims Act <br> [ ] 376 Qui Tam (31 USC 3729(a)) <br> [ ] 400 State Reapportionment <br> [ ] 410 Antitrust <br> [ ] 430 Banks and Banking <br> [ ] 450 Commerce <br> [ ] 460 Deportation <br> [ ] 470 Racketeer Influenced and Corrupt Organizations <br> [ ] 480 Consumer Credit (15 USC 1681 or 1692) <br> [ ] 485 Telephone Consumer Protection Act <br> [ ] 490 Cable/Sat TV <br> [ ] 850 Securities/Commodities/ Exchange |
| **REAL PROPERTY** <br> [ ] 210 Land Condemnation <br> [ ] 220 Foreclosure <br> [ ] 230 Rent Lease & Ejectment <br> [ ] 240 Torts to Land <br> [ ] 245 Tort Product Liability <br> [ ] 290 All Other Real Property | **CIVIL RIGHTS** <br> [ ] 440 Other Civil Rights <br> [ ] 441 Voting <br> [ ] 442 Employment <br> [ ] 443 Housing/ Accommodations <br> [ ] 445 Amer. w/Disabilities - Employment <br> [ ] 446 Amer. w/Disabilities - Other <br> [ ] 448 Education | **PRISONER PETITIONS** <br> **Habeas Corpus:** <br> [ ] 463 Alien Detainee <br> [ ] 510 Motions to Vacate Sentence <br> [ ] 530 General <br> [ ] 535 Death Penalty <br> **Other:** <br> [ ] 540 Mandamus & Other <br> [ ] 550 Civil Rights <br> [ ] 555 Prison Condition <br> [ ] 560 Civil Detainee - Conditions of Confinement | **LABOR** <br> [ ] 710 Fair Labor Standards Act <br> [ ] 720 Labor/Management Relations <br> [ ] 740 Railway Labor Act <br> [ ] 751 Family and Medical Leave Act <br> [ ] 790 Other Labor Litigation <br> [ ] 791 Employee Retirement Income Security Act <br> **IMMIGRATION** <br> [ ] 462 Naturalization Application <br> [ ] 465 Other Immigration Actions | **SOCIAL SECURITY** <br> [ ] 861 HIA (1395ff) <br> [ ] 862 Black Lung (923) <br> [ ] 863 DIWC/DIWW (405(g)) <br> [ ] 864 SSID Title XVI <br> [ ] 865 RSI (405(g)) <br> **FEDERAL TAX SUITS** <br> [ ] 870 Taxes (U.S. Plaintiff or Defendant) <br> [ ] 871 IRS—Third Party 26 USC 7609 | [ ] 890 Other Statutory Actions <br> [ ] 891 Agricultural Acts <br> [ ] 893 Environmental Matters <br> [ ] 895 Freedom of Information Act <br> [ ] 896 Arbitration <br> [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision <br> [ ] 950 Constitutionality of State Statutes |

## V. ORIGIN *(Place an "X" in One Box Only)*

- [x] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. § 1332

Brief description of cause:
Libel, Civil Conspiracy, Tortious Inteference With Contractual or Business Relations, Private Nuisance, Unjust Enrichment

## VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $ >75,000

CHECK YES only if demanded in complaint:
JURY DEMAND: [x] Yes [ ] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____ DOCKET NUMBER _____

| DATE | SIGNATURE OF ATTORNEY OF RECORD |
|---|---|
| March 30, 2023 | /s/ Michael L. Bell |

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

**Wachtell, Lipton, Rosen & Katz**

William Savitt
Sarah K. Eddy
Nathaniel Cullerton
Adabelle U. Ekechukwu
Sijin Choi
Charles M. Melman

51 West 52nd Street
New York, NY 10019

(212) 403-1000

**Quinn Emanuel Urquhart & Sullivan, LLP**

Corey Worcester
Jomaire A. Crawford

51 Madison Avenue, 22nd Floor
New York, NY 10010

(212) 849-7000

Anthony Bongiorno

111 Huntington Ave, Suite 520
Boston, MA 02199

(617) 712-7100

**Lightfoot, Franklin & White LLC**

Michael L. Bell
Wesley B. Gilchrist

The Clark Building
400 20th Street North
Birmingham, AL 35203

(205) 581-0700

FILED

2023 Mar-30  PM 03:10
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT 1

## Part 1 of 2

# JANUARY 26, 2023 REPORT

# Medical Properties (dis)Trust

Aggressive healthcare property roll-up caters almost exclusively to distressed tenants. Rent is round-tripped via "fake" purchases of massively inflated assets. The fat lady is singing.

**January 26, 2023** – Viceroy Research is short Medical Properties Trust (NASDAQ : **MPW**), a healthcare property REIT who has engaged in billions of dollars of uncommercial transactions with its tenants and their management teams in order to mask a pervasive revenue round-robin scheme and / or theft.

The value of MPW's assets, as a result of capitalizing these uncommercial transactions, are massively overstated. MPW employed an aggressive, debt-fuelled roll-up strategy in order to affect these transactions. We believe the true value of MPW's LTV is ~85%, creating enormous **credit risk**. We believe MPW will have no choice but to significantly **cut dividends**.

Substantially all of MPW's major tenants appear distressed. This precedes the need to engage in revenue round-robin transactions. **MPW is a subprime asset roll-up generating prime yields**.

## The Transactions

Broadly, we believe MPW engaged in 4 major types of uncommercial transactions with its clients. We believe substantial portions of cash is round-tripped back to MPW. Some may overlap:

### Sale-Leasebacks

Many MPW property acquisitions are on leaseback terms, where the vendor becomes the tenant of the properties. MPW has engaged in billions of dollars of uncommercial sale-leaseback transactions

- MPW almost exclusively engages in these transactions with counterparties who are in financial ruin.
- Despite this, MPW appear to constantly overpay for fire sale assets, sometimes by as much as 10x, which in-turn allow debt-crippled tenants to meet their financial rent obligations as and when they fall due in the short term.

| | | |
|---|---|---|
| **Salt Lake City Portfolio**<br>**Annexure 2** | MPW loaned Steward $1.4b to purchase a Salt Lake City Hospital operator IASIS and their portfolio of 19 hospitals. IASIS owned and operated 17 hospitals.<br><br>A $700m portion of this loan was immediately extinguished in exchange for 9 properties. The second $700m loan was secured against only a further 2, leaving Steward with 7 properties courtesy of MPW at a value of $750m. | **$750m - overpayment** |

### Cash-Giveaways

MPW engages in various transactions with a common cast of friends in which hundreds of millions of dollars go missing. MPW has disappeared hundreds of millions of dollars in what appear to be fraudulent transactions.

- Underlying asset values are, also, fractions of the transaction values. Similarly: only fractions of the consideration are received by the vendors. In many instances, it appears that a middle-man is involved in brokering these transactions.

| | | |
|---|---|---|
| **Malta Hospitals**<br>**Annexure 5** | MPW invested $205m for a 49% stake in an unnamed JV with Steward & MPW management. It paid $205m for 3 hospitals worth $27m in Malta formerly operated by a group of businessmen under investigation for corruption.<br><br>Steward reaped a $173m windfall and the $5m difference between MPW's acquisition loan and the price paid to Steward remains unaccounted for. | **$173m overpayment $5m missing** |



## Bailouts

MPW engages in various in run-of-the-mill bailout transactions. MPW has spent hundreds of millions of dollars bailing out distressed tenants.

- MPW will acquire equity in failing operators or issue them loans in order to mask uncollectable rent via round tripping revenues and, consequently, avoid impairment of their assets.

| | | |
|---|---|---|
| **Prospect**<br>**Annexure 7** | In 2019 MPW entered into a $113m promissory note with Prospect, payable in August 2022 or the sale-leaseback of the properties.<br><br>Rhode-Island regulators approved Prospect's MBO contingent on the removal of the sale-leaseback option, effectively leaving MPW holding the bag. | **$113m**<br>**unrecoverable** |

## Capex Assistance & Fake Builds

MPW appear to collude with tenants to establish "fake" projects in order to siphon money away from the company. It is also frequently strong-armed by distressed tenants and regulators for financial assistance for maintenance capex on triple-net leases.

- Various of MPW's ongoing developments appear to be either non-existent or have not broken ground. Despite this, MPW claim to have spent tens of millions of dollars on each development. Site visits of barren construction sites and local news sources suggest this is a lie.
- MPW's tenants are exclusively on triple-net leases, meaning they are on the hook for real estate taxes, insurance, and maintenance. Despite this, various filings and MPW's financial accounts show substantial cash amounts being devoted to capex, including maintenance, of its distressed tenants.

| | | |
|---|---|---|
| **Wadley Regional**<br>**Medical Centre**<br>**Annexure 1** | MPW committed $169m to build a Steward facility which.<br><br>Wadley Regional Medical Center and MPW, in its Q3 2022 interim report, said that it had already spent $58m on the development.<br><br>News stories, including a site visit in October 2022, show that the development site does not appear to have broken ground, and does not even have a site office.<br><br>Local news agencies captured video of the site, which shows a sprawling bushland surrounded by temporary blue fencing. | **$58m - missing** |



*Figure 1 – Screen Capture – KSLA News 12 site visit to Wadley Regional Medical Centre[1]*

The above image is from a local news stie visit to Wadley Regional Medical Centre in October 2022. MPW claimed to have outlaid $58m on this development, with over $100m in further commitments. The site did not even appear to have an office.

---

[1] https://www.ksla.com/2022/10/20/construction-apparently-paused-texarkana-hospital/

## The Financials

It's important to understand MPW's financial gimmicks in order to properly evaluate the impact of MPW misrepresentations. Viceroy's analysis of MPW's operational cash flows show that it consistently generates enormous losses, cumulating to $1.9b since 2015.

| Medical Properties Trust -Viceroy Free Cash Flow $000's | 2015-2019 | 2020 | 2021 | Q3 2022 | Cumulative 2015-Q3 2022 |
|---|---|---|---|---|---|
| **Normalized FFO - Management** | **2,019,387** | **831,212** | **1,035,920** | **829,487** | **4,716,006** |
| *Reconcile to cash flow from operations* | | | | | |
| Straight-line revenue & other | (387,895) | (226,906) | (288,717) | (214,435) | (1,117,953) |
| Share based compensation | 77,706 | 47,154 | 52,110 | 33,001 | 209,971 |
| Debt costs amortization | 36,436 | 13,099 | 16,856 | 13,123 | 79,514 |
| Other | (45,622) | (64,144) | (17,632) | (26,666) | (154,063) |
| *Working capital* | 77,107 | 17,221 | 13,119 | (76,595) | 30,852 |
| **Cash flow from operations** | **1,777,119** | **617,636** | **811,656** | **557,915** | **3,764,326** |
| *Capex & suspect round-tripping* | | | | | |
| Equity investments/investments in unconsolidated JV's | (932,985) | (233,593) | (123,427) | (399,456) | (1,689,461) |
| Other loans/investments in unconsolidated operating entities | (995,321) | (309,523) | (909,669) | (131,105) | (2,345,618) |
| Capex-adjacent line items | (1,142,494) | (104,530) | (356,964) | (242,090) | (1,846,078) |
| Proceeds from return of equity investment | - | 69,224 | 65,546 | 14,295 | 149,065 |
| **Viceroy Adjusted Free Cash Flow** | **(1,293,687)** | **39,213** | **(512,859)** | **(200,442)** | **(1,967,774)** |

*Figure 2 – Viceroy Analysis*

- MPW's adoption of straight-line revenue model hides a pervasive rent-deferral program for distressed tenants. Viceroy do not believe straight-line rent is collectable. Straight-line revenues have increased from ~8% of total rent in 2015 to ~20% of total rent in 2021.

- Our research shows material portions of MPW's billed rent is round tripped through uncommercial loans and equity investments[2]. Viceroy include these outflows in our FCF calculation as our research suggests they are instrumental to operations and to MPW receiving rent from distressed tenants.

- MPW's tenants are exclusively on triple-net leases. Despite this, various filings and MPW's financial accounts show substantial cash amounts being devoted to capex, including maintenance, of its properties. Viceroy included these outflows in our FCF calculation as our research show MPW is strongarmed into making absurd investments for distressed clients in order to receive rent.

A break-down of MPW's cash flows shows that it has financed both a heavily loss-making operation *and* an aggressive (and unsuccessful) roll-up strategy in a zero-rate environment with mountains of debt and dilutive equity raises. The fat lady is singing.

| Medical Properties Trust -Viceroy Cash Flow Analysis $000's | 2015-2019 | 2020 | 2021 | Q3 2022 | Cumulative 2015-Q3 2022 |
|---|---|---|---|---|---|
| **Viceroy Adjusted Free Cash Flow** | **(1,293,687)** | **39,213** | **(512,859)** | **(200,442)** | **(1,967,774)** |
| *Remaining cash flows from investing activities* | | | - | | |
| Acquisitions & other related investments** | (10,216,349) | (3,706,064) | (4,317,143) | (441,682) | (18,681,238) |
| Asset sale proceeds, net of costs | 1,907,736 | 94,177 | 246,468 | 2,185,574 | 4,433,955 |
| Principal received on loans receivable, net of investment in loans | 1,825,221 | 1,243,536 | 1,536,776 | (127,405) | 4,478,128 |
| **Viceroy adjusted cash flows from investing activities** | **(6,483,392)** | **(2,368,351)** | **(2,533,899)** | **1,616,487** | **(9,769,155)** |
| *Cash flows from financing activities* | | | | | |
| Net proceeds / (repayment) of term debt & credit facilities | 5,603,012 | 1,578,583 | 2,576,526 | (933,661) | 8,824,460 |
| Proceeds from sale of units, net of offering costs | 5,166,274 | 411,101 | 1,051,229 | - | 6,628,604 |
| Distributions paid | (1,503,705) | (567,969) | (643,473) | (524,536) | (3,239,683) |
| Other financing activities | (146,037) | (20,641) | (36,674) | (85,492) | (288,844) |
| **Cash flow from financing activities** | **9,119,544** | **1,401,074** | **2,947,608** | **(1,543,689)** | **11,924,537** |

*Figure 3– Viceroy Analysis*

---

[2] These are reflected in "Equity investments / investments in consolidated JVs" and in "Other loans/investments in unconsolidated operating entities"

## The Valuation & Credit Risk

It is difficult to assign a valuation to MPW as we believe investors are working with misleading and incomplete information. We believe MPW presents enormous short-term downside. Viceroy have nonetheless recreated the copy-paste sell-side future FFO valuation model with some adjustments which we believe begin to illustrate the value-destructive nature of MPW's actions.

Viceroy's adjusted FFO per share removes the impact of straight-line rent (which has historically equated to ~25% of FFO). It also attempts to remove the impact of MPW's round-robin transactions (50% is generous[3]).

| Medical Properties Trust - Viceroy Valuation | | Notes |
|---|---|---|
| Consensus 2023 FFO | 1.78 | |
| Straight-line rent reduction | (0.45) | 25% off FFO |
| Round Trip Estimate | (0.89) | 50% off FFO |
| **Viceroy Adjusted FFO** | **0.45** | |

| Medical Properties Trust - Viceroy Valuation | | Valuation | |
|---|---|---|---|
| Range | Multiple | ($/share) | Downside |
| Bullish | 10.00 | 4.45 | **-67%** |
| Mid | 8.75 | 3.89 | **-71%** |
| Bearish | 7.50 | 3.34 | **-75%** |
| Stock Price @ 24 Jan 2023 | 13.48 | | |
| Current Multiple on consuensus 2023 FFO | 7.57 | | |

*Figures 4 & 5 – Viceroy Analysis*

*Around current forwards FFO multiples, we deduce a short-term downside of 67% - 75%.*

This valuation does not consider that MPW is subject to immense credit risk. It has played an aggressive, debt-fuelled roll-up strategy in a zero-interest bull-market. It has had the best economic conditions of all time to fester into one the largest financial disasters to plague the USA – and indeed global – medical industry.

| Medical Properties Trust - LTV Calc | | | |
|---|---|---|---|
| $000's | Q3 2022 | Adjustments | Viceroy LTV |
| **Net debt** | | | |
| Debt | (9,476,144) | | (9,476,144) |
| Cash & equivalents | 299,171 | | 299,171 |
| Accounts payable & accrued expenses | (569,017) | | (569,017) |
| Interest & rent receivables | 117,555 | | 117,555 |
| Deferred revenue | (18,569) | | (18,569) |
| Obligations to tenants & other lease liabil | (146,438) | | (146,438) |
| **Net debt and obligations** | **(9,793,442)** | **-** | **(9,793,442)** |
| **Assets** | | | |
| Net investment in real estate assets | 14,264,905 | (3,566,226) | 10,698,679 |
| Straight-line rent receivables | 710,082 | (710,082) | - |
| Investments in unconsolidated real estate | 2,850,071 | (2,850,071) | - |
| Other loans | 200,245 | | 200,245 |
| Other assets | 601,387 | | 601,387 |
| **Asset base** | **18,626,690** | **(7,126,379)** | **11,500,311** |
| **LTV** | **52.58%** | | **85.16%** |

*Figure 6 & 7 – Viceroy LTV Analysis*

*Viceroy believe MPW's` LTV is closer to 85%.*
*This kneecaps MPW's ability to continue paying dividends.*

In December 2022, S&P placed MPW on downgrade watch. It already sits below investment grade at BB+[4].

---

[3] The quantum of round-robin transactions typically exceeds FFO. We believe a 50% haircut is generous.
[4] https://disclosure.spglobal.com/ratings/en/regulatory/article/-/view/type/HTML/id/2932303


**Attention: Whistleblowers**

Viceroy encourage any parties with information pertaining to misconduct within Medical Properties Trust, its affiliates, or any other entity to file a report with the appropriate regulatory body.

We also understand first-hand the retaliation whistleblowers sometimes face for championing these issues. Where possible, Viceroy is happy act as intermediaries in providing information to regulators and reporting information in the public interest in order to protect the identities of whistleblowers.

You can contact the Viceroy team via email on viceroy@viceroyresearch.com.

**About Viceroy**

Viceroy Research are an investigative financial research group. As global markets become increasingly opaque and complex – and traditional gatekeepers and safeguards often compromised – investors and shareholders are at greater risk than ever of being misled or uninformed by public companies and their promoters and sponsors. Our mission is to sift fact from fiction and encourage greater management accountability through transparency in reporting and disclosure by public companies and overall improve the quality of global capital markets.

**Important Disclaimer – Please read before continuing**

This report has been prepared for educational purposes only and expresses our opinions. This report and any statements made in connection with it are the authors' opinions, which have been based upon publicly available facts, field research, information, and analysis through our due diligence process, and are not statements of fact. All expressions of opinion are subject to change without notice, and we do not undertake to update or supplement any reports or any of the information, analysis and opinion contained in them. We believe that the publication of our opinions about public companies that we research is in the public interest. We are entitled to our opinions and to the right to express such opinions in a public forum. You can access any information or evidence cited in this report or that we relied on to write this report from information in the public domain.

To the best of our ability and belief, all information contained herein is accurate and reliable, and has been obtained from public sources we believe to be accurate and reliable, and who are not insiders or connected persons of the stock covered herein or who may otherwise owe any fiduciary duty or duty of confidentiality to the issuer. We have a good-faith belief in everything we write; however, all such information is presented "as is," without warranty of any kind – whether express or implied.

In no event will we be liable for any direct or indirect trading losses caused by any information available on this report. Think critically about our opinions and do your own research and analysis before making any investment decisions. We are not registered as an investment advisor in any jurisdiction. By downloading, reading or otherwise using this report, you agree to do your own research and due diligence before making any investment decision with respect to securities discussed herein, and by doing so, you represent to us that you have sufficient investment sophistication to critically assess the information, analysis and opinions in this report. You should seek the advice of a security professional regarding your stock transactions.

This document or any information herein should not be interpreted as an offer, a solicitation of an offer, invitation, marketing of services or products, advertisement, inducement, or representation of any kind, nor as investment advice or a recommendation to buy or sell any investment products or to make any type of investment, or as an opinion on the merits or otherwise of any particular investment or investment strategy.

Any examples or interpretations of investments and investment strategies or trade ideas are intended for illustrative and educational purposes only and are not indicative of the historical or future performance or the chances of success of any particular investment and/or strategy. As of the publication date of this report, you should assume that the authors have a direct or indirect interest/position in all stocks (and/or options, swaps, and other derivative securities related to the stock) and bonds covered herein, and therefore stand to realize monetary gains in the event that the price of either declines.

The authors may continue transacting directly and/or indirectly in the securities of issuers covered on this report for an indefinite period and may be long, short, or neutral at any time hereafter regardless of their initial recommendation.

# 1. Financial Analysis

It is contextually important that readers understand MPW's financial accounting gimmicks and executive incentives prior to diving into the weeds of the malfeasance. Acquiring terrible businesses, siphoning cash through acquisitions, and bailing out failing tenants aligns with the financial goals of the board.

This section will highlight MPW's operational cash shortfalls, revenue round-tripping, and accounting gimmicks. It will also highlight *how* MPW actually "makes" money (*spoiler*: debt & unit offerings).

## 1.1   FFO, AFFO

MPW uses Funds From Operations (FFO) as their main performance indicator. FFO (or a slightly Adjusted FFO) is also utilized by most analysts covering MPW to derive valuations. Executives are compensated based on normalized FFO and EBITDA.

| Medical Proerties Trust - FFO Breakdown | | | | | | Cumulative |
|---|---|---|---|---|---|---|
| $000's | 2015-2018 | 2019 | 2020 | 2021 | Q3 2022 | 2015-Q3 2022 |
| Net income less participating share in earnings | 1,664,442 | 372,376 | 429,345 | 653,860 | 1,042,036 | 4,162,059 |
| Depreciation & amortization | 437,303 | 183,921 | 306,496 | 374,599 | 300,731 | 1,603,050 |
| (Gain) / Loss on sale of real estate | (797,259) | (41,560) | 2,833 | (52,471) | (536,788) | (1,425,245) |
| Real estate impairment charges | 48,007 | 21,031 | 19,006 | - | - | 88,044 |
| **Funds from operations (FFO) - Management** | **1,352,493** | **535,768** | **757,680** | **975,988** | **805,979** | **4,427,908** |
| Write-off of straight-line rent & other* | 30,333 | 15,539 | 26,415 | (2,271) | 27,444 | 97,460 |
| Debt refinancing & unutilized financing costs | 82,019 | 4,367 | 28,180 | 27,650 | (12,563) | 129,653 |
| Release of income tax valuation allowance | (8,361) | - | - | - | - | (8,361) |
| Non-real estate impairment charges | 7,229 | - | - | - | - | 7,229 |
| Tax rate & other changes | - | - | 9,295 | 42,746 | (825) | 51,216 |
| Non-cash fair value adjustments | - | - | 9,642 | (8,193) | 9,452 | 10,901 |
| **Normalized FFO - Management** | **1,463,713** | **555,674** | **831,212** | **1,035,920** | **829,487** | **4,716,006** |

*Figure 8 – MPW Management FFO Calculations*

FFO is a **completely unsuitable metric** without significant adjustments that can account for MPW's enormous revenue round tripping, distressed straight-lined rent, and suspected theft. Our calculations in [Figure XX] below account for various cash outflows, including investment outflows, which we believe are necessary for MPW's operations.

| Medical Properties Trust -Viceroy Free Cash Flow | | | | Cumulative |
|---|---|---|---|---|
| $000's | 2015-2019 | 2020 | 2021 | Q3 2022 | 2015-Q3 2022 |
| **Normalized FFO - Management** | **2,019,387** | **831,212** | **1,035,920** | **829,487** | **4,716,006** |
| *Reconcile to cash flow from operations* | | | | | |
| Straight-line revenue & other | (387,895) | (226,906) | (288,717) | (214,435) | (1,117,953) |
| Share based compensation | 77,706 | 47,154 | 52,110 | 33,001 | 209,971 |
| Debt costs amortization | 36,436 | 13,099 | 16,856 | 13,123 | 79,514 |
| Other | (45,622) | (64,144) | (17,632) | (26,666) | (154,063) |
| *Working capital* | 77,107 | 17,221 | 13,119 | (76,595) | 30,852 |
| **Cash flow from operations** | **1,777,119** | **617,636** | **811,656** | **557,915** | **3,764,326** |
| *Capex & suspect round-tripping* | | | | | |
| Equity investments/investments in unconsolidated JV's | (932,985) | (233,593) | (123,427) | (399,456) | (1,689,461) |
| Other loans/investments in unconsolidated operating entities | (995,321) | (309,523) | (909,669) | (131,105) | (2,345,618) |
| Capex-adjacent line items | (1,142,494) | (104,530) | (356,964) | (242,090) | (1,846,078) |
| Proceeds from return of equity investment | - | 69,224 | 65,546 | 14,295 | 149,065 |
| **Viceroy Adjusted Free Cash Flow** | **(1,293,687)** | **39,213** | **(512,859)** | **(200,442)** | **(1,967,774)** |

*Figure 9 – Viceroy Adjusted Free Cash Flows*

Viceroy's assessment is that MPW's cumulative free cash flow since 2015 is **negative $1.9b.**

We believe MPW's multi-billion dollar roll-up strategy has conclusively failed in generating any real cash-flows. In fact, MPW appears to have burnt more money than ever in the last 3 years.

## 1.2 Straight-Line Rent – Suspect Uncollectible

MPW 's rent revenue is split into 2 balance sheet components:

1. Rent billed – as in, of the recorded rent revenue, how much was remitted in cash or is currently receivable; and
2. Straight-line rent - an additional amount of rent MPW should have collected per period if the entire payment stream of the rent contract was recognized evenly over the rental period (which it is not).



We receive income from operating leases based on the fixed required rents (base rents) per the lease agreements. Rent revenue from base rents is recorded on the straight-line method over the terms of the related lease agreements for new leases and the remaining terms of existing leases for those acquired as part of a property acquisition. The straight-line method records the periodic average amount of base rents earned over the term of a lease, taking into account contractual rent increases over the lease term. The straight-line method typically has the effect of recording more rent revenue from a lease than a tenant is required to pay early in the term of the lease. During the later parts of a lease term, this effect reverses with less rent revenue recorded than a tenant is required to pay. Rent revenue, as recorded on the straight-line method, in our consolidated statements of net income is presented as two amounts: rent billed and straight-line rent. Rent billed

*Figure 10 – MPW annual report extract of straight-line accounting policy*

MPW's adoption of straight-line revenue model for its tenants suggests that significant portions of rent has been deferred, and will only be collectable in the future[5]. Straight-line rent has rapidly increased as a percentage of rent revenues since 2015.

| Medical Proerties Trust - Straight Line Rent Analysis | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| $000's | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | Q3 2022 |
| Rent-billed | 247,604 | 327,269 | 435,782 | 473,343 | 474,151 | 741,311 | 931,942 | 737,029 |
| Straight-line rent | 23,375 | 41,067 | 65,468 | 74,741 | 110,456 | 158,881 | 241,433 | 146,114 |
| Total rent revenues | 270,979 | 368,336 | 501,250 | 548,084 | 584,607 | 900,192 | 1,173,375 | 883,143 |
| Straight-line as % of total revenues | 8.6% | 11.1% | 13.1% | 13.6% | 18.9% | 17.6% | 20.6% | 16.5% |

*Figure 11 – Viceroy straight-line rent analysis*

This report will show that substantially all MPW's major tenants are in financial distress:

- Material portions of MPW's rent-billed is round tripped through uncommercial loans and equity investments.
- Straight-line revenue appears to be utilized as a method of rent-deferral for distressed tenants, and is likely uncollectable.

While straight-lining of rents is normally a permitted accounting treatment, ASC 842 requires recognition on a cash-basis when collectability is in question:



Under ASC 842, a lessor's pattern of revenue recognition for an operating lease is impacted by its assessment of the collectibility of lease payments. If collectibility is probable at commencement, lease income is generally recognized on an accrual basis (generally on a straight-line basis) over the term of the lease. Otherwise, lease income is limited to the lesser of (1) income that would have been recognized if collectibility was probable, or (2) lease payments collected (i.e., a cash basis).

Collectibility should be reassessed during the lease term. If collectibility is no longer probable (i.e., the lease subsequently becomes "troubled"), and cumulative cash receipts are less than lease income recognized to date, the excess lease income would be reversed.

*Figure 12 – Extract from ASC 842[6]*

Viceroy Research believe that the straight-lining of rent hides the deteriorating underlying financial health of MPW's tenants. Executives are compensated based on normalized FFO, FFO and EBITDA, none of which back-out straight-line rent.

