**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

In re:

MOTION TO QUASH SUBPOENA
ISSUED TO NON-PARTY CHEYNE
CAPITAL US, LP

Case No. 1:24-mc-00218 (VEC)

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF
<u>NON-PARTY CHEYNE CAPITAL US, LP'S MOTION TO QUASH SUBPOENA</u>**

**<u>TABLE OF CONTENTS</u>**

PRELIMINARY STATEMENT ................................................................................................. 1

ARGUMENT ......................................................................................................................... 3

     I.      Cheyne Capital US Does Not Have The MPT documents. ................................. 3

     II.     MPT May Not Improperly Circumvent The Hague Convention. .......................... 9

     III.    The Subpoena Is Unduly Burdensome. ............................................................... 9

     IV.   Cheyne Capital US Is Entitled To Fees And Costs............................................. 10

CONCLUSION..................................................................................................................... 10

## <u>TABLES OF AUTHORITIES</u>

**Cases**

*Huang v. iTV Media, Inc.*,
  2017 WL 706194 (E.D.N.Y. Feb. 22, 2017) ....................................................................... 4, 5

*Hunter Douglas, Inc. v. Comfortex Corp.*,
  1999 WL 14007 (S.D.N.Y. Jan. 11, 1999) ............................................................................ 4

*In re Application of CBRE Glob. Invs. (NL) B.V.*,
  2021 WL 2894721 (S.D.N.Y. July 9, 2021) ....................................................................... 3, 5

*In re Liverpool Ltd. P'ship*,
  2021 WL 5605044 (S.D.N.Y. Nov. 24, 2021) ................................................................. 4, 5, 8

*In re Ski Train Fire of Nov. 11, 2000 Kaprun Austria*,
  2006 WL 1328259 (S.D.N.Y. May 16, 2006) ........................................................................ 4

*In re Stadtwerke Frankfurt Am Main Holding GmbH*,
  2019 WL 3004150 (S.D.N.Y. July 10, 2019) ......................................................................... 6

*In re: App. of Passport Special Opps. Master Fund, LP*,
  2016 WL 844833 (S.D.N.Y. Mar. 1, 2016) ....................................................................... 5, 8

*Laker Airways Ltd. v. Pan Am. World Airways*,
  607 F. Supp. 324 (S.D.N.Y. 1985) ........................................................................................ 9

*Linde v. Arab Bank, PLC*,
  262 F.R.D. 136 (E.D.N.Y. 2009) ...................................................................................... 5, 9

*Motorola Credit Corp.* v. *Uzan*,
  2013 WL 6098388 (S.D.N.Y. Nov. 20, 2023) .................................................................. 4, 5

*Zenith Elecs. LLC v. Vizio, Inc.*,
  2009 WL 3094889 (S.D.N.Y. Sept. 25, 2009) .................................................................. 5, 8

*Zervos v. S.S. Sam Houston*,
  79 F.R.D. 593 (S.D.N.Y. 1978) ............................................................................................ 3

## PRELIMINARY STATEMENT

MPT's Opposition paints a fanciful version of the "facts" that relies almost entirely on conjecture and fails to address MPT's own questionable actions that have led to the instant motion to quash before this Court.  The key facts are this:

- To obtain a letter rogatory, MPT told a judge: "[t]he evidence sought by Plaintiff can **only** be obtained by subpoenaing Cheyne Capital [UK] directly."  Ex. 2 at 8 (emphasis added).[1]

- On March 6, 2024, MPT sent "Cheyne Capital UK Ltd." an entity which does not exist, a letter demanding production of documents based on its Letter Rogatory and expressing a (false) entitlement to pre-action disclosure for putative planned *English* proceedings.  Ex. 5.

- On March 13, 2024, Cheyne Capital UK responded, explaining that MPT's document demands were overbroad and vague and noting that it was an **abuse of process** to attempt to obtain pre-action discovery through a Letter Rogatory.  Ex. 6.

- On April 30, 2024, six weeks later, the Subpoena was received by Cheyne Capital US.[2] Second Bordage Decl. ¶ 1.

