**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

CHEYNE CAPITAL US, LP,

                                            Petitioner,

          - v. -

MEDICAL PROPERTIES TRUST, INC.,

                                            Respondent.

Case No. 1:24-mc-00218 (VEC)

<u>Oral Argument Requested</u>

**MEDICAL PROPERTIES TRUST, INC.'S MEMORANDUM IN OPPOSITION**
**TO CHEYNE CAPITAL US, LP'S MOTION TO QUASH SUBPOENA**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

FACTUAL BACKGROUND ................................................................................................... 4

    A.   MPT sues Viceroy in Alabama ................................................................. 4

    B.   Discovery reveals that Cheyne Capital provides financial backing to Viceroy .......... 5

    C.   MPT seeks discovery from Cheyne Capital in the UK, and is rebuffed ................... 6

    D.   MPT seeks discovery from Cheyne Capital in the US, and is rebuffed ..................... 7

    E.   Cheyne Capital's "group operations" ........................................................ 8

    F.   The parties meet and confer, and Cheyne stonewalls ................................. 9

ARGUMENT ..................................................................................................................... 11

  I.   THE SUBPOENA SHOULD NOT BE QUASHED ......................................................... 11

    A.   Cheyne US has possession, custody, or control of responsive documents .............. 11

    B.   Cheyne US has the practical ability to obtain responsive documents ...................... 13

    C.   MPT may seek discovery without resort to the Hague Convention ......................... 21

    D.   The Subpoena imposes no undue burden ................................................. 23

  II.  CHEYNE US IS NOT ENTITLED TO FEES AND COSTS ........................................... 24

CONCLUSION ................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alcan Int'l Ltd.* v. *S.A. Day Mfg. Co., Inc.*,
  176 F.R.D. 75 (W.D.N.Y. 1996)..................................................................................20, 21

*Cooper Indus., Inc.* v. *British Aerospace, Inc.*,
  102 F.R.D. 918 (S.D.N.Y. 1984) ......................................................................................21

*Costa* v. *Kerzner Int'l Resorts, Inc.*,
  277 F.R.D. 468 (S.D. Fla. 2011) ......................................................................................17

*DeSmeth* v. *Samsung Am., Inc.*,
  1998 WL 74297 (S.D.N.Y. Feb. 20, 1998).......................................................................13

*Dietrich* v. *Bauer*,
  2000 WL 1171132 (S.D.N.Y. Aug. 16, 2000) ..................................................................13

*First Am. Corp.* v. *Price Waterhouse LLP*,
  154 F.3d 16 (2d Cir. 1998)..................................................................................... 22 & n.4

*Hermitage Glob. Partners LP* v. *Prevezon Holdings Ltd.*,
  2015 WL 728463 (S.D.N.Y. Feb. 19, 2015).....................................................................25

*Huang* v. *iTV Media, Inc.*,
  2017 WL 706194 (E.D.N.Y. Feb. 22, 2017).........................................................13, 17, 20

*Hunter Douglas, Inc.* v. *Comfortex Corp.*,
  1999 WL 14007 (S.D.N.Y. Jan. 11, 1999) ............................................................13, 14, 17

*In re Application of CBRE Glob. Invs. (NL) B.V.*,
  2021 WL 2894721 (S.D.N.Y. July 9, 2021) (Caproni, J.)................................................11, 18

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
  236 F.R.D. 177 (S.D.N.Y. 2006) ......................................................................................22

*In re Glob. Power Equip. Grp. Inc.*,
  418 B.R. 833 (Bankr. D. Del. 2009) .................................................................................20

*In re Ski Train Fire of Nov. 11, 2000 Kaprun Austria*,
  2006 WL 1328259 (S.D.N.Y. May 16, 2006) ..............................................................14, 20

*In re Vivendi Universal, S.A. Sec. Litig.*,
  2009 WL 8588405 (S.D.N.Y. July 10, 2009) ...................................................................21

*Laker Airways Ltd.* v. *Pan Am. World Airways,*
    607 F. Supp. 324 (S.D.N.Y. 1985) ...............................................................21, 22 n.4

*Marc Rich & Co., A.G.* v. *United States,*
    707 F.2d 663 (2d Cir. 1983).........................................................................................13

*Med. Props. Tr., Inc.* v. *Viceroy Rsch. LLC,*
    2024 WL 150502 (N.D. Ala. Jan. 12, 2024)..............................................................6, 23, 24

*Med. Props. Tr., Inc.* v. *Viceroy Rsch. LLC,*
    No. 2:23-cv-00408, Dkt. 1 (N.D. Ala. Mar. 30, 2023) ............................................4

*Mirlis* v. *Greer,*
    80 F.4th 377 (2d Cir. 2023) .....................................................................................13, 14

*Motorola Credit Corp.* v. *Uzan,*
    2013 WL 6098388 (S.D.N.Y. Nov. 20, 2023)........................................................13, 20, 21

*Probulk Carriers Ltd.* v. *Marvel Int'l Mgmt. & Transp.,*
    180 F. Supp. 3d 290 (S.D.N.Y. 2016).....................................................................22, 24

*SEC* v. *Strauss,*
    2009 WL 3459204 (S.D.N.Y. Oct. 28, 2009) .......................................................13

*Sergeeva* v. *Tripleton Int'l Ltd.,*
    834 F.3d 1194 (11th Cir. 2016) .................................................................................20

*Societe Nationale Industrielle Aerospatiale* v. *U.S. Dist. Ct. for the S. Dist. of
    Iowa,*
    482 U.S. 522 (1987).....................................................................................................22, 23

*Steele Software Sys., Corp.* v. *DataQuick Info. Sys., Inc.,*
    237 F.R.D. 561 (D. Md. 2006)...................................................................................17

*Uniden Am.* v. *Ericsson Inc.,*
    181 F.R.D. 302 (M.D.N.C. 1998) ...........................................................................13, 17, 18

**Statutes and Rules**

Fed. R. Civ. P. 45.................................................................................................................7, 24

## PRELIMINARY STATEMENT

This matter arises from federal litigation pending in the Northern District of Alabama. There, Medical Properties Trust, Inc. ("MPT") is pursuing defamation and other claims against Viceroy Research, LLC and its members. Viceroy is in the business of publishing false and misleading information about public companies for profit. Its basic playbook is simple, and effective: it takes a short position in the securities of its target, then unleashes a barrage of what it calls "research"—false vitriol—to drive down the target's stock price. In early 2023, Viceroy trained its fire on MPT, publishing a dozen "reports" in rapid succession accusing MPT and its executives of all manner of fraud. MPT sued, and all of its claims have survived motions to dismiss.