We note that MPW has written off ~$100m in straight line rent since 2015.

---

[5] There are instances where straight-line rent is required to price in minimum yearly rent increases. In MPW's case, straight-line has rapidly increased as a percentage of rent revenues billed since 2015.
[6] https://viewpoint.pwc.com/dt/us/en/pwc/accounting_guides/leases/leases__4_US/chapter_8_other_topi_US/8_9_Lessor-operating-leases_impact-of-collectibility_assessment-_added-November-2019_.html

### 1.3    Capex & suspect round-tripping

This report will highlight that MPW frequently engaged with its own tenants in various types of uncommercial transactions which we believe constitute rent round-tripping. It will also highlight transactions where MPW supports distressed clients on triple-net leases by providing significant support in the form of capex.

Viceroy's adjusted free cash flows attempt to adjust for these transactions, however accounts are incredibly opaque and the business is vast to reliably track all of these transactions.

MPW's "growth strategy" and executive incentive schemes reward "Acquisitions". The exact terms or measurement of "Acquisitions" is undefined, however management has consistently scraped the bottom of the barrel in its search for new properties and new tenants. All these transactions will look good on paper. All these transactions will qualify executives for bonuses. Investors must look beneath the surface.

Broadly, we believe MPW engaged in 4 major types of uncommercial transactions with its clients. Some may overlap:

#### Sale-Leasebacks

Many MPW property acquisitions are on leaseback terms, where the vendor becomes the tenant of the properties. MPW almost exclusively engages in these transactions with counterparties who are in financial ruin.

Despite this, MPW appear to constantly overpay for fire sale assets, sometimes by as much as 10x, which in-turn allow debt-crippled tenants to meet their financial rent obligations as and when they fall due in the short term.

**MPW has engaged in billions of dollars of uncommercial sale-leaseback transactions.**

#### Cash-Giveaways

If overpaying wasn't enough MPW engages in various transactions with its tenants in which millions of dollars are basically given to tenants. Underlying asset values are fractions of the transaction values, and only fractions of the consideration is received by the vendors.

These transactions tend to be international, perhaps as a deterrent for analysts to investigate the matter further. In any case, Viceroy believe they must be scrutinized by MPW's auditors.

**MPW has disappeared hundreds of millions of dollars in what appear to be round-trip transactions.** We believe substantial portions of cash is round-tripped back to MPW.

#### Bailouts

MPW engages in various in run-of-the mill bailout transactions, where it will acquire equity in failing operators in order to mask uncollectable rent and, consequently, avoid impairment of their assets.

**MPW has spent hundreds of millions of dollars bailing out distressed tenants.**

#### Capex assistance & fake developments

MPW's tenants are exclusively on triple-net leases, meaning they are on the hook for real estate taxes, insurance, and maintenance. Despite this, various filings and MPW's financial accounts show substantial cash amounts being devoted to capex, including maintenance, of its properties.

In the instance of Pipeline Health, MPW has devoted tens of millions in capex to maintain and build new facilities as part of Pipeline Health's restructuring plan. **MPW doubles down on losers.**

Various of MPW's ongoing developments appear to be either non-existent or have not broken ground. Despite this, MPW claim to have spent tens of millions of dollars on each development. Site visits of barren construction sites and local news sources suggest this is a lie.

### 1.5    Executive Compensation Incentives

Substantially all executive performance-based incentives are tied to FFO, FFO Growth, EBITDA, and "Acquisitions".



| Base Salary | Based on duties, experience and internal pay equity | Provides a fixed level of cash compensation to attract and retain talented executives |
|---|---|---|
| **Annual Cash Bonus** | 50% Normalized FFO per Share | Aligns our executives with near-term financial goals and strategic priorities, which for 2021 included FFO growth and managing leverage |
| | 20% EBITDA/Interest Expense | |
| | 10% ESG Initiatives | For 2021 as we remain focused on the importance of ESG for both internal and external stakeholders, we continued to include the achievement of ESG initiatives in our annual cash bonus program as standalone assessment criteria |
| | 20% Qualitative Performance | Given that the majority of our compensation is based on pre-established metrics and goals, allows for a subjective assessment of performance on a more holistic basis and considers factors that may not be quantifiable |
| Time-Based Shares | Vest ratably over 3 years | Promotes retention and aligns executives with stockholders |
| **Performance-Based Shares** | 30% FFO per Share Growth | Rewards executives for meaningful FFO per share growth in both the short- and long-term. Achievement of these goals requires significant accretive growth on an annual and cumulative basis |
| | 40% EBITDA | Ensures that executives are focused on profitability and stockholder value creation through sector-leading EBITDA growth in both the short-term and long-term periods |
| | 30% Acquisitions | Motivates our executives to execute our growth strategy that involves making accretive acquisitions to achieve portfolio growth that would not be achieved through a simpler organic growth model focused only on leasing spreads |
| | Absolute and Relative TSR Modifier | Adjusts payouts to align with long-term stockholder returns on both an absolute and relative basis |

*Figure 13 – MPW 2022 Proxy Statement extract*

This compensation structure has fostered and encouraged management's trigger-happy acquisition spree and does not disincentivize bad behavior. It's important to note in analysis that executive incentives are aligned with fraud, bailouts, and creative accounting.

### 1.6    How Does MPW Make Money?

For a long time, the business of being an aggressive roll-up was substantially better than the business of being a health facility landlord. MPW's aggressive roll-up strategy in a strong bull-market has masked the underperformance of its underlying business.

A break-down of MPW's cash flows shows that it has financed both a heavily loss-making operation *and* an aggressive (and unsuccessful) roll-up strategy in a zero-rate environment.

| Medical Properties Trust -Viceroy Cash Flow Analysis $000's | 2015-2019 | 2020 | 2021 | Q3 2022 | Cumulative 2015-Q3 2022 |
|---|---|---|---|---|---|
| **Viceroy Adjusted Free Cash Flow** | **(1,293,687)** | **39,213** | **(512,859)** | **(200,442)** | **(1,967,774)** |
| | | | | | |
| *Remaining cash flows from investing activities* | - | | | | |
| Acquisitions & other related investments** | (10,216,349) | (3,706,064) | (4,317,143) | (441,682) | (18,681,238) |
| Asset sale proceeds, net of costs | 1,907,736 | 94,177 | 246,468 | 2,185,574 | 4,433,955 |
| Principal received on loans receivable, net of investment in loans | 1,825,221 | 1,243,536 | 1,536,776 | (127,405) | 4,478,128 |
| **Viceroy adjusted cash flows from investing activities** | **(6,483,392)** | **(2,368,351)** | **(2,533,899)** | **1,616,487** | **(9,769,155)** |
| *Cash flows from financing activities* | | | | | |
| Net proceeds / (repayment) of term debt & credit facilities | 5,603,012 | 1,578,583 | 2,576,526 | (933,661) | 8,824,460 |
| | | | | | |
| Proceeds from sale of units, net of offering costs | 5,166,274 | 411,101 | 1,051,229 | - | 6,628,604 |
| Distributions paid | (1,503,705) | (567,969) | (643,473) | (524,536) | (3,239,683) |
| Other financing activities | (146,037) | (20,641) | (36,674) | (85,492) | (288,844) |
| **Cash flow from financing activities** | **9,119,544** | **1,401,074** | **2,947,608** | **(1,543,689)** | **11,924,537** |

*Figure 14 – Viceroy Analysis*

## 1.7    LTV Analysis

MPW's Loan-To-Value ration (**LTV**) sits above 50% without any adjustments for:

- Pervasive overpayments of assets & real estate;
- Revenue round-tripping transactions; and
- Straight-line revenue deferrals provisions to distressed clients.

Viceroy's analysis below attempts to account for MPW's accounting gimmicks. We believe MPW's real LTV is closer to 85%.

| Medical Properties Trust - LTV Calc<br>$000's | Q3 2022 | Adjustments | Viceroy LTV |
|---|---|---|---|
| **Net debt** | | | |
| Debt | (9,476,144) | | (9,476,144) |
| Cash & equivalents | 299,171 | | 299,171 |
| Accounts payable & accrued expenses | (569,017) | | (569,017) |
| Interest & rent receivables | 117,555 | | 117,555 |
| Deferred revenue | (18,569) | | (18,569) |
| Obligations to tenants & other lease liabil | (146,438) | | (146,438) |
| **Net debt and obligations** | **(9,793,442)** | **-** | **(9,793,442)** |
| | | | |
| **Assets** | | | |
| Net investment in real estate assets | 14,264,905 | (3,566,226) | 10,698,679 |
| Straight-line rent receivables | 710,082 | (710,082) | - |
| Investments in unconsolidated real estate | 2,850,071 | (2,850,071) | - |
| Other loans | 200,245 | | 200,245 |
| Other assets | 601,387 | | 601,387 |
| **Asset base** | **18,626,690** | **(7,126,379)** | **11,500,311** |
| **LTV** | **52.58%** | | **85.16%** |

*Figure 15 – Viceroy Analysis of MPW's LTV*

It is difficult to make an accurate calculation of MPW's real LTV as financial accounts are opaque, transactions are needlessly complex, and the scope of the business is vast. Viceroy believe MPW's accounts should be subject to greater scrutiny in order to provide investors will a real view of MPW's underlying business and balance sheet.

We note the following in relation to Viceroy's estimate LTV calculations above:

- Viceroy believe MPW's net investment in real estate is overvalued by *at least* 25% ($3.6b). We note that our review of a handful of Steward transactions alone evidence over $1b of overpayments of real estate.
- Viceroy do not believe straight-line rent is collectible given the financial state of MPW's tenants. A review of major tenants show substantially all of them appear to be distressed, and all appear to receive financial assistance from MPW in order to pay rent to MPW. This brings us to our final adjustment:
- Viceroy do not believe MPW's financial investments in unconsolidated operators and in JVs are of any value. We believe these investments largely constitute round-tripping of revenues.

---

*Viceroy estimate MPW's LTV is ~85%.*

---

## 2. The Customers – A Summary

Viceroy conducted background due diligence on dozens of MPW transactions. Substantially all of them looked uncommercial.

Several detailed case studies on various transactions are annexed to this report. Broadly, these case studies comprise most of MPW's major tenants, and are spread across various geographies. Viceroy have identified many further suspicious transactions however we simply do not have the capacity to cover all of them.

A brief overview of each transaction and their relevant Annexure is below:

| Transaction & Annexure | Overview | Financial Impact |
|---|---|---|
| **Wadley Regional Medical Centre** <br> **Annexure 1** | MPW committed $169m to build a Steward facility which. <br><br> Wadley Regional Medical Center and MPW, in its Q3 2022 interim report, said that it had already spent $58m on the development. <br><br> News stories, including a site visit in October 2022, show that the development site does not appear to have broken ground, and does not even have a site office. <br><br> Local news agencies captured video of the site, which shows a sprawling bushland surrounded by temporary blue fencing. | **$58m - missing** |
| **Salt Lake City Portfolio** <br> **Annexure 2** | MPW loaned Steward $1.4b to purchase a Salt Lake City Hospital operator IASIS and their portfolio of 19 hospitals. IASIS owned and operated 17 hospitals. <br><br> A $700m portion of this loan was immediately extinguished in exchange for 9 properties. The second $700m loan was secured against only a further 2, leaving Steward with 7 properties courtesy of MPW at a value of $750m. | **$750m - overpayment** |
| **Massachussetts Portfolio** <br> **Annexure 3** | In October 2016 MPW acquired 9 Massachussetts facilities from Steward: 5 of them outright for 600m, 4 for 600m in mortgage loans and 50m in equity contributions. <br><br> In Q2, Q3 and Q4 2018 MPW extinguished the mortgages on these 4 facilities by taking ownership. Steward's 2018 financials show additional consideratio of $42.8m was made. <br><br> As part of the conversion there also appears to be a ping-pong exchange of the St Joseph Medical Centre which MPW acquired in September 2017. In March 2018 it sold the property to Steward for a $148m mortgage, only to reacquire months later again in Q3 2018 for an extra $15m. | **$57.8m - overpayment** |

| Transaction & Annexure | Overview | Financial Impact |
|---|---|---|
| **Colombia Hospitals**<br>**Annexure 4** | On November 17, 2020, MPW claims to have purchased 3 Colombian hospitals for $135m from local operator National Clinics Colombia an unnamed JV.<br><br>Local filings suggest 2 of the 3 Colombian Hospital properties were sold for only ~$36m, which still represents 2-3x what Steward paid for these properties in preceding years.<br><br>We believe ~$60m of the $135m total consideration for 3 Colombian hospitals is unaccounted for.<br><br>While originally presented as an "investment", this was actaially a mortgage loan against the 3 properties. | **$60m overpayment** |
| **Malta Hospitals**<br>**Annexure 5** | MPW invested $205m for a 49% stake in an unnamed JV with Steward & MPW management. It paid $205m for 3 hospitals worth $27m in Malta formerly operated by a group of businessmen under investigation for corruption.<br><br>Steward reaped a $173m windfall and the $5m difference between MPW's acquisition loan and the price paid to Steward remains unaccounted for. | **$173m overpayment $5m missing** |
| **Investment in Steward**<br>**Annexure 6** | In its 2018 annual report MPW disclosed a 9.9% equity stake in Steward valued at $150m, however as of its 2020 annual report MPW has declined to disclose the value of its stake which remains at 9.9%. This stake appears to be a result of the equity contributions from the Massachusetts and IASIS transactions<br><br>MPW also made a $335m loan to Steward in January 2021 used to redeem a similarly sized loan from Steward's private equity sponsors, Cerberus .<br><br>Cerberus had transferred its controlling stake to Steward management in exchange for a convertible note of unspecified size.  If this $335m was the value of the 90% stake, then it values MPW's 9.9% stake in Steward at ~$36.85m.<br><br>In 2019 MPW disclosed a $44m promissory note from Steward but would not reveal its size until its 2021 filings. The purpose of this note is not stated by MPW. | **$115m - overvaluation $44m - opaque loan** |
| **Prospect**<br>**Annexure 7** | In 2019 MPW entered into a $113m promissory note with Prospect, payable in August 2022 or the sale-leaseback of the properties.<br><br>Rhode-Island regulators approved Prospect's MBO contingent on the removal of the sale-leaseback option, effectively leaving MPW holding the bag. | **$113m unrecoverable** |

| Transaction & Annexure | Overview | Financial Impact |
|---|---|---|
| **Priory**<br>Annexure **8** | MPW financed acquisition of Priory by Waterland Private Equity with a £1,050m loan: £800m netted off against the purchase of 35 Priory properties and £250m acquisition loan against the same properties.<br><br>Priory's seller, Acadia's filings suggest that all 279 of Priory's properties have a combined market value of only £925 million.<br><br>It seems MPW believed the 35 properties were worth £800m. It is absurd to suggest that the remaining Priory business and a further 244 properties were worth only £250m. For MPW's financing to make any sense the entire Priory business less property would be valued at close to zero. | ~$600m - overpayment<br>$? - investment in tenant |
| **Pipeline Health**<br>Annexure **9** | MPW acquired 6 facilities from Pipeline Health for $215m on leaseback terms. Despite this short term liquidity, Pipeline nonetheless filed for bankruptcy.<br><br>Bankruptcy filings show this requires MPW to sink $23.5m into new facilities & capex. Much of this appears to be offset from rent owed by Pipeline health, and will now form part of Lease Base calculations | $215m - payment for hospital with bankrupt tenant<br>$25m - capex investment in bankrupt tenant |

Also annexed to this report are several background checks on the remainder of MPWs largest tenants with whom they do not conduct transactions with (or at least, none that we could easily identify within the swamp of MPW transaction data).

**Steward Health Care Financials - Viceroy Analysis**

| | 2017 | 2018 | 2019 | 2020 | |
|---|---|---|---|---|---|
| Revenues | 3,705,641 | 626,189 | 6,727,521 | 5,413,904 | |
| Gross profit | (321,597) | (269,186) | 125,313 | (439,161) | |
| Gross margin | -8.7% | -43.0% | 1.9% | -8.1% | |
| Net loss | (207,181) | (279,547) | 82,493 | (407,593) | |
| Net margin | -5.6% | -44.6% | 1.2% | -7.5% | |

**Circle Health Holdings Financials - Viceroy Analysis**
(2020 & 2021 figures have removed BMI Healthcare)

| | 2017 | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|---|
| Revenues | 100,882 | 100,728 | 102,894 | 121,147 | 96,526 |
| Gross profit | 29,948 | 29,506 | 30,835 | (66,013) | (119,593) |
| Gross margin | 30% | 29% | 30% | -54% | -124% |
| Net loss | (6,155) | (11,934) | (20,833) | (6,505) | (39,376) |
| Net margin | -6% | -12% | -20% | -5% | -41% |
| Free cash flow | (6,588) | (3,886) | (1,383) | | |

**BMI Healthcare - Viceroy Analysis**

| | 2017 | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|---|
| Revenues | 886,947 | 1,313,265 | 918,149 | 863,729 | 955,116 |
| Gross profit | 323,622 | 456,819 | 357,747 | 278,397 | 325,715 |
| Gross margin | 36% | 35% | 39% | 32% | 34% |
| Net loss | (97,394) | (59,886) | 14,326 | (53,871) | (13,300) |
| Net margin | -11% | -5% | 2% | -6% | -1% |

**Prospect Medical Holdings Financials - Viceroy Analysis**

| | 2017 | 2018 | 2019 | 2020 | |
|---|---|---|---|---|---|
| Revenues | 2,538,695 | 2,766,929 | 2,487,156 | 2,733,388 | |
| Gross profit | 72,220 | (45,858) | 206,445 | (103,314) | |
| Gross margin | 2.8% | -1.7% | 8.3% | -3.8% | |
| Net loss | 34,252 | (244,165) | (137,718) | (99,610) | |
| Net margin | 1.3% | -8.8% | -5.5% | -3.6% | |

**Swiss Healthcare - Viceroy Analysis**

| | 2017 | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|---|
| Revenues | (109,154) | 70,398 | 97,731 | (10,525) | 955,116 |
| Gross profit | (88,869) | (58,625) | 17,134 | (53,771) | 325,715 |
| Gross margin | 81% | -83% | 18% | 511% | 34% |
| Net loss | - | - | - | 1,734 | (13,300) |
| Net margin | 0% | 0% | 0% | -16% | -1% |

# 3. Key Takeaways, Valuation & Credit Risk

- MPW has engaged in billions of dollars of uncommercial transactions with its tenants and their management teams in order to mask a pervasive revenue round-robin scheme and / or theft.
- The value of MPW's assets, as a result of capitalizing these uncommercial transactions, are massively overstated.
- MPW engaged in an aggressive, debt-fuelled roll-up strategy in order to affect these transactions. We believe the true value of MPW's LTV is ~85%, creating enormous credit risk.
- Many of MPW's tenants are severely distressed. This precedes the need to engage in revenue round-robin transactions.
- Financial accounting gimmicks ensure MPW's management are incentivised to continue engaging in uncommercial transactions and possible fraud. These align with management incentive schemes.

## 3.1   Valuation

In light of the above, it is incredibly difficult to assign a valuation to MPW as we believe investors are working with false information. We believe MPW presents enormous short-term downside. It is also incredibly difficult to for management to justify payment of dividends given its precarious financial position and incredible cash-burning furnace.

Viceroy have nonetheless recreated the copy-paste sell-side future FFO valuation model with some adjustments which we believe begin to illustrate the value-destructive nature of MPW's actions. We reiterate that these valuations are subject to management figures which we believe are incorrect and require audit scrutiny.

| Medical Properties Trust - Viceroy Valuation $000's | | Notes |
|---|---|---|
| Consensus 2023 FFO | 1.78 | |
| Straight-line rent reduction | (0.45) | 25% off FFO |
| Round Trip Estimate | (0.89) | 50% off FFO |
| **Viceroy Adjusted FFO** | **0.45** | |

*Figure 16 – Medical Properties Trust Viceroy Valuation*

Viceroy's adjusted FFO per share removes the impact of straight-line rent (which has historically equated to ~25% of FFO). It also attempts to remove the impact of MPW's round-robin transactions (50% is generous to MPW[7]).

| Medical Properties Trust - Viceroy Valuation | | Valuation | |
|---|---|---|---|
| Range | Multiple | ($/share) | Downside |
| Bullish | 10.00 | 4.45 | **-67%** |
| Mid | 8.75 | 3.89 | **-71%** |
| Bearish | 7.50 | 3.34 | **-75%** |
| Stock Price @ 24 Jan 2023 | 13.48 | | |
| Current Multiple on consensus 2023 FFO | 7.57 | | |

*Figure 17 – Medical Properties Trust Viceroy Valuation*

Around current forwards FFO multiples, we deduce a short-term downside of ~67% - 75%.

Viceroy will consider a review this price target after a thorough investigation of MPW's dealings, specifically surrounding the quantum uncommercial dealings.

It is important to note that this valuation does not consider that MPW is subject to immense credit risk. It has played an aggressive, debt-fuelled roll-up strategy in a zero-interest bull-market. It has had the best economic conditions of all time to fester into one the largest financial disasters to plague the USA – and indeed global – medical industry.

Over the last 6 months, this environment has changed drastically. MPW is overburdened. The fat lady is about to sing. Please take your seats.

---

[7] The quantum of round-robin transactions typically exceeds FFO. We believe a 50% haircut is generous.

## 3.2    Credit Risk

In December 2022, S&P placed MPW on downgrade watch. It already sits below investment grade at BB+[8]. S&P notes MPW's enormous exposure to Steward as the main reason for concern.

Medical Properties Trust Ratings Placed
On Watch Negative On Increased
Exposure To Pressured Tenant Steward
Health Care

*Figure 18 – Medical Properties Trust Ratings Placed On Watch Negative*

We believe S&P will be subject to downgrades following investigations into round-tripping transactions with many of is tenants, and an investigation into their wellbeing. This will deteriorate MPW's ability to obtain cheap financing.

| Medical Proerties Trust - Debt Overview | | | | | | |
|---|---|---|---|---|---|---|
| Issuer | ISIN | Maturity Date | Security Type | Coupon Rate (%) | Currency | $000's ** |
| MPT Operating Partnership, L.P. | XS2390849318 | 15/10/2026 | Corporate Debentures | 0.993 | EUR | 543,478 |
| MPT Operating Partnership, L.P. | US55342UAH77 | 15/10/2027 | Corporate Debentures | 5 | USD | 1,400,000 |
| MPT Operating Partnership, L.P. | XS2085724073 | 5/12/2023 | Foreign Currency Debenture | 2.55 | GBP | 494,945 |
| Medical Properties Trust, Inc. | | 1/02/2024 | Revolving Credit | Variable | USD | 920,245 |
| Medical Properties Trust, Inc. | | 1/02/2026 | Term Loans | Variable | USD | 200,000 |
| MPT Operating Partnership, L.P. | US55342UAM62 | 15/03/2031 | Corporate Debentures | 3.5 | USD | 1,300,000 |
| MPT Operating Partnership, L.P. | XS1523028436 | 24/03/2025 | Foreign Currency Debenture | 3.325 | EUR | 543,478 |
| MPT Operating Partnership, L.P. | XS2322419776 | 24/03/2026 | Foreign Currency Debenture | 2.5 | GBP | 618,682 |
| MPT Operating Partnership, L.P. | XS2322420352 | 24/04/2030 | Corporate Debentures | 3.375 | GBP | 433,077 |
| MPT Operating Partnership, L.P. | XS2085724156 | 5/06/2028 | Foreign Currency Debenture | 3.692 | GBP | 742,418 |
| MPT Operating Partnership, L.P. | US55342UAG94 | 1/08/2026 | Corporate Debentures | 5.25 | USD | 500,000 |
| MPT Operating Partnership, L.P. | US55342UAJ34 | 1/08/2029 | Corporate Debentures | 4.625 | USD | 900,000 |
| **Native currency | | | | | | |

*Figure 19 – MPW Outstanding Maturities[9]*

We also note that, per Section XX of this report, we believe MPW's LTV is closer to 85%. Even without adjustments, MPW presents an LTV of ~53%. This is extremely high. Again, bondholders will be incredibly displeased if MPW continues to pay dividends given these findings.

| Medical Proerties Trust - LTV Calc | | | |
|---|---|---|---|
| $000's | Q3 2022 | Adjustments | Viceroy LTV |
| **Net debt** | | | |
| Debt | (9,476,144) | | (9,476,144) |
| Cash & equivalents | 299,171 | | 299,171 |
| Accounts payavle & accrued expenses | (569,017) | | (569,017) |
| Interest & rent receivables | 117,555 | | 117,555 |
| Deferred revenue | (18,569) | | (18,569) |
| Obligations to tenants & other lease liabilities | (146,438) | | (146,438) |
| **Normalized FFO - Management** | **(9,793,442)** | **-** | **(9,793,442)** |
| **Assets** | | | |
| Net Investment in real estate assets | 14,264,905 | (3,566,226) | 10,698,679 |
| Straight-line rent receivables | 710,082 | (710,082) | - |
| Investments in unconsolidated real estate operating entities / JVs | 2,850,071 | (2,850,071) | - |
| Other loans | 200,245 | | 200,245 |
| Other assets*** | 601,387 | | 601,387 |
| **Asset base** | **18,626,690** | **(7,126,379)** | **11,500,311** |
| **LTV** | **52.58%** | | **85.16%** |

*Figure 20 – Viceroy Analysis*

We believe MPW poses serious credit risks to its bondholders, who should scrutinize MPW's various acquisitions and ascertain true valuations for its property portfolio in order to properly account for:

- Pervasive overpayments of assets & real estate;
- Revenue round-tripping transactions; and
- Straight-line revenue deferrals provisions to distressed clients.

---

[8] https://disclosure.spglobal.com/ratings/en/regulatory/article/-/view/type/HTML/id/2932303
[9] S&P Market Intelligence.

## Annexure 1 – Wadley Regional Medical Centre - Texas

MPW committed $169m to build a Steward facility which, according to MPW, commenced works in Q4 2021



estate gain of nearly $44 million;
- **Commenced in the fourth quarter** the construction of a replacement hospital for Steward Health Care System's ("Steward") **Wadley Regional Medical Center** in *Texarkana, TX* for a total expected investment of roughly $169 million;

*Figure 21 – MPW Q4 2021 announcement*

Wadley Regional Medical Center and MPW, in its Q3 2022 interim report, said that it had already spent $58m on the development.



**SUMMARY OF CURRENT DEVELOPMENT PROJECTS AS OF SEPTEMBER 30, 2022**
*(Amounts in thousands)*

| Operator | Location | Commitment | Costs Incurred as of September 30, 2022 | Estimated Commencement Date |
|---|---|---|---|---|
| Steward Health Care | Texas | $ 169,408 | $ 57,911 | Q4 2025 |

*Figure 22 – MPW Q3 2022 Supplemental Information[10]*

However, a news story from late October shows that the development site does not appear to have broken ground and does not even have a site office.

Local news agencies captured video of the site, which shows a sprawling bushland surrounded by temporary blue fencing.

*Figure xx – Screen Capture – KSLA News 12 site visit to Wadley Regional Medical Centre[11]*

The latest news was in January 2023 after Steward replaced its general contractor Hoar with Robins & Morton. The completion date is now expected to be complete in late 2025, instead of its original date of Summer 2024[12,13,14].

---

**What has the $58m been spent on?**

---

[10] https://www.medicalpropertiestrust.com/supplementals-reports
[11] https://www.ksla.com/2022/10/20/construction-apparently-paused-texarkana-hospital/
[12] https://www.wadleyhealth.org/wadley-regional-northwest-texarkana
[13] MPW Q3 2022 Earnings Call
[14] https://www.1017hotfm.com/news/news-of-the-ark-la-tex/steward-health-care-robins-and-morton-sign-for-construction-of-wadley-facility/


## Annexure 2 – Massachusetts

In October 2016 MPW acquired 9 Massachusetts facilities from Steward: 5 of them outright for 600m, 4 for 600m in mortgage loans and 50m in equity contributions.

> On October 3, 2016, we closed on a portfolio of nine acute care hospitals in Massachusetts operated by Steward. Our investment in the portfolio includes the acquisition of five hospitals for $600 million, the making of
>
> $600 million in mortgage loans on four facilities, and a $50 million minority equity contribution in Steward, for a combined investment of $1.25 billion. The five facilities acquired are being leased to Steward under a master lease agreement that has a 15-year term with three 5-year extension options, plus annual inflation-based escalators. The terms of the mortgage loan are substantially similar to the master lease.