- On May 10, 2024, MPT refused to withdraw (or narrow) its improper Subpoena despite Cheyne Capital US' request that they do so.  Ex. 8.  MPT then stopped engaging. Accordingly, on May 15, 2024, Cheyne Capital US filed the instant motion.  *See* ECF No. 4.

- In response to the motion to quash, MPT decided to re-engage with Cheyne Capital US through a series of phone and email meet and confers during which MPT identified four categories of documents it sought.  *See* Opp., Ex. 24.  Cheyne Capital US confirmed and communicated that it **did not** possess or have access to any of those documents or communications.  *Id.* at 1, 4, 7; *see also* Second Bordage Decl. ¶ 4.

- Counsel for MPT then engaged in a multiweek email campaign to twist the facts.  This culminated in MPT's Opposition, which focuses on collapsing the corporate distinction between Cheyne Capital US and Cheyne Capital UK by putting forward a series of inaccurate and purposefully misleading inferential leaps based on regulatory filings.

---

[1] Citations in the form "Ex.__" refer to exhibits to the Decl. of Shireen Barday, ECF No. 3.  Words not otherwise defined herein have the meanings ascribed to them in Cheyne Capital US, LP's Motion to Quash, ECF No. 4.

[2] MPT contends that it served the Subpoena on April 11, 2024, and submitted a "Proof of Service" affidavit from a process server who purports to have delivered it on that date for a total of "$0.00."  *See* Opp., ECF No. 15, Ex. 5 at 3. Cheyne Capital US, however, did not receive the Subpoena until April 30, 2024, Second Bordage Decl. ¶ 1; regardless, Cheyne Capital US promptly responded to the Subpoena with its Responses and Objections on May 9, 2024, the return date for the Subpoena, and MPT has not argued that it was prejudiced by any delay.

MPT's arguments should be rejected for at least three reasons: ***first***, MPT is not entitled to pre-action discovery from Cheyne Capital UK or Cheyne Capital US and may not use the Subpoena for this improper purpose; ***second***, MPT is misusing legal process to skirt the Hague Convention for documents possessed solely by Cheyne Capital UK, presumably because it recognizes that the Courts of England will closely scrutinize MPT's overbroad document requests and may deny some or all discovery; and ***third***, the Subpoena is overly broad, unduly burdensome, and raises due process concerns given that the documents sought have ***no connection*** to any US-based entity; Cheyne Capital US does ***not*** have the documents MPT seeks.

MPT appears to have recognized these shortcomings and tries desperately to characterize Cheyne Capital US as an instrumentality of Cheyne Capital UK, citing everything from a data privacy policy to email domains to cobble together a story of a unified multinational corporation. In fact, as a regulatory matter, Cheyne Capital US is not even permitted to perform the trading activity that forms the basis of the transaction to which the documents relate.  Second Bordage Decl. ¶ 2.  Critically, too, MPT dodges the only essential fact: Cheyne Capital UK and Cheyne Capital US do not regularly share documents (other than a limited subset of marketing-related documents provided on a case-by-case basis) in the ordinary course, *id.* ¶ 3, and the Viceroy agreement, submitted by MPT, prohibits Cheyne Capital UK from sharing any information relating to the agreement with any third party, including Cheyne Capital US.  Opp., Ex. 2 at 7.

Instead of addressing the information-sharing limitation in the Viceroy agreement, MPT relies on inapposite case law analyzing parent/subsidiary corporate structures that do not bear on those at issue here—and which nevertheless would still require MPT to have made a showing that Cheyne Capital UK would necessarily cooperate in providing documents to Cheyne Capital US, which it has not shown.  The relationship between Cheyne Capital US and Cheyne Capital

UK is far more attenuated than a parent/subsidiary relationship—Cheyne Capital UK is more of

an aunt—and the analysis that MPT offers from other corporate contexts does not dictate the

outcome here.  As set forth more fully below, the motion to quash should accordingly be granted.