In discovery, MPT has learned that Viceroy's activities are bankrolled by Cheyne Capital, a global investment firm comprised of several legal entities through which Cheyne operates offices worldwide, including in New York. To facilitate its funding, Viceroy has entered into a number of agreements with one of these entities, Cheyne Capital Management (UK) LLP ("Cheyne UK"), based in London. Under the most recent of these agreements, Cheyne pays Viceroy $36,000 per month for the right to obtain advance copies of Viceroy's "research" before it is published. Viceroy is also entitled to a share of any profits Cheyne derives from trading in the securities of MPT's targets. The agreement designates Jonathan Lourie (Cheyne Capital's founder and the CEO of Cheyne UK) as the recipient of Viceroy's research, and Peter Head (Cheyne UK's Chief Compliance Officer), as the person responsible for authorizing Viceroy to share the research with Cheyne. Viceroy has produced email correspondence with Head in discovery.

Through the Hague Convention, the Alabama court approved document requests to Cheyne UK concerning its relationship with Viceroy and any profits from trades in MPT

securities. But when MPT then gave the requests to Cheyne UK, Cheyne UK refused to cooperate. MPT also served a subpoena in the US on an entity called Cheyne Capital US, LP ("Cheyne US") with substantially the same requests as the Alabama court had approved. Cheyne operates its New York office through Cheyne US; Cheyne US's Chief Compliance Officer (Head) and owner (Lourie) are the same people named in the agreement with Viceroy; and Cheyne US markets the "Client" fund named in the Cheyne/Viceroy agreement.

Nevertheless, Cheyne US followed Cheyne UK's lead (though the same law firm), demanding that MPT withdraw the subpoena and refusing to engage. Less than a week after belatedly serving responses and objections, and while the parties were working to schedule a meet and confer, Cheyne US moved to quash the subpoena. The motion provides no legal or evidentiary basis to quash.

(1)  Cheyne US principally contends that because MPT first sought documents from Cheyne UK through the Hague Convention, any responsive documents must be obtained in the UK through those means. But regardless of whether Cheyne UK also possesses responsive documents, the law is clear that Cheyne US has an independent obligation to produce responsive documents in its own "possession, custody, or control." Cheyne US's motion does not contend that it has no responsive documents. Nor could it—responsive correspondence from Cheyne US's own Chief Compliance Officer has already been produced by Viceroy, sent from the "@cheynecapital.com" email domain shared by both Cheyne US and Cheyne UK.

(2)  Regardless, in disclaiming its obligations under Rule 45, Cheyne US invokes the wrong legal standard, contending that it lacks the "legal right" to obtain documents from Cheyne UK. That formalistic position has been rejected again and again in this circuit, where courts instead pragmatically assess whether related or affiliated entities have "the practical ability to

obtain" documents from one another. On that question, the evidence is overwhelming: Far from being "entirely separate" as Cheyne claims, the US and UK entities are tightly intertwined—Cheyne US markets the funds managed by Cheyne UK—and both are closely integrated into Cheyne Capital's "group operations," with a shared Chief Compliance Officer (responsible for administering the Viceroy agreement at the heart of this dispute), a shared President (who lobbies in the US on behalf of Cheyne US), shared employees, common email, a single shared social media presence, a single website, and single points of contact for general inquiries, human resources, public relations, and investor relations. Cheyne UK's CEO (Lourie) is also Cheyne US's owner, both entities are ultimately controlled by Lourie's family trust, and Cheyne's securities filings represent that Cheyne US and Cheyne UK are "related" and "affiliated" entities under "common control."

Put simply, the evidence demonstrates that if responsive documents really are in the UK in some sense, all Cheyne US has to do to get them is ask. For example, as the Chief Compliance Officer of both entities, Head surely has the "practical ability" to access his own documents, wherever they are—his emails, whether in his US role or his UK role—are identical. The motion to quash should be denied.

## FACTUAL BACKGROUND

### A.    MPT sues Viceroy in Alabama

MPT is a real estate investment trust that acquires, develops, and invests in community healthcare facilities across the United States and internationally. MPT is incorporated in Maryland, and has its headquarters in Birmingham, Alabama. MPT's stock trades on the New York Stock Exchange.

In early 2023, MPT became the target of an aggressive "short and distort" campaign led by Viceroy and its members, Fraser Perring, Gabe Bernarde, and Aidan Lau. Perring—a self-proclaimed "Grand Poobah" of short-sellers—entered the short-and-distort game after British regulators revoked his social work license upon finding that he lied and fabricated evidence. Dkt. 3-1 ¶ 33. In 2021, five years after Viceroy's founding, a South African securities regulator fined Viceroy's members millions of dollars for spreading false claims about a bank on behalf of a hedge fund bent on driving down the bank's stock price. *Id.* ¶ 38; *see* Ex. 26 ¶¶ 23-24.[1]

MPT is Viceroy's latest target. In a campaign launched on January 26, 2023 that is ongoing, Viceroy and its members published more than a dozen "reports" and scores of social media posts containing false and defamatory statements about MPT's business and executives, including accusations of accounting fraud. The effect was as intended: MPT's stock price plummeted, leaving Viceroy, with its admitted short position, in the money. Dkt. 3-1 ¶ 41.

On March 30, 2023, after months of Viceroy's unrelenting attacks, MPT sued Viceroy and its members in the U.S. District Court for the Northern District of Alabama, alleging defamation, civil conspiracy, and other torts. *Med. Props. Tr., Inc.* v. *Viceroy Rsch. LLC*, No.

---

[1] As noted in MPT's complaint, South Africa's Financial Services Tribunal dismissed the matter on jurisdictional grounds without disturbing the above or other findings of fact.  Dkt. 3-1 ¶ 40.

2:23-cv-00408, Dkt. 1 (N.D. Ala. Mar. 30, 2023). Defendants moved to dismiss, and those motions were denied in full. *See* 2023 WL 4356355 (N.D. Ala. June 30, 2023).

**B.    Discovery reveals that Cheyne Capital provides financial backing to Viceroy**

Discovery in the Alabama litigation is ongoing, and has revealed that Viceroy's short attack on MPT was bankrolled by Cheyne. To facilitate its funding, Viceroy has entered into a number of agreements with Cheyne UK, a London-based entity in the Cheyne "group." Exs. 2; 17. Under the most recent agreement, dated November 22, 2023, Cheyne pays Viceroy $36,000 a month in exchange for the opportunity to review Viceroy's "research" before it is published. Ex. 2 § 4.1(A). Viceroy is also entitled to a percentage of any profits Cheyne earns from trading in the securities of Viceroy's targets. *Id.* §§ 10-12. Payments are denominated in US dollars, and must be paid to a US bank account. *Id.* §§ 4.1(A), 4.2. The purpose of these agreements is obvious—Cheyne gets advance access to potentially market-moving information, giving it the ability to take short positions in Viceroy's targets before their stock prices fall as intended when Viceroy's attacks go public.