*Figure 23 – MPW 2017 Annual Report*

### Uncommercial fair value mark-ups

In Q2, Q3 and Q4 2018 MPW extinguished the mortgages on the 4 facilities by taking ownership, along with an unnamed cash consideration[15]. Steward's 2018 financials show this was $42.8m.

> During 2018, we acquired the fee simple real estate of five general acute care hospitals, four of which are located in Massachusetts and one located in Texas, from Steward Health Care System LLC ("Steward") in exchange for the reduction of $764.4 million of mortgage loans made to Steward in October 2016 and March 2018, along with additional cash consideration. These properties are being leased to Steward pursuant to the original master lease from October 2016 that had an initial 15-year term with three five-year extension options, plus CPI increases.

> In 2018, the real property associated with the 2016 Mortgages was sold to MPT in exchange for $42.8 million in cash and the repayment of the 2016 Mortgages. The system simultaneously entered into leases with MPT under the MPT Master Lease Agreement for the four hospital campuses that were sold. As a result, approximately $3.5 million of previously capitalized debt issuance costs were written off as additional interest expense in 2018.

*Figures 24 & 25 – MPW 2018 Annual Report & Steward 2018 Annual Report*

### Ping Pong St Joseph

As part of the conversion there also appears to be a ping-pong exchange of the St Joseph Medical Centre which MPW acquired in September 2017. In March 2018 it sold the property to Steward for a $148m mortgage, only to reacquire months later again in Q3 2018. We believe this was done intentionally to muddy the waters.

> *Disposals*
>
> On March 1, 2018, we sold the real estate of St. Joseph Medical Center in Houston, Texas, for approximately $148 million to Steward Health Care System LLC ("Steward"). In return, we received a mortgage loan equal to the purchase price, with such loan secured by the underlying real estate. The mortgage loan has terms consistent with the other mortgage loans in the Steward portfolio. This transaction resulted in a gain of $1.5 million, offset by a $1.7 million non-cash charge to revenue to write-off related straight-line rent receivables on this property.

*Figure 26 – MPW 2018 Annual Report*

As part of the IASIS deal in September 2017 in which St Joseph's was acquired, $15m of additional cash was paid to Steward by MPW. This is recognized in Steward's accounts as an "additional to the loan bases for the 2016 mortgages" and the $115m (not the previously stated $100m) in cash consideration of the IASIS merger.

> On September 29, 2017, the System completed the IASIS Merger by acquiring all of the outstanding shares of IASIS Healthcare Corporation.
>
> Cash provided by Steward totaled $419.2 million. Additional cash consideration received from by MPT approximated $115 million toward the merger partially in exchange for equity interests in Steward.

> Massachusetts, among other items. On September 29, 2017, the date of the IASIS Merger, Steward entered into a Joinder and Amendment to Real Estate Loan Agreement (the Mortgage Joinder) that amended the 2016 Mortgages. As a result of this Mortgage Joinder, additional loan proceeds totaling $700 million were provided simultaneously with the IASIS Merger (the 2017 Mortgages) to retire outstanding debt of IASIS. Additionally, $15 million was added to the loan bases for the 2016 Mortgages. The 2017 Mortgages were secured by the real property associated with hospital

*Figures 27 & 28 – MPW 2018 Annual Report*

The St Joseph ping-pong transaction allowed MPW to funnel an extra $15m in cash to Steward hence the total mortgage loan reduction of $764.4m: $600m for the 2016 mortgages, $148m for St Joseph's and the leftover $15m and change.

---

[15] $14.4m disclosed in Q2, the amount is unspecified in later disclosures



## Annexure 3 – Salt Lake City Portfolio

In 2017, MPW loaned Steward $1.4b to purchase a Salt Lake City Hospital operator IASIS and their portfolio of 19 hospitals. It also made a further $100m minority interest equity contribution in the transaction. IASIS owned and operated 17 hospitals.

> *Steward Transactions*
>
> On September 29, 2017, we acquired, from IASIS Healthcare LLC ("IASIS"), a portfolio of ten acute care hospitals and one behavioral health facility, along with ancillary land and buildings that are located in Arizona, Utah, Texas, and Arkansas. The portfolio is now operated by Steward which separately completed its acquisition of the operations of IASIS on September 29, 2017. Our investment in the portfolio includes the acquisition of eight acute care hospitals and one behavioral health facility for approximately $700 million, the making of $700 million in mortgage loans on two acute care hospitals, and a $100 million minority equity contribution in Steward, for a combined investment of approximately $1.5 billion.

*Figure 29 – MPW 2017 Annual Report*

A $700m portion of this loan was immediately extinguished in exchange for 9 properties.

The remaining $700m was a mortgage loan against 2 unnamed properties: Jordan Valley Medical Center and Davis Hospital & Medical Center.

> On July 8, 2020, we acquired the fee simple real estate of two general acute care hospitals located in the Salt Lake City, Utah area, Davis Hospital & Medical Center and Jordan Valley Medical Center, in exchange for the reduction of the mortgage loans made to Steward for such properties and additional cash consideration of $200 million based on their relative fair value. The approximate $950 million investment in these two facilities is now subject to the Steward master lease that has an initial fixed term ending in October 2031 with multiple extension options and annual escalation provisions.
>
> *Real Estate Loan Agreement and Sale of Property*
>
> At December 31, 2019, the System held mortgage agreements with MPT related to the real property of two acute care hospital campuses. On July 2, 2020, the System sold the real property of the two acute care hospital campuses to a joint venture, of which MPT is the majority owner. The System subsequently leased the property from the joint venture. Due to specified forms of continuing involvement, under the provisions of Accounting Standards Codification Topic 840-40, Leases – Sale-Leaseback Transactions, the System is required to continue to capitalize the real estate and to recognize an obligation for the sales proceeds received. The System recognized an initial obligation of $937.2 million, which included the former mortgage obligations of $737.2 million as well as $200.0 million in sale proceeds. The obligation will be amortized

*Figures 30 & 31 – MPW 2020 Annual Report and Steward Health Care 2019 Annual Report*

On July 8, 2020, MPW acquired the Jordan Valley Medical Center and Davis Hospital & Medical Center in exchange for a total extinguishment of the loan and an additional $200m cash payment it labelled a fair value increase.

Jordan Valley Medical Centre and Davis Hospital & Medical Centre were certainly not the largest hospitals in this portfolio.

| Hospital | Location | Licensed # of Beds |
|---|---|---|
| Davis Hospital and Medical Center | Layton, UT | 220 |
| Jordan Valley Medical Center | West Jordan, UT | 172 |
| Jordan Valley Medical Center—West | West Valley, UT | 102 |
| Mountain Point Medical Center | Lehi, UT | 40 |
| Salt Lake Regional Medical Center | Salt Lake City, UT | 158 |
| Mountain Vista Medical Center | Mesa, AZ | 178 |
| St. Luke's Medical Center | Phoenix, AZ | 200 |
| St. Luke's Behavioral Health Center | Phoenix, AZ | 124 |
| Tempe St. Luke's Hospital | Phoenix, AZ | 87 |
| Odessa Regional Medical Center | Odessa, TX | 225 |
| Southwest General Hospital | San Antonio, TX | 327 |
| St. Joseph Medical Center | Houston, TX | 790 |
| The Medical Center of Southeast Texas | Port Arthur, TX | 199 |
| The Medical Center of Southeast Texas—Victory | Beaumont, TX | 17 |
| Wadley Regional Medical Center | Texarkana, TX | 370 |
| Glenwood Regional Medical Center | West Monroe, LA | 278 |
| Wadley Regional Medical Center | Hope, AR | 79 |
| Pikes Peak Regional Hospital | Woodland Park, CO | 15 |
| | | 3,581 |

*Figure 32 – Steward Health Care Annual Report 2018*

The first $700m loan was exchanged for 9 properties, and the second $700m loan was secured against a further 2, but Iasis owned and operated 18 facilities in total at the time of acqusition. Steward basically received 7 of them for free.

> *Steward Transactions*
>
> On September 29, 2017, we acquired, from IASIS Healthcare LLC ("IASIS"), a portfolio of ten acute care hospitals and one behavioral health facility, along with ancillary land and buildings that are located in Arizona, Utah, Texas, and Arkansas. The portfolio is now operated by Steward which separately completed its acquisition of the operations of IASIS on September 29, 2017. Our investment in the portfolio includes the acquisition of eight acute care hospitals and one behavioral health facility for approximately $700 million, the making of $700 million in mortgage loans on two acute care hospitals, and a $100 million minority equity contribution in Steward, for a combined investment of approximately $1.5 billion.

> At the time of the completion of the IASIS Merger, IASIS owned and operated seventeen hospitals, one behavioral health hospital, and several affiliated outpatient service facilities and physician clinics. The hospitals acquired include:

*Figures 33 & 34 – MPW Annual Report 2017 & Steward Annual Report 2017*

On a back-envelope, per-beds basis, we estimate that the purchase price of Jordan Valley Medical Centre and Davis Hospital & Medical Centre was ~$196m[16]. Given Steward is running its hospitals business to the ground, we do not believe any fair value adjustment is warranted. We believe MPW must take a $700m write off on this transaction alone representing the $950 mortgage and payment less a conservative $250m for the value of Jordan Valley and Davis.

The pattern in the Masschusetts portfolio of increasing loans continued with the Salt Lake City portfolio with Steward adding a further $27m in Q4 2018.

> 2016 Mortgages. The 2017 Mortgages were secured by the real property associated with hospital campuses located in Utah acquired as part of the IASIS Merger. On November 30, 2018, Steward entered into amendments to the 2017 Mortgages increasing the principal amount of these mortgages by $27 million. The 2017 Mortgages bear the same interest rate as the 2016 Mortgages of 7.5% for 2018. All payment terms and the maturity date of October 31, 2031 are identical to the 2016 Mortgages as a result of the Mortgage Joinder.

*Figure 35 – Steward 2018 Annual Report*

The FTC has blocked Steward's sale of operations in Utah to HCA Healthcare on the grounds of maintaining competition in the area[17].

---

[16] Iasis PPE balance of $1.79b, portfolio beds of 3,581

[17] https://www.ftc.gov/news-events/news/press-releases/2022/06/ftc-sues-block-merger-between-utah-healthcare-rivals-hca-healthcare-steward-health-care-system



## Annexure 4 – Colombia

Colombia is a textbook example of MPW's opacity in its dealings with Steward.

On November 17, 2020, MPW claims to have invested in 3 Colombian hospitals for $135m from local operator National Clinics Colombia (NCC) through an unnamed JV[18]. The hospitals acquired were Clinica Centenario, Clinica Los Nevados and Clinica San Rafael.

- In reality the JV Cordiant Health Care acquired the first 2 hospitals and the only the real estate to San Rafael, entering into a collaboration agreement with San Rafael[19].

> On November 17, 2020, we invested in the real estate of three general acute care hospitals in Colombia for approximately $135 million. These properties will be operated by the new international joint venture discussed below.

*Figure 36 – MPW 2020 Annual Report*

Local filings show Cordiant paid NCC COP134.93b ($39.45m) for NCC's operations but notes that NCC did not own the real estate to San Rafael. NCC had engaged in sale-and-leaseback transaction with GSRVC for its San Rafael hospital for in 2016[20]. The 2019 sale-leaseback liability on NCC's book amounts to COP112b ($34.15m) and the JV would have had to purchase this property separately.

### 1.2 Acuerdo de Venta de Acciones

El 30 de Julio 2020 se firmó el acuerdo de Compraventa "Share Purchase Agreement" entre National Clinics Colombia S.A.S (NCC) como vendedor y Cordiant Health Services Colombia S.A.S como comprador; la transacción contempló: (i) la venta de los intangibles poseídos por la sociedad (derecho de nombrar miembros de Junta Directiva del Hospital Universitario Clínica San Rafael - HUSCR y cesión del acuerdo de colaboración entre National Clinics Colombia y el Hospital Universitario Clínica San Rafael) por $123,438,780 y (ii) la venta por parte de NCC del 100% de las acciones de Capital que se poseían en National Clinics Centenario S.A.S. y National Clinics Nevados S.A.S, por $11,498,586.

Adicionalmente los inmuebles donde opera National Clinics Centenario, National Clinics Nevados y el Hospital Universitario Clínica San Rafael debían ser parte de la transacción, aunque NCC no fuera dueño de los inmuebles. La venta de estos inmuebles debía hacerse de manera simultánea a la venta de los activos de NCC.

*On July 30, 2020, the Share Purchase Agreement was signed between National Clinics Colombia S.A.S (NCC) as seller and Cordiant Health Services Colombia S.A.S as buyer; The transaction contemplates: (i) the sale of intangible assets owned by the company (right to appoint members of the Board of Directors of the Hospital Universitario Clínica San Rafael - HUSCR and assignment of the collaboration agreement between National Clinics Colombia and the Hospital Universitario Clínica San Rafael) for $123,438,780 and (ii) the sale by NCC of 100% of the Capital shares held in National Clinics Centenario S.A.S. and National Clinics Nevados S.A.S, for $11,498,586.*
*Additionally, the properties where National Clinics Centenario, National Clinics Nevados and Hospital Universitario Clínica San Rafael operate were to be part of the transaction, **even though NCC was not the owner of the properties**. The sale of these properties was to be done simultaneously with the sale of NCC's assets.*

*Figure 37 & Tramslation– National Clinics Colombia Annual Report 2020 & Translation[21]*

Local news reports show that one of the hospitals, Los Nevados, was severely damaged in an earthquake and needed extensive repairs. The hospital appears to remain closed according to google reviews and local press and Steward Colombia's page on Los Nevados is "under construction"[22].

MPW's $135m investment was actually a $135m mortgage loan on the properties[23]. These details raise the question: what was the $135m spent on? This transaction MUST be scrutinized by investors and regulators:

- NCC filings show its operations, and two Colombian hospital properties were sold for only ~$40m.
- We believe a sale of San Rafael for the remaining $95m is unlikely considering it would constitute a 2.8x in increase in value in 4 years during a weakening exchange rate.
- The ownership structure of the Colombian hospitals suggest it is owned and/or controlled by Steward and/or its executives, not by MPW.

We believe a write-off of ~$60m is required for this transaction alone ($135 less $40m for NCC and $35m from San Rafael).

---

[18] https://www.toprankedlegal.com/press-release/medical-properties-trust-and-steward-health-care-to-enter-into-the-colombian-health-care-market-with-the-acquisition-of-clinics-operated-by-national-clinics/
[19] https://www.beckershospitalreview.com/hospital-transactions-and-valuation/steward-acquires-3-hospitals-in-colombia.html
[20] https://www.prnewswire.com/news-releases/rizk-ventures-announces-healthcare-real-estate-sale-leaseback-transaction-of-san-rafael-hospital-in-bogota-colombia-300286010.html
[21] Emphasis ours, all figures in 000's Colombian pesos
[22] https://forbes.co/2020/11/25/negocios/el-millonario-plan-de-steward-health-care-en-colombia-tras-la-compra-de-tres-hospitales/
[23] MPW 2020 Annual Report pg 116

## Annexure 5 – Malta

In Q2 2020, MPW invested $205m for a 49% stake in an unnamed JV with Steward and MPW management, paying $205m for assets worth $27m and funneling $173m of cash into Steward. The assets purchased were 3 hospitals in Malta formerly operated by a group of businessmen under investigation for corruption.

> **(6)  Related Party Transaction**
> On May 11, 2020, there was a related party transaction involving Steward Health Care International Holdings Ltd ("Steward International"), the System's international operations. Steward International was transferred to a company owned by certain of the System's management equity holders and Medical Properties Trust, Inc. (MPT). The System received $200.0 million in cash for the sale of Steward International. Total assets sold by the System were approximately $27.0 million, resulting in a net cash contribution from the management equity holders of $173.0 million to the System. The transaction has been accounted for as a related party transaction and is shown as a contribution to equity on the accompanying consolidated statement of changes in members' deficit of $130.5 million after taking into account the tax impact of the contribution.

*Figure 38 – Steward Health Care 2020 Annual Report*

MPW were vague about the deal and for good reason: the hospitals purchased in Malta were the Vitals Global Healthcare group of hospitals in Malta purchased by Steward in 2017[24].

- Vitals sold their concession to Steward for a nominal €1 after paying out huge bonuses to executives and doing nothing to develop the hospitals, the entire premise of the concession[25]. Former Vital's CEO Armin Ernst was found to have worked at both Steward and Vitals at the time the sale was being negotiated[26] with Malta's Health Minister Chris Fearne stating it was Ernst's idea that Steward purchase the concession[27].
- Vitals had no experience in healthcare, but was awarded an €7b, 30-year concession to operate the Gozo, St Luke, and Karin Grech hospitals in 2015 before going bankrupt in 18 months after taking €51m of Maltese taxpayer's money and €55m in debt.
- Steward International's business development director, Asad Ali, was involved in the tender from the outset. Ali was a shareholder of Pivot Holdings signatory to the original MOU in October 2014. Former Maltese government officials are under investigation in the matter. Shaukat Ali Abdul Gafoor, a relation of Asad, has continued work on behalf of Steward and is also alleged to be another member of the Vitals organization.
- Steward has failed to meet its obligations and is now attempting to renegotiate with the Maltese government. Reporting shows the hospitals in an advanced state of disrepair with Steward claiming that until its agreements are renegotiated, no further works will be done[28,29].

A full summary of the Vitals saga is beyond the scope of this report. The Shift News has a complete summary of the affair at the link below[30].

> MPT closed in mid-May on a $205 million investment to own 49% of a joint venture with Steward CEO and Founder Dr. Ralph de la Torre and members of his management team organized to invest in select international hospitals. The distinct entity simultaneously purchased from Steward the rights and existing assets related to all present and future international opportunities previously owned by Steward for strategic, regulatory, and risk management purposes. In a transaction expected to close in the fourth quarter, MPT expects to invest $100 million in a portfolio of three hospitals in underserved areas of Colombia to be operated by the new joint venture.

*Figure 39 – Medical Properties Trust, Inc. Reports Second Quarter Results*

In summary, MPW paid $205m to a JV owned by MPW management, Steward Management and MPW. Of this, $200m was paid to acquire Steward International with total assets of $27m, mostly 3 controversy-laden hospitals in a politically charged setting. Steward reaped a $173m windfall and the $5m difference between MPW's acquisition loan and the price paid to Steward remains unaccounted for.

[24] https://www.maltatoday.com.mt/news/national/83233/vitals_selling_malta_hospitals_concession_american_steward_healthcare#.YS3rAI4zaUk

[25] https://www.maltatoday.com.mt/news/national/100594/vitals_global_healthcare_boss_ram_tumuluri_paid_himself_5_million_bonus#.YP5w_Y4zaUk

[26] https://timesofmalta.com/articles/view/vitals-ceo-profile-says-he-worked-simultaneously-for-new-concession.666264

[27] https://timesofmalta.com/articles/view/ex-vitals-ceo-is-now-president-of-steward.667175

[28] https://theshiftnews.com/2022/07/04/in-pictures-the-hospitals-managed-by-steward-healthcare-from-bad-to-worse/

[29] https://theshiftnews.com/2022/07/22/while-maltas-hospitals-deteriorate-steward-healthcare-insists-on-renegotiation-of-concession-terms/

[30] https://theshiftnews.com/2019/10/24/the-big-pay-off-a-key-hidden-investor-in-vitals-global-healthcare/

## Annexure 6 – Investment in Steward

MPW has also directly invested in Steward.

In its 2018 annual report MPW disclosed a 9.9% equity stake in Steward valued at $150m, however as of its 2020 annual report MPW has declined to disclose the value of its stake which remains at 9.9%. This stake appears to be a result of the equity contributions from the Massachusetts and IASIS transactions.

the master leased properties, cross default provisions for the leases, and a right of first refusal for the repurchase of the leased properties. The master loan agreement has independent extension options for each property and does not provide comparable cross default provisions. At December 31, 2018, we hold a 9.9% equity investment in Steward for $150 million.

opportunities for participation in the value of Steward's growth. All of the proceeds from this loan were used to redeem a similarly sized convertible loan from Steward's former private equity sponsor. Finally, we hold a 9.9% equity investment in Steward.

*Figures 40 & 41 – MPW 2018 & 2021 Annual Reports, respectively*

MPW also made a $335m loan to Steward in January 2021 used to redeem a similarly sized loan from Steward's private equity sponsors, Cerberus[31].

On January 8, 2021, we made a $ 335 million loan to affiliates of Steward, all of the proceeds of which were used to redeem a similarly sized convertible loan from Steward's former private equity sponsor.

*Figure 42 – MPW 2021 Annual Financial Statement Extract*

Cerberus had transferred its controlling stake to Steward management in exchange for a convertible note of unspecified size[32,33]. If this $335m was the value of the 90% stake, then it values MPW's 9.9% stake in Steward at ~$36.85m.

In 2019 MPW disclosed a $44m promissory note from Steward but would not reveal its size until its 2021 filings. The purpose of this note is not stated by MPW.

or none of the master leased properties and a right of first refusal for the repurchase of the leased properties. In addition to the master lease, we hold a promissory note which consists of three tranches with varying terms and a 9.9% equity investment in Steward.

*Figure 43 – MPW 2019 Annual Financial Statement Extract*

---

[31] Q1 2022 Page 16
[32] https://www.bizjournals.com/boston/news/2020/06/02/steward-buys-out-cerberus-capital.html
[33] https://www.wsj.com/articles/pe-backed-hospital-chain-got-help-from-major-landlord-as-losses-mounted-11624014000

## Annexure 7 – Prospect Transaction(s)

Prospect is a private-equity fueled roll-up of hospitals which engaged MPW for large-scale sale and leaseback transaction. Management has recently been the subject of scrutiny for the state it has left Prospect prior to engaging in a minority interest MBO.

This is because Prospect was borderline bankrupt and had landed itself in this position by selling off assets to MPW and paying its shareholders enormous dividends with the proceeds.

### Background

A Prospect investor consortium are proposing to sell their combined 66% stake to its remaining 34% owners, Samuel Lee and David Topper, for $11.9 million. As this represents a change of control, Lee and Topper have to seek approval from the various states where Prospect has hospital facilities. The last state where approval was pending was Rhode Island, where the MBO faced concerted opposition.

This is because Prospect was borderline bankrupt and had landed itself in this position by selling off assets to MPW and paying its shareholders enormous dividends at the expense of the state.

> Our investigation revealed a company whose principals and investors have issued millions of dollars in dividends from a business responsible for the safety-net hospitals and services they own, which has translated into debt held by the entire system, such that liabilities now exceed assets by over $1 billion. In an ever-changing healthcare market, this debt-to-asset ratio raises a concern for the Attorney General that the national company that owns these Rhode Island Hospitals can become unstable, disrupting and even threatening Rhode Island's third largest hospital system. In other words, PMH is a system that is at risk of developing a lack of financial ability to respond to the volatility of the healthcare market, putting every hospital in its system including our Rhode Island Hospitals at risk of reduction in services, sale, or closure.

*Figure 44 – Statement from Rhode Island Attorney General[34]*

There are a number of documents – particularly those relating to MPW's transactions with Prospect in 2019 – that were agreed by the State of Rhode Island Attorney General to be commercially confidential. These documents have not been publicized. However, there is a

- a list of the confidential documents
- a list of questions asked by the RIAG following a review of the confidential documents; and
- a report by RIDH's financial adviser PYA, who had access to the confidential documents

---

## Leaseback Transaction

In August 2019, Prospect closed a $1.4b sale-leaseback transaction with MPW. As a result of the sale lease back transaction, Prospect actually has higher expenses from rent versus its previous debt service, which crippled the business[35].

- On August 23, 2019, PMH closed a series of transactions with MPT, a publicly traded REIT, whereby PMH sold to MPT hospital real estate assets in California, Connecticut, and Pennsylvania for an aggregate purchase price approximating $1.386 billion[7]. Proceeds from the sale were utilized, in part, to extinguish the long-term debt assumed in FY2018. Concurrent with the real estate transactions, PMH entered into two master lease agreements whereby the assets sold to MPT were leased back for an initial 15-year term with options to extend. These long-term lease arrangements are recorded on the PMH balance sheet as liabilities. No Rhode Island facilities were included in the MPT sale/leaseback transactions. In addition to this sale/leaseback transaction and other transactions between MPT and PMH involving PMH real property assets, MPT and PMH entered into the aforementioned TRS Note which can be satisfied, among other alternatives, by entering into a sales/leaseback transaction for the PCC facilities.

*Figure 45 – PYA Financial Analysis of Prospect*

Substantial portions of the proceeds from this transaction were used to pay Prospect shareholders dividends. Prospect's leverage position. Leverage actually *increased* in the year of the transaction.

The Rhode Island Attorney General's investigation of Prospect's financials show clear signs of distress including a negative equity value of >$1b, negative operating income and negative free cash flows (ex-sale of assets).



| Table 5 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **(Dollars in Thousands)** | **FY2017** | **FY2018** | **FY2019** | **FY2020** | **(Dollars in Thousands)** | **FY2017** | **FY2018** | **FY2019** | **FY2020** |
| **Income Statement** | | | | | **Cash Flow Statement** | | | | |
| Total Net Revenue | $2,914,497 | $2,893,888 | $2,849,198 | $2,733,388 | Cash from Operating Activities | $50,239 | $(5,962) | $(71,448) | $412,236 |
| Total Operating Expenses | 2,847,665 | 2,888,619 | 2,853,052 | 2,836,702 | Cash from Investing Activities | (90,461) | (108,799) | (65,587) | (4,670) |
| Net Operating Income (Loss) | | | | | Cash from Financing Activities | 37,744 | 95,346 | 181,432 | (72,833) |
| before grants and investments | 66,832 | 5,269 | (3,854) | (103,314) | | | | | |
| Net Income (Loss) | 34,252 | (244,165) | (297,736) | (99,610) | | | | | |
| EBITDA | 212,344 | 36,512 | (48,613) | 89,762 | **Liquidity** | | | | |
| | | | | | Total Cash | 27,109 | 7,694 | 52,091 | 386,824 |
| **Balance Sheet** | | | | | Available Line of Credit | 29,900 | 41,000 | 175,600 | 210,800 |
| Total Assets | 1,862,400 | 1,818,633 | 1,866,367 | 2,042,389 | | | | | |
| Total Liabilities | 1,795,084 | 2,440,982 | 2,836,427 | 3,102,004 | | | | | |
| Total Stockholders Equity (Deficit) | 67,316 | (622,349) | (970,060) | (1,059,615) | | | | | |
| Net Working Capital Surplus (Deficit) | 27,932 | (136,886) | 58,335 | 130,032 | | | | | |

*Figure 46 – PYA Financial Analysis of Prospect[36]*

MPW also held a promissory note for $113m secured against Prospect's Rhode Island properties. The note's maturity was set for August 2022 or the sale-leaseback of the properties, effectively a delayed sale-leaseback agreement.

Additionally, the Company entered into a promissory note (the "TRS Note"), under which MPT has advanced to the Company $112,937,000 related to and secured by the value of the properties in Rhode Island. The interest on this note is 7.5% per annum and is subject to annual escalation of consumer price index, limited to a minimum of 2% and a maximum of 4%. The maturity date of this note is the earlier of August 2022 or the conversion to and sale-leaseback of the properties in Rhode Island. The balance due under this note is reflected in long term debt in the accompanying consolidated financial statements (see Note 9).

*Figure 47 – Prospect Medical Holdings Annual Report 2019*

We note that in its 2019 Annual Report Prospect Medical Holdings discloses a "current portion of MPT liabilities" of $43m.

This seems to have backfired with Rhode Island regulators' approval of Prospect's MBO on the condition that this $113m loan be extended by 5 years with the removal of the sale-and-leaseback option. This effectively leaves MPW holding the bag as Prospect are prohibited from repaying the note the only way possible.

---

[35] Prospect Financial Statements 2018/2019
https://pestakeholder.org/broken-promises-rhode-island-regulators-question-leonard-greens-investment-in-prospect-medical-holdings/#_edn30
[36] https://riag.ri.gov/sites/g/files/xkgbur496/files/documents/Prospect_Chamber_Ivy_AG_HCA_Decision.pdf

> • PMH must extend the payment date of a $113 million loan by five years and remove the sale and lease back of the Rhode Island hospitals as an option to pay back that loan during that time. Further, any transfer of assets or financial encumbrances on the Rhode Island hospitals beyond the five years, including a sale/leaseback, must be approved by the Attorney General.

*Figure 48 – Attorney General imposes unprecedented conditions on hospital ownership change to ensure future operations[37]*

Crucially, there is conflicting information as to whether – even if all relevant conditions are met – the $113m TRS note is actually secured against the relevant hospital properties.