## <u>ARGUMENT</u>

**I.      CHEYNE CAPITAL US DOES NOT HAVE THE MPT DOCUMENTS.**

MPT argues first that Cheyne Capital US has not "undertaken any effort to determine

whether it has responsive documents" because Cheyne Capital US has not provided MPT with

discovery about discovery—though MPT has not cited a single case supporting its entitlement to

that information under these circumstances.  Absent extraordinary circumstances, "a party's good

faith averment that the items sought simply do not exist, or are not in [its] possession, custody or

control" is sufficient.  *Zervos v. S.S. Sam Houston*, 79 F.R.D. 593, 595 (S.D.N.Y. 1978).

*In re Application of CBRE Glob. Invs. (NL) B.V.*, 2021 WL 2894721 (S.D.N.Y. July 9,

2021), cited by MPT, does not compel a contrary outcome.  In the first instance, the case said

nothing about disclosure of "what documents reside" with a subpoenaed party, contrary to MPT's

misrepresentation.  *But see* Opp. at 11.  In *CBRE,* Petitioners overcame Respondents' averments

that they did not possess the relevant documents by submitting court filings that established that

Respondents had produced—and therefore had custody of—standalone financial records that

Petitioner was seeking, which moreover related to a transaction to which Respondents were a

party.  *CBRE*, 2021 WL 2894721 at *4-5.  Here, MPT has submitted no evidence showing that

***Cheyne Capital US*** possesses the documents it seeks; all documents filed by MPT tie back to

Cheyne Capital UK.  Therefore, Cheyne Capital US's "good faith averment" that the items sought

"are not in [its] possession," and the lack of ***any*** evidence rebutting this averment, is sufficient

grounds to grant the motion to quash.  *Zervos*, 79 F.R.D. at 595.

3

MPT's second argument is premised on the faulty premise that Cheyne Capital US could obtain documents from Cheyne Capital UK "simply by asking." Opp. at 14. But as MPT acknowledges, Opp. at 13, the determination of whether one entity has the practical ability to obtain the documents of another is based on "the nature of the relationship between" entities. *Hunter Douglas, Inc. v. Comfortex Corp.*, 1999 WL 14007, at *3 (S.D.N.Y. Jan. 11, 1999). This inquiry is critical where, as here, there has been no showing that the entity has ever obtained such documents; even a parent entity is not, without more, deemed to have control over documents of a subsidiary. *See In re Liverpool Ltd. P'ship*, 2021 WL 5605044 (S.D.N.Y. Nov. 24, 2021). Here, the subpoenaed entity and the UK entity whose documents are sought are not even directly related. Instead, the grandparent entity of Cheyne Capital US is one of twenty-seven total corporate and individual members of Cheyne Capital UK.



This corporate structure renders the cases cited by MPT inapposite. *Motorola Credit Corp. v. Uzan*, 2013 WL 6098388 (S.D.N.Y. Nov. 20, 2023), *Huang v. iTV Media, Inc.*, 2017 WL 706194 (E.D.N.Y. Feb. 22, 2017), and *In re Ski Train Fire of Nov. 11, 2000 Kaprun Austria*, 2006 WL 1328259 (S.D.N.Y. May 16, 2006) all addressed the question of whether a ***parent*** entity has the practical ability to obtain documents from a ***subsidiary***—not a niece from an aunt. From a commonsense perspective, a parent corporation has the greatest potential ability to obtain

documents from a subsidiary; even so, courts analyze multiple factors, including intertwined operations, common controlling ownership, and the flow of information to fully assess the extent of control the parent exercises over the subsidiary, *see, e.g.*, *Motorola Credit Corp*., 2013 WL 6098388; *Huang*, 2017 WL 706194, and even so, courts in this Circuit have sometimes determined that a parent in fact lacks that control.  *See, e.g.*, *Liverpool Ltd. P'ship*, 2021 WL 5605044.  MPT fails to cite a single case finding "practical ability," *see id.* at *2, between entities that have anything akin to the corporate relationship at issue here.