In the agreement, Cheyne represents that it "wishes to use Viceroy's research to assist it to make investment decisions on behalf of" the "Cheyne Global Equity Fund." *Id.* at 1, § 1.1(B). The agreement sets out a process that Viceroy must follow before sharing any non-public "research" with Cheyne. That process is entrusted to Peter Head, the Chief Compliance Officer of both Cheyne US and Cheyne UK, who must give his approval to Viceroy before any research is sent. *Id.* §§ 1.1(C), 2. Once Head approves, there is one person designated by name to receive Viceroy's "research": Jonathan Lourie, Cheyne's co-founder, Chief Executive Officer, and Chief Investment Officer. *Id.* § 1.1(I); Ex. 3.

The agreement makes clear that Cheyne and Viceroy have worked together since at least December 11, 2021. Ex. 2 at 1. Nevertheless, after more than nine months of discovery, Viceroy

has produced only three emails exchanged with Cheyne. All of those emails were exchanged directly with Head. In those emails, Head directs Viceroy as contemplated by the agreement. *See, e.g.*, Ex. 4.

### C.    MPT seeks discovery from Cheyne Capital in the UK, and is rebuffed

After Viceroy disclosed the agreement, MPT sought discovery from Cheyne UK through the Hague Convention. Doing so required MPT to file a Letter of Request in the Alabama court setting forth the documents sought from Cheyne, including documents relating to the Viceroy defendants, the agreements between Viceroy and Cheyne, and documents relating to trading in MPT securities. *See* Dkt. 3-2.

Judge Proctor, presiding over the Alabama litigation, approved MPT's discovery requests in full, holding that "the requested documents from Cheyne Capital are directly material to [MPT's] assertion that [the Viceroy defendants] acted with actual malice, absence of mistake, or motive." *Med. Props. Tr., Inc.* v. *Viceroy Rsch. LLC*, 2024 WL 150502, at *5 (N.D. Ala. Jan. 12, 2024). And the Court credited MPT's claim "that the evidence sought can only be obtained from Cheyne Capital because [the Viceroy defendants] either do not have access to certain internal communications requested or have failed to produce the requested communications with Cheyne Capital." *Id.*

Following the Court's decision, MPT asked Cheyne UK to produce documents responsive to MPT's document requests. MPT noted its "inten[t]" to file Hague Convention papers in the UK, Dkt. 3-5 ¶ 2, and "reserv[ed] the right to" file a motion to compel in the UK, *id.* ¶ 8. However, to avoid the "time, cost, and court resources" of doing so, MPT offered to meet and confer. *Id.* Cheyne UK refused to produce any documents, and ignored the offer to meet and confer. Dkt. 3-6.

**D.      MPT seeks discovery from Cheyne Capital in the US, and is rebuffed**

Cheyne runs a New York office through Cheyne US, so MPT issued a subpoena on Cheyne US containing document requests substantially identical to those approved by Judge Proctor. MPT served the subpoena on Cheyne US's registered agent on April 11, Ex. 5 (affidavit of service), meaning any objections were due within 14 days (April 25). Fed. R. Civ. P. 45(d)(2)(B).

Cheyne US did not respond within 14 days. On May 9, Cheyne US—through the same law firm that represented Cheyne UK—demanded that MPT withdraw the subpoena within one day, under threat of a motion to quash and an application for fees and costs. Dkt. 3-7 at 1. Neither the correspondence nor the responses and objections Cheyne US concurrently served contained any representation that Cheyne US did not have possession, custody, or control of the documents MPT sought. *See id.* at 1-19.

MPT responded the next day, pointing out that Cheyne US had not disputed possession, custody, or control, and offering to meet and confer. Ex. 6 at 3. In reply, Cheyne US referred to general objections "to the extent" any documents were not in its possession, custody, or control, and claimed that MPT's document requests were "so broad as to be incognizable." *Id.* at 1-2. Cheyne US accepted MPT's offer to meet and confer, but demanded—despite Judge Proctor's approval of substantially similar requests—that MPT "explain beforehand how" MPT's document requests "even arguably relate[]" to the Alabama case. *Id.* at 2.

Two days later, and while the parties were working to set a date to meet and confer, Cheyne US filed its motion to quash. Dkt. 4. Attached to the motion is a declaration from Daniel Bordage, a manager of Cheyne Capital US, LLC, Cheyne US's general partner. Dkt. 2. Bordage does not describe what, if any, efforts Cheyne US undertook to determine whether it had possession, custody, or control of any responsive documents. Nor does he state that Cheyne US

lacks the practical ability to obtain responsive documents from Cheyne UK, asserting instead that Cheyne US has no "legal right or authority to obtain" such documents. *Id.* ¶ 9. Bordage further states that Cheyne US and Cheyne UK "maintain independent . . . executive level personnel," Dkt. 2 ¶ 7, and "do not share employees, facilities, office space or documents" in the "ordinary course," *id.* ¶ 8. The Bordage declaration omits a number of material facts and is inconsistent with Cheyne's own representations to regulators and the public, all of which evidence close coordination and cooperation between Cheyne US, Cheyne UK, and other entities within the Cheyne Capital "group."

### E.    Cheyne Capital's "group operations"

Cheyne represents itself to the public and regulators as a global firm with "group operations," Ex. 17, under a single banner, with a unified online presence, and "offices" around the world, *see* Ex. 7 at 2-3, each operating though entities that make up the "Cheyne Capital group," Ex. 17. The US and UK offices (operating through Cheyne US and Cheyne UK, respectively) are home to many of Cheyne's "170 employees worldwide," Ex. 1, and are well integrated with each other and with Cheyne's global "group operations," Ex. 17. In particular, and as more fully explained below:

- The same person—Mr. Head, who the Viceroy agreement designates to carry out the agreement—is the Chief Compliance Officer of both Cheyne UK and Cheyne US. Head is also designated as Cheyne US's "key contact" in regulatory filings. *See* Exs. 2, 9, 10, 16.

- Cheyne UK's CEO and Chief Investment Officer—Lourie, identified in Cheyne's agreement with Viceroy as the person to receive information from Viceroy—is Cheyne US's owner. *See* Exs. 2, 3, 9, 10.