Never one to let circumstances stop them throwing good money after bad, MPW made a $100m mortgage loan to Prospect, secured against a California hospital, in Q2 2022 for unspecified reasons. We doubt the collectability of this loan.

| | For the Six Months Ended June 30, | | |
|---|---|---|---|
| | 2022 | | 2021 |
| Land and land improvements | $ 34,204 | $ | 345,039 |
| Buildings | 290,256 | | 825,322 |
| Intangible lease assets — subject to amortization (weighted-average useful life of 20.1 years for 2022 and 45.0 years for 2021) | 16,949 | | 96,455 |
| Mortgage loans(1)(2) | 100,000 | | 1,090,400 |
| Investments in unconsolidated real estate joint ventures | 399,456 | | — |
| Investments in unconsolidated operating entities | 131,105 | | 845,646 |
| Liabilities assumed | (25,727) | | (65,411) |
| | 946,243 | | 3,137,451 |
| Loans repaid(1) | — | | (1,090,400) |
| Total net assets acquired | $ 946,243 | $ | 2,047,051 |

(1) The 2021 column includes an £800 million mortgage loan advanced to the Priory Group ("Priory") in the first quarter of 2021 and converted to fee simple ownership of 35 properties in the second quarter of 2021 as described below.

(2) In the 2022 second quarter, we increased our mortgage loan to Prospect Medical Holdings, Inc. ("Prospect") that was originated in 2019 and that is secured by a first lien on a California hospital. The loan bears interest at a current market rate plus a component of additional interest upon repayment, which is anticipated during the fourth quarter.

*Figure 49 – MPW Q2 2022 10-Q*

---

[37] https://riag.ri.gov/press-releases/attorney-general-imposes-unprecedented-conditions-hospital-ownership-change-ensure


## Future Prospects

Beyond its dire financial situation Prospect's credit rating is in the toilet after a series of bond issuances that prompted Moody's to downgrade their credit rating to junk status in March 2019 citing poor liquidity outlook and leverage levels[38]. The sale-and-leaseback agreement with MPW failed to materially change Moody's view on their "continuing operating challenges and lease-adjusted leverage"[39].



*Figure 50 Moody's downgrades Prospect Medical Holdings, Inc.'s CFR to B3; outlook changed to negative*

Since the hospital company was reporting operating losses even with lower debt servicing, the new arrangement will push the losses wider and likely require restructuring of the expense base.

Prospect's poor financial...prospects… are also reflected in regular media coverage of its facilities; ProPublica has penned several articles detailing the decline of its hospitals including operational, hygiene and staffing failures[40,41].

In this event: a round-tripping transaction appears to have actually worsened the financial wellbeing of an MPW client, despite providing short-term liquidity

---

[38] https://www.moodys.com/research/Moodys-downgrades-Prospect-Medical-Holdings-Incs-CFR-to-B3-outlook--PR_397518
[39] https://www.moodys.com/research/Moodys-Prospect-Medicals-sale-leaseback-improves-liquidity-however-operating-challenges--PR_405116
[40] https://www.propublica.org/article/investors-extracted-400-million-from-a-hospital-chain-that-sometimes-couldnt-pay-for-medical-supplies-or-gas-for-ambulances
[41] https://www.propublica.org/article/a-hospital-chain-said-our-article-was-inaccurate-its-not



## Annexure 8 – Priory Transaction

In December 2020 owners of Median Kliniken, Waterland Private Equity, acquired UK-based Priory Group from Acadia Healthcare for £1,078m[42]. Both Median Kliniken & Priory were MPW hospital operators, so the transaction consolidated MPW's 4th and 5th largest tenants by lease assets at the time.

Acadia purchased this business for £1.3b in 2016 and put it back on the market just 2 years later.

MPW financed Waterland's entire transaction with a £1,050m loan: £800m mortgage loan against 35 properties from Priory, and a further £250m acquisition loan secured against the same properties. The mortgage loan would be converted into ownership of those properties in June 2021. MPW received a 9.9% stake in Waterland's Priory fund for an *additional* "nominal amount".

> **PORTFOLIO UPDATE**
>
> During and subsequent to the first quarter, MPT continued to execute on accretive acquisitions.
>
> MPT expects to replace the £800 million Priory real estate loan with sale-leaseback transactions involving 35 properties by the end of the second quarter, at which time the Company will begin to recognize a GAAP investment yield of 8.6%.

> 2021 Activity
>
> **Priory Group Transaction**
>
> On January 19, 2021, we completed the first of two phases in the Priory Group ("Priory") transaction in which we funded an £800 million interim mortgage loan on an identified portfolio of Priory real estate assets. In phase two, in a series of transactions we expect will be completed during the 2021 second quarter, we will acquire a portfolio of select real estate assets from Priory (now owned by Waterland Private Equity Fund VII C.V. ("Waterland VII")) in individual sale-and-leaseback transactions, subject to customary real estate and other closing conditions. As all conditions to closing for a particular asset are satisfied, the applicable purchase price for the asset will be paid by us by proportionally converting and reducing the principal balance of the interim mortgage loan we made to Waterland VII in phase one. The aggregate purchase price for the real estate assets we acquire from Priory is thus expected to be approximately £800 million, plus customary stamp duty, tax, and other transaction costs.
>
> In addition, we agreed to provide Waterland VII with a 364-day £250 million acquisition loan, which we funded on January 19, 2021, in connection with the closing of Waterland VII's acquisition of Priory. The loan is secured by the same security assets securing the £800 million interim mortgage loan.
>
> In connection with these transactions, we also acquired a 9.9% passive equity interest in the Waterland VII affiliate that indirectly owns Priory for a nominal amount.

*Figures 51 & 52 – MPW Q1 2021 results and 10-Q[43]*

MPW claimed that this £1,050m loan was collectively secured against a subset of Priory's properties.

However Acadia's 2020 10-K shows the Priory business consisted of "345 inpatient behavioral health facilities with approximately 8,200 beds" of which 279 were owned and 66 leased. The PPE assets for the sale were valued at $1.298m (£949m) at the lesser of carrying value and fair value less costs to sell.

> 40 states, the United Kingdom ("U.K.") and Puerto Rico. During the year ended December 31, 2020, we added 460 beds in the United States ("U.S."), consisting of 240 added to existing facilities and 220 added through the opening of two joint venture facilities, and we opened six comprehensive treatment centers ("CTCs"). On January 19, 2021, we completed the sale of the U.K. business, which included 345 facilities and approximately 8,200 beds.
>
> children's services facilities and approximately 60% were adult care facilities at December 31, 2020. At December 31, 2020, we owned 279 of the properties at our U.K. Facilities and leased 66 properties.

It seems MPW believed the 35 properties were worth £800m. It is absurd to suggest that the remaining Priory business *and* a further 244 properties were worth only £250m. For MPW's financing to make any sense the entire Priory business less property would be valued close to zero.

A back-of-envelope calculation assuming homogenous property values across the portfolio suggests an overpayment of at least £600m.

[42] https://www.ft.com/content/6058bdd8-3ff2-4f54-93c6-5911c1ec29d5
[43] https://www.businesswire.com/news/home/20210429005594/en/Medical-Properties-Trust-Inc.-Reports-First-Quarter-Results

| Priory Transaction Analysis - Viceroy Research | | |
|---|---|---|
| Acadia PPE value | £m | 949 |
| Total number of properties | # | 279 |
| Avg property value | £m | 3.40 |
| | | |
| MPW mortgage loan | £m | 800 |
| Security assets converted | # | 35 |
| Total value of security assets | £m | 119 |
| | | |
| Overpayment | £m | 681 |

*Figure 53 – Priory Transaction Analysis*

MPW has absolutely no concern for high-risk investments, and casually engages in quasi-unsecured lending of hundreds of millions of dollars for the purchase of firesale assets.

High leverage put on by its PE sponsor contribute to Priory's weak financial position. According to the Financial Times, Priory's new annual rent cost would be around ~£50m.

> The agreement burdens the Priory with significant rental costs of about £50m a year, and a minimum annual increase of 2 per cent, according to three sources close to the transaction.

*Figure 54 – Priory property deal saddles mental health chain with high rents – Financial Times[44]*

Priory has also had a number of operational issues/negligence at its hospitals[45,46,47]

## Annexure 9 – Pipeline Health

On July 6, 2021, MPW acquired 4 hospitals and 2 on-campus medical office buildings from Pipeline Health for $215m. These were leased back to Pipeline Health System.

> On July 6, 2021, we acquired four acute care hospitals and two on-campus medical office buildings in Los Angeles, California for $215 million. These hospitals are leased to Pipeline Health System ("Pipeline") pursuant to a long-term lease with annual inflation-based escalators.

Pipeline Health was a forced seller in this scenario due to a liquidity crisis. It nonetheless filed for bankruptcy in October 2022:

44 https://www.ft.com/content/56c04cd9-80ec-4ddb-9165-e8e634a7ce99
45 https://www.bbc.com/news/uk-england-nottinghamshire-63415407
46 https://www.laingbuissonnews.com/healthcare-markets-content/priory-group-hospital-ratings-suspended-over-fresh-safety-concerns/
47 https://www.nelsonslaw.co.uk/priory-hospital-arnold/

> 44. *Property Financing.* While Pipeline owns the real estate and buildings for its operations in Illinois, Pipeline has entered into agreements for the use of real property that allow it to operate in its California and Texas markets respectively. With respect to the operations in California, on July 6, 2021, certain Pipeline entities entered as lessees in a sale-leaseback arrangement under that certain master lease agreement, dated July 6, 2021 (the "California Property Financing") with certain affiliates of Medical Properties Trust, Inc., a real estate trust focused on developing net-leased hospital facilities. The California Property Financing purported to lease back such real estate so that the Debtors could continue its operations for a term of 20 years, subject to extensions. Entry into the California Property Financing arrangement was intended to pay off debt, lower interest rates, and providing capital support for the organization with a focus on repairing aging building infrastructure. With respect to the operations in Texas,

*Figure 55 – Pipeline Health Bankruptcy Documents[48]*

On January 13, 2022, MPW announced that Pipeline Health would reassume the master lease terms of the Los Angeles hospitals. It caveats this announcement by stating 30% of 2023 rent would be "deferred" (or, straight-lined), and MPW will invest in *more* facilities for Pipeline Health[49].

> Following the December sale of its Illinois hospitals, Pipeline is primarily focusing its post-bankruptcy business plan on opportunities within its attractive Los Angeles footprint. On the effective date of the Plan, MPT will be paid all rent that accrued through the first half of January 2023, and it has agreed to defer approximately $5.6 million, or approximately 30%, of 2023 cash rent into 2024 when it will be collected with interest. MPT and Pipeline also agreed to complete Pipeline's pre-bankruptcy plans to add a behavioral facility within Coast Plaza Hospital. MPT will fund the capital addition, which will be joined to the master lease and earn rent at the lease rate upon completion.

*Figure 56 – Extract from MPW market announcement 13 January 2023*

Viceroy have pulled the amended restructuring plans from the same date of this announcement. MPW must sink $23.5m into new facilities and into standard repairs and maintenance as part of the settlement terms. Much of this appears to be offset from rent owed by Pipeline health, and will now form part of Lease Base calculations.

---

[48] https://document.epiq11.com/document/getdocumentbycode?docId=4110689&projectCode=PIH&source=DM
[49] https://www.businesswire.com/news/home/20230113005440/en/

| Capital Expenditure Funding | Following the Plan Effective Date, MPT shall fund $23.65 million in capital expenditures to be utilized only for the benefit of the L.A. Hospitals through a combination of: |
|---|---|
| | • a release of up to $9.4 million in security deposits; provided, however, that a letter of credit from a financial institution reasonably acceptable to the MPT Lessors is posted in favor of the MPT Lessors in the amount released.<br>• Up to $6 million for Capital Additions pursuant to section 10.3(b) of the Original Lease related to the construction of the Debtors' proposed behavioral facility at Coast Plaza Hospital, to include reimbursement of reimbursable expenses that have already been |
| | incurred by the Debtors as of the Agreement Effective Date; *provided* that such $6 million in Capital Additions shall be included in the calculation of Lease Base in the Amended Lease.<br>• Up to an additional $5 million for additional Capital Additions to be available on the Agreement Effective Date for projects to be identified in the Lease Amendment, such funding to be provided pursuant to section 10.3(b) of the Original Lease and to include Major Repairs; *provided* that such $5 million in Capital Additions shall be included in the calculation of Lease Base in the Amended Lease.<br>• Up to $3.25 million in repairs and upgrades to be funded from the existing reserve held by the MPT Lessors, which would remain intact and accessible for the purposes specified in the Original Lease. |

*Figure 57 – Pipeline Health Bankruptcy Filings - final restructuring proposal*

We reiterate that MPW tenants are on triple-net leases. Clearly, this is not actually the case. MPW has not recognized a write-down on the Pipeline assets to date, but it is unfathomable that MPW continue to engage in high-risk transactions with bankrupt entities which are, in no uncertain terms, still distressed. This transaction must be scrutinized.

**Pipeline Health System**

On October 2, 2022, Pipeline filed for reorganization relief under Chapter 11 protection of the United States Bankruptcy Code in the Southern District of Texas, while keeping its hospitals open to continue providing care to the communities served. As mentioned above in this same Note 3, all of the facilities we lease to Pipeline are located in California, representing 1% of our total assets. At September 30, 2022, Pipeline has made all of its required rental payments, and we have on-hand cash deposits of approximately $13 million. We believe our investment in these facilities is fully recoverable at this time, but no assurances can be given that we will not have any write-offs or impairments in future periods.

*Figure 58 – MPW Pipeline Health announcement*

## Annexure 10 – Steward – Financial Health

Steward is MPW's largest customer by assets and revenue. Steward was formed in November 2010 when Cerberus Capital acquired the Charitas Christi system[50] before expanding aggressively, but ultimately not profitably. MPW came to the rescue in 2016 through a sale-and-leaseback arrangement, whereby MPW would acquire Steward's facilities and lease them right back to Steward.

Steward resumed its aggressive acquisition strategy and continued to engage MPW for sale-leaseback transactions. This made Steward the largest private hospital operator in the United States by revenue and number of hospitals.

Steward's failure to achieve profitability despite scale has led to a mutually parasitic relationship with MPW.

### Massachusetts State Reports

The Massachusetts Center for Health Information and Analysis (CHIAMass) publishes annual reports on financial and operating statistics for each hospital in the state including Steward Health System[51]. Steward even sued the state in 2017 to prevent filing financial information[52], all reports after 2018 by CHIAMass rely on publicly available financials.

The result of these reports: Steward at the bottom of the ladder in almost every financial metric amongst hospitals in the state reporting ($271m) in losses, negative margins and ($1.2b) in negative equity[53]. Most other hospitals in the state reported positive financial indicators.

| Entity | Organization Type | Months Reported | Operating Margin | Non-Operating Margin | Total Margin | COVID Funding in Operating Revenue [1] | Excess (Deficit) of Revenue over Expenses | Current Ratio | Net Assets |
|---|---|---|---|---|---|---|---|---|---|
| **Cambridge Health Alliance** | | 3 | -7.5% | 0.6% | -6.8% | $0.0 | ($14.3) | 3.5 | $281.9 |
| Cambridge Health Alliance ε | Teaching Hospital | 3 | -7.4% | 0.6% | -6.8% | $0.0 | ($14.2) | 3.5 | $275.0 |
| **Shriners Hospitals for Children** | | 9 | -35.3% | 31.5% | -3.8% | $0.0 | ($28.4) | 8.0 | $9,305.4 |
| Shriners Hospital for Children - Boston* | Specialty Hospital | 9 | * Shriners Hospital Boston (SHB) and Shriners Hospital Springfield are part of the national Shriners Hospitals for Children system (SHC) and are reliant upon support from the SHC endowment to cover the costs associated with fulfilling their mission to provide care to patients regardless of their ability to pay. This support is provided through transfers from the SHC's endowment to the hospitals, as these transfers are not considered revenue for the purpose of calculating profitability margin. SHB's and SHS's profitability margins are not comparable to other acute hospitals. Therefore, they have been excluded from the graphics but are included in the statewide median and the databook. | | | | | | |
| Shriners Hospital for Children - Springfield* | Specialty Hospital | 9 | | | | | | | |
| **Steward Health Care** | | | Steward Health Care did not submit the required hospital health system data | | | | | | |
| Morton Hospital | Community-High Public Payer | 9 | -1.7% | 0.0% | -1.7% | $0.0 | ($2.0) | 1.6 | $23.0 |
| Nashoba Valley Medical Center | Community-High Public Payer | 9 | -6.0% | 0.0% | -6.0% | $0.0 | ($3.2) | 1.8 | $8.0 |
| Steward Carney Hospital ε | Teaching Hospital | 9 | -30.8% | 0.0% | -30.8% | $0.0 | ($23.3) | 1.1 | $7.9 |
| Steward Good Samaritan Medical Center | Community-High Public Payer | 9 | 6.6% | 0.0% | 6.6% | $0.0 | $15.4 | 1.7 | $31.3 |
| Steward Holy Family Hospital | Community-High Public Payer | 9 | -1.9% | 0.0% | -1.9% | $0.0 | ($3.8) | 1.7 | $20.4 |
| Steward Norwood Hospital | Community-High Public Payer | 9 | -39.6% | 0.0% | -39.6% | $0.0 | ($11.9) | 0.1 | ($10.3) |
| Steward Saint Anne's Hospital | Community-High Public Payer | 9 | 12.6% | 0.0% | 12.6% | $0.0 | $30.5 | 2.3 | $43.3 |
| Steward St. Elizabeth's Medical Center ε | Teaching Hospital | 9 | -2.0% | 0.0% | -2.0% | $0.0 | ($6.7) | 1.9 | $65.1 |
| Steward Medical Group | Physician Organization | | Steward Health Care did not submit the required physician organization data | | | | | | |

*Figure 59 – CHIAMass extract*

MPW also filed Steward's 2020 financials as part of a significant tenant disclosure. Steward's positive performance in 2019 did not carry over to 2020 with losses widening to ($407m). MPW has not filed Steward's financials for 2021.

| Steward Health Care Financials - Viceroy Analysis | | | | |
|---|---|---|---|---|
| | **2017** | **2018** | **2019** | **2020** |
| Revenues | $ 3,705,641 | $ 626,189 | $ 6,727,521 | $ 5,413,904 |
| Gross profit | $ (321,597) | $ (269,186) | $ 125,313 | $ (439,161) |
| Gross margin | -8.7% | -43.0% | 1.9% | -8.1% |
| Net loss | $ (207,181) | $ (279,547) | $ 82,493 | $ (407,593) |
| Net margin | -5.6% | -44.6% | 1.2% | -7.5% |

*Figure 60 – Steward Health Care Financials – Viceroy Analysis*

---

[50] http://archive.boston.com/business/healthcare/articles/2010/11/28/caritas_owner_has_a_history_of_quiet_buyouts_that_pay_off/
[51] https://www.chiamass.gov/hospital-financial-trend-analysis
[52] https://www.beckershospitalreview.com/finance/steward-health-care-sues-massachusetts-to-avoid-financial-disclosures.html
[53] https://www.healthcarefinancenews.com/news/losses-mount-steward-health-care-as-concern-over-its-future-grows



## Odessa Hospital

Steward Healthcare and its local Odessa operating subsidiary are currently being sued for non-payment of wages:

DC-22-17919

CAUSE NO. _____

| | | |
|---|---|---|
| ADVANCED CLINICAL EXPERTS, PLLC, | § | IN THE DISTRICT COURT |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | DALLAS COUNTY, TEXAS |
| | § | |
| ODESSA REGIONAL HOSPITAL, L.P. and | § | |
| STEWARD HEALTH CARE NETWORK, | § | |
| INC., | § 162nd | |
| Defendants. | § | _____ JUDICIAL DISTRICT |

**PLAINTIFF'S ORIGINAL PETITION**

Plaintiff Advanced Clinical Experts, PLLC ("**Ace**" or "**Plaintiff**") files this *Original Petition* against Defendants Odessa Regional Hospital, L.P. ("**Odessa Regional**") and Steward Health Care Network, Inc. ("**Steward**") (collectively, Odessa Regional and Steward are referred to as "**Defendants**").

*Figure 61 – Extract from Cause No. DC-22-17919*

This demonstrates one of many distressed Steward facilities in MPW's rent-roll:



*Figure XX – MPW Property Map identifying Steward facility in Odessa, TX*

## Annexure 11 – Circle Health Holdings – Financial Health

Circle was the company behind the first privately run hospital in the UK but fell afoul of regulators for poor standards of care and practice. Since being taken private by Toscafund in 2017, Circle has not reported a single year of profitability or free cash flow.

UK based Circle Health Holdings acquired competitor BMI Healthcare's operations in December 2019. MPW acquired BMI's properties for £1.5b in the same transaction and leased them back to Circle.

| Circle Health Holdings Financials - Viceroy Analysis | | | | | |
|---|---|---|---|---|---|
| (2020 & 2021 figures have removed BMI Healthcare) | **2017** | **2018** | **2019** | **2020** | **2021** |
| Revenues | 100,882 | 100,728 | 102,894 | 121,147 | 96,526 |
| Gross profit | 29,948 | 29,506 | 30,835 | (66,013) | (119,593) |
| Gross margin | 30% | 29% | 30% | -54% | -124% |
| Net loss | (6,155) | (11,934) | (20,833) | (6,505) | (39,376) |
| Net margin | -6% | -12% | -20% | -5% | -41% |

*Figure 62 – Circle Health Holdings Financials – Viceroy Analysis*

BMI, now the largest component of Circle, has a similar history of loss-making operations.

| BMI Healthcare - Viceroy Analysis | | | | | |
|---|---|---|---|---|---|
| | **2017** | **2018** | **2019** | **2020** | **2021** |
| Revenues | 886,947 | 1,313,265 | 918,149 | 863,729 | 955,116 |
| Gross profit | 323,622 | 456,819 | 357,747 | 278,397 | 325,715 |
| Gross margin | 36% | 35% | 39% | 32% | 34% |
| Net loss | (97,394) | (59,886) | 14,326 | (53,871) | (13,300) |

*Figure 63 – BMI Healthcare Financials – Viceroy Analysis*

# FEBRUARY 1, 2023 REPORT

# MPW **Case Study** – Neuropsychiatric Hospitals

MPW pay a 200% premium for newly built Neuropsychiatric Hospital. Loss-making tenant consistent with revenue round-tripping model.

**PLEASE READ IMPORTANT DISCLAIMER – PAGE 4**

**February 1, 2023** – In October 2019 MPW committed $27.5m to develop a NeuroPsychiatric Hospital for the development of a 92-bed facility in Clear Lake, Texas. The facility was estimated to open in Q3 2020.



Additionally, we just closed on a $28 million behavioral health opportunity with NeuroPsychiatric Hospitals for the development of a 92-bed freestanding hospital in the Houston, Texas market. NPH is a behavioral health company focused on providing best-in-class care for patients with acute, complex, medical or psychiatric conditions and is known as the largest neuropsychiatric care organization in the country. They meet an underserved need in treating the more severe comorbid cases that traditionally psych hospitals are not equipped to take. NPH currently operates 4 facilities with 187 beds in Indiana and is well positioned for near-term growth into new markets in 2020. Construction is underway, with an estimated opening in the third quarter of 2020.

*Figure 1 – Q3 2019 earnings call*

MPW's Q3 2020 supplemental information report also shows cash costs incurred on the still incomplete project as of reporting date.



SUMMARY OF CURRENT DEVELOPMENT PROJECTS AS OF SEPTEMBER 30, 2020
*(Amounts in thousands)*

| Operator | Location | Commitment | Costs Incurred as of 9/30/2020 | Estimated Rent Commencement Date |
|---|---|---|---|---|
| NeuroPsychiatric Hospitals | Texas | $ 27,500 | $ 20,241 | Q2 2021 |
| Ernest | California | 47,929 | 16,010 | Q4 2021 |
| | | $ 75,429 | $ 36,251 | |

*Figure 2 – Q3 2020 supplemental information report*

In MPW's 2021 10-K, we learn that the project "commenced rent" on December 18, 2020. A subsequent 8-K filed in October 27, 2022, we learn that the committed investment amount increased to $28.5m.

## The Real Construction Costs & Property Appraisal

Project details of the Neuropsychiatric Hospital were submitted to the Texas Department of Licensing and Regulation, which show estimated project costs to be $7.00m.



**Texas Department of Licensing and Regulation**
Architectural Barriers Project Details Page

Project #: TABS2019016744                                            Registration Date: 7/23/2019

https://www.tdlr.texas.gov/TABS/Projects/TABS2019016744

PROJECT

Project Name: Medistar Corporation Medical Behavioral Hospital
Project Number: TABS2019016744
Facility Name: Medistar Corporation Medical Behavioral Hospital
Location Address: 15850 Buccaneer Lane
Houston, TX 77058
Location County: Harris

Start Date: 8/23/2019
Completion Date: 6/23/2020
Estimated Cost: $7,000,000
Type of Work: renovation/alteration
Type of Funds: This project is privately funded, on private land for private use.
Scope of Work: Existing non-combustible structure (metal deck over concrete walls) renovated into a private psychiatric hospital with 94 beds and 48466 sf. The project includes a commercial kitchen, parking increase, landscape improvements and fire sprinkler syst.
Square Footage: 48,466 ft²

Are the private funds provided by the tenant? Yes

Current Status: Project Closed

*Figure 3 – Extract from TDLR[1]*

---

[1] https://www.tdlr.texas.gov/TABS/Search/Project/TABS2019016744

Further, Harris County appraisal district ownership history shows that MPT bought the site from Medistar on October 25, 2019 when the appraised valued was listed as $2.1m. Post completion of the development, it was appraised at $8.8m.

| Ownership History: 0963020000001 | |
| --- | --- |
| **16850 BUCCANEER LN**<br>**HOUSTON TX 77058** | |
| Owner | Effective Date |
| MPT OF SOUTH CLEAR LAKE LLC | 10/25/2019 |
| MEDISTAR GEMINI LLC | 12/09/2013 |
| LEEWARD STRATEGIC PROPERTIES INC | 02/24/2012 |
| BLOCK 15 GEMINI J V | 01/02/1989 |
| BLOCK 15 GEMINI JOINT VEN | 01/02/1986 |

*Figure 4 – HCAD Ownership History extract[2]*

| APPRAISED VALUE HISTORY: 0963020000001 | | | | | Print |
| --- | --- | --- | --- | --- | --- |
| **Tax Year:** | 2023 | 2022 | 2021 | 2020 | 2019 |
| Appraised Value: | Pending | 7,850,250 | 8,824,549 | 2,150,000 | 2,100,000 |

*Figure 5 – HCAD Appraised Value extract[3]*

It is completely unfathomable that MPW claims to have spent $28.5m on the development of the Neuropsychiatric Hospital given that the cost of development and market value of the land was combined total of $9.1m.

Further, we question how MPW has accounted for the value of this facility in its books, given that its appraised value is 72% less than the capitalized cost of the facility.

---

***MPW has paid over 3x the market value for the Neuropsychiatric Hospital.***

---

## Obscure Structure & Distressed Tenant

Neuropsychiatric Hospitals is the tenant of the Texas Clear Lake facility, however it does not lease the facility from MPW, but from Medistar Corporation.

Medistar were the original owners of the site, conceived the plan for its development into a 92 bed facility, and lodged the project details with the Texas Department of Licensing and Regulation, per Figure 3 above.

Medistar appear to have sold the site prior to development to MPW on leaseback terms. Medistar subsequently leases the site to Neuropsychiatric Hospitals. This is disclosed in a joint press release by Neuropsychiatric Hospitals and Medistar in December 2019, after MPW's acquisition of the site in October 2019.

**HOUSTON, TX AND SOUTH BEND, IN** Medistar Corporation ("Medistar") and NeuroPsychiatric Hospitals, LLC ("NPH") are pleased to announce the development of Medical Behavioral Hospital of Clear Lake. The 92 bed facility, located at 16850 Buccaneer Lane in **Houston**, is now in construction and scheduled to open in mid 2020. This will be NPH's sixth hospital and among only a select number of hospitals nationwide that focus on treating patients with psychiatric issues who also suffer with complex medical and/or neurological conditions. The facility will be leased from Medistar by an affiliate of NPH pursuant to a long term lease.