Indeed, the case law that involves whether a ***subsidiary*** can obtain documents from a ***parent***, which is still not entirely analogous to the situation here, establishes that the "party seeking to compel a subsidiary to produce the documents of its foreign parent has the burden of showing that . . . ***documents ordinarily flow freely between parent and subsidiary***."  *Linde v. Arab Bank, PLC*, 262 F.R.D. 136, 141 (E.D.N.Y. 2009) (internal quotations and citations omitted) (emphasis added); *CBRE*, 2021 WL 2894721, at *6 (petitioner "failed to point to any evidence tending to show that . . . there is a free flow of information and documents among . . . entities"); *Zenith Elecs. LLC v. Vizio, Inc*., 2009 WL 3094889, at *2 (S.D.N.Y. Sept. 25, 2009) (subsidiary must have "demonstrated access" to its parent's documents "in the ordinary course of business."); *In re: App. of Passport Special Opps. Master Fund, LP*, 2016 WL 844833 at *6 (S.D.N.Y. Mar. 1, 2016) (entity lacked control over documents held by a foreign affiliate where no showing "that documents of the type sought flow[ed] freely" between entities or that Respondent "had access to such documents in the ordinary course of business" (internal quotations and citations omitted)).

Not surprisingly, MPT does not mention this standard in its Opposition, as it is one that it clearly cannot meet: the Bordage Declaration states explicitly that Cheyne Capital US and Cheyne Capital UK "maintain independent . . . documents," Bordage Decl., ECF No. 2, ¶ 7, and that "in

the ordinary course of business, neither Cheyne Capital US, LP nor Cheyne Capital US, LLC (its parent company) has possession, custody, or control over the documents of Cheyne Capital Management (UK) LLP and neither has any legal right or authority to obtain any such documents." *Id.* ¶ 9. Cheyne Capital US has further explained that "documents of Cheyne Capital UK are not accessible to any employees of Cheyne Capital US due to platform-wide access restrictions, other than a limited subset of marketing-related documents, which are provided to Cheyne Capital US on a case-by-case basis." Second Bordage Decl. ¶ 3. These representations are more than sufficient under the legal standard of this Circuit to quash the Subpoena. *See, e.g.*, *In re Stadtwerke Frankfurt Am Main Holding GmbH*, 2019 WL 3004150, at *2 (S.D.N.Y. July 10, 2019) (quashing subpoena where Respondent submitted two declarations establishing the "dispositive facts" that Respondent had not located any responsive documents after a reasonable search, and that Respondent did not have the ability to obtain documents from foreign parent entity: "[Petitioner] offers no basis to question those representations or . . . to conclude that the requested materials would not be more properly sought from [foreign parent] which was party to" the relevant transaction). There is no reason the documents at issue here would "flow freely" from Cheyne Capital UK to Cheyne Capital US considering that the Viceroy transaction involves trading activity that the US entity does not have regulatory clearance to perform, Second Bordage Decl. ¶ 2, and the Viceroy agreement contains a confidentiality clause that prohibits Cheyne Capital UK from sharing related documents with third parties, with no carve-out for its affiliates. Opp., Ex. 2 at 7.

As noted, MPT has solely applied the factors courts analyze when determining whether a parent corporation can obtain documents from a subsidiary, *i.e.*, overlapping management, common controlling ownership, and a shared level of cooperation. In doing so, MPT has attempted to meet these factors through a distorted and inaccurate view of the relationship between Cheyne

Capital US and Cheyne Capital UK that entirely collapses the operational, legal, and corporate distinctions between them: ***first***, MPT suggests that Jonathan Lourie has total control over Cheyne Capital US because he is listed as an "owner" of the entity on a form filed with the National Futures Association ("NFA").  Opp., Ex. 10.  But at the time Mr. Lourie registered, anyone with a beneficial interest exceeding a certain threshold had to be listed as an "owner" on such form.  *See* https://www.nfa.futures.org/news/newsProposedRule.asp?ArticleID=461 (striking "owner" from the Rule 101 definitions and adding a new "principal" category).  Mr. Lourie is the beneficiary of a Jersey discretionary trust, which is the indirect majority owner of Cheyne Capital Management Limited, which is itself the sole member of Cheyne Capital US, LLC, the general partner of Cheyne Capital US (the subpoenaed entity).  As the beneficiary of the trust, Mr. Lourie has no ability to influence or direct its activities or operations, let alone the operations of a company owned by it, Cheyne Capital Management Limited, and especially not Cheyne Capital US, which is another step further removed.  Accordingly, MPT's assertion that Mr. Lourie "controls one entity and owns the other" is flatly untrue.  Opp. at 17.