- Cheyne UK and Cheyne US also share a President, who lobbies on behalf of Cheyne US despite being based in London. *See* Exs. 3, 9, 10, 11, 12, 13, 20.

- On government forms, the shared President and shared Chief Compliance Officer treat their contact details at Cheyne US and Cheyne UK as interchangeable. *See* Exs. 11, 12, 13.

- Cheyne US has told government authorities that its address is Cheyne UK's address. *See* Exs. 12, 13.

- Cheyne US and Cheyne UK are under common ownership and control, including by the executives who overlap between them and who, again, are the key individuals interacting with Viceroy from whom MPT seeks documents. *See* Exs. 3, 9, 10, 21, 22, 23.

- Cheyne tells people with whom its agents communicate that it can share information between entities within Cheyne's "group operations," including from Cheyne UK to Cheyne US. *See* Ex. 17.

- Cheyne US and Cheyne UK share the same email domain, and, along with the other entities in the Cheyne group, have a single shared social media presence, a single website, and single points of contact for general inquiries, HR, PR, and investor relations. *See* Exs. 1, 7, 25.

- Regulatory filings and audited financial statements identify Cheyne US and Cheyne UK as "related" and "affiliated" entities under common control. *See* Exs. 21, 22, 23.

## F.    The parties meet and confer, and Cheyne stonewalls

The parties met and conferred on May 20. During that call, Cheyne US's counsel was unable to explain what steps, if any, Cheyne US had taken to determine whether it had possession, custody, or control of responsive documents, save for the representation that unspecified "searches" may have been run over unspecified custodians and files. Ex. 24 at 5-6. When MPT asked about the nature of those searches—which files were searched, from whom, and with what terms—counsel explained that it would have to check with Cheyne US and report back. *Id.* at 6. MPT also asked Cheyne US to identify whether it maintains one or more email servers for its single email domain, and where the server is located. *Id.*

In an effort to avoid uncertainty about what the subpoena seeks, MPT also explained the core documents it was interested in: (1) documents and communications exchanged with or

related to the Viceroy defendants, including any agreements with the Viceroy defendants; and (2) documents and communications related to trades in MPT securities. *See id.* at 7. On May 22, Cheyne's counsel represented that Cheyne US "does not have" such documents, but refused to provide any information concerning any steps Cheyne US, or counsel, had taken to confirm as much. *Id.* Counsel also again made no representation that Cheyne US lacked the practical ability to obtain responsive documents, and ignored MPT's question regarding Cheyne's email servers. *Id.* MPT reiterated its questions, explaining that, without any information about Cheyne US's efforts to locate responsive documents, MPT had no basis to agree that Cheyne US lacks possession, custody, or control of such documents. *Id.* at 5-6.

Cheyne US then refused to engage further, claiming that MPT was seeking "the minutia [sic] of the particulars of what types of searches were conducted," and that MPT simply "has no good faith basis to believe" that Cheyne US has possession, custody, or control of responsive documents. *Id.* at 4-5. MPT responded that, among other things, Cheyne US's own Chief Compliance Officer and owner are identified by name in the Cheyne/Viceroy agreement, and the Chief Compliance Officer had corresponded with Viceroy pursuant to the agreement. MPT supplied the documents showing the same. *Id.* at 2; Exs. 2; 4.

To date, Cheyne US has refused to say how it searched for responsive documents, or to even confirm whether any searches were run. It has ignored MPT's explanations for why Lourie and Head are likely to have responsive documents. It has not explained why it would not at least have possession, custody, or control over the custodial files of its Chief Compliance Officer or owner. Nor has it provided any basis to believe that it does not have the practical ability to obtain responsive documents if it wanted to.

## ARGUMENT

I.    **THE SUBPOENA SHOULD NOT BE QUASHED**

A.    **Cheyne US has possession, custody, or control of responsive documents**

Cheyne US devotes its motion to arguing that it cannot obtain documents from Cheyne UK. Dkt. 4 at 8-12. That argument skips over the more fundamental question of whether Cheyne US *itself* has responsive documents in *its own* possession, custody, or control. It surely does. Cheyne US's own Chief Compliance Officer and "key contact" for regulatory purposes in the US—Head—is contractually responsible for corresponding with Viceroy and managing the flow of information from Viceroy to Cheyne. Ex. 2 §§ 1.1(C), 2.3; Ex. 16. And Viceroy has already produced responsive correspondence exchanged with Head, in which Head performs his contractual role. Ex. 4. Head sent this correspondence from the same @cheynecapital.com email account that US employees use; there is no indication that Head or anyone else separates UK-related messages from US-related messages. Moreover, Cheyne US markets the "Client" fund named in Cheyne's agreement with Viceroy, *see infra* at 20; it is not credible that Cheyne US would not at least have documents reflecting profits or losses on any of that fund's trades in MPT securities.

Despite these facts, it does not appear that Cheyne US has undertaken any effort to determine whether it has responsive documents. The Bordage declaration does not "describe [Cheyne US's] efforts to ensure that it had conducted an adequate search for responsive documents," or say anything at all about what documents reside with Cheyne US itself. *In re Application of CBRE Glob. Invs. (NL) B.V.*, 2021 WL 2894721, at *5 (S.D.N.Y. July 9, 2021) (Caproni, J.). Nor does Cheyne US's brief.

Instead of telling MPT and the Court what documents it does or does not have, Cheyne US contends that *MPT* has somehow conceded that only Cheyne UK has responsive documents.

Pointing to MPT's Hague Application, Cheyne argues that MPT represented that the evidence sought therein "could '***only*** be obtained' in the UK." Dkt. 4 at 9 (emphasis in original); *see* Dkt. 3-2 at 8. That characterization is inaccurate. MPT's statement to the Alabama court was that relevant documents could "only be obtained" from Cheyne, *rather than the Viceroy defendants*. Dkt. 3-2 at 8-9. MPT had unsuccessfully "attempted to obtain relevant documents and communications involving Cheyne Capital from [the Viceroy] [d]efendants," who also would "not have . . . documents or communications that are wholly internal to Cheyne Capital and its agents." *Id.*

MPT has asked Cheyne US repeatedly to explain the steps it took, if any, to investigate its possession, custody, or control, explaining each time that the answer could narrow or eliminate this dispute. Cheyne US has been unable or unwilling to answer. First, counsel simply pointed to the Bordage declaration, which says nothing about Cheyne's efforts to identify responsive documents. Next, counsel claimed there may have been "searches" run, but could not confirm whose files were searched, or how, or even definitively whether there were any searches at all. Then, counsel purported to follow up, but did not provide any of the detail it suggested it would. Ex. 24 at 4-7.