*Figure 6 – NPH & Medistar press release 30 Dec 2019[4]*

[2] https://public.hcad.org/records/Ownership.asp?crypt=%94%9A%B0%94%BFg%84%96%85%7Dhf%8EI%87tXtYW%9E%99%A2%D3%89%9 5%C2e%7CU%8A%85

[3] https://public.hcad.org/records/HistoryValue.asp?crypt=%94%9A%B0%94%BFg%84%96%85%7Dhf%8EI%87tXtYW%8D%AD%9C%CC%89 %A2%C4%9C%AB%9D%D2%B1%C1%CF%87hy%7B%60

[4] https://www.neuropsychiatrichospitals.net/medistar-corporation-and-neuropsychiatric-hospitals-announce-the-development-of-medical-behavioral-hospital-of-clear-lake-in-houston-tx/

Case 2:23-cr-00482-RED Document 371 Filed 03/15/23 Page 132 of 153

Viceroy have obtained 2021 financial data for the underlying tenant, Medical Behavioral Hospital of Clear Lake. It shows a severely loss-making operator burdened by debt.



*Figure 7 – 2021 Financial Summary of Medical Behavioral Hospital of Clear Lake*

---

*Medical Behavioral Hospital of Clear Lake reported a $8.5m operating loss in 2021.*
*Its liabilities exceed assets by over $2m.*

---

## Key Takeaways

We reiterate our belief that MPW engages in pervasive revenue round-tripping schemes. It is clear that MPW vastly overpaid for this facility, with appraisals and state filings directly contradicting statements from MPW.

The tenant, Medistar Corporation, is subletting this property to a distressed client. We believe this is consistent with round-tripping behavior.

MPW overpaid for the Neuropsychiatric Hospital facility by 3x. It capitalizes these absurd overpayments, and proceeds to borrow more money to make more uncommercial investments.


Case 2:23-cv-00408-RDP Document 71 Filed 06/15/23 Page 133 of 153

**Attention: <u>Whistleblowers</u>**

Viceroy encourage any parties with information pertaining to misconduct within Medical Properties Trust, its affiliates, or any other entity to file a report with the appropriate regulatory body.

We also understand first-hand the retaliation whistleblowers sometimes face for championing these issues. Where possible, Viceroy is happy act as intermediaries in providing information to regulators and reporting information in the public interest in order to protect the identities of whistleblowers.

You can contact the Viceroy team via email on viceroy@viceroyresearch.com.

**About Viceroy**

Viceroy Research are an investigative financial research group. As global markets become increasingly opaque and complex – and traditional gatekeepers and safeguards often compromised – investors and shareholders are at greater risk than ever of being misled or uninformed by public companies and their promoters and sponsors. Our mission is to sift fact from fiction and encourage greater management accountability through transparency in reporting and disclosure by public companies and overall improve the quality of global capital markets.

**Important Disclaimer – Please read before continuing**

This report has been prepared for educational purposes only and expresses our opinions. This report and any statements made in connection with it are the authors' opinions, which have been based upon publicly available facts, field research, information, and analysis through our due diligence process, and are not statements of fact. All expressions of opinion are subject to change without notice, and we do not undertake to update or supplement any reports or any of the information, analysis and opinion contained in them. We believe that the publication of our opinions about public companies that we research is in the public interest. We are entitled to our opinions and to the right to express such opinions in a public forum. You can access any information or evidence cited in this report or that we relied on to write this report from information in the public domain.

To the best of our ability and belief, all information contained herein is accurate and reliable, and has been obtained from public sources we believe to be accurate and reliable, and who are not insiders or connected persons of the stock covered herein or who may otherwise owe any fiduciary duty or duty of confidentiality to the issuer. We have a good-faith belief in everything we write; however, all such information is presented "as is," without warranty of any kind – whether express or implied.

In no event will we be liable for any direct or indirect trading losses caused by any information available on this report. Think critically about our opinions and do your own research and analysis before making any investment decisions. We are not registered as an investment advisor in any jurisdiction. By downloading, reading or otherwise using this report, you agree to do your own research and due diligence before making any investment decision with respect to securities discussed herein, and by doing so, you represent to us that you have sufficient investment sophistication to critically assess the information, analysis and opinions in this report. You should seek the advice of a security professional regarding your stock transactions.

This document or any information herein should not be interpreted as an offer, a solicitation of an offer, invitation, marketing of services or products, advertisement, inducement, or representation of any kind, nor as investment advice or a recommendation to buy or sell any investment products or to make any type of investment, or as an opinion on the merits or otherwise of any particular investment or investment strategy.

Any examples or interpretations of investments and investment strategies or trade ideas are intended for illustrative and educational purposes only and are not indicative of the historical or future performance or the chances of success of any particular investment and/or strategy. As of the publication date of this report, you should assume that the authors have a direct or indirect interest/position in all stocks (and/or options, swaps, and other derivative securities related to the stock) and bonds covered herein, and therefore stand to realize monetary gains in the event that the price of either declines.

The authors may continue transacting directly and/or indirectly in the securities of issuers covered on this report for an indefinite period and may be long, short, or neutral at any time hereafter regardless of their initial recommendation.

# FEBRUARY 6, 2023 REPORT

# MPW **Fun Facts –** Puts & Mortgages

SEC enquiries show MPW mortgages to Steward exceed values of the properties Steward buy.

**PLEASE READ IMPORTANT DISCLAIMER – PAGE 2**

**February 6, 2023** – As Viceroy prepare an extended case study highlighting MPW exposure to international criminal inquiries, we present readers with a fun throwback to 2018, when the SEC questioned MPW's uncommercial transactions.

A link to the correspondence is below:

https://www.sec.gov/Archives/edgar/data/1287865/000119312518271134/filename1.htm

The background to the SEC's questions related to MPW's determination that it was unnecessary to disclose Steward Healthcare's financials as an exhibit to its 10-K, which is broadly consistent with Steward and MPW's minimal-transparency policy.

Of interest, the SEC's examination of MPW's 10-K exhibits showed that:

1.  MPW provided Steward  with a mortgage and/or loan to purchase properties
2.  The value of the loan exceeded the value of the properties by 10%.
3.  Under the terms of the loan agreement, MPW has an option to buy the property from Steward at 110% of its fair market value.

> **Item 8. Financial Statements and Supplementary Data, page 71**
>
> 2.   Please tell us how you considered if the loan agreement with Steward is a loan, an investment in real estate, or a joint venture. We refer you to the Real Estate Loan Agreement filed as Exhibit 10.34 to your Form 10-K for the year ended December 31, 2016 and the Joinder and Amendment to Real Estate Loan Agreement filed as Exhibit 10.2 to your Form 10-Q for the quarterly period ended September 30, 2017. Based on these agreements, it appears that you have the option to purchase the properties at 110% of fair market value, which is defined as specific dollar amounts in the agreement and equals the amount lent to Steward. Your response should address how you considered the terms of the loan, including, but not limited to, the purchase option. In your response, please refer to the guidance in ASC 310-10 for Acquisition, Development, and Construction Arrangements and SAB 1L.

*Figure 1 – Extract from MPW / SEC correspondence, September 11, 2018.*

Already, it is absolutely astounding that MPW would make such blatantly uncommercial deals with Steward when it could outrightly buy the hospital itself, and not pay a 10% premium to its tenant middle-man.

In response to the SEC's question on how MPW considered the terms of the loan, MPW spectacularly state that this option is put in place in order for Steward to avoid paying capital gains tax on the transfer of the property that it would acquire in the following year (it was the IASIS transaction, covered in our report).

In other words, MPW answered why they gave Steward a 10% premium structured as mortgage, rather than just paying them cash.

> *When structuring transactions, our goal is to achieve the best outcome for our shareholders, including the investment decisions we make regarding structuring a deal as either a lease or a mortgage loan. In regards to Steward specifically, we decided to structure two of our transactions with them with a combination of both leases and mortgage loans. One of the main reasons for agreeing to originate mortgage loans was to prevent Steward from having to pay significant capital gains taxes upon transfer of the real estate, which benefited Steward, but also our shareholders, by allowing Steward to maintain more free cash on-hand to meet its obligations as they come due.*

*Figure 2 – Extract from MPW / SEC correspondence, September 11, 2018.*

It has structured multiple transactions with Steward in this way.

This query from the SEC confirms half of our IASIS analysis in our original report. In total, we estimate that MPW round tripped over $700m to Steward as part of this transaction.

Our reports can be found here:

https://viceroyresearch.org/medical-properties-trust-research/


**Attention: <u>Whistleblowers</u>**

Viceroy encourage any parties with information pertaining to misconduct within Medical Properties Trust, its affiliates, or any other entity to file a report with the appropriate regulatory body.

We also understand first-hand the retaliation whistleblowers sometimes face for championing these issues. Where possible, Viceroy is happy act as intermediaries in providing information to regulators and reporting information in the public interest in order to protect the identities of whistleblowers.

You can contact the Viceroy team via email on <u>viceroy@viceroyresearch.com</u>.

**About Viceroy**

Viceroy Research are an investigative financial research group. As global markets become increasingly opaque and complex – and traditional gatekeepers and safeguards often compromised – investors and shareholders are at greater risk than ever of being misled or uninformed by public companies and their promoters and sponsors. Our mission is to sift fact from fiction and encourage greater management accountability through transparency in reporting and disclosure by public companies and overall improve the quality of global capital markets.

**Important Disclaimer – Please read before continuing**

This report has been prepared for educational purposes only and expresses our opinions. This report and any statements made in connection with it are the authors' opinions, which have been based upon publicly available facts, field research, information, and analysis through our due diligence process, and are not statements of fact. All expressions of opinion are subject to change without notice, and we do not undertake to update or supplement any reports or any of the information, analysis and opinion contained in them. We believe that the publication of our opinions about public companies that we research is in the public interest. We are entitled to our opinions and to the right to express such opinions in a public forum. You can access any information or evidence cited in this report or that we relied on to write this report from information in the public domain.

To the best of our ability and belief, all information contained herein is accurate and reliable, and has been obtained from public sources we believe to be accurate and reliable, and who are not insiders or connected persons of the stock covered herein or who may otherwise owe any fiduciary duty or duty of confidentiality to the issuer. We have a good-faith belief in everything we write; however, all such information is presented "as is," without warranty of any kind – whether express or implied.

In no event will we be liable for any direct or indirect trading losses caused by any information available on this report. Think critically about our opinions and do your own research and analysis before making any investment decisions. We are not registered as an investment advisor in any jurisdiction. By downloading, reading or otherwise using this report, you agree to do your own research and due diligence before making any investment decision with respect to securities discussed herein, and by doing so, you represent to us that you have sufficient investment sophistication to critically assess the information, analysis and opinions in this report. You should seek the advice of a security professional regarding your stock transactions.

This document or any information herein should not be interpreted as an offer, a solicitation of an offer, invitation, marketing of services or products, advertisement, inducement, or representation of any kind, nor as investment advice or a recommendation to buy or sell any investment products or to make any type of investment, or as an opinion on the merits or otherwise of any particular investment or investment strategy.

Any examples or interpretations of investments and investment strategies or trade ideas are intended for illustrative and educational purposes only and are not indicative of the historical or future performance or the chances of success of any particular investment and/or strategy. As of the publication date of this report, you should assume that the authors have a direct or indirect interest/position in all stocks (and/or options, swaps, and other derivative securities related to the stock) and bonds covered herein, and therefore stand to realize monetary gains in the event that the price of either declines.

The authors may continue transacting directly and/or indirectly in the securities of issuers covered on this report for an indefinite period and may be long, short, or neutral at any time hereafter regardless of their initial recommendation.

# FEBRUARY 7, 2023 REPORT

Case 2:25-cr-00424-FMO Document 127 Filed 06/13/23 Page 138 of 753

# MPW **Case Study** – Springstone Texas

MPW commit $35 million to complete a $17 million build in McKinney Texas following sale-leaseback transaction with Springstone (49% owned by MPW).

**PLEASE READ IMPORTANT DISCLAIMER – PAGE 4**

**February 7, 2023** – In Q2 2022, MPW committed $34.6m in funding for a new facility in McKinney, Texas, which would be leased to Springstone LLC. MPW did not disclose that the site was also purchased from Springstone, who already lease 18 facilities from MPW.

> **Development Activities**
>
> During the 2022 second quarter, we agreed to finance the development of four new projects. One of these development projects is a behavioral health facility in McKinney, Texas with a total budget of approximately $35 million. This facility will be leased to Springstone, LLC ("Springstone") pursuant to the existing long-term master lease. In addition, we agreed to finance the development of and lease three general acute care facilities located

*Figure 1 – Extract from MPW Q3 2022 10-Q*

At Q3 2022, MPW had outlaid $1.14m on the project, with an estimated "rent commencement date" of Q1 2024.

| Property | Commitment | Costs Incurred as of September 30, 2022 | Estimated Rent Commencement Date |
|---|---|---|---|
| Steward (Texas) | $ 169,408 | $ 57,911 | 4Q 2025 |
| Ernest (Stockton, California) | 47,700 | 43,785 | 4Q 2022 |
| IMED (Spain) | 46,159 | 11,809 | 2Q 2023 |
| IMED (Spain) | 41,577 | 29,182 | 3Q 2023 |
| Springstone (Texas) | 34,600 | 1,144 | 1Q 2024 |
| IMED (Spain) | 33,635 | 7,535 | 3Q 2024 |
| | $ 373,079 | $ 151,366 | |

*Figure 2 – Q3 2020 supplemental information report*

## The Real Construction Costs & Property Appraisal

Project details of the Springstone facility were submitted to the Texas Department of Licensing and Regulation, which show estimated project costs to be $17.5m.



Texas Department of Licensing and Regulation
Architectural Barriers Project Details Page
Project #: TABS2022008780
Registration Date: 1/7/2022
https://www.tdlr.texas.gov/TABS/Projects/TABS2022008780

PROJECT
Project Name: Springstone McKinney Hospital
Project Number: TABS2022008780
Facility Name: Springstone McKinney Hospital
Location Address: 4650 West University Drive
McKinney, TX 75071
Location County: Collin

Start Date: 3/15/2022
Completion Date: 3/15/2023
Estimated Cost: $17,500,000
Type of Funds: This project is privately funded. on private land for private use.
Type of Work: New Construction
Scope of Work: 72 Bed private psychiatric hospital with inpatient treatment outpatient therapy dietary pharmacy lab admin and support services
Square Footage: 58,000 ft²

*Figure 3 – Extract from TDLR[1]*

It is unfathomable that MPW has committed $34.6m on the development of the Springstone facility given the estimated cost of development and market value of the development was only $17.5m **as of July 2022**.

---

***MPW will pay over 2x the development cost of a new facility in McKinney.***
***Investors & creditors should <u>demand</u> an independent investigation into management conduct.***

---

[1] https://www.tdlr.texas.gov/TABS/Search/Project/TABS2022008780

## Who did MPW purchase the property from?

A title search on the McKinney plot shows that MPW purchased the facility from Carrolton Springs, a Springstone subsidiary. It will be leased back to Springstone. This does not appear to have been disclosed.

The sale for $2.95m took place in October 2021, more than 6 months before the deal was announced and is not included in MPW's "costs incurred" figures[2], nor does it appear to form part of MPW's capex commitment. It is astounding that MPW would acquire an empty lot from a tenant.



| Deed History | | | | |
| --- | --- | --- | --- | --- |
| Deed Date | Seller | Buyer | Instr # | Volume/Page |
| 10/19/2021 | CARROLLTON SPRINGS LLC | MPT OF MCKINNEY-SPRINGSTONE LLC | 20211020002147330 | |
| 09/07/2018 | KAYASA FAMILY LTD | CARROLLTON SPRINGS LLC | 20180907001128410 | |

*Figure 4 – Extract Collins County Appraisal District[3]*

MPW's website facility search shows that Springstone is a tenant at 18 existing MPW properties.



*Figure 5 – Sample extract from MPW website*

*<span style="color:red">The cherry on top: MPW owns 49% of Springstone. It appears MPW is round tripping cash even between their own off-balance sheet JVs.</span>*

> So just to wrap up our recent activities. Last week, we closed on our acquisition of 18 inpatient behavioral hospitals master leased to Springstone across several U.S. states for a total of $760 million. These facilities are purpose-built behavioral hospitals in carefully selected communities and very well run, a unique portfolio that we have been observing for several years. We also invested $190 million to own a 49% interest in the operator.

*Figure 6 – MPW Q3 2021 conference call - Steven Hamner*

We believe this outrageous overspend aligns with MPW's pervasive revenue round-tripping model. The facts simply do not add up.

---

[2] https://www.collincad.org/propertysearch?prop=2784249&year=2023#valuetable
[3] https://www.collincad.org/propertysearch?prop=2784249&year=2023



## Key Takeaways

We reiterate our belief that MPW engages in pervasive revenue round-tripping schemes. It is clear that MPW intends to vastly overpaid for this facility, with appraisals and state filings directly contradicting statements from MPW.

The tenant, Springstone, rents 18 other properties from MPW. We believe this overpayment is consistent with round-tripping behavior in order to assist Springstone in meeting its payment obligations to MPW.

When MPW overpay for this facility by 2x, it will capitalize these absurd overpayments, and proceeds to borrow more money to make more uncommercial investments.

---

*Viceroy's full investigation of MPW's multiple transactions with Springstone and its management team will follow shortly.*

---



**Attention: <u>Whistleblowers</u>**

Viceroy encourage any parties with information pertaining to misconduct within Medical Properties Trust, its affiliates, or any other entity to file a report with the appropriate regulatory body.

We also understand first-hand the retaliation whistleblowers sometimes face for championing these issues. Where possible, Viceroy is happy act as intermediaries in providing information to regulators and reporting information in the public interest in order to protect the identities of whistleblowers.

You can contact the Viceroy team via email on [viceroy@viceroyresearch.com](mailto:viceroy@viceroyresearch.com).

**About Viceroy**

Viceroy Research are an investigative financial research group. As global markets become increasingly opaque and complex – and traditional gatekeepers and safeguards often compromised – investors and shareholders are at greater risk than ever of being misled or uninformed by public companies and their promoters and sponsors. Our mission is to sift fact from fiction and encourage greater management accountability through transparency in reporting and disclosure by public companies and overall improve the quality of global capital markets.

**Important Disclaimer – Please read before continuing**

This report has been prepared for educational purposes only and expresses our opinions. This report and any statements made in connection with it are the authors' opinions, which have been based upon publicly available facts, field research, information, and analysis through our due diligence process, and are not statements of fact. All expressions of opinion are subject to change without notice, and we do not undertake to update or supplement any reports or any of the information, analysis and opinion contained in them. We believe that the publication of our opinions about public companies that we research is in the public interest. We are entitled to our opinions and to the right to express such opinions in a public forum. You can access any information or evidence cited in this report or that we relied on to write this report from information in the public domain.

To the best of our ability and belief, all information contained herein is accurate and reliable, and has been obtained from public sources we believe to be accurate and reliable, and who are not insiders or connected persons of the stock covered herein or who may otherwise owe any fiduciary duty or duty of confidentiality to the issuer. We have a good-faith belief in everything we write; however, all such information is presented "as is," without warranty of any kind – whether express or implied.

In no event will we be liable for any direct or indirect trading losses caused by any information available on this report. Think critically about our opinions and do your own research and analysis before making any investment decisions. We are not registered as an investment advisor in any jurisdiction. By downloading, reading or otherwise using this report, you agree to do your own research and due diligence before making any investment decision with respect to securities discussed herein, and by doing so, you represent to us that you have sufficient investment sophistication to critically assess the information, analysis and opinions in this report. You should seek the advice of a security professional regarding your stock transactions.

This document or any information herein should not be interpreted as an offer, a solicitation of an offer, invitation, marketing of services or products, advertisement, inducement, or representation of any kind, nor as investment advice or a recommendation to buy or sell any investment products or to make any type of investment, or as an opinion on the merits or otherwise of any particular investment or investment strategy.

Any examples or interpretations of investments and investment strategies or trade ideas are intended for illustrative and educational purposes only and are not indicative of the historical or future performance or the chances of success of any particular investment and/or strategy. As of the publication date of this report, you should assume that the authors have a direct or indirect interest/position in all stocks (and/or options, swaps, and other derivative securities related to the stock) and bonds covered herein, and therefore stand to realize monetary gains in the event that the price of either declines.

The authors may continue transacting directly and/or indirectly in the securities of issuers covered on this report for an indefinite period and may be long, short, or neutral at any time hereafter regardless of their initial recommendation.

# FEBRUARY 8, 2023 REPORT

# MPW **Case Study** – Steward International

Viceroy detail structure of MPW's JV with Ralph De La Torre including fake transactions, backdated statements, outright lies, and MPW implications in criminal probe.

**PLEASE READ IMPORTANT DISCLAIMER – PAGE 3**

**February 8, 2023** – MPW's joint venture with Steward CEO, Ralph De La Torre, has been the subject of intense curiosity by MPW bulls and bears alike. Today, Viceroy Research will detail the JV's structure, the ownership of Steward Malta, and egregious, and likely criminal, payments made between MPW, Steward Systems, the JV, and various international entities.

- **Assets purchased by the JV were never transferred to the JV**. There appears to have been **no AML or KYC** checks.

- **The assets that the JV purportedly bought from Steward for $200m were valued at $27m.**

- **MPW & Steward uniformly deny they are related to "independent" Steward International and Steward Malta**. Viceroy's investigation shows that **Steward Malta's UBO is based in Steward's HQ**, and that **MPW appear to own 49% of Steward Malta**. MPW actively lies to investors.

- Steward Malta, its staff, and its concession are the **subject of broad international criminal inquiries**.

## The JV

**MPW closed a $205m investment for 49% of a JV** with Steward founder, Ralph De La Torre ("**the JV**").

- This JV transaction is reported in more detail in the 2020 Steward Health Care System's ("**Steward Systems**") financial statements. Steward claims that it divested Steward Health Care International Holdings Ltd ("**Steward International**"), a UK entity, to a joint venture controlled by Steward's "management equity holders" and MPW for $200m.

  - **Total assets sold by system amounted to $27m. MPW appears to have overpaid by 640%.**

- Filings of Steward International show that it was never transferred to the JV. Steward International was 100% owned by Steward Systems until its strike off in February 2022.

- At the date of the JV transaction, Steward International owned Steward Malta, who bears the controversial Malta concession.

  - Steward Malta lodged a 1-year backdated letter correcting a further 6-month backdated filing. It retrospectively stated that Steward Malta had been sold to Steward Spain, the "new and independent" Steward International.

## Who Owns Malta?

MPW, Steward Systems uniformly deny that they have any commercial or legal relationship with Steward Malta, even via the JV. **Viceroy's research suggests this is a lie.**

- Dozens of filings pulled from Spanish business registries show that Steward Spain (the immediate parent of Steward Malta) is owned by a Delaware company called **Manolete Health Management LLC.**

  - A similarly named entity, **Manolete Health Limited**, was incorporated and immediately dissolved by **Ralph De La Torre** in the UK

  - It appears that Manolete Health Management LLC exists in a group of Delaware companies created one month before the JV transaction.

- **MPW also has a subsidiary titled "Manolete"**, also in Delaware, and **created only days before the date of the JV transaction**. It appears that this MPW subsidiary holds the 49% JV interest, including in Steward Malta.

- The UBO of Steward Spain, Steward Health Care International Investors LLC ("Steward Investors"), appears to hold the remaining 51% JV interest.

  - Steward Investors shares headquarters and staff with Steward Systems.

## MPW's JV Structure



*Figure 1 – Viceroy Analysis - estimates*

## Who Wants Malta?

Put simply, Steward purchased a Maltese hospital concession obtained through corruption while retaining the key actors in that corruption. Viceroy will show in this section how the same individuals that brokered the Vitals deal came to work for Steward in their international campaign.

- Steward purchased the Maltese hospital concession knowing it was **connected to corrupt practices**.
- Vitals had **no reliable accounting records** to speak of.
- The individuals behind those corrupt practices would remain involved with Steward, either directly in Ernst's and Asad Ali's case or indirectly with Shaukat Ali cheerleading projects in eastern Europe.
- Vitals was systematically looted by its shareholders and had no intention or capability of ever fulfilling the concession.
- Maltese courts will present a decision on revoking the Steward's concession which have been a significant source of problems.
- Steward has repeatedly claimed that its Maltese operations are loss-making when seeking further funding from the government.

**A background to the Malta concession scandal is also annexed to this report.**



**Attention: <u>Whistleblowers</u>**

Viceroy encourage any parties with information pertaining to misconduct within Medical Properties Trust, its affiliates, or any other entity to file a report with the appropriate regulatory body.

We also understand first-hand the retaliation whistleblowers sometimes face for championing these issues. Where possible, Viceroy is happy act as intermediaries in providing information to regulators and reporting information in the public interest in order to protect the identities of whistleblowers.

You can contact the Viceroy team via email on [viceroy@viceroyresearch.com](mailto:viceroy@viceroyresearch.com).

**About Viceroy**

Viceroy Research are an investigative financial research group. As global markets become increasingly opaque and complex – and traditional gatekeepers and safeguards often compromised – investors and shareholders are at greater risk than ever of being misled or uninformed by public companies and their promoters and sponsors. Our mission is to sift fact from fiction and encourage greater management accountability through transparency in reporting and disclosure by public companies and overall improve the quality of global capital markets.

**Important Disclaimer – Please read before continuing.**

This report has been prepared for educational purposes only and expresses our opinions. This report and any statements made in connection with it are the authors' opinions, which have been based upon publicly available facts, field research, information, and analysis through our due diligence process, and are not statements of fact. All expressions of opinion are subject to change without notice, and we do not undertake to update or supplement any reports or any of the information, analysis and opinion contained in them. We believe that the publication of our opinions about public companies that we research is in the public interest. We are entitled to our opinions and to the right to express such opinions in a public forum. You can access any information or evidence cited in this report or that we relied on to write this report from information in the public domain.

To the best of our ability and belief, all information contained herein is accurate and reliable, and has been obtained from public sources we believe to be accurate and reliable, and who are not insiders or connected persons of the stock covered herein or who may otherwise owe any fiduciary duty or duty of confidentiality to the issuer. We have a good-faith belief in everything we write; however, all such information is presented "as is," without warranty of any kind – whether express or implied.

In no event will we be liable for any direct or indirect trading losses caused by any information available on this report. Think critically about our opinions and do your own research and analysis before making any investment decisions. We are not registered as an investment advisor in any jurisdiction. By downloading, reading, or otherwise using this report, you agree to do your own research and due diligence before making any investment decision with respect to securities discussed herein, and by doing so, you represent to us that you have sufficient investment sophistication to critically assess the information, analysis and opinions in this report. You should seek the advice of a security professional regarding your stock transactions.

This document or any information herein should not be interpreted as an offer, a solicitation of an offer, invitation, marketing of services or products, advertisement, inducement, or representation of any kind, nor as investment advice or a recommendation to buy or sell any investment products or to make any type of investment, or as an opinion on the merits or otherwise of any particular investment or investment strategy.

Any examples or interpretations of investments and investment strategies or trade ideas are intended for illustrative and educational purposes only and are not indicative of the historical or future performance or the chances of success of any particular investment and/or strategy. As of the publication date of this report, you should assume that the authors have a direct or indirect interest/position in all stocks (and/or options, swaps, and other derivative securities related to the stock) and bonds covered herein, and therefore stand to realize monetary gains in the event that the price of either declines.

The authors may continue transacting directly and/or indirectly in the securities of issuers covered on this report for an indefinite period and may be long, short, or neutral at any time hereafter regardless of their initial recommendation.

# 1. Investment in Steward Health Care International Ltd

On May 11, 2020, MPW closed a **$205m investment for 49% of a JV** with Steward founder, Ralph De La Torre, to "**invest in select international hospitals**" ("**the JV**"). The JV was said to have purchased "rights and existing assets related to all present and future international opportunities previously owned by Steward".

MPT closed in mid-May on a $205 million investment to own 49% of a joint venture with Steward CEO and Founder Dr. Ralph de la Torre and members of his management team organized to invest in select international hospitals. The distinct entity simultaneously purchased from Steward the rights and existing assets related to all present and future international opportunities previously owned by Steward for strategic, regulatory, and risk

*Figure 2 – MPW Q2 2020 Results Announcement – Jul 30, 2020[1]*

Related to this transaction, MPW also announced that it would invest a **further** "$100 million in a portfolio of three hospitals in underserved areas of Colombia". These would be operated by the JV.

management purposes. In a transaction expected to close in the fourth quarter, MPT expects to invest $100 million in a portfolio of three hospitals in underserved areas of Colombia to be operated by the new joint venture.

*Figure 3 – MPW Q2 2020 Results Announcement – Jul 30, 2020*

Despite announcing that the JV's business would be to "invest in select international hospitals", MPW CEO, Ed Aldag, clearly states on the conference call that the JV is an "opco", meaning that it will not "invest" in hospitals: it will operate them.