    ***Second***, MPT states (falsely) that "Cheyne US markets the 'Cheyne Global Equity Fund Master ICAV,'" Opp. at 11; in fact, MPT has not, and cannot, demonstrate that any such marketing has taken place.  But there are good reasons why a party would nevertheless make broad disclosures on its regulatory filings.  MPT has not indicated any actual connection between Cheyne Capital US and the Viceroy transaction, which involved only Cheyne Capital UK, even though MPT has received extensive disclosure from Viceroy.  ***Third***, MPT's attempt to paint Peter Head as resident in the New York office of Cheyne Capital US is similarly off base.  Mr. Head serves as Chief of Compliance for Cheyne Capital UK and, in that capacity, oversees compliance work for all affiliated entities, including any NFA filings required for Cheyne Capital US.  To the extent

that Mr. Head can be deemed to have conducted business arising from the Viceroy agreement, it was in his capacity as a partner of Cheyne Capital UK; MPT does not allege otherwise.  This is why Mr. Head's UK signature block appears on the email thread submitted to this Court by MPT. Opp., Ex. 4 at 1.  Regardless, a shared Compliance officer is not sufficient to show control.  *See Passport Special Opps.*, 2016 WL 844833, at *8 ("references to Deloitte's 'International legal department' and 'Global GC,' . . . reflect the reality that the Deloitte empire has global reach, but they do not imply an ability . . . to unilaterally access the internal documents of member firms").

Through its misrepresentations, MPT attempts to paint a picture of two entities that, through common ownership and control, function seamlessly as one entity.  In fact, the reality is quite different: the NFA forms required for Cheyne Capital US have limited options for certain ownership and executive-level questions, and the inputs of Cheyne Capital US reflect the reality of translating a complex entity ownership structure into these limited options.  The regulatory filings do not prove—nor does MPT allege—that Messrs. Lourie or Head are actively involved in the day-to-day operations of, or receive paychecks from, Cheyne Capital US.  Nor is the fact that a single email suffix is used for both Cheyne Capital US and Cheyne Capital UK, much like how the same email suffix is used for Samsung affiliates around the world (@samsung.com), determinative of control.  *See Zenith Elecs.*, 2009 WL 3094889, at *3 (denying motion to compel where Samsung Korea refused to provide documents to Samsung US).

Indeed, MPT goes to great lengths, through citations of Cheyne Capital UK's data privacy policy, email domain information, and various SEC filings, to make a point that Cheyne Capital US does not dispute: that it is an affiliate of Cheyne Capital UK.  This, however, is not the standard for finding control over relevant documents.  *See, e.g.*, *Liverpool Ltd. P'ship*, 2021 WL 5605044, at *3 ("[T]he fact that [the subsidiary entity] is a wholly owned (or even 'significant') subsidiary

of Respondent is not dispositive of control."); *Laker Airways Ltd. v. Pan Am. World Airways*, 607 F. Supp. 324, 325 (S.D.N.Y. 1985) (vacating subpoenas seeking records from entity's New York branch because the records were in London).  MPT has not made any showing to suggest that "documents ordinarily flow freely" between the two entities, *Linde*, 262 F.R.D. at 141, as required by the case law of this Circuit.