MPT then pointed out that Head was Cheyne US's Chief Compliance Officer, and responsible for administering the agreement with Viceroy, and that correspondence between Head and Viceroy had been produced in the Alabama litigation. *Id.* at 2-3. MPT even provided Cheyne US's counsel with copies of the relevant documents. *Id.* at 2; *see* Exs. 2, 4. In response, Cheyne did not deny any of these facts, instead pointing out that Head's emails with Viceroy included Head's Cheyne UK signature block. Ex. 24 at 1; *see* Ex. 4. Cheyne's position thus appears to be that it cannot access the documents of its Chief Compliance Officer and "key

contact" because that senior executive also serves in the exact same role for Cheyne UK. That position is untenable.

### B.    Cheyne US has the practical ability to obtain responsive documents

Even crediting Cheyne US's conclusory assertion that "the only relevant discovery sought by MPT "is located abroad," Dkt. 4 at 2, the motion to quash should still be denied. It is well settled in this circuit that so long as Cheyne US has "the practical ability to obtain" relevant documents, it is "immaterial that the documents sought may be located abroad." *Dietrich* v. *Bauer*, 2000 WL 1171132, at *2 (S.D.N.Y. Aug. 16, 2000). That is because "the test for production of documents is control, not location." *Id.* (quoting *Marc Rich & Co., A.G.* v. *United States*, 707 F.2d 663, 667 (2d Cir. 1983)). And "control" in the Rule 45 context is broadly construed: "a party has control over material that it has the practical ability to obtain." *SEC* v. *Strauss*, 2009 WL 3459204, at *7 (S.D.N.Y. Oct. 28, 2009) (citations omitted); *see also Mirlis* v. *Greer*, 80 F.4th 377, 382 (2d Cir. 2023).

That test is a "pragmatic" one, "based upon common sense notions of control." *DeSmeth* v. *Samsung Am., Inc.*, 1998 WL 74297, at *10 (S.D.N.Y. Feb. 20, 1998). The analysis is flexible and fact-dependent, focused not on formalities but on "the nature of the relationship between" corporate entities. *Hunter Douglas, Inc.* v. *Comfortex Corp.*, 1999 WL 14007, at *3 (S.D.N.Y. Jan. 11, 1999); *see also Uniden Am.* v. *Ericsson Inc.*, 181 F.R.D. 302, 305 (M.D.N.C. 1998) (crediting "substance over form," based on "actual control").

Among the factors courts commonly examine are: "overlapping management," "intertwined operations," *Motorola Credit Corp.* v. *Uzan*, 2013 WL 6098388, at *3-4 (S.D.N.Y. Nov. 20, 2023), common controlling ownership, the flow of information, shared facilities, and "a level of cooperation," *Huang* v. *iTV Media, Inc.*, 2017 WL 706194, at *8-9 (E.D.N.Y. Feb. 22, 2017). Ultimately, if an entity could obtain documents "to assist itself in litigation, it must

-13-

produce them for discovery purposes." *Hunter Douglas*, 1999 WL 14007, at *3; *see also In re Ski Train Fire of Nov. 11, 2000 Kaprun Austria*, 2006 WL 1328259, at *8 (S.D.N.Y. May 16, 2006) (question is whether foreign affiliate would provide "assistance or cooperation . . . in a matter of concern to the company . . . in the form of providing documents" or otherwise). All of these factors are present here, and all support only one reasonable conclusion: if Cheyne US wanted documents from Cheyne UK, it could get them simply by asking.

Cheyne US has submitted no evidence to the contrary. The Bordage declaration does not claim that Cheyne US lacks the practical ability to obtain documents from Cheyne UK. Instead, Bordage avers that Cheyne US does not have "any legal right or authority" to obtain its affiliate's documents.[2] Dkt. 2 ¶ 9. But the test is "practical ability," not "legal right." *See Mirlis*, 80 F.4th at 382. And on that question, the Bordage declaration offers only conclusory statements concerning Cheyne US's purported "ordinary course" practices, all of which are inconsistent with the publicly available evidence.

***First***, the declaration claims that Cheyne US and Cheyne UK "maintain independent . . . executive level personnel." Dkt. 2 ¶ 7. But Cheyne's own regulatory filings confirm the opposite, making clear that both entities share senior personnel and operate under common control.

*Filings with the National Futures Association.* Cheyne UK registers its executives' identities with the U.S.-based National Futures Association ("NFA"), a self-regulatory organization with which financial firms like Cheyne UK must register under the Commodity Exchange Act and federal regulations. Ex. 8. Cheyne UK's registration shows that Lourie is

---

[2] In all of Cheyne US's papers and correspondence, it claims just once that it does not have the practical ability to obtain documents from Cheyne UK. Dkt. 4 at 11. For evidentiary support, Cheyne US cites only the inapposite "legal right" claim in the Bordage declaration. *Id.* (citing Dkt. 2 ¶¶ 8-9).

CEO, Fiertz is President, and both men own at least a 10 percent financial interest in Cheyne UK. Ex. 9 at 3. The NFA also lists Head as Cheyne UK's Chief Compliance Officer. *Id.* Lourie, Fiertz, and Head are identified in Cheyne UK's NFA filing as that entity's "principals" because of "their ability to control [Cheyne UK's] business activities, their formal title or position with [Cheyne UK], or their ownership or financial stake in [Cheyne UK]." *Id.*

Cheyne US also registers with the NFA. Ex. 10. Lourie, Fiertz, and Head are identified as "principals," and Lourie and Fiertz own at least 10 percent of Cheyne US. *Id.* At Cheyne US, Fiertz and Head hold the exact same titles as at Cheyne UK—President and Chief Compliance Officer, respectively. *Id.* Only Lourie's title is different; in addition to being the CEO of Cheyne UK, he is the "owner" of Cheyne US. *Id.*

*Filings with state authorities.* Other US filings reflect that Cheyne UK's executives affiliate with Cheyne US and work alongside Cheyne US employees. For example, Fiertz, the President of Cheyne US and Cheyne UK, is registered as a lobbyist in multiple states. From 2019-22 he registered as a lobbyist in California as an employee of "Cheyne Capital US, LP," at addresses associated with Cheyne US. Ex. 11 at 14-15, 21, 23 (excerpted California records). In California, Illinois, and Rhode Island, Fiertz has registered alongside Jeffrey Peate, a Cheyne employee who represents on LinkedIn that he is a Managing Director at Cheyne in New York. *Id.* at 22-23 (California); Exs. 12 at 2 (excerpted Illinois records); 13 at 2-3 (Rhode Island records); 14 (Peate's LinkedIn profile).