**Edward K. Aldag**
*Founder, Chairman, President & CEO*

Yes. So it is, Tayo, this $205 million in the opco joint venture and then $100 million in the real estate that we own 100% of. What it gets us in the opco joint venture is that Steward has been working several international markets, only one of which we're prepared to announce today, and that's Colombia. They put an awful lot of time and effort and infrastructure in place, and that's what the $205 million is for. Is that clear, Tayo?

*Figures 4 – MPW Q2 2020 Earnings Call – Jul 30, 2020*

## The Steward Angle

This JV transaction is reported in more detail in the 2020 Steward Health Care System's ("**Steward Systems**") financial statements.

Steward claims that it divested **Steward Health Care International Holdings Ltd** ("**Steward International**") to a joint venture controlled by Steward's "management equity holders" and MPW for $200m.

**(6) Related Party Transaction**

On May 11, 2020, there was a related party transaction involving Steward Health Care International Holdings Ltd ("Steward International"), the System's international operations. Steward International was transferred to a company owned by certain of the System's management equity holders and Medical Properties Trust, Inc. (MPT). The System received $200.0 million in cash for the sale of Steward International. Total assets sold by the System were approximately $27.0 million, resulting in a net cash contribution from the management equity holders of $173.0 million to the System. The transaction has been accounted for as a related party transaction and is shown as a contribution to equity on the accompanying consolidated statement of changes in members' deficit of $130.5 million after taking into account the tax impact of the contribution.

*Figures 5 – MPW Q2 2020 Earnings Call – Jul 30, 2020*

## Key Takeaways

- MPW appears to have entirely funded the JV with $205m, for which they received a minority stake of 49%.

- The JV acquires Steward International for $200m, resulting in a $173m gain-on-sale to Steward.

- MPW paid 7.4x premium to book for Steward International. We will explore these assets. This is consistent with revenue round tripping. The only winner otherwise is Ralph De La Torre. The transaction is entirely uncommercial.

- MPW committed $100m to purchasing 3 Colombian hospitals, which will be operated by the JV.

---

[1] https://www.medicalpropertiestrust.com/press-release?page=https://medicalpropertiestrust.gcs-web.com/news-releases/news-release-details/medical-properties-trust-inc-reports-second-quarter-results-4

## 2. Who Owns Steward International?

We'll preface this section by stating that, to our knowledge, **MPW has never disclosed the name of its JV entity with Ralph De La Torre**. This is an enormous red-flag. Off-balance sheet entities create the potential for theft, round-tripping, or even hiding losses, and should be heavily scrutinized.

Steward's financials claim that the JV purchased "Steward Health Care International Holdings Ltd", a British entity:



*Figure 6 – Extract from UK Companies House[2]*

From the date of the JV transaction announcement until its dissolution in February 2022, almost 2 years after it was acquired by the JV, Steward International was always owned by Steward Systems. It never changed hands.

A confirmation statement was lodged on 22 April 2020 showing Steward International as sole shareholder. A subsequent confirmation statement was made on 22 April 2021 with "no updates". The company was subsequently struck-off.



*Figure 7 – Extract from Steward International Confirmation statement – 10 Jun 2020*

---

***What did the JV acquire for $200m?***

---

[2] https://find-and-update.company-information.service.gov.uk/company/11934840

## 3.  What did Steward International Own?

The only assets Viceroy believe Steward International owned at the date of the JV transaction were in Malta. This is corroborated by wayback archives of Steward International's website in early 2021[3].

Indeed, at the date of the JV's fictional acquisition of Steward International, Steward's Malta "Holdco", Steward Health Care International Ltd Malta ("**Steward Malta**") was 100% owned by Steward International.

| Folio in register ledger containing particulars | Names Addresses (in the case of a body corporate, its registered office) | Account of Shares | | | Remarks |
|---|---|---|---|---|---|
| | | Number of shares held by existing members at date of return *# | Particulars of shares transferred or transmitted *causa mortis* since the date of the last return, or, in the case of the first return, of the registration of the company by (a) persons who are still members and (b) persons who have ceased to be members ** | | |
| | | | Number # | Date of Registration of transfer | |
| | | Ordinary | (a) | (b) | |
| | Steward Health Care International Holdings Limited Suite 1, 3rd Floor, 11-12 St. James's Square, London SW1Y 4LB, United Kingdom. (Reg. No. 11934840) | 150,000 | | | |
| | TOTAL | 150,000 | | | |

*Figure 8 – Steward Malta – Annual Return for period ending 1 November 2020*

In a bizarre turn of events, Steward Malta lodged a correction to this 2020 Annual Return in November 2021, along with a transfer of ownership form, in August 2022 – almost 2 years after the JV supposedly acquired Steward International.

These claim, retrospectively, that Steward Malta was transferred to Steward Health Care International S.L. Spain (formerly Cordiant Healthcare Services KSA, S.L, referred to herein as "**Steward Spain**") on 12 May 2020, **one day after the MPW closed the JV investment**.

PWC needs to pay attention here. This document appears to have been **backdated** by over 1 year.



*Figure 9 – Extract from Steward Malta Annual Return correction notice*

---

[3] https://web.archive.org/web/20210314205135/https://www.stewardinternational.org/

## 4. Who Owns Steward Spain? – "Manolete"

Dozens of filings pulled from Spanish business registries show that Steward Spain's *immediate* parent entity is a Delaware company called **Manolete Health Management LLC**. It appears that Manolete Health Management LLC exists in a group of Delaware companies which include Manolete Health LLC and Manolete Health Holdings LLC.

A similarly named entity, **Manolete Health Limited**, was incorporated and immediately dissolved by **Ralph De La Torre** in the UK[4].



*Figure 10 – UK Companies House Extract*

All of these entities were created in April 2020, the month preceding the JV transaction.

### MPT Manolete Opco TRS, LLC – 49% JV Interest Holder

Curiously, MPW also has a subsidiary titled "Manolete", also in Delaware, and created only days before the date of the JV transaction.



*Figure 11 – UK Companies House Extract[5]*

---

**MPT Manolete Opco TRS appears hold MPW's 49% JV equity interest in Steward International.**

---

[4] Manolete is the name of one of the greatest bullfighters of all time.
[5] It is likely that Ralph De La Torre was unaware that his details would be made public. He actively distanced his registration from his other UK registrations of Steward entities by apparently creating a "second" Ralph De La Torre on the register's system.


### Steward Health Care International Investors LLC – 51% JV Interest Holder

Steward Spain's ultimate beneficial owners are Steward Health Care International Investors LLC, based in Delaware ("**Steward Investors**"). Steward Investors is listed as the UBO in Steward Spain's financial accounts for period ending 31 December 2020. We note that, at this date, Steward Malta was already an alleged subsidiary of Steward Spain.

| Pertenencia a un grupo de sociedades: | | DENOMINACIÓN SOCIAL | | NIF |
|---|---|---|---|---|
| Sociedad dominante directa: | 01041 | | 01040 | |
| Sociedad dominante última del grupo: | 01061 | STEWARD HEALTH CARE INTERNATIONAL INVESTOR LLC | 01060 | 1 |

*Figure 12 – Extract from Steward Spain 2020 Financial Accounts*

Steward Investors is also the *only* non-individual listed as an authorized person of Steward Spain.



*Figure 13 – Extract from Spanish Business Registries – Steward Spain*

---

***Steward Investors appears to hold the 51% JV equity interest in Steward International.***

---

We note that we cannot determine ownership of Steward Investors but note that its registered office is the same address, including Suite, as Steward Systems.

---

***Steward Malta crucially appears to share staff & offices with Steward Systems.***

---



*Figures 14 & 15 – Steward Investors LLC OpenGov extract[6] & Steward Corporate HQ Address (LinkedIn)*

---

[6] https://opengovus.com/texas-taxpayer/32080709150

## 5. The JV Structure – Viceroy Research

Viceroy's investigations show a much clearer picture of MPW's Steward International JV structure.

We have developed a rough corporate tree which illustrates the *current* structure of the JV, as it stands, and note that the circumstances surrounding the transaction, what MPW paid for, and what MPW received, are completely fabricated and intentionally opaque.

This behavior is consistent with money laundering and revenue round tripping.



*Figure 16 – Viceroy Analysis*

Given the intentionally opaque nature of the JV, we note that there may be further entities which fall between various HoldCos and Opcos and Management Cos. From our understanding. This is substantially the current structure.

### "NOT US"

Despite piecing together dozens of filings to detail JV ownership of Steward Internal, both **MPW and Steward Systems explicitly deny owning any part of Steward International and Steward Malta.**

## 7. "We do not own Malta"

Under fire from the media: Steward Malta made the strange and impossible claim that it had no connection to both MPW and Steward, directly contradicting statements made by both.

> Neither SHCI nor SHCM have any current commercial connection to MPT, nor any legal connection to Steward operations in the US. As such the link to MPT as depicted in the article is completely false, the company said.

*Figure 17 – Steward denies it will sell Barts – Malta Independent[7]*

When Steward was queried further regarding the structure of the JV by MaltaToday journalist, Matthew Vella, he received this response:

> *"…**Ahead of the 2020 transaction** to which you refer, **Steward Health Care International owned a collection of rights, intellectual property and subsidiaries. Most of the assets were sold into the international joint venture you mention**; however, **the name 'Steward Health Care International' and the subsidiary, Steward Health Care International-Malta, were sold to a Madrid-based and incorporated company** – the current Steward Health Care International. **This company now owns and runs the Maltese operations** and is a **fully independent** company **not related to Steward Health Care Systems LLC or the joint venture**.*
>
> *As it is a fully independent entity, Steward Health Care International is not in a position to respond to questions relating to the ownership or the activities of the joint venture or Steward Health Care Systems LLC, nor the activities of its shareholders. Any questions on these matters must be addressed to the relevant parties..."*
>
> - **Steward Malta Spokesperson** – provided to Viceroy Research by **Matthew Vella** of **MaltaToday**

---

*This entire recollection of events appears to be completely fabricated and backdated by Steward & MPW.*

---

- MPW and Steward Systems annual financial statements and disclosures state that **the JV purchased Steward Health Care International Ltd and rights to all of Steward's present and future international opportunities on 11 May 2020**.
    - At the date of acquisition, **Steward Health Care International Ltd owned Steward Malta**.
- **Steward Health Care International Ltd was never transferred to a JV** and deregistered in February 2022.
- 2 years after the JV transaction date, and 6 months after the deregistration of Steward Health Care International Ltd: **Steward Malta lodged a backdated letter to the Malta companies house, stating that Steward Malta had been transferred to Steward Spain on May 12, 2020**.
    - This followed, not preceded, the JV's purported May 11, 2020, acquisition of Steward International.
- Steward Spain, the current owner of Steward Malta, appears to be held by **Manolete Health Holdings: the JV holding vehicle**.
    - **MPW appears to hold its 49% stake in the JV via MPT Manolete Opco TRS**
    - The remaining 51% controlling holder of the JV, purportedly controlled by Ralph De La Torre, is Steward Health Care International Investors LLC
- "Commercial connections" between MPW and Steward Malta appear relatively straight forward.
- **Steward Malta's UBO operates out of Steward System's headquarters and shares staff and management with Steward Systems**.

---

*Even if MPW insist they don't know Steward Malta, then what did the did the $205m buy!?*

---

[7] https://www.independent.com.mt/articles/2022-02-01/local-news/Steward-International-denies-it-will-sell-Barts-says-it-is-completely-renegotiating-hospital-deal-6736240285

## 8. Hot Potato – Who Wants Malta?

It is already clear that the circumstances surrounding the JV appear tantamount to money laundering. Hold onto your hats. We presume readers have some background Malta's highly controversial/corrupt hospital concession scandal. In any case, we have **Annexed to this report a quick breakdown of the story**.

Put simply, Steward purchased a Maltese hospital concession obtained through corruption while retaining the key actors in that corruption. Viceroy will show in this section how the same individuals that brokered the Vitals deal came to work for Steward in their international campaign.

Steward acknowledged in "irregular and collusive practices" (read: corrupt) that led to the Vitals concession. Strange that it would then go on to work with so many of those individuals following.

> The Steward companies claimed that MANV had been involved in "irregular and collusive practices" on the 30-year hospitals concession granted by the Maltese government.

*Figure 18 – Steward drops its legal bid to avoid US$6.5m payment – Times of Malta[8]*

## Vitals Global Healthcare & Major Players – What KYC/AML?

Vitals Global Healthcare ("**VGH**") appear to have originally obtained the Malta hospital concession through corrupt means. Steward is VGH's successor, in the sense that Steward has purchased the concession.

The Shift has a fantastic investigative series on the "Vital Hospital Deal". It can be found here[9].

Behind the Vitals deal were Bluestone Investments and the following individuals (among others). This section provide a brief of their involvement in the VGH scandal, and highlight that **many worked for, or still work for, Steward International.**

We note that substantially all of these player appear to be "of interest" in the running criminal enquiries surrounding VGH. They may be subject to formal criminal proceedings subject to outcomes of legal cases submitted by Malta politician and Muscat opponent, Adrian Delia.

### Ram Tumuluri - Investor in Bluestone

Mr. Tumuluri appears to be a career con man. Extensively written about by the late Daphne Caruana Galiza.



*Figure 19 – Extract from Running Commentary – November 4, 2016[10]*

Mr. Tumuluri has subsequently been suspected of replicating VGH's fraudulent model in Mumbai, as his brand-new company was awarded a €332m to procure double decker and electric busses. Mr. Tumuluri has no background in busses. Legislative assembly members in India labeled Mr. Tumuluri an "international scammer"[11].

Previously, Mr. Tumuluri has been accused of abandoning failed projects in Canada, which now face "big lawsuits", according to investors left holding the bag[12]. Albanian news outlet Exit News states that Ram Tumuluri and Shaukat Ali were "involved in both VGH and Steward"[13].

[8] https://timesofmalta.com/articles/view/steward-drops-its-legal-bid-to-avoid-us65m-payment.934738
[9] https://theshiftnews.com/category/investigations/hospital-deal/
[10] https://daphnecaruanagalizia.com/2016/11/ram-tumuluri-running-canadian-lakeside-hotel-insolvency-running-maltas-public-hospitals/
[11] https://theshiftnews.com/2022/03/18/ram-tumuluri-suspected-of-replicating-fraudulent-malta-vgh-model-in-mumbai/
[12] https://ram-tumuluri.yolasite.com/
[13] https://english.republika.mk/news/macedonia/suspicious-businessman-with-ties-to-gaddafi-is-zaevs-contact-for-a-major-healthcare-project/


Case 1:24-cr-10047-RGS Document 171 Filed 06/13/23 Page 155 of 753

## Shaukat Ali Ghafoor & Asad Ali – Investors in Bluestone.

Shaukat Ali Ghafoor & his son[14], Asad Ali, appear to be a career con men. Along with his son, Asad Ali, Shaukat was signatory to the original MoU which awarded the corrupt hospital concession to VGH[15] in 2014.

### Power broking for Steward

Shaukat Ali allegedly brokered similar agreements to that in Malta with the governments of Montenegro, Macedonia and Albania wherein Vitals was the original counterparty, later replaced by Steward.

- Media reports indicate that Steward retained the services of Shaukat Ali to negotiate with the Northern Macedonian government led by Prime Minister Zoran Zaev[16].
- In May 2018 Macedonian prime minister Zaev allegedly met with then-Prime Minister of Malta Joseph Muscat and Shaukat Ali to discuss the privatization of North Macedonian hospitals. Albanian news outlet Exit News claims that there are photos evidencing that the meeting took place, but these photos have not been publicized.
  - By then Steward had announced its takeover of the VGH concession in Malta (this happened on 20 December 2017)[17].
- Albanian news outlet Exit News states that Ram Tumuluri and Shaukat Ali were "involved in both VGH and Steward"[18].

### Other issues

- Shaukat Ali had previously tried to buy the St James hospital together with Tumuluri and Gupta but the deal fell through when they were unable to come up with a down payment[19].
- Both Shaukat Ali Ghafoor and Asad Ali are "investors" in Ram Tumuluri's suspected fraudulent scheme to supply busses to India[20].
  - Indian political figures also allege that Asad Ali is involved with the hawala business, an informal remittance network that operates in the middle east and India.
- Shaukat Ali also received suspicious payments from Accutor Limited, a company that acted as a go-between for under-the-table payments relating to the hospital concession to Muscat, Tumuluri and Bluestone. Swiss banking and accounting records reviewed by the Times of Malta showed Steward wired Accutor EUR3.6m, 2.49m of which was wired on the same day it issued a statement that it was taking over the Vitals concession[21]. For their part Steward claimed ignorance, saying that it was directed to make those payments by Vitals management.
  - Two of Accutor's directors resigned simultaneously when they found that these payments had been hidden from them[22].
- Asad Ali was previously a major shareholder in Corporate International Consultancy, a company headed by John Dalli, former EU commissioner found to have taken bribes and operated several frauds[23].

---

[14] https://www.maltatoday.com.mt/news/national/84246/saint_james_hospital_the_botched_sale_and_the_middleman#.YkdV5igpCUk
[15] https://theshiftnews.com/2018/01/27/vitals-ownership-untangling-the-web/
[16] https://english.republika.mk/news/macedonia/suspicious-businessman-with-ties-to-gaddafi-is-zaevs-contact-for-a-major-healthcare-project/
[17] https://www.maltatoday.com.mt/news/national/83233/vitals_selling_malta_hospitals_concession_american_steward_healthcare#.YkdVsigpCUk
[18] https://exit.al/en/2020/03/03/company-eyeing-lucrative-healthcare-ppp-in-albania-owes-e12-million-to-maltese-government/
[19] https://www.maltatoday.com.mt/news/national/84246/saint_james_hospital_the_botched_sale_and_the_middleman#.Y-O2s3bMKUk
[20] https://theshiftnews.com/2022/03/18/ram-tumuluri-suspected-of-replicating-fraudulent-malta-vgh-model-in-mumbai/
[21] https://timesofmalta.com/articles/view/joseph-muscat-wired-thousands-of-euro-by-swiss-firm-linked-to-vgh.913212
[22] https://timesofmalta.com/articles/view/former-partners-raise-red-flags-on-man-behind-joseph-muscat-payments.913224
[23] https://www.nytimes.com/2017/05/12/world/europe/dalli-eu-fraud-ponzi-scheme.html

## Mark Pawley – Investor in Bluestone

Mark Edward Pawley represented majority Bluestone Special Situation 4 Ltd, Vitals' ultimate beneficial owner.

A court filing by KPMG Singapore for nonpayment relating to services to Bluestone Special Situations 4 shows Pawley is indeed the UBO of Bluestone. Amusingly the legal actions hinge on Pawley's attempted avoidance of a personal guarantee over Bluestone[24].

While the judgment is silent on what exactly KPMG was doing for Bluestone, the timing and labelling of the charges suggest it was for advisory services related to the Vitals deal.

> 63  The updates which Mr Pawley received included an email from KPMG (S) dated 15 August 2014 which set out the deliverables provided and a breakdown of fees:[57]
>
>   (a)  pre-deal financial and tax due diligence (US$ 470,000, "as per [LOE] signed 24 January 2014");
>
>   (b)  addendum and updates to report (US$200,000, as "[p]reviously communicated … which includes a 25% discount"); and
>
>   (c)  tax structuring (US$269,000, as "[p]reviously communicated … which includes a 25% discount").
>
> 64  The amounts KPMG (S) invoiced were agreed to by Mr Pawley before the invoices were issued:
>
>   (a)  on 21 February 2014, KPMG (S) emailed Mr Pawley to say that it would need to issue its invoice for half of some US$400,000 with disbursements of US$6,500;[58] Mr Pawley replied on 22 February 2014, saying "[t]hanks for the heads up. By all means submit the bill",[59] and on 17 March 2014 KPMG (S) duly invoiced US$200,000 in professional fees and US$6,500 in disbursements, as agreed;
>
>   (b)  on 14 January 2016, KPMG (S) informed Mr Pawley, "[t]he [total] amount we will invoice is US$939,000 plus [US]$15,000 expenses and taxes as applicable – please confirm prior to us issuing invoice", Mr Pawley replied "[y]ep",[60] and on 19 January 2016 KPMG (S) duly invoiced the balance US$739,000 in professional fees and US$8,500 in disbursements[61] (making a total of US$939,000 and US$15,000 in disbursements, as agreed).

*Figure 20 – Suit No 264 of 2019 High Court of Singapore*

Pawley further claimed in a December 2020 transcript that Bluestone had no assets and was not in a position to pay KMPG.

Bluestone effectively began funneling money out of Vitals as quickly as it came in. In fact, it's clear that Vitals was simply a conduit of cash from the Maltese government to Bluestone.



*Figure 21 – Millions of euros shifted out of Vitals on days of government payments – Times of Malta[25]*

Pawley along with Tumuluri also signed a backdated EUR400k a year contract for himself that Steward would eventually pay out of their pocket[26].

---

[24] https://www.elitigation.sg/gd/s/2021_SGHC_54
[25] https://timesofmalta.com/articles/view/millions-euros-shifted-vitals-days-government-payments.970193
[26]
https://www.maltatoday.com.mt/news/national/100845/vitals_directors_paid_themselves_1_million_annually_in_contract_drawn_up_months_before_exit#.Y-NnoXbMKUk

### Armin Ernst – CEO of Steward International, former CEO of VGH

Ernst was a previous Steward employee, who then became the head of VGH, and then became Steward International's CEO in the collapse of VGH. The Times of Malta state that these roles appear to overlap for extended periods[27].

Ernst was actively involved in various questionable transactions at VGH, even as Steward attempt to distance themselves from VGH's alleged fraud and could not deliver on any of VGH's financial obligations required under its concession. VGH nonetheless accepted €50m in concessions from the Government through these concessions[28].

Ernst also accompanied VGH staff and investors to various Eastern European countries in an apparent attempt to replicate VGH's scheme in Malta.

### Ambrish Gupta – Investor in Bluestone

Ambrish Gupta is the owner of Medical Associates of Northern Virginia (now Inovadocs), an early investor in the Vitals project who funded its expenses through a loan. As part of a dispute between Vitals investors a settlement was reached to pay MANV $10m, 5m immediately and 5m later which was never paid.

While we do not have enough visibility to say for certain it appears as though Gupta's role in the Vitals saga extended as far as this bridge loan. It is over this unpaid $5m that Gupta sued Steward Health Care in the UK.

### Nadine Delicata – VP of Operations at Vitals

Steward Health Care Malta's Executive Director and President Nadine Delicata was formerly VP of Operations at Vitals Global Healthcare[29,30]. Delicata wrote a piece for the Independent trashing Vitals and praising Steward while neglecting to mention her own involvement in the situation[31].

---

[27] https://timesofmalta.com/articles/view/20171222/local/vitals-ceo-profile-says-he-worked-simultaneously-for-new-concession.666264
[28] https://theshiftnews.com/2018/02/25/key-questions-no-answers/
[29] https://mt.linkedin.com/in/nadine-delicata-4068a827
[30] https://www.independent.com.mt/articles/2017-04-02/local-interviews/VGH-will-ensure-equity-of-care-for-NHS-patients-and-paying-patients-6736172385
[31] https://timesofmalta.com/articles/view/stewards-president-things-were-actually.932314#cta_comments

## Maltese government officials

### Joseph Muscat – Disgraced former Prime Minister

Disgraced former Maltese Prime Minister, **Joseph Muscat**, has been and appears to continue to be involved in government negotiations between Steward and VGH[32]. Muscat resigned unceremoniously in controversy surrounding his alleged involvement in the murder-for-hire assassination of journalist, Daphne Caruana Galiza, who wrote extensively on this fraudulent Maltese concession.

Muscat was also accompanied by Steward representatives in his visits to Macedonia to cheerlead for a public-private partnership there.

Shaukat was also seen in meetings between Steward and foreign governments, alongside Joseph Muscat[33].

Muscat received EUR60k in suspicious payments, claiming that this was in exchange for consultancy work he carried out by the firm.

Nonetheless, scrutiny over the deal led to a raid on Muscat's home by Maltese police in January 2022 over the ongoing corruption probe.

### Konrad Mizzi – Disgraced former Tourism Minister

Former Maltese tourism minister Konrad Mizzi was the individual who set in motion the Vitals saga by awarding the 30-year concession to Vitals in the first place in 2015 through Projects Malta, a company under his purview. Later investigations by the National Audit Office would show that the MoU with Vitals was signed **before** a request for proposals was submitted.

The original agreement required funding to be secured before the concession became effective, a requirement waived six months later by MIzzi[34].

Mizzi also signed the 2019 agreement with Steward that contained an "escape clause", part of a EUR28m loan stating that any termination of the concession in a court of law would constitute a government default while granting Steward a EUR100m pay-out.

### Keith Schembri

Keith Schembri is the former chief of staff to Joseph Muscat who resigned in relation to the murder investigation of Maltese journalist Daphne Caruana Galizia.

A design firm owned by Schembri's wife and himself, 3City design, received payment from Vitals and then Steward. These payments began around the time Steward was in talks to buy the concession from Vitals and were to design a carpark at the hospital although this duty belonged to the local council. After taking over the concession from Vitals Steward kept up the payments for another 9 months.

The entity through which Schembri owned his stake in 3City was Kasco, which was used for money laundering in a separate case. Both Schembri and his wife were charged with money laundering in 2021 with prosecutors alleging EUR1.5m were laundered through the company from 2008 to 2020.

---

[32] https://www.independent.com.mt/articles/2020-01-25/local-news/Muscat-s-presence-at-OPM-Steward-Healthcare-meeting-raises-eyebrows-6736218873

[33] https://web.archive.org/web/20200202231116/https://exit.al/en/2020/01/31/ppp-by-stealth-north-macedonia-a-disgraced-ex-prime-minister-and-ramas-healthcare-propaganda/

[34] https://theshiftnews.com/2018/02/25/key-questions-no-answers/

## 9. Implication

It's easy to get lost in the details of the Maltese transaction but the key takeaways are:

- **Steward purchased the Maltese hospital concession knowing it was connected to corrupt practices**.
- **Vitals had no reliable accounting records** to speak of, a fact that would have come up in Steward and MPW's due diligence processes.
- **The individuals behind those corrupt practices (Ernst, Shaukat and Asad Ali) would remain involved with Steward**, either directly in Ernst's and Asad Ali's case or indirectly with Shaukat Ali cheerleading projects in eastern Europe.
- **Vitals was systematically looted by its shareholders** and had no intention or capability of ever fulfilling the concession.
- Maltese courts will present a **decision on revoking the Steward's concession** which have been a significant source of problems.
- **Steward has repeatedly claimed that its Maltese operations are loss-making** when seeking further funding from the government.

It's not hard to see why no one wants Malta.

# Annexure – Background: Malta Hospital Concession

In this section, **we will explain why MPW and Steward are playing hot potato with Steward Malta**. This is by no means a full background to one of the most fascinatingly long winded, and most obviously corrupt, political healthcare deals of all time. We take our hats off to the various journalists who uncovered this corruption.

In 2015 Projects Malta, a company under the purview of then tourism minister Konrad Mizzi, awarded a 30-year concession to Vitals Global Healthcare ("**VGH**") to operate and modernize three previously state-owned hospitals: the St. Luke's Hospital, Karen Grech Rehabilitation Hospital and Gozo General Hospital.

The deal immediately attracted media controversy in Malta because VGH had no track record as a healthcare operator and refused to disclose its beneficial owners. It also became the subject of allegations that the deal between the Maltese government and VGH was arranged ahead of the public tender for the concession.

It was uncovered that VGH was connected to various career con men.

In the next two years, VGH also failed to honor its contractual obligations to the Maltese government. While it received around 70 million annually to run the hospitals, it failed to make the required EUR 220 million in capital expenditures.

## Preliminary Malta Investigations - NAO

In 2018 Adrian Delia, the leader of the main opposition party, the Nationalist Party, called on the National Audit Office ("NAO") to probe the government's agreement with VGH. He also filed a lawsuit against former prime minister Joseph Muscat, VGH, the Attorney General, the CEO of Malta Industrial Parks Limited and the chairman of the board of the Lands Authority. Delia asked the court to cancel the contract underlying the concession for the three hospitals, and to re-nationalize the hospitals[35].

The NAO published its report in July 2020. It found "proof of collusion" between government decision-makers and VGH. Specifically, the NAO alleges that the government signed a memorandum of understanding ("MoU") with VGH several months before publishing its request for proposals ("RfP"). VGH then effectively used the MoU to raise financing for the project and entered into an agreement with Bank of India several days before the publication of the RfP[36].