## II.  MPT MAY NOT IMPROPERLY CIRCUMVENT THE HAGUE CONVENTION.

MPT's arguments as to why it should be entitled to discovery from Cheyne Capital US, rather than following the requisite Hague Convention procedures to obtain the discovery it initiated from Cheyne Capital UK, rely on the demonstrably incorrect notion that Cheyne Capital US has possession of the documents MPT seeks.  *See* Second Bordage Decl. ¶ 4.  Cheyne Capital US has repeatedly told MPT that the documents it seeks are only available from Cheyne Capital UK, a proposition that MPT itself endorsed when it told the Alabama District Court that it could secure the relevant documents "***only*** through a letter of request pursuant to the Hague Convention."[3]  Ex. 2 at 2 (emphasis added).  The Subpoena is nothing more than an eleventh-hour attempt to try to avoid the legal process associated with obtaining foreign documents.

## III.  THE SUBPOENA IS UNDULY BURDENSOME.

For the reasons stated in the motion to quash, the Subpoena requests are so broad as to be nearly nonsensical.  Contrary to MPT's suggestion, Cheyne Capital US' arguments as to the breadth and burden of these requests were not before Judge Proctor in Alabama, who was, in any

---

[3] MPT argues that it previously told the Alabama District Court only that "relevant documents could 'only be obtained' from Cheyne, *rather than the Viceroy defendants*."  Opp. at 12 (emphasis in original).  In its Letter Rogatory motion, MPT defines "Cheyne Capital" as "Cheyne Capital Management (UK) LLP" and makes no mention of Cheyne Capital US.  Ex. 2 at 1.  It then says: "Because Cheyne Capital is a non-party, **resides in the United Kingdom**, and is otherwise outside of this Court's jurisdiction, MPT can secure Cheyne Capital's documents **only** through a letter of request pursuant to the Hague Convention."  *Id.* at 2 (emphasis added).  Heading III of MPT's brief then reads: "The Evidence Sought by Plaintiff Can **only** be Obtained by Subpoenaing Cheyne Capital **Directly**."  *Id.* at 8 (emphasis added).  Thus, MPT has conceded, acknowledged, and repeatedly recognized that the documents it seeks are located abroad.

event, ruling on a request for a letter rogatory rather than a subpoena.  Moreover, the fact that the documents sought from Cheyne Capital US concern exclusively foreign, out-of-forum contacts raises clear due process concerns.  Finally, MPT's assertion that Cheyne Capital US "bypassed a meet-and confer" before filing its motion to quash, Opp. at 24, is incorrect and ignores that MPT refused to withdraw its Subpoena even after Cheyne Capital US had communicated to MPT that it did possess the documents it sought, *see* Opp., Ex. 24 at 1, 4, 7, thereby rendering the meet and confer process moot.

## IV.   CHEYNE CAPITAL US IS ENTITLED TO FEES AND COSTS.

Cheyne Capital US has repeatedly represented to MPT that it does not possess, and cannot access, the documents MPT seeks.  *See id*.  Contrary to MPT's assertion, it is not entitled to "information that would enable MPT to assess whether Cheyne's refusal to provide discovery had any basis," Opp. at 24-25, particularly when MPT improperly attempted to use the Letter Rogatory to secure pre-action disclosure.  From refusing to narrow its overly broad and burdensome document requests to subpoenaing an indirect, US-based affiliate with no connection to the Viceroy transaction, MPT has obstinately refused to acknowledge that the documents it seeks are in the UK and only accessible through Cheyne Capital UK.  Cheyne Capital US should not have to foot the bill for litigation driven by MPT's wish that the facts were different.  Accordingly, Cheyne Capital US is entitled to fees from this meritless fishing expedition.

## <u>CONCLUSION</u>

For the reasons stated above, this Court should grant Cheyne Capital US' motion to quash and award Cheyne Capital US its reasonable fees and costs incurred in bringing this motion.

Dated:  June 14, 2024

Respectfully submitted,

By: */s/ Shireen A. Barday*

Shireen A. Barday
PALLAS PARTNERS (US) LLP
75 Rockefeller Plaza
New York, NY 10019
Telephone: (212) 970-2302
shireen.barday@pallasllp.com

*Attorneys for Cheyne Capital US, LP*

11