Cheyne US has for years told California that Head is its Chief Compliance Officer, with an address matching Cheyne US's registered agent in Delaware. Ex. 11 at 15, 23. In 2022 and 2023, Head declared under penalty of perjury to Washington, D.C.'s Board of Ethics and Government Accountability that he was Cheyne US's "key contact." Ex. 16.

*Filings with the Securities and Exchange Commission.* Cheyne UK registers as an investment advisor with the Securities and Exchange Commission, requiring it to file a Form ADV. Its Form ADV echoes the statements on its website, representing that Cheyne UK and Cheyne US are "affiliated" "Cheyne group entities." Ex. 21 at 175. The filing also describes Cheyne UK and Cheyne US as "related person[s]" under "common control," sharing "supervised persons." *Id.* at 24. The SEC defines "supervised persons" as any "officers, partners, directors . . . or employees, or any other person who provides investment advice on your behalf *and is subject to your supervision or control*." U.S. Sec. & Exch. Comm'n, Form ADV Glossary of Terms at 35 ¶ 59, https://www.sec.gov/about/forms/formadv-instructions.pdf (emphasis added).

*Audited financial statements.* Cheyne UK's audited financial statements repeat that Cheyne UK and Cheyne US are under "common control," and characterize transactions between the two as "related party transactions." Ex. 22 at 21. Cheyne UK and Cheyne US also share a controlling parent, named Cheyne Capital Management Ltd. ("Cheyne Ltd."). Lourie is one of Cheyne Ltd.'s three directors; Fiertz is another. Ex. 23. In its audited financial statements, Cheyne Ltd. presents its results and those of its subsidiaries, including Cheyne US's general partner—together comprising "the Group," *id.* at 3—"as if they form a single entity," *id.* at 16. Those financial statements note that Cheyne Ltd. wholly owns the LLC that controls Cheyne US, and "is deemed to control" Cheyne UK "through its control of [Cheyne UK's] executive committee." *Id.* at 26. "[U]ltimate control[]" of Cheyne Ltd.—and thus of Cheyne UK and Cheyne US—rests with an entity called Galilee Trust. *Id.* at 30. All the beneficiaries are Lourie's family. Ex. 21 at 133.

In these circumstances, the notion that Lourie has no practical ability to access Cheyne UK's documents on behalf of Cheyne US—when he controls one entity and owns the other—or that Cheyne US has no practical ability to obtain its own Chief Compliance Officer's documents, defies common sense. *See Huang*, 2017 WL 706194, at *8 (ordering production from sister entity where, "[e]ven though the two entities have different Boards of Directors, they share the same Chief Executive Officer"); *Uniden*, 181 F.R.D. at 307 (between sister entities, there was "some exchange of officers, to the extent that the officer of [one] has some control over an officer of [the other]"). Surely, for example, Cheyne US could obtain documents from Lourie and Head if it were "the subject of a government investigation in the United States." *Hunter Douglas*, 1999 WL 14007, at *3 (compelling production).  Indeed, "[c]ourts have consistently held that 'control' exists 'where [a] party and its related nonparty affiliate are owned by the same individual.'" *Costa* v. *Kerzner Int'l Resorts, Inc.*, 277 F.R.D. 468, 472 (S.D. Fla. 2011) (quoting *Steele Software Sys., Corp.* v. *DataQuick Info. Sys., Inc.*, 237 F.R.D. 561, 564 (D. Md. 2006)) (collecting cases).

*Second*, the Bordage declaration claims that Cheyne US and Cheyne UK "maintain independent . . . documents." Dkt. 2 ¶ 7. But Cheyne's website makes clear that even *personal* data from third-parties can flow freely between entities in "the Cheyne Capital group," never mind the business communications of the group's shared executive teams. Ex. 17.

Emails from Cheyne personnel, for example, direct recipients to "read our Privacy Notice which explains how Cheyne Capital Management UK LLP uses and shares personal data of individuals with whom we interact." Ex. 4 at 2 (email from Peter Head to Fraser Perring). The Privacy Notice on Cheyne's website states that "Cheyne Capital comprises of [sic] several different legal entities, including Cheyne Capital Management (UK) LLP . . . [and] Cheyne

-17-

Capital US, LP." Cheyne therefore defines "references to 'Cheyne', 'we', 'us' or 'our'" in the Privacy Notice "as references to the relevant entity *in the Cheyne Capital group* responsible for processing your personal data." Ex. 17 (emphasis added). And when someone shares information with Cheyne, Cheyne may freely "*share[] [such information] across other Cheyne Capital entities . . . as part of our group operations*." *Id.* (emphasis added). In other words, Cheyne warns people in email correspondence that information from that correspondence can flow freely between the Cheyne entities in the "group," including to Cheyne US.

Consistent with Cheyne's "group operations," a set of common email addresses is used for all the firm's global offices. For example, anyone who wants to contact Cheyne US is told to email info@cheynecapital.com, the same address provided for Cheyne UK and all other worldwide offices and entities in the Cheyne group. Ex. 25 at 1. Cheyne tells all prospective employees, for positions at any of its entities or offices, to email hr@cheynecapital.com if they want a job at the firm. *Id.* Cheyne directs all press inquiries to pr@cheynecapital.com. *Id.* And questions about Cheyne's Privacy Notice go to cheyneinvestor.relations@cheynecapital.com. Ex. 17. Regulatory filings and documents produced in the Alabama case confirm that Cheyne's US- and UK-based employees share the same "@cheynecapital.com" email domain. *See* Exs. 4 at 1 (email from Head); 13 at 3 (Mr. Peate, based in New York).

Notably, Bordage does not claim that Cheyne US and Cheyne UK "have separate computer systems that are inaccessible" between the entities, or that "there are governance documents preventing affiliates" in the Cheyne group "from accessing each other's records." *CBRE*, 2021 WL 2894721, at *5. Nor could he—for all practical purposes, information sent to the overlapping owners and executives of Cheyne US and Cheyne UK, through their single email domain, reaches both entities simultaneously. *See Uniden*, 181 F.R.D. at 307 (compelling

production where two entities were "part of the same internal e-mail system"); *In re Application of Bloomfield Inv. Res. Corp.*, 315 F.R.D. 165, 168 (S.D.N.Y. 2016) (common controller held an email address at sister entity).