Hearings related to Delia's lawsuit have produced testimony confirming other controversial aspects of agreements related to the hospital concession. Current health minister Chris Fearne confirmed that in August 2019 Mizzi signed an agreement with Steward that contained an 'escape clause'.

The clause forms part of a EUR 28 million loan agreement between the Bank of Valetta and Steward. It states that any termination of the concession agreement in a court of law – even if Steward was in breach of contract – would be considered a government default. It means that under these circumstances all liabilities in conjunction with the hospitals would be passed on to the government, while Steward would receive, among other things:

- a EUR 100 million contractual pay-out for its equity[37]
- the ability to sell properties to MPW via long-dated leaseholds[38]

---

[35] https://www.independent.com.mt/articles/2021-01-18/local-news/Joseph-Muscat-to-testify-in-VGH-case-6736230247
https://www.maltatoday.com.mt/news/national/107086/hospitals_steward_facility_managers_cabinet_deal#.Y-DSDHbP1aY
https://www.independent.com.mt/articles/2021-03-01/local-news/Mizzi-OPM-were-holding-parallel-talks-with-VGH-behind-Fearne-s-back-court-hears-6736231430
[36] https://www.independent.com.mt/articles/2020-07-12/blogs-opinions/Lock-them-up-6736225028
[37] https://www.maltatoday.com.mt/news/national/120727/labour_braced_for_steward_fallout_over_penalty_fraud_investigation_#.Y-MU8nbP1aY
[38] https://www.maltatoday.com.mt/news/national/114729/steward_2019_unsigned_memorandum_included_plan_to_sell_barts_leasehold#.Y-MJNHbP1aY

## Steward acquires hospital concession

In 2018 VGH sold its hospital concession to Steward for a symbolic price of EUR 1, having amassed net liabilities of €27m in less than two years of operation. However, a settlement between Steward and former investors in VGH about a an allegedly backdated contract meant that Bluestone Investment Management, VGH's parent, and Ram Tumuluri, one of its promoters, received a combined €15 million from Steward[39].

The key driver behind the transaction was reportedly VGH's former CEO Armin Ernst. **He had been an administrative officer at Steward, before joining VGH as its CEO in June 2016**. He then left VGH in October **2017 and later re-joined Steward as the CEO of its international division, Steward Health Care International**. The division also oversees Steward's hospital concession in Malta.

## Steward attempts to re-negotiate contract

The transfer of the concession had to be approved by the Maltese government. It reportedly did so by signing a preliminary MOU with Mizzi, which was expected to govern the parties' relations until a re-negotiation of the concession contract in 2019. The latter never materialized because of the political crisis in Malta that unfolded in November 2019 over allegations that Mizzi and Muscat's chief of staff, Keith Schembri, were involved in the murder-for-hire of investigative journalist Daphne Caruana Galizia in 2017[40].

The contract negotiations were re-launched after Muscat resigned and handed power to Robert Abela in January 2020. Steward reportedly sought higher annual fees to run the hospital – up to EUR 120 million – and more preferable default clauses. Steward's CEO de la Torre and Steward Malta president Armin Ernst were reportedly supported by diplomats from the US embassy[41].

Steward also appears to enjoy the support of former Prime Minister Joseph Muscat. On 26 January, two weeks after Muscat's formal handover of power to party colleague and new prime minister Robert Abela, Muscat reportedly requested a meeting with Abela on behalf of Steward. He is also said to have accompanied Steward Malta CEO Ernst in the subsequent meeting with Abela, deputy prime minister Chris Fearne, principal permanent secretary Mario Cutajar[42].

## Criminal Investigations & Recession of Concession

Since 2019 there has also been a criminal inquiry into the government's concession award. In November 2019 the Criminal Court in Malta threw out an appeal by former cabinet ministers Edward Scicluna, Konrad Mizzi and Chris Cardona against conducting a criminal inquiry into the events leading up to hospital concession award. The request for the criminal inquiry had been filed by NGO Repubblika[43] in order to establish whether the ministers had given VGH an unfair advantage. The inquiry is ongoing.

Mr. Delia has subsequently filed a court case in Malta for the recession of the privatization of the Maltese hospitals. The outcome is due in the coming weeks[44].

---

[39] https://www.maltatoday.com.mt/news/national/66633/vital_groups_hospital_management_takeover_kicks_off#.Y-MNzXbP1aY
https://www.maltatoday.com.mt/news/national/107086/hospitals_steward_facility_managers_cabinet_deal#.Y-MN3nbP1aY
https://theshiftnews.com/2018/02/25/key-questions-no-answers/
[40] https://www.theguardian.com/politics/2019/dec/01/malta-pm-joseph-muscat-quits-daphne-caruana-galizia
[41] https://www.maltatoday.com.mt/news/national/104813/americans_put_the_heat_on_ministers_with_moneyval_test#.Y-MYN3bP1aa
[42] https://www.independent.com.mt/articles/2020-01-26/local-news/Muscat-s-presence-at-OPM-Steward-Healthcare-meeting-raises-eyebrows-6736218873
https://www.maltatoday.com.mt/news/national/99979/joseph_muscat_lobbies_robert_abela_to_renegotiate_steward_deal#.Y-MYgnbP1aY
[43] https://timesofmalta.com/articles/view/passport-buyer-milked-millions-vitals-deal.967303
[44] https://www.maltatoday.com.mt/news/national/120727/labour_braced_for_steward_fallout_over_penalty_fraud_investigation_#.Y-DbZnbP1aY

# FEBRUARY 13, 2023 REPORT

# MPW **Case Study** – Steward International Pt. 2

Steward International falsely denies MPW ownership or control. Viceroy investigations unearth Colombian title deeds and securities filings exposing this lie.

**PLEASE READ IMPORTANT DISCLAIMER – PAGE 10**

**February 13, 2023** – On February 9, 2023, Viceroy Research investigations exposed MPW & Ralph De La Torre's JV's structure, the ownership of Steward Malta, and egregious, and possibly criminal, payments made between MPW, Steward Systems, the JV, and various international entities.

- **Assets purchased by the JV were never transferred to the JV**. There appears to have been **no AML or KYC** checks.

- **The assets that the JV purportedly bought from Steward for $200m were valued at $27m.**

- **MPW & Steward uniformly deny they are related to "independent" Steward International and Steward Malta**. Viceroy's investigation shows that **Steward Malta's UBO is based in Steward's HQ**, and that **MPW appear to own 49% of Steward Malta**. MPW actively lies to investors.

- Steward Malta, its staff, and its concession are the **subject of broad international criminal inquiries**.

Our MPW investigations can be found [here](#).

On February 11, 2023, Steward International doubled down, and stated to MaltaToday journalists that "MPW does not in any way own or control Steward Health Care International". It has also previously categorically denied any commercial relationship with MPW, and any legal relationship with Steward Health Care Systems (US). This was a **honeypot**.

Viceroy investigations will today show that:

- Steward International subsidiary by-laws filed in Colombia, where Steward International operate, **explicitly state MPW is a shareholder of the Manolete Health** companies, who directly own Steward Health Care International SL (Spain), vis a vis Steward Malta and Colombia.

- **Steward International's Colombia venture is equally convoluted, opaque, and dishonest**. MPW have misrepresented the structure of this venture without corrections, leaving analysts in the dark.

- MPW have vastly overpaid for Steward International real assets and operational businesses through uncommercial transactions with Manolete / the Ralph De La Torre JV.

This report will dive into ground-level details of MPW's Colombia exposure. The structure, value, and yield of MPW's proposed Colombian investment varied with the seasons, literally. In all forms of proposed Colombian transactions, MPW massively overpaid for Colombian assets, and financed Steward and/or Ralph De La Torre's entire venture into the market.

- Conflicting statements and filings suggest MPW do not own any direct interest in the properties of Colombian hospitals, despite explicit assertions that MPW would invest $100m in Colombian real assets, which would subsequently be *operated* by its Steward International JV.

- **The value of MPW Colombian mortgages to its Manolete JV vastly exceeds the value of underlying secured assets** and is substantially financed by the equity of Colombian hospital *operators*.

- MPW appears to have entered into financial commitments to invest in Colombian hospitals without any discernible due diligence, and without any transparent or consistent disclosures to stakeholders.

> *We do not believe MPW auditors can reasonably assure the accuracy of MPW's financial statements, given that **management is actively concealing the group's corporate structure**.*
>
> *We believe a **disclaimer of opinion** is warranted.*

## 1. Steward Denials

In response to Viceroy's investigations, Steward International provided the following quote to MaltaToday's Matthew Vella, denying any association between Steward International, MPW and Steward Health Care Systems (USA).

> "Manolete and Steward Health Care International are two separate companies, with separate operations, management and corporate structure. MPT does not in any way own or control Steward Health Care International, and saying otherwise is wrong and intentionally misleading. Viceroy's statements are transparently and knowingly false; they plainly have the effect, or are intended, to cause serious and unjustified reputational harm to Steward International; and Steward International will not hesitate to take steps necessary to protect its patients and its reputation."

*Figure 1 – Opaque Steward ownership distances Americans from Malta fall-out – MaltaToday[1]*

The company goes on to say that it is **fully independent** of Steward Systems and the joint venture that it does not address by name.

> Steward International, now a company registered in Spain, had told MaltaToday it alone is the concessionaire, and was "fully independent" and unrelated to either the joint venture or Steward Systems in the USA.

*Figure 2 – Opaque Steward ownership distances Americans from Malta fall-out – MaltaToday*

Viceroy have already shown that the Manolete entities are immediate parents of Steward Health Care International through several opaque jurisdictions.

The UBO of Steward International is Steward Health Care International Investors, who share staff and office with Steward Systems. The CEO of Steward International has an active @steward.org email address and appears on the Steward Systems leadership page.

This report will confirm that MPW is a minority JV shareholder in Manolete via bylaw filings lodged by Steward International's Malta subsidiaries. The entire acquisition of Steward International was funded by MPW.

These denials are ridiculous. Steward International is allegedly fully independent of:

- MPW, the company who fully funded the JV to acquire Steward's international assets.
- Manolete, its shareholder according to Spanish company registry filings.
- The unnamed joint venture, which we have identified as Manolete.
- Steward Health Care International Holdings Ltd (UK), the company Steward System sold to MPW and Steward management equity holders.
- Steward System, the company with which its UBO Steward Health Care International Investors LLC shares address and personnel.

Steward's statements, limitations of public disclosures, make any attempt to map out the Steward International ownership speculative at best, especially with ongoing denials of ownership that appear to be patently false.

We do not believe MPW auditors can reasonably assure the accuracy of MPW's financial statements, given that management is actively concealing the group's corporate structure. We believe a disclaimer of opinion is warranted.

---

[1] https://www.maltatoday.com.mt/news/national/121239/opaque_steward_ownership_distances_americans_from_malta_fallout#.Y-nfo3bMKUk

## 2. Colombia Filings – MPW Shareholders of Steward International

Readers may be aware of MPW's sizeable and vague investments in Colombia through and/or connected to its Steward International JV with Steward founder, Ralph De La Torre.

Various filings pulled from Steward International subsidiaries in Colombia show that MPW is unequivocally a shareholder in Manolete. These filings include amendments to Steward International subsidiary bylaws, which allows MPT, in its capacity as a shareholder of Manolete, to deliver notice of default to any Steward International subsidiary in the event the subsidiaries are insolvent.



**Artículo 43.- Acciones extraordinarias.** *Sin perjuicio de cualquier disposición en contrario en estos estatutos, si se ha producido un Incumplimiento Mayor (Major Default, según se define en el Acuerdo de Accionistas) por o con respecto a la Sociedad o cualquiera de sus Subsidiarias (o, con respecto a cualquier garante de sus obligaciones respectivas) (según corresponda, cada una de las cuales es una "Parte Incumplida"). y luego de la entrega por MPT (mientras MPT sea miembro de Manolete Health LLC) a la Sociedad de la notificación de que tal Incumplimiento Mayor ha ocurrido con respecto a dicha Parte Incumplida de acuerdo con los términos y condiciones de estos estatuos y del Acuerdo de Accionistas y el Gerente Especial (Special Manager, como se define en el Acuerdo de Accionistas y que será un funcionario debidamente designado por la asamblea de accionistas en los términos del Acuerdo de Accionistas) podrá optar por ejercer facultades exclusivas de administración y representación con respecto a dicha Parte Incumplida, y hacer que la Sociedad ejerza su responsabilidad directa y derechos indirectos de administración en cada una de sus Subsidiarias con respecto a dicha Parte Incumplida, los siguientes (el ejercicio de cualquiera de los cuales se denomina en el presente documento "Acción Extraordinaria"):*

*"if there has been a Major Default…by or with respect to the Company or any of its Subsidiaries …, and upon delivery by MPT (so long as MPT is a member of Manolete Health LLC) to Company of notice that such Default Major has occurred…*

*Figure 3 – Cordiant (Steward Colombia) by-laws amendment and translation*

Manolete, in turn, are immediate parent companies of both Steward Malta and Steward Colombia.



| BOLETIN 217 | NUMERO DE REFERENCIA 387703 | |
|---|---|---|
| ACTOS | DETALLES Sociedad unipersonal. Cambio de identidad del socio único: MANOLETE MANAGEMENT LLC. | |
| CAMBIO DE SOCIO UNICO | | |
| | DATOS REGISTRALES T 40425, F 42, S 8, H M 717963, I/A 4 (03.11.2020) | |
| DENOMINACION SOCIAL **STEWARD HEALTH CARE INTERNATIONAL SL** | | |
| NUMERO DE INSCRIPCION 5 | FECHA DE INSCRIPCIÓN 04/11/2020 | FECHA DE PUBLICACIÓN 12/11/2020 |
| BOLETIN 218 | NUMERO DE REFERENCIA 389580 | |
| ACTOS | DETALLES Ceses/Dimisiones. Adm. Unico. DE LA TORRE RALPH. Nombramientos. Adm. Solid.. DE LA TORRE RALPH, ERNST | |
| CESES/DIMISIONES | ARMIN. Otros conceptos: Cambio del Organo de Administración: Administrador único a Administradores solidarios | |
| NOMBRAMIENTO | | |
| OTROS CONCEPTOS | | |
| | DATOS REGISTRALES T 40425, F 43, S 8, H M 717963, I/A 5 (04.11.2020) | |

*Figure 4 – Steward Health Care International SL Registry entries*

*Figure 5 – Viceroy Research – estimate structure*


## Steward International & Steward Systems

We further note that Steward International has denied any legal relationship with Steward Health Care Systems, the US Steward parent company. This is despite the fact that Steward International's ultimate beneficial owner (i.e. the 51% shareholder in Manolete), Steward Health Care International Investors LLC, is based out of Steward System's offices.



*Figure 6 – Steward Health Care International Investors LLC – Texas company search[2]*

Steward International's web domains are registered by Steward System staff and addresses. The registrant, Mark Rich remains a senior advisor at Steward Health Care Investors LLC and served as Steward System's Interim CFO[3]. The registrant email is Steward System's head of digital marketing[4].



*Figure 7 – stewardinternational.org whois search results[5]*

---

[2] Visit https://mycpa.cpa.state.tx.us/coa/search.do and search for Tax ID 32080709176
[3] https://www.linkedin.com/in/mark-rich-14628b10/
[4] https://www.healthcarestrategy.com/blog/speakers/colleen-walsh/
[5] https://uk.godaddy.com/whois/results.aspx?checkAvail=1&tmskey=&domain=stewardinternational.org

Steward International's leadership team, who proclaim to be entirely independent from their US counterparts, nevertheless feature on the Steward Systems' "Leadership" web page:



*Figure 8 - Steward.org "Leadership" page*

Steward International's CEO, Armin Ernst, has an active @steward.org email address which delivered questions from Viceroy relating to the structure of Steward International.



*Figure 9 - Viceroy delivered email to Armin Ernst mailbox under steward.org domain*

Viceroy do not believe MPW and Steward auditors can provide reasonable assurance as to the accuracy of respective company financial statements given intentionally deceptive behavior, which now appears to include the fabrication of international corporate structures.

## 3. Steward Colombia – Uncommercial in its own right

### Finger in the wind – how much money did MPW burn in Colombia?

According to MPW, it invested $135m in the **real estate** of 3 Colombian companies as was stated in their Q2 2020 earnings call.

> • Financed three general acute care hospitals in Colombia for approximately $135 million operated by the new international joint venture;

> previously owned by Steward for strategic, regulatory, and risk management purposes. Through this joint venture, we invested, on November 17, 2020, in the real estate of three general acute care hospitals in Colombia for approximately $135 million. These properties are operated by the international joint venture.

> Our equity investment and related loan to the international joint venture, our loan investment in the real estate of three hospitals operated by subsidiaries of the international joint venture in Colombia, and our equity investment and related loans in Springstone are measured at value on a

*Figures 10, 11 & 12 – Annual Report 2020 and Annual Report 2021 and Q3 2022 10-Q*

> **Edward K. Aldag**
> *Founder, Chairman, President & CEO*
>
> Yes. So it is, Tayo, this $205 million in the opco joint venture and then $100 million in the real estate that we own 100% of. What it gets us in the opco joint venture is that Steward has been working several international markets, only one of which we're prepared to announce today, and that's Colombia. They put an awful lot of time and effort and infrastructure in place, and that's what the $205 million is for. Is that clear, Tayo?

*Figure 13 – Q2 2020 Earnings Call*

It turns out these statements were a touch misleading.

- The structure, value, and yield of MPW's proposed Colombian investment varied with the seasons, literally. In all forms of proposed Colombian transactions, MPW massively overpaid for Colombian assets, and financed Steward and/or Ralph De La Torre's entire venture into the market.

- A trace of MPW's Colombian JV show that it is a subsidiary of the Steward International Manolete JV: the same MPW JV group that holds interest in Steward Malta.

- MPW's does not appear to hold any direct interest in the properties of Colombian hospitals, despite explicit assertions that MPW would invest $100m in Colombian real assets, which would subsequently be *operated* by its Steward International JV.

- The value of MPW Colombian mortgages to its Manolete JV vastly exceeds the value of underlying secured assets and is substantially financed by the equity of Colombian hospital *operators*.

- MPW entered into financial commitments to invest in Colombian hospitals without any evident due diligence, and without any transparent or consistent disclosures to stakeholders.

We believe that MPW financed this acquisition wholesale, corroborated by local media reports that the purchase "would be financed entirely by Medical Properties Trust".

> Posse Herrera Ruiz has advised the American REIT, Medical Properties Trust, Inc., in a joint acquisition with Steward Health Care, of the three outpatient clinics operated by National
> Clinics Colombia in the cities of Bogotá D.C. and Pereira. The acquisition will be made through MPT and Steward's joint venture and will be financed entirely by Medical Properties Trust. The deal included the purchase of the real estate used in the clinics, including the real estate property of GSRVC Holdings.

*Figure 14 – Medical Properties Trust and Steward Health Care enter Colombian healthcare market[6]*

---

[6] https://www.toprankedlegal.com/press-release/medical-properties-trust-and-steward-health-care-to-enter-into-the-colombian-health-care-market-with-the-acquisition-of-clinics-operated-by-national-clinics/



## Centenario – Timeline

The deed for Centenario shows it was transferred from Loto Asociados SAS (formerly Lithia Investment SAS) to PA Centenario for COP52b ($14.4m).

**- PARÁGRAFO PRIMERO - <u>CUANTÍAS</u>:** Para efectos de derechos notariales generados por el otorgamiento de la presente escritura, se tendrá en cuenta lo establecido en el Decreto 188 de 2013, la Resolución 1299 del 11 de febrero de 2020, expedida por la Superintendencia de Notariado y Registro y las normas que los modifiquen o adicionen, formándose como base de liquidación el valor del avalúo catastral de los bienes fideicomitidos, en este caso es la suma de **CINCUENTA Y DOS MIL TRESCIENTOS SETENTA Y NUEVE MILLONES CUATROCIENTOS OCHENTA Y CUATRO MIL PESOS ($52.379.484.000)** moneda legal colombiana, la cual será asumida por EL FIDEICOMITENTE B. -----

*"taking as the settlement basis the value of the cadastral appraisal of the trust assets, in this case it is the sum of FIFTY-TWO THOUSAND THREE HUNDRED SEVENTY-NINE MILLION FOUR HUNDRED EIGHTY-FOUR THOUSAND PESOS ($52,379 .484,000) Colombian legal currency, which will be assumed by THE TRUSTOR B."*

*Figure 15 – Centenario Sales Deed and accompanying documents and translation*

Loto Asociados was a vehicle used by owners of the defrauded Colombian EPS Salud Vida company to siphon assets out of the SaludVida company and into their hand's owner Hortensia Arenas Avila and her family.

▪ Between 2014 and 2016 Salud Vida sold 46 properties from their holding company clinic Bogota valued at COP 32.0b to Lithia Investment SAS in exchange for promissory notes in the value of COP164b ($34.28m)[7]. These buildings include the property clinica Centenario operates in[8].

In addition, **Salud Vida transferred 46 assets valued at more than 32 billion pesos** to a Panamanian company called Lithia Investment SAS , but the transfer was made for **16,884,451,000 pesos** through a promissory note.

Lithia Investment controls two IPS that provides services to Salud Vida and points out the Liquidator's complaint, **that business was carried out in six transactions** , 5 of them on the same day June 5, 2015, a few days before Supersalud **declared special surveillance** .

The one who transferred these assets to Panama was the Bogotá clinic, **whose legal representative is Daniel Fernando Silva Roa,** brother of the President of Salud Vida, Juan Pablo Silva Roa.

*Figure 16 - Prosecutor's Office investigates robberies and irregular operations of the EPS Salud Vida – Caracol Radio*

▪ Local media appear to incorrectly report that Lithia is a Panamanian company[9] and a court dispute between Loto Asociados and SaludVida (then in liquidation) appears to confirm that the Loto Asociados that sold Centenario is the same that looted SaludVida[10].

▪ The trust was settled by an agreement between Loto Asociados (formerly Lithia Investment SAS) and Cordiant Health Services.

▪ Loto Asociados is owned by Panama based Proteas International Investments Corp[11]. Its directors Vernon Emmanuel Salazar Zurita, Delio Jose de Leon Mela and Lilia Tovar de Leon have all been implicated in wrongdoing and appear prominently in the Panama Papers[12,13,14,15].

[7] https://caracol.com.co/radio/2019/12/05/judicial/1575542198_354472.html
[8] https://stewardcolombia.org/wp-content/uploads/2021/04/Centenario_Balance_General_Estado_Resultados_2018.pdf
[9] Its parent company Proteas is Panamanian
[10] https://unilibrebog-my.sharepoint.com/personal/camilo-baqueroa_unilibre_edu_co/_layouts/15/onedrive.aspx?ga=1&id=%2Fpersonal%2Fcamiloa%2Dbaqueroa%5Funilibre%5Fedu%5Fco%2FDocuments%2F20%2E%20ESTADOS%20VIRTUALES%2FAUTOS%2F2022%2FESTADO%20No%2E%2039%2F017%2D2020%2D264%2Epdf&parent=%2Fpersonal%2Fcamiloa%2Dbaqueroa%5Funilibre%5Fedu%5Fco%2FDocuments%2F20%2E%20ESTADOS%20VIRTUALES%2FAUTOS%2F2022%2FESTADO%20No%2E%2039
[11] https://www.ccb.org.co/content/download/168121/file/%285799%29%20Julio%2023%20de%202020%20publicado%2024%20de%20julio%20de%202020.pdf
[12] https://opencorporates.com/companies/pa/843515
[13] https://www.tvn-2.com/nacionales/judicial/realizan-audiencia-peculado-caso-ciudad_1_2001350.html
[14] https://www.prensa.com/judiciales/suspenden-audiencia-preliminar-en-caso-de-supuesto-peculado-en-ciudad-deportiva-de-david/
[15] https://www.eldiario.es/papeles-castellana/utilizaron-sociedades-barcenas-pujol-herencia_1_3963492.html

FILED

2023 Mar-30 PM 03:10
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT 1
# Part 2 of 2

Los Nevados – Timeline

The deed for Los Nevados shows it was transferred from its owner Dr Ciro Alejandro Olaya Forero to PA Nevados on November 6, 2020, for $2.9m[16].

The financier of the transaction is listed as MPT Colombia TRL SL, a 100% subsidiary of MPW registered in Spain.



*Figure 17 – Los Nevados Sales Deed and accompanying documents.*

Nevados deed shows in annex 3 a US Tax Form 8832 which shows the PA Nevados trust's US taxpayer status. The address provided is that of Steward Health Care System's main address.

*Figure 18 – Los Nevados Sales Deed and accompanying documents*

We note that Steward International is not domiciled in the US and believe that Steward's Colombian operations are under the same "Manolete" structure outlined in our previous report due to an indemnification clause in the purchase agreement.

*Figure 19 – Sale agreement for National Clinics Colombia*

[16] https://www.findeter.gov.co/index.php/system/files/convocatorias/PAF-SENA-C-017-2020/PAF-SENA-C-017-2020%40paf-sena-c-017-2020_informe-definitivo-de-verificacion-de-requisitos-habilitantes.pdf

## Key takeaways

We now know the price paid for two of the Colombian hospital properties, with the third San Rafael being acquired from GSRVC for an undisclosed price. We believe the price paid was equivalent to the 2019 sale-leaseback liability of $34.15m.

We believe remainder went toward the purchase of the hospital operations for $39.45m. The value of MPW Colombian mortgages to its Manolete JV vastly exceeds the value of underlying secured assets and is substantially financed by the equity of Colombian hospital *operators.* Further, MPW wholesale financing of the venture only earned it a minority stake.

| MPW Colombia Investment Analysis - Viceroy Research | |
|---|---|
| | **$m** |
| MPW Investment | 100 |
| Centenario | 14.4 |
| Los Nevados | 2.9 |
| *San Rafael* | *34.2* |
| Difference | 48.5 |

*Figure 20 – MPW Colombia Investment Analysis Viceroy Research*

This is a clear failure of transparency and an eminently uncommercial transaction.



**Attention: <u>Whistleblowers</u>**

Viceroy encourage any parties with information pertaining to misconduct within Medical Properties Trust, its affiliates, or any other entity to file a report with the appropriate regulatory body.

We also understand first-hand the retaliation whistleblowers sometimes face for championing these issues. Where possible, Viceroy is happy act as intermediaries in providing information to regulators and reporting information in the public interest in order to protect the identities of whistleblowers.

You can contact the Viceroy team via email on [viceroy@viceroyresearch.com](mailto:viceroy@viceroyresearch.com).

**About Viceroy**

Viceroy Research are an investigative financial research group. As global markets become increasingly opaque and complex – and traditional gatekeepers and safeguards often compromised – investors and shareholders are at greater risk than ever of being misled or uninformed by public companies and their promoters and sponsors. Our mission is to sift fact from fiction and encourage greater management accountability through transparency in reporting and disclosure by public companies and overall improve the quality of global capital markets.

**Important Disclaimer – Please read before continuing**

This report has been prepared for educational purposes only and expresses our opinions. This report and any statements made in connection with it are the authors' opinions, which have been based upon publicly available facts, field research, information, and analysis through our due diligence process, and are not statements of fact. All expressions of opinion are subject to change without notice, and we do not undertake to update or supplement any reports or any of the information, analysis and opinion contained in them. We believe that the publication of our opinions about public companies that we research is in the public interest. We are entitled to our opinions and to the right to express such opinions in a public forum. You can access any information or evidence cited in this report or that we relied on to write this report from information in the public domain.

To the best of our ability and belief, all information contained herein is accurate and reliable, and has been obtained from public sources we believe to be accurate and reliable, and who are not insiders or connected persons of the stock covered herein or who may otherwise owe any fiduciary duty or duty of confidentiality to the issuer. We have a good-faith belief in everything we write; however, all such information is presented "as is," without warranty of any kind – whether express or implied.

In no event will we be liable for any direct or indirect trading losses caused by any information available on this report. Think critically about our opinions and do your own research and analysis before making any investment decisions. We are not registered as an investment advisor in any jurisdiction. By downloading, reading or otherwise using this report, you agree to do your own research and due diligence before making any investment decision with respect to securities discussed herein, and by doing so, you represent to us that you have sufficient investment sophistication to critically assess the information, analysis and opinions in this report. You should seek the advice of a security professional regarding your stock transactions.

This document or any information herein should not be interpreted as an offer, a solicitation of an offer, invitation, marketing of services or products, advertisement, inducement, or representation of any kind, nor as investment advice or a recommendation to buy or sell any investment products or to make any type of investment, or as an opinion on the merits or otherwise of any particular investment or investment strategy.