**Third**, the Bordage declaration claims that Cheyne US and Cheyne UK do not, "[i]n the ordinary course . . . share employees." Dkt. 2 ¶ 8. But Cheyne claims on its website that it has "170 employees worldwide," without distinguishing between US- or UK-based employees, who apparently are all hired by a single human resources function in any event. *See* Exs. 1, 25. Moreover, Cheyne US has represented to the State of Rhode Island that its "[p]rincipal [c]ontact [p]erson" was someone reachable at a UK-related contact email (complianceuk@cheynecapital.com), and who, according to LinkedIn, was a compliance analyst in Cheyne's London office. Exs. 13 at 1; 15 at 2 (employee LinkedIn profile).  And as noted above, Cheyne US and UK share executive personnel.

**Fourth**, the Bordage declaration claims that Cheyne US and Cheyne UK do not, "[i]n the ordinary course . . . share . . . facilities [or] office space." Dkt. 2 ¶ 8. But in regulatory filings, Cheyne US has listed its address as **Cheyne UK's address**. To authorities in California and Washington, D.C., Cheyne US's address is in New York or Delaware. Exs. 11 at 21-22; 16 at 1-3. Yet in Illinois and Rhode Island, Cheyne US lists its address as "Stornoway House" in London—the same location as Cheyne UK's "[r]egistered office." Exs. 12 at 2; 13 at 2; 22 at 2.

And Cheyne publicly represents its organization as a unified whole. Cheyne maintains a single corporate profile on LinkedIn. *See* Ex. 18. Senior personnel in the UK and US associate with the profile and amplify its posts.[3] There is one corporate logo for all "12 offices . . . worldwide" that are part of its "group operations," including the New York "office" operated

---

[3] These include Peate, the Managing Director identified above; a New York-based Director; and Fiertz. *See* Exs. 14; 19; 20.

through Cheyne US. Exs. 1, 17. In short, Cheyne US and Cheyne UK may be "legally independent units," *In re Ski Train Fire*, 2006 WL 1328259, at *7, but they "are corporate members of a unified worldwide business entity," branded as a "[g]roup," with "the same corporate logo" and under common control, *Alcan Int'l Ltd.* v. *S.A. Day Mfg. Co., Inc.*, 176 F.R.D. 75, 79 (W.D.N.Y. 1996) (compelling production); *see also Uzan*, 2013 WL 6098388, at *4 (same where entities held "themselves out to the public as significantly intertwined"); *In re Glob. Power Equip. Grp. Inc.*, 418 B.R. 833, 842 (Bankr. D. Del. 2009) (similar).

Unsurprisingly given this background, Cheyne US and Cheyne UK have a clear "history of helping out" one another, further reason to deny the motion to quash. *Huang*, 2017 WL 706194, at *9 (quotation and alterations omitted). For years, Fiertz, the common President, has registered as a lobbyist in the US under Cheyne US's flag—no doubt to tout the same financial products he and Lourie oversee at Cheyne UK. Head, the common Chief Compliance Officer, is Cheyne US's filer or "key contact" in multiple US jurisdictions. This history "suggests that [Cheyne UK] would continue to provide assistance to its sister [partnership], either through producing documents or otherwise." *Id.*

Indeed, Cheyne US exists to market the funds that personnel in London manage, and Cheyne UK discloses numerous such funds its Form ADV filed with the SEC. *See, e.g.*, Ex. 21 at 32, 37, 48, 59. Cheyne US even markets the "Client" fund named in Cheyne's agreement with Viceroy. *See* Exs. 2 § 1.1(B) (agreement identifying "Client" as the "Cheyne Global Equity Fund"); 21 at 42 (Cheyne US markets the "Cheyne Global Equity Fund Master ICAV"). Even considered in isolation, it strains belief that the marketing or client-relations arm of a corporate "group" providing "complimentary and international financial services" would have no practical ability to obtain information from an entity managing those financial-services products. *Sergeeva*

-20-

v. *Tripleton Int'l Ltd.*, 834 F.3d 1194, 1201 (11th Cir. 2016); *see also Alcan*, 176 F.R.D. at 79 (domestic distributor of foreign manufacturer); *Cooper Indus., Inc.* v. *British Aerospace, Inc.*, 102 F.R.D. 918, 919-20 (S.D.N.Y. 1984) (same).

Despite all this, Cheyne US claims it has no practical ability to obtain documents from Cheyne UK because the two are not "truly . . . operating as a single entity." Dkt. 4 at 11. That assertion is directly contrary to the evidence discussed above, all of which shows unified "group operations," as Cheyne itself represents publicly. Ex. 17. Moreover, Cheyne's only case for its "single entity" test, *In re Vivendi Universal, S.A. Sec. Litig.*, 2009 WL 8588405 (S.D.N.Y. July 10, 2009), is inapposite and has expressly been disapproved by at least one judge in this district in any event, *see Uzan*, No. 02 Civ. 666 (JSR), 2013 WL 6098388, at *4. *Vivendi* involved an effort to obtain documents protected by bank secrecy laws in Luxembourg, 2009 WL 8588405, at *1, raising issues of international law that are not present here. And the *Vivendi* plaintiffs failed to show that the two entities' "day-to-day operations [had] anything in common." *Id.* at *4. Here, by contrast, Cheyne US and Cheyne UK "share[] employees, share[] facilities, [and] share[] office space." *Id.* And they "utilize[] common practices and forms," *id.*, including email addresses, corporate branding, and consolidated financial statements at the parent-company level. *Supra* at 16, 18-20. That is a far cry from the facts in *Vivendi*.

### C.    MPT may seek discovery without resort to the Hague Convention

Unable to contend that Cheyne US lacks responsive documents, or the practical ability to obtain them, Cheyne US devotes much of its motion to complaints that MPT is "attempt[ing] to circumvent the Hague Convention." Dkt. 4 at 12 (citing *Laker Airways Ltd.* v. *Pan Am. World Airways*, 607 F. Supp. 324 (S.D.N.Y. 1985)). That argument misses the mark for two reasons. First, Cheyne US is based in the US, and the Hague Convention is irrelevant to it. Regardless of

whether Cheyne UK *also* has responsive documents, Cheyne US must produce any responsive documents in *its own* possession, custody, or control.