Any examples or interpretations of investments and investment strategies or trade ideas are intended for illustrative and educational purposes only and are not indicative of the historical or future performance or the chances of success of any particular investment and/or strategy. As of the publication date of this report, you should assume that the authors have a direct or indirect interest/position in all stocks (and/or options, swaps, and other derivative securities related to the stock) and bonds covered herein, and therefore stand to realize monetary gains in the event that the price of either declines.

The authors may continue transacting directly and/or indirectly in the securities of issuers covered on this report for an indefinite period and may be long, short, or neutral at any time hereafter regardless of their initial recommendation.

# FEBRUARY 15, 2023 REPORT

# MPW Case Study – Tenet Florida Hospitals

MPW overpaid for Florida Hospitals to the tune of ~$650m (2.4x fair value). Overpayment subsidized Steward investments in Florida

**PLEASE READ IMPORTANT DISCLAIMER – PAGE 3**

**February 15, 2023** – MPW's purchase of 5 Florida Hospitals in 2021 was another Steward subsidy at MPW shareholder's expense.

In August 2021 MPW acquired 5 Florida Hospitals ("**the Florida Hospitals**") for $900m.

- Acquired five general acute care facilities in South Florida for approximately $900 million that are leased to Steward; and
- Acquired four acute care facilities and two on-campus medical office buildings in California for $215 million, leased to Pipeline Health Systems.

*Figure 1 – MPW Q2 2021 10-Q*

**MPW drew $650m from an credit facility to complete the transaction.**

**July 2021 Interim Credit Facility**

On July 27, 2021, we entered into a $1 billion interim credit facility with Barclays Bank PLC as administrative agent ("July 2021 Interim Credit Facility"), and several lenders from time-to-time are parties thereto. This facility matures on July 28, 2022 and bears interest at a variable rate. We used this facility to partially fund the acquisition of five South Florida facilities in August 2021 and the Springstone investments in October 2021. At December 31, 2021, the outstanding balance under this facility was $869.6 million at a rate of 1.610%.

*Figure 2 – MPW Annual Report 2021*

The acquisition of the Florida Hospitals forms part of **Steward's greater $1.1b acquisition of Tenet Healthcare's Southeast Florida hospitals and operations**. We can see from Tenet's 2021 annual report that this sum includes the $900m MPW section of the purchase meaning Steward only had to put forward ~$200m.

Under the terms of the agreement, Steward will purchase five hospitals and their associated physician practices from Tenet for approximately $1.1 billion. The hospitals included in the sale are Coral Gables Hospital, Florida Medical Center, Hialeah Hospital, North Shore Medical Center and Palmetto General Hospital. The agreement also provides that Tenet's Conifer Health Solutions subsidiary will continue to provide revenue cycle management services to the five hospitals following completion of the transaction. Tenet's ambulatory facilities operated by United Surgical Partners International (USPI) in these markets will remain with Tenet and are not included in the transaction.

*Figure 3 – Steward Health Care to Acquire Five Hospitals in the Miami Area[1]*

## What *were* the Florida Hospitals Worth?

The Florida Hospitals were held-for-sale in Tenet's 2021 financial accounts, **valued at only $371m**.

**NOTE 4. ASSETS AND LIABILITIES HELD FOR SALE**

In June 2021, certain of our subsidiaries entered into a definitive agreement to sell five of our Miami-area hospitals and certain related operations. As a result, the assets and liabilities associated with these facilities were classified as held for sale at June 30, 2021 in the accompanying Condensed Consolidated Balance Sheets. We expect to complete the sale of these facilities in the third quarter of 2021.

Assets and liabilities classified as held for sale at June 30, 2021 were comprised of the following:

| | |
|---|---:|
| Accounts receivable | $ 150 |
| Other current assets | 40 |
| Investments and other long-term assets | 41 |
| Property and equipment | 371 |
| Other intangible assets | 35 |
| Goodwill | 191 |
| Current liabilities | (98) |
| Long-term liabilities | (47) |
| **Net assets held for sale** | **$ 683** |

*Figure 4 – Tenet Healthcare Q2 2021 10-Q*

To our knowledge: MPW did not identify what specific hospitals they purchased in Florida, only the counterparty[2].

---

[1] https://investor.tenethealth.com/press-releases/press-release-details/2021/Steward-Health-Care-to-Acquire-Five-Hospitals-in-the-Miami-DadeSouthern-Broward-Area-From-Tenet-Healthcare/default.aspx#:~:text=Under%20the%20terms%20of%20the,Center%20and%20Palmetto%20General%20Hospital.

[2] https://www.businesswire.com/news/home/20210623005922/en/Medical-Properties-Trust-Agrees-to-Acquire-Five-General-Acute-Hospitals-in-South-Florida

## What are the Florida Hospitals worth today?

A search of county appraisal district databases identifies MPW's $900m purchase of the Florida Hospitals.

The 2022 appraised values for the same hospitals are ~70% below MPW's outlay[3]. Note that the assessed values are stated to represent "**…market value minus any assessment reductions…**".

| MPW Florida Hospitals Purchase Analysis - Viceroy Research | | | | | | | |
|---|---|---|---|---|---|---|---|
| MPW Subsidiary | Hospital | Folio Number | Sale Price | Sale Date | 2022 Appraisal Value | Beds | Cost per bed |
| MPT of Coral Gables | Coral Gables | 03-4117-005-7550 | 114,059,600 | 8/1/2021 | 4,860,636 | 245 | 465,549 |
| | | 03-4117-005-9010 | | | 33,627,202 | | |
| MPT of Hialeah Exchange | Hialeah | 04-3108-001-2700 | | | 289,680 | 378 | 357,143 |
| | | 04-3108-001-2880 | 1,264,800 | 7/31/2021 | 336,600 | | |
| | | 04-3108-001-2710 | | | 285,150 | | |
| | | 04-3108-001-1380 | | | 395,850 | | |
| | | 04-3108-001-1790 | 133,735,300 | 7/31/2021 | 35,547,807 | | |
| MPT of Hialeah Palmetto | Palmetto | 04-2027-001-0610 | | | 23,809,775 | 360 | 875,000 |
| | | 04-2027-001-0660 | | | 8,735,824 | | |
| | | 04-2027-097-0030 | | | 6,002,810 | | |
| | | 04-2027-001-0611 | 315,000,000 | 7/31/2021 | 19,100,000 | | |
| | | 04-2027-021-0010 | | | 1,950,251 | | |
| | | 04-2027-001-0622 | | | 14,097,769 | | |
| | | 04-2027-001-0620 | | | 13,013,551 | | |
| MPT of Miami | North Shore | 30-3102-031-0010 | 162,000,000 | 7/31/2021 | 24,308,799 | 357 | 453,782 |
| MPT of Lauderdale Lakes | Florida Medical Center | 494125000051 | | | 5,810,520 | 459 | 372,549 |
| | | 494125000052 | | | 120 | | |
| | | 494125000055 | | | 1,074,030 | | |
| | | 494125410010 | 171,000,000 | 7/22/2021 | 3,148,070 | | |
| | | 494125000080 | | | 66,202,150 | | |
| | | 494125000092 | | | 1,063,360 | | |
| | | 494125000056 | | | 1,111,630 | | |
| Total | | | 897,059,700 | | 264,771,584 | Avg | 504,805 |

*Figure 5 – MPW Florida Hospitals Purchase Analysis – Viceroy Research*

MPW's purchase of 5 Florida hospitals leased to Steward for $900m is nothing more than more acquisition financing for a subs. MPW is effectively subsidizing Steward's return on investment at the expense of its own shareholders.

*This transaction is completely uncommercial.*

***MPW appears to have paid 2.4x fair value for Tenet's Florida Hospitals.***

Investors should question MPW on the reasoning and due diligence carried out as part of this transaction.

## Hospital Income

The Florida Hospitals generated annualized income of $68m as at Q2 2021. This appears to make the purchase a great investment for Steward at their $200m outlay. MPW, on the other hand, have paid $900m for $371m in assets.

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2021 | 2020 | 2021 | 2020 |
| **Significant planned divestitures classified as held for sale:** | | | | |
| Income from continuing operations, before income taxes | | | | |
| Miami area | $ 16 | $ 9 | $ 29 | $ 15 |
| **Total** | $ 16 | $ 9 | $ 29 | $ 15 |

*Figure 6 – Tenet Healthcare Q2 2021 10-Q*

---

[3] https://bcpa.net/RecMenu.asp and https://www.miamidade.gov/Apps/PA/propertysearch/#/


**Attention: <u>Whistleblowers</u>**

Viceroy encourage any parties with information pertaining to misconduct within Medical Properties Trust, its affiliates, or any other entity to file a report with the appropriate regulatory body.

We also understand first-hand the retaliation whistleblowers sometimes face for championing these issues. Where possible, Viceroy is happy act as intermediaries in providing information to regulators and reporting information in the public interest in order to protect the identities of whistleblowers.

You can contact the Viceroy team via email on viceroy@viceroyresearch.com.

**About Viceroy**

Viceroy Research are an investigative financial research group. As global markets become increasingly opaque and complex – and traditional gatekeepers and safeguards often compromised – investors and shareholders are at greater risk than ever of being misled or uninformed by public companies and their promoters and sponsors. Our mission is to sift fact from fiction and encourage greater management accountability through transparency in reporting and disclosure by public companies and overall improve the quality of global capital markets.

**Important Disclaimer – Please read before continuing**

This report has been prepared for educational purposes only and expresses our opinions. This report and any statements made in connection with it are the authors' opinions, which have been based upon publicly available facts, field research, information, and analysis through our due diligence process, and are not statements of fact. All expressions of opinion are subject to change without notice, and we do not undertake to update or supplement any reports or any of the information, analysis and opinion contained in them. We believe that the publication of our opinions about public companies that we research is in the public interest. We are entitled to our opinions and to the right to express such opinions in a public forum. You can access any information or evidence cited in this report or that we relied on to write this report from information in the public domain.

To the best of our ability and belief, all information contained herein is accurate and reliable, and has been obtained from public sources we believe to be accurate and reliable, and who are not insiders or connected persons of the stock covered herein or who may otherwise owe any fiduciary duty or duty of confidentiality to the issuer. We have a good-faith belief in everything we write; however, all such information is presented "as is," without warranty of any kind – whether express or implied.

In no event will we be liable for any direct or indirect trading losses caused by any information available on this report. Think critically about our opinions and do your own research and analysis before making any investment decisions. We are not registered as an investment advisor in any jurisdiction. By downloading, reading or otherwise using this report, you agree to do your own research and due diligence before making any investment decision with respect to securities discussed herein, and by doing so, you represent to us that you have sufficient investment sophistication to critically assess the information, analysis and opinions in this report. You should seek the advice of a security professional regarding your stock transactions.

This document or any information herein should not be interpreted as an offer, a solicitation of an offer, invitation, marketing of services or products, advertisement, inducement, or representation of any kind, nor as investment advice or a recommendation to buy or sell any investment products or to make any type of investment, or as an opinion on the merits or otherwise of any particular investment or investment strategy.

Any examples or interpretations of investments and investment strategies or trade ideas are intended for illustrative and educational purposes only and are not indicative of the historical or future performance or the chances of success of any particular investment and/or strategy. As of the publication date of this report, you should assume that the authors have a direct or indirect interest/position in all stocks (and/or options, swaps, and other derivative securities related to the stock) and bonds covered herein, and therefore stand to realize monetary gains in the event that the price of either declines.

The authors may continue transacting directly and/or indirectly in the securities of issuers covered on this report for an indefinite period and may be long, short, or neutral at any time hereafter regardless of their initial recommendation.

# FEBRUARY 16, 2023 REPORT

# MPW – Steward's having a fire, sale

Steward has sold operational assets purchased from IASIS at a cost effectively entirely borne by MPW. New tenant receives discounted rent.

**PLEASE READ IMPORTANT DISCLAIMER – PAGE 5**

**February 16, 2023** – On February 15, 2023, Steward Health Care Systems ("**SHCS**") announced that it had entered into an agreement to sell its Utah operations to Commonspirit[1]. This is an objectively bad deal for MPW, who have taken a 20% haircut on their Utah rent.

The sale by Steward is equally nonsensical. Steward and MPW management have consistently told select investors and analysts in the course of the preceding weeks that SHCS had its best EBITDA year and was FCF positive. Why has it sold its best asset at fire sale prices?

The real kick in the teeth is for MPW investors, who effectively paid for SHCS's Utah assets and will see no money from its sale.

## The Announcement & Rent Haircut

Light on details as usual: MPW's statement announcing its new tenant of Utah properties failed to explicitly disclose a rent haircut of $17m, which can be derived from the reported new lease base, gross asset value, and Steward's master lease agreement.

Viceroy estimate MPW are now generating ~94m rental income from this property, substantially less than its current ~$110m.

Cash lease base appears to have been cut to 7.8% from ~9%.

> healthcare providers, will become one of MPT's largest tenants. Cash rental payments during the 15-year initial lease term are to begin at roughly 7.8% of MPT's gross investment and increase by 3.0% annually. The overall cash flow profile of the lease is particularly attractive given the tenant's strong investment grade credit. The lessee will have the option to purchase the facilities at the higher of fair market value or MPT's gross investment at 5, 10 and 15 years.

*Figure 1 – MPW Press Release – February 15, 2023*

MPW's master lease agreement with Steward can be accessed here:

https://www.sec.gov/Archives/edgar/data/1287865/000119312517065943/d295656dex1033.htm

---

*Commonspirit will pay substantially less rent on its Utah hospital tenancy than its predecessor, Steward.*

---

[1] https://www.healthcaredive.com/news/hcas-purchase-5-utah-hospitals-put-on-pause-after-judges-order/625111/

## Steward Exposure & Fire Sale

It's reported that MPW have told analysts that Steward's sale of Utah assets was commensurate with its prior deal with HCA, which fell through after the FTC challenged the transaction[2]. This was slated at $800-$850m.

We thank HedgeEye for publishing Commonspirit's unaudited quarterly financials showing a purchase price of **$685m**[3], which is in **fire sale territory at 15% - 20% discount to SHCS's failed HCA deal.**

> In February 2023, CommonSpirit entered into an asset purchase agreement to acquire a regional health system, including five hospitals, over 40 clinics, and other ambulatory services in Utah for a gross purchase price of $685 million, plus certain working capital adjustments. The acquired facilities will support the mission and strategy to better serve the health care needs of the communities in Utah. The acquired facilities will be managed by Centura Health. The transaction is subject to customary closing terms and conditions and is scheduled to close by the end of the fiscal year.

*Figure 2 – CommonSpirit unaudited quarterly financials*

This is even more bizarre as Steward and MPW have similarly advised analysts that it was FCF positive, and vastly beat earnings expectations.



Results improving substantially versus Q1 2022, as restrictions on elective surgeries in Massachusetts have expired and as staffing and other cost pressures have eased.

- **Volume metrics up** across all key categories
- **Higher-quality volume** improving profitability
- **EBITDAR increased** in majority of regions
- **Contract labor expense decreased 21%**, with labor costs now < 50% of revenue
- May and June significantly **outperformed** original expectations
- **Q2 2022 +11%** versus pre-COVID Q2 2019 (excluding South Florida)

**LIQUIDITY UPDATE**[1]

Recent improvements to hospital operations noted above are expected to continue through the remainder of the year and to coincide with positive developments related to Steward's liquidity position:

- **$350 million annual labor and non-labor cost savings initiative** is fully-implemented as of August
- **$70 million** in Medicaid reimbursement previously delayed due to dispute between Texas and CMS is now being collected
- **$70 million** collection in Q3 2022 of accounts receivable related to Tenet transition in Florida
- **$125 million** in cash expected from CareMax transaction, expected to close in Q4 2022
- **$45-50 million** current *monthly* pace of Medicare advance and Tenet management contract repayments ends in September

Steward expects a **substantial and sustainable positive free cash flow run-rate beginning in Q4 2022**

And before turning the call over to Steve, let me outline the strong operating performance that Steward is reporting to us. Unadjusted EBITDA for the second quarter was approximately $51 million. The third quarter is expected to be more than $30 million. Fiscal year '22 unadjusted EBITDA is projected to be between $50 million and $80 million. Contract labor in Q3 fiscal year '22 has decreased 30% from Q1 FY '22 run rate and is expected to decline an incremental 20% in Q4, resulting in a 50% decline since the first quarter of this year. Steward is also forecasting unadjusted EBITDA of more than $350 million for fiscal year '23, Steve?

*Figures 3 & 4 – MPT August 2022 Investor Update and Q3 2022 earnings call*

Obviously, MPW provide none of Steward's financial statements to validate these Blue-Sky statements, however it is perplexing that Steward would sell its best assets for fire sale prices if it didn't have to.

Further, we note that the sale decreases MPW's tenant exposure to SHCS. We anticipate this will justify MPW's withholding of Steward's financial data once more.

[2] https://www.beckershospitalreview.com/hospital-transactions-and-valuation/hca-steward-make-for-2nd-called-off-hospital-deal-within-days-of-ftc-challenge.html
[3] https://app.hedgeye.com/mu/12-31-2022-unaudited-quarterly-report-final-secured?encoded_data=fqBZ!bpqJxAnjZji+CUtj6FY08FaMIEk=,



## The Utah Background

In 2017, MPW loaned Steward $1.4b to purchase a Salt Lake City Hospital operator IASIS and their portfolio of 19 hospitals. It also made a further $100m minority interest equity contribution in the transaction. IASIS owned and operated 17 hospitals.

> *Steward Transactions*
>
> On September 29, 2017, we acquired, from IASIS Healthcare LLC ("IASIS"), a portfolio of ten acute care hospitals and one behavioral health facility, along with ancillary land and buildings that are located in Arizona, Utah, Texas, and Arkansas. The portfolio is now operated by Steward which separately completed its acquisition of the operations of IASIS on September 29, 2017. Our investment in the portfolio includes the acquisition of eight acute care hospitals and one behavioral health facility for approximately $700 million, the making of $700 million in mortgage loans on two acute care hospitals, and a $100 million minority equity contribution in Steward, for a combined investment of approximately $1.5 billion.

*Figure 5 – MPW 2017 Annual Report*

A $700m portion of this loan was immediately extinguished in exchange for 9 properties.

The remaining $700m was a mortgage loan against 2 unnamed properties: Jordan Valley Medical Center and Davis Hospital & Medical Center.

> On July 8, 2020, we acquired the fee simple real estate of two general acute care hospitals located in the Salt Lake City, Utah area. Davis Hospital & Medical Center and Jordan Valley Medical Center, in exchange for the reduction of the mortgage loans made to Steward for such properties and additional cash consideration of $200 million based on their relative fair value. The approximate $950 million investment in these two facilities is now subject to the Steward master lease that has an initial fixed term ending in October 2031 with multiple extension options and annual escalation provisions.
>
> *Real Estate Loan Agreement and Sale of Property*
>
> At December 31, 2019, the System held mortgage agreements with MPT related to the real property of two acute care hospital campuses. On July 2, 2020, the System sold the real property of the two acute care hospital campuses to a joint venture, of which MPT is the majority owner. The System subsequently leased the property from the joint venture. Due to specified forms of continuing involvement, under the provisions of Accounting Standards Codification Topic 840-40, Leases – Sale-Leaseback Transactions, the System is required to continue to capitalize the real estate and to recognize an obligation for the sales proceeds received. The System recognized an initial obligation of $937.2 million, which included the former mortgage obligations of $737.2 million as well as $200.0 million in sale proceeds. The obligation will be amortized

*Figures 6 & 7 – MPW 2020 Annual Report and Steward Health Care 2019 Annual Report*

On July 8, 2020, MPW acquired the Jordan Valley Medical Center and Davis Hospital & Medical Center in exchange for a total extinguishment of the loan and an additional $200m cash payment it labelled a fair value increase.

Jordan Valley Medical Centre and Davis Hospital & Medical Centre were certainly not the largest hospitals in this portfolio. Their combined appraised value is $111m in 2017

| Hospital | Location | Licensed # of Beds |
|---|---|---|
| Davis Hospital and Medical Center | Layton, UT | 220 |
| Jordan Valley Medical Center | West Jordan, UT | 172 |
| Jordan Valley Medical Center—West | West Valley, UT | 102 |
| Mountain Point Medical Center | Lehi, UT | 40 |
| Salt Lake Regional Medical Center | Salt Lake City, UT | 158 |
| Mountain Vista Medical Center | Mesa, AZ | 178 |
| St. Luke's Medical Center | Phoenix, AZ | 200 |
| St. Luke's Behavioral Health Center | Phoenix, AZ | 124 |
| Tempe St. Luke's Hospital | Phoenix, AZ | 87 |
| Odessa Regional Medical Center | Odessa, TX | 225 |
| Southwest General Hospital | San Antonio, TX | 327 |
| St. Joseph Medical Center | Houston, TX | 790 |
| The Medical Center of Southeast Texas | Port Arthur, TX | 199 |
| The Medical Center of Southeast Texas—Victory | Beaumont, TX | 17 |
| Wadley Regional Medical Center | Texarkana, TX | 370 |
| Glenwood Regional Medical Center | West Monroe, LA | 278 |
| Wadley Regional Medical Center | Hope, AR | 79 |
| Pikes Peak Regional Hospital | Woodland Park, CO | 15 |
| | | 3,581 |

*Figure 8 – Steward Health Care Annual Report 2018*

| Davis and Jordan Valley 2017 Value - Viceroy Research | | | | | |
|---|---|---|---|---|---|
| Hospital | Owner | Parcel ID | Address | | 2017 Appraised value |
| Davis Hospital and Medical Center | MPT of Layton-Steward Property LLC | 90230086 | | $ | 34,979,886 |
| | | 90230013 | 1600 W Antelope Dr, Layton, | $ | 365,900 |
| | | 90230012 | UT 84041 | $ | 8,895,000 |
| Jordan Valley Medical Center | MPT of West Jordan-Steward Property LLC | 27-05-251-024-2000 | 3580 W 9000 S | $ | 10,744,200 |
| | | 27-05-251-024-2001 | 3580 W 9000 S | $ | 40,491,400 |
| | | 27-05-251-024-2002 | 3580 W 9000 S | $ | 6,049,700 |
| | | 27-05-251-026-0000 | 3590 W 9000 S | $ | 2,965,000 |
| | | 27-05-251-025-0000 | 3592 W 9000 S | $ | 5,681,600 |
| | | 27-05-251-006-0000 | 3434 W 9000 S | $ | 616,900 |
| | | 27-05-251-005-0000 | 3434 W 9000 S | $ | 1,113,700 |
| Total | | | | $ | 111,903,286 |

*Figure 9 – Davis and Jordan Valley 2017 Value – Viceroy Research*

The first $700m loan was exchanged for 9 properties, and the second $700m loan was secured against a further 2, but Iasis owned and operated 18 facilities in total at the time of acqusition. Steward basically received 7 of them for free.



*Steward Transactions*

On September 29, 2017, we acquired, from IASIS Healthcare LLC ("IASIS"), a portfolio of ten acute care hospitals and one behavioral health facility, along with ancillary land and buildings that are located in Arizona, Utah, Texas, and Arkansas. The portfolio is now operated by Steward which separately completed its acquisition of the operations of IASIS on September 29, 2017. Our investment in the portfolio includes the acquisition of eight acute care hospitals and one behavioral health facility for approximately $700 million, the making of $700 million in mortgage loans on two acute care hospitals, and a $100 million minority equity contribution in Steward, for a combined investment of approximately $1.5 billion.

At the time of the completion of the IASIS Merger, IASIS owned and operated seventeen hospitals, one behavioral health hospital, and several affiliated outpatient service facilities and physician clinics. The hospitals acquired include:

*Figures 10 & 11 – MPW Annual Report 2017 & Steward Annual Report 2017*

On a back-envelope, per-beds basis, we estimate that the purchase price of Jordan Valley Medical Centre and Davis Hospital & Medical Centre was ~$196m[4]. Given Steward is running its hospitals business to the ground, we do not believe any fair value adjustment is warranted. We believe MPW must take a $700m write off on this transaction alone representing the $950 mortgage and payment less a conservative $250m for the value of Jordan Valley and Davis.

The pattern in the Masschusetts portfolio of increasing loans continued with the Salt Lake City portfolio with Steward adding a further $27m in Q4 2018.



2016 Mortgages. The 2017 Mortgages were secured by the real property associated with hospital campuses located in Utah acquired as part of the IASIS Merger. On November 30, 2018, Steward entered into amendments to the 2017 Mortgages increasing the principal amount of these mortgages by $27 million. The 2017 Mortgages bear the same interest rate as the 2016 Mortgages of 7.5% for 2018. All payment terms and the maturity date of October 31, 2031 are identical to the 2016 Mortgages as a result of the Mortgage Joinder.

*Figure 12 – Steward 2018 Annual Report*

The FTC has blocked Steward's sale of operations in Utah to HCA Healthcare on the grounds of maintaining competition in the area[5].

---

*Steward has sold assets purchased from IASIS at a cost effectively entirely bourne by MPW.*

*It has now sold those assets. Investors have a right to be pissed off.*

---

[4] Iasis PPE balance of $1.79b, portfolio beds of 3,581
[5] https://www.ftc.gov/news-events/news/press-releases/2022/06/ftc-sues-block-merger-between-utah-healthcare-rivals-hca-healthcare-steward-health-care-system



**Attention: Whistleblowers**

Viceroy encourage any parties with information pertaining to misconduct within Medical Properties Trust, its affiliates, or any other entity to file a report with the appropriate regulatory body.

We also understand first-hand the retaliation whistleblowers sometimes face for championing these issues. Where possible, Viceroy is happy act as intermediaries in providing information to regulators and reporting information in the public interest in order to protect the identities of whistleblowers.

You can contact the Viceroy team via email on viceroy@viceroyresearch.com.

**About Viceroy**

Viceroy Research are an investigative financial research group. As global markets become increasingly opaque and complex – and traditional gatekeepers and safeguards often compromised – investors and shareholders are at greater risk than ever of being misled or uninformed by public companies and their promoters and sponsors. Our mission is to sift fact from fiction and encourage greater management accountability through transparency in reporting and disclosure by public companies and overall improve the quality of global capital markets.

**Important Disclaimer – Please read before continuing**

This report has been prepared for educational purposes only and expresses our opinions. This report and any statements made in connection with it are the authors' opinions, which have been based upon publicly available facts, field research, information, and analysis through our due diligence process, and are not statements of fact. All expressions of opinion are subject to change without notice, and we do not undertake to update or supplement any reports or any of the information, analysis and opinion contained in them. We believe that the publication of our opinions about public companies that we research is in the public interest. We are entitled to our opinions and to the right to express such opinions in a public forum. You can access any information or evidence cited in this report or that we relied on to write this report from information in the public domain.

To the best of our ability and belief, all information contained herein is accurate and reliable, and has been obtained from public sources we believe to be accurate and reliable, and who are not insiders or connected persons of the stock covered herein or who may otherwise owe any fiduciary duty or duty of confidentiality to the issuer. We have a good-faith belief in everything we write; however, all such information is presented "as is," without warranty of any kind – whether express or implied.

In no event will we be liable for any direct or indirect trading losses caused by any information available on this report. Think critically about our opinions and do your own research and analysis before making any investment decisions. We are not registered as an investment advisor in any jurisdiction. By downloading, reading or otherwise using this report, you agree to do your own research and due diligence before making any investment decision with respect to securities discussed herein, and by doing so, you represent to us that you have sufficient investment sophistication to critically assess the information, analysis and opinions in this report. You should seek the advice of a security professional regarding your stock transactions.

This document or any information herein should not be interpreted as an offer, a solicitation of an offer, invitation, marketing of services or products, advertisement, inducement, or representation of any kind, nor as investment advice or a recommendation to buy or sell any investment products or to make any type of investment, or as an opinion on the merits or otherwise of any particular investment or investment strategy.

Any examples or interpretations of investments and investment strategies or trade ideas are intended for illustrative and educational purposes only and are not indicative of the historical or future performance or the chances of success of any particular investment and/or strategy. As of the publication date of this report, you should assume that the authors have a direct or indirect interest/position in all stocks (and/or options, swaps, and other derivative securities related to the stock) and bonds covered herein, and therefore stand to realize monetary gains in the event that the price of either declines.

The authors may continue transacting directly and/or indirectly in the securities of issuers covered on this report for an indefinite period and may be long, short, or neutral at any time hereafter regardless of their initial recommendation.

# FEBRUARY 17, 2023 REPORT