Second, and in any event, the Supreme Court has expressly rejected the argument Cheyne US advances here: There is no "rule of law that would require first resort to Convention procedures whenever discovery is sought from a foreign litigant," or when seeking "evidence located abroad." *Societe Nationale Industrielle Aerospatiale* v. *U.S. Dist. Ct. for the S. Dist. of Iowa*, 482 U.S. 522, 539, 542 (1987). The Hague Convention's procedures are "a permissive supplement, not a pre-emptive replacement, for other means of obtaining evidence located abroad." *Id.* at 536; *see also First Am.*, 154 F.3d at 21 (rejecting argument "that primary resort to the Hague Convention is or should be mandatory if the demand for discovery is addressed to a non-party witness"). Thus, this Court has repeatedly rejected arguments about "attempt[s] to circumvent [t]he Hague Convention." *Probulk Carriers Ltd.* v. *Marvel Int'l Mgmt. & Transp.*, 180 F. Supp. 3d 290, 292 (S.D.N.Y. 2016) (addressing motion to quash). To the extent a subpoenaed party has responsive documents within its possession, custody, or control, it must produce them—"regardless of where the documents are located."[4] *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 236 F.R.D. 177, 182 (S.D.N.Y. 2006); *First Am.*, 154 F.3d at 21 (applying this principle in the Rule 45 context).

Nor has MPT "abandoned" the Hague Convention. Dkt. 4 at 10. It sought Cheyne UK's cooperation, and though Cheyne UK refused even to engage, MPT retains the "option[]" to file

---

[4] Moreover, *Laker Airways*, the sole case on which Cheyne US relies, is distinguishable. There, the Court was "heavily influenced" by the discovering party's attempt to circumvent specific "British laws proscribing disclosure of the bank records sought." *First Am. Corp.* v. *Price Waterhouse LLP*, 154 F.3d 16, 21 (2d Cir. 1998) (interpreting *Laker Airways*). Nothing like that is alleged here. And in *Laker Airways*, "the entire . . . litigation situation [was] a matter of sensitive international interest"—a claim Cheyne US has not made. *Laker Airways*, 607 F. Supp. at 327. What is more, the *Laker Airways* Court reserved on the very issue for which Cheyne cites the case: "whether the Hague Convention is always the exclusive method of discovery against a non-party." *Id.*

process in England, *Aerospatiale*, 482 U.S. at 538, just as it retains the option to pursue discovery in the US.

> **D.      The Subpoena imposes no undue burden**

Cheyne US also seeks to quash on the basis of burden, arguing that the subpoena seeks irrelevant documents and is overbroad. Dkt. 4 at 12-17. Judge Proctor already rejected these arguments in his consideration of nearly identical requests.

*The documents sought are relevant.* Cheyne US's contention that MPT has "made no showing" of relevance is false. *Id.* at 13. As Judge Proctor already held when rejecting Viceroy's relevance objection, the first of MPT's requests—for documents related to agreements with or payments to the Viceroy defendants—seeks records that are "probative of [the Viceroy defendants'] state of mind when publishing the statements at issue about MPT." *Viceroy*, 2024 WL 150502, at *5. As for MPT's second request—for documents concerning MPT or MPT securities—there is no dispute that Cheyne is providing financial backing to Viceroy, including through an agreement to share profits from securities trades. Cheyne's communications about MPT will illustrate the extent of the Viceroy defendants' collaboration with Cheyne. Information about Cheyne's trading in MPT securities will show how much money the Viceroy defendants and others have made or stand to make by defaming MPT, which, among other things, is directly relevant to MPT's damages.

*The subpoena is not overly broad.* Cheyne US complains that the subpoena's first request encompasses agreements and communications beyond those immediately related to MPT. Dkt. 4 at 13. Again, Judge Proctor already rejected this argument:

> [I]n-depth evidence of any agreements between [the Viceroy defendants] and Cheyne Capital to publish research and statements about companies – whether those agreements involve MPT or another company – is directly relevant as it will shed light on whether [the Viceroy defendants] had actual malice or motive, or alternatively whether their statements were merely mistaken.

*Viceroy*, 2024 WL 150502, at *5 (addressing substantially identical request).

Next, Cheyne US—which bypassed a meet-and-confer before filing its motion—spends pages parsing the subpoena's definitions, arguing that the subpoena's requests are "unintelligible" or "nonsensical." Dkt. 4 at 16-17. Once the parties had a chance to speak, however, MPT explained in basic terms what it is seeking: "evidence of any agreements between [the Viceroy defendants] and Cheyne Capital to publish research and statements about companies," *Viceroy*, 2024 WL 150502, at *5; communications about or with the Viceroy defendants; and documents related to trades or profits in MPT securities. *See* Ex. 24 at 7. Cheyne US indicated it understood this commonsense reading of MPT's subpoena, *see id.*—just as Judge Proctor did when holding that substantially similar requests fell "within the scope of discovery authorized by the Federal Rules." *Viceroy*, 2024 WL 150502, at *6. To the extent the Court disagrees, the appropriate remedy is to modify under Rule 45(d)(3)(A), not to quash the subpoena entirely. *See Probulk*, 180 F. Supp. 3d at 294 n.9 (citation omitted).

## II.    CHEYNE US IS NOT ENTITLED TO FEES AND COSTS

Cheyne's request for sanctions is meritless. Cheyne first contends that "MPT has not made any effort to establish the relevance of the Subpoena to the Alabama Proceedings." Dkt. 4 at 19. That's rich, given that the federal judge presiding over those very proceedings has already ruled that the exact same requests are "directly material." *Viceroy*, 2024 WL 150502, at *5.

Cheyne also claims that MPT did not take "reasonable steps to avoid imposing undue burden or expense" on Cheyne. Dkt. 4 at 19. More misdirection. *Cheyne*, not MPT, prematurely rushed to quash the subpoena, after blowing its deadline to respond, and before the parties had even met and conferred. And *Cheyne*, not MPT, then spent the next two weeks refusing to provide MPT with any information that would enable MPT to assess whether Cheyne's refusal to

provide discovery had any basis. Opposing Cheyne's motion in these circumstances, and in light of the mountain of evidence demonstrating Cheyne US's practical ability to obtain relevant documents, is the opposite of "so unreasonable as to merit sanctions." *Hermitage Glob. Partners LP* v. *Prevezon Holdings Ltd.*, 2015 WL 728463, at *6 (S.D.N.Y. Feb. 19, 2015).

## CONCLUSION

For the foregoing reasons, Cheyne Capital US, LP's Motion to Quash Subpoena should be denied.

Dated:  June 7, 2024                          WACHTELL, LIPTON, ROSEN & KATZ
New York, New York

                                             /s/ *William Savitt*
                                             William Savitt
                                             Sarah K. Eddy
                                             Nathaniel Cullerton
                                             Charles M. Melman
                                             51 West 52nd Street
                                             New York, NY  10019
                                             Tel.: (212) 403-1000


                                             *Attorneys for Medical Properties Trust, Inc.*