USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 7/31/24

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
CHEYNE CAPITAL US, LP,                          :
                                                :
                                  Petitioner,   :      24-MC-218 (VEC)
                                                :
               -against-                        :      OPINION & ORDER
                                                :
MPT PROPERTIES TRUST, INC.,                     :
                                                :
                                  Respondent.   :
------------------------------------------------------------X

VALERIE CAPRONI, United States District Judge:

On May 15, 2024, Cheyne Capital US, LP ("Cheyne US") moved to quash a subpoena *duces tecum* served on it by Medical Properties Trust, Inc. ("MPT") that demanded production of documents in connection with ongoing litigation between MPT and third parties in the District Court for the Northern District of Alabama ("Motion"). *See* Not. of Mot., Dkt. 1. MPT opposed the Motion, stating that Cheyne US is obligated to produce responsive documents along with documents that it has the "practical ability to obtain" from its affiliated entity Cheyne Capital Management (UK) LLP ("Cheyne UK"). *See* MPT Mem. at 2–3, Dkt. 23. For the following reasons, Cheyne US's Motion to Quash is GRANTED.

## BACKGROUND[1]

MPT sued Viceroy Research LLC ("Viceroy") and other individuals in the District Court for the Northern District of Alabama (the "Alabama Litigation"). *See* Compl., *Medical Properties Tr., Inc., v. Viceroy Research LLC, et al.*, No. 23-CV-00408 (N.D. Ala.), Barday Decl. Ex. 1, Dkt. 3–1. In that lawsuit, MPT alleges that Viceroy undertook a campaign to

---

[1] Citations to "Bordage Decl." refer to the Declarations of Daniel Bordage at Dkts. 2 and 19 and the attached exhibits; citations to "Barday Decl." refer to the Declaration of Shireen Barday at Dkt. 3 and the attached exhibits; citations to "Cullerton Decl." refer to the to the Declaration of Nathaniel Cullerton at Dkt. 15 and the attached exhibits.

1

"defame, injure, and drive down the stock price of MPT" by publishing "false, misleading, and defamatory statements" purporting to be "research" about MPT's business; Viceroy held a short position in MPT and, therefore, profited when the stock price dropped. *Id*. ¶¶ 1, 3, 6, 44.

During discovery in the Alabama Litigation, Viceroy disclosed an agreement between itself and Cheyne UK, which is not a defendant in the Alabama Litigation ("Viceroy Agreement"). Cheyne US Mem. at 3, Dkt. 4. Pursuant to the Viceroy Agreement, Cheyne UK pays Viceroy monthly for the opportunity to review Viceroy's research prior to publication.[2] *Id*. MPT then sought discovery from Cheyne UK by obtaining a Letter Rogatory signed by the Alabama District Court. Barday Decl. Ex. 4 at 1, Dkt. 3–4.[3] The Letter Rogatory included requests for "Documents and Communications related to any Defendant, or any person working on behalf of or in concert with any Defendant," and "Documents and Communications relating to MPT or MPT Securities." *Id*. Ex. 1 at 7.[4]

In April 2024,[5] MPT served a third-party subpoena *duces tecum* (the "Subpoena") on Cheyne US. Bordage Decl. Ex. 1, Dkt. 2–1. The documents demanded by the Subpoena are nearly identical to the documents MPT sought from Cheyne UK in the Letter Rogatory.

---

[2] Viceroy also receives a portion of Cheyne UK's profits from trading securities that Viceroy researches. Cullerton Decl. Ex. 2 ¶ 4, Dkt. 15–4.

[3] MPT stated in its motion papers in support of its application for the Letters Rogatory that "[t]he evidence sought by [MPT] can only be obtained by subpoenaing Cheyne [UK] directly." Barday Decl. Ex. 2 at 8, Dkt. 3–2. The Alabama District Court issued a Letter Rogatory finding that "it would further the interests of justice to obtain documents in the possession of non-party [Cheyne UK]." Barday Decl. Ex. 4 at 1, Dkt. 3–4.

[4] On March 6, 2024, in a letter addressed to "Cheyne Capital UK Ltd." (a non-existent company), MPT demanded production of documents based on the Letter Rogatory and noted that it was preparing an application pursuant to the Hague Convention. Barday Decl. Ex. 5 at 2–3, Dkt. 3–5. Cheyne UK promptly responded, denying MPT's requests for documents and asserting that the request amounted to an "inappropriate fishing expedition" for "irrelevant documents." Barday Decl. Ex. 6 at 3, Dkt. 3–6. To this Court's knowledge, MPT has yet to actually commence the process in the UK to obtain a response to the Letter Rogatory.

[5] The parties dispute when Cheyne US was served with the Subpoena. *Compare* Bordage Decl. ¶ 1, Dkt. 2–1 (Subpoena was served on April 30, 2024) *with* Cullerton Decl. Ex. 5 at 3, Dkt. 15–5 (Subpoena was served on April 11, 2024). The actual date of service is irrelevant to the issue at hand.

*Compare* Barday Decl. Ex. 4, Dkt. 3–4, *with* Bordage Decl. Ex. 1, Dkt. 2–1. The Subpoena demands "Documents and Communications related to any Defendant, or any Person working on behalf of or in concert with Any Defendant" and "Documents and Communications relating to MPT or MPT Securities." Bordage Decl. Ex. 1 at 8, Dkt. 2–1. The Subpoena required compliance by May 9, 2024, and identified the place of compliance as the offices of Quinn Emanuel Urquhart & Sullivan LLP in New York City. *See id.* at 1.

On May 9, 2024, Cheyne US demanded that MPT withdraw the Subpoena, as Cheyne US is not "directly related to the [Cheyne] UK entity whose documents MPT seeks." Barday Decl. Ex. 7 at 1, Dkt. 3–7. Cheyne US warned that it would move to quash the Subpoena if it were not withdrawn. *Id.* MPT refused to withdraw the Subpoena and suggested the parties meet and confer to resolve their disputes. Barday Decl. Ex. 8 at 1, Dkt. 3–9. On May 13, 2024, Cheyne US provided MPT more substantive objections to the Subpoena and agreed to schedule a meet and confer provided MPT articulated the relevance of the documents it was seeking. Barday Decl. Ex. 9 at 2, Dkt. 3–10. On May 15, 2024, Cheyne US filed the instant Motion.[6] Not. of Mot.

I. **The Motion to Quash is GRANTED**[7]

   A. **Legal Standard**

Under the Federal Rules of Civil Procedure, a subpoenaed party must only produce those documents that are in its "possession, custody, or control." Fed. R. Civ. P. 34(a)(1),

---

[6] After Cheyne US filed the Motion, on May 20, 2024, the parties met and conferred; during that meeting, MPT identified the core documents it seeks and asked whether Cheyne US maintains one or more email servers and, if so, the location of the server. MPT Mem. at 9–10. On May 22, 2024, Cheyne US represented that it "does not have" such documents; it did not respond to MPT's question regarding its email server. Second Bordage Decl. ¶ 4, Dkt. 19; Cullerton Decl. Ex. 24 at 7, Dkt. 23–1.

[7] The Court grants Cheyne US's Motion to quash the Subpoena because it has represented that it does not possess the requested documents, and MPT has not demonstrated that it has the practical ability to obtain them.

3

45(a)(1)(A)(iii).  *See also In re Stadtwerke Frankfurt Am Main Holding GmbH*, No. 19-MC-35, 2019 WL 3004150, at *1 (S.D.N.Y. July 10, 2019).  The party seeking discovery must "make a showing that the other party has control over the materials sought." *Sec. & Exch. Comm'n v. Credit Bancorp, Ltd.*, 194 F.R.D. 469, 472 (S.D.N.Y. 2000).  A party not in actual possession of documents may still have "control" of the documents if it has "the practical ability to obtain" the documents or if "it has a legal right to obtain" the documents.  *Sec. & Exch. Comm'n v. Strauss*, No. 09-CV-4150, 2009 WL 3459204, at *7 (S.D.N.Y. Oct. 28, 2009) (citations omitted); *see also Shcherbakovskiy v. Da Capo Al Fine, Ltd.*, 490 F.3d 130, 138 (2d Cir. 2007) (holding that "control" connotes "access and the practical ability" to obtain requested documents).  Where "documents ordinarily flow freely between" two affiliated entities or a parent and a subsidiary, courts will typically find that either entity has access and the practical ability to obtain documents from the other.  *See Hunter Douglas, Inc. v. Comfortex Corp.,* No. CIV. A. M8–85, 1999 WL 14007, at *3 (S.D.N.Y. Jan. 11, 1999).

When a subpoena is served on a non-party, the issuing party "must take reasonable steps to avoid imposing undue burden or expense on [the entity] subject to the subpoena." Fed. R. Civ. P. 45 (d)(1).  That fact "entitles the [non-party] to consideration regarding expense and inconvenience." *Night Hawk Ltd. v. Briarpatch Ltd., L.P.*, No. 03-CV-1382, 2003 WL 23018833, at *8 (S.D.N.Y. Dec. 23, 2003) (internal quotations and citation omitted).  *See also Cohen v. City of New York*, No. 05-CV-6780, 2010 WL 1837782, at *3 (S.D.N.Y. May 6, 2010) (internal quotations and citation omitted) (recognizing that "special weight [should be given] to the burden on non-parties of producing documents to parties involved in litigation").

---

Accordingly, the Court need not analyze whether the Subpoena is overbroad and whether compliance would impose an undue burden.

4

The party seeking discovery bears the burden of demonstrating that the subpoenaed party has control over the documents sought. *In re Application of CBRE Global Investors (NL) B.V.*, No. 20-MC-315, 2021 WL 2894721, at *3 (S.D.N.Y. July 9, 2021) (citation omitted); *see also Golden Trade S.r.L. v. Lee Apparel Co.*, 143 F.R.D. 514, 525 n. 7 (S.D.N.Y. 1992) ("In the face of a denial by a party that it has possession, custody or control of documents, the discovering party must make an adequate showing to overcome this assertion."); *Credit Bancorp, Ltd.*, 194 F.R.D. at 472. Generally, "a party's good faith averment that the items sought simply do not exist, or are not in [its] possession, custody, or control" is a sufficient response to a subpoena. *Zervos v. S.S. Sam Houston*, 79 F.R.D. 593, 595 (S.D.N.Y. 1978).

"A determination to grant or deny . . . a motion to quash a subpoena is discretionary." *John Wiley & Sons, Inc. v. Doe Nos. 1-30*, 284 F.R.D. 185, 189 (S.D.N.Y. 2012).

### B. Cheyne US Does Not Possess or Have Custody or Control of the Subpoenaed Documents

The dispositive question is whether Cheyne US has possession, custody, or control of documents or communications responsive to the Subpoena or whether it has the practical ability to obtain such documents from Cheyne UK. Among the records sought by the Subpoena are documents and communications related to Viceroy, the defendant in the Alabama Litigation, as well as records relating to MPT or MPT securities. Bordage Decl. Ex. 1 at 8, Dkt. 2–1.

In support of its Motion, Cheyne US asserts that it does not have and cannot get the documents MPT is seeking.[8] It argues that Cheyne US is not directly affiliated with Cheyne UK,

---

[8] Cheyne US also argues that the Subpoena must be quashed because MPT is wrongfully seeking to circumvent the Hague Convention. Cheyne US Mem. at 12. In support, it argues that MPT represented to the Alabama District Court that "[t]he evidence [in question] . . . can only be obtained" from Cheyne UK and that the relevant documents "reside[] in the United Kingdom." Barday Decl. Ex. 2 at 2, 8, Dkt. 3–2. MPT correctly notes that Cheyne US's argument mischaracterizes its representations to the Alabama District Court; MPT did not represent that the documents could "only be obtained" in the UK, but rather that the evidence could only be obtained from Cheyne, as opposed to from the defendant Viceroy in the Alabama Litigation. MPT Mem. at 11–12. MPT

and it has neither access nor the practical ability to obtain Cheyne UK's documents. Cheyne US Reply at 2, Dkt. 18; Bordage Decl. ¶¶ 7–9, Dkt. 2. The relationship between Cheyne US and Cheyne UK is not that of a parent-subsidiary, as argued by MPT, but, rather, more akin to that of an aunt and niece. Cheyne US Mem. at 11, Cheyne US Reply at 4. Specifically, the general partner of Cheyne US is Cheyne Capital US, LLC. Bordage Decl. ¶ 3, Dkt. 2. That entity has a single member: Cheyne Capital Management Limited. Cheyne Capital Management Limited and 26 natural persons are the members of Cheyne UK. *Id.* ¶¶ 3, 5–7, Dkt. 2. Cheyne US and Cheyne UK do not regularly share documents, aside from limited marketing materials that are shared on a case-by-case basis. *Id.* ¶ 8; Cheyne US Reply at 2. Further, documents do not "ordinarily flow freely between [Cheyne UK] and [Cheyne US]." Cheyne US Reply at 5 (citing *Linde v. Arab Bank, PLC*, 262 F.R.D. 136, 141 (E.D.N.Y. 2009) (internal quotation marks and citation omitted). "[D]ue to platform-wide access restrictions," Cheyne US employees are not able to access the documents of Cheyne UK. Second Bordage Decl. ¶ 3, Dkt. 19.

In opposition to the Motion, MPT argues that Cheyne US failed to represent that it does not have responsive documents in its possession and instead has focused on its purported inability to obtain documents from Cheyne UK. MPT Mem. at 11.[9] MPT argues that Cheyne US has documents in its possession because Peter Head, Cheyne US's Chief Compliance Officer for regulatory purposes, serves as Cheyne UK's "key contact" per the Viceroy Agreement and is responsible for corresponding with Viceroy. *Id.* at 11. MPT argues that the position of Cheyne

---

also argues that the Hague Convention is irrelevant because MPT has the right to seek documents from both Cheyne UK and Cheyne US, MPT Mem. at 21–22, and that MPT has neither "abandoned" nor "circumvented" the Hague Convention, *id.* at 22–23. This argument is irrelevant. Given the fact that the Hague Convention process can be time-consuming, it is neither surprising nor inappropriate for MPT to proceed on two tracks to attempt to get the material it seeks for the Alabama Litigation.

[9]   Cheyne US has now definitively represented that it "does *not* have the documents MPT seeks." Cheyne Reply at 2; Second Bordage Dec. ¶ 4, Dkt. 19.

US that it cannot access the documents of its own Chief Compliance Officer is not credible. *Id.* at 12–13.

Regardless whether Cheyne US has the "legal right or authority" to obtain Cheyne UK's documents, MPT argues that there is ample evidence that Cheyne US has the "practical ability" to obtain documents from Cheyne UK. MPT Mem. at 14. MPT offers publicly-available evidence in support of its argument: Cheyne US's regulatory filings show that Cheyne UK and Cheyne US share senior personnel and operate under common control[10]; Cheyne's website

---

[10]  Cheyne UK's registration with the U.S. based National Futures Association ("NFA") states that Jonathan Lourie is CEO and Stuart Fiertz is President, both of whom own at least a ten percent interest in Cheyne UK. Cullerton Decl. Ex. 9 at 3, Dkt. 15–9. The NFA lists Peter Head as Chief Compliance Officer of Cheyne UK. *Id.* The NFA identifies Lourie and Head as Cheyne UK's "principals" due to "their ability to control [Cheyne UK's] business activities, their formal title or position with [Cheyne UK], or their ownership or financial stake in [Cheyne UK]." *Id.* In Cheyne US's registration with the NFA, Lourie, Fiertz, and Head are all listed as "principals," as Lourie and Fiertz own at least a ten percent stake. Cullerton Decl. Ex. 10 at 2, Dkt. 15–10. Lourie is also listed as the "owner" of Cheyne US. *Id.*

Fiertz, President of both Cheyne US and Cheyne UK, is registered as a lobbyist in California as an employee of Cheyne US. Cullerton Decl. Ex. 11 at 14–15, 21, 23, Dkt. 15–11. In other states, Fiertz is registered along with Jeffrey Peate, whose LinkedIn profile states that he is the Managing Director of Cheyne in New York. *Id.* at 22–23, Ex. 12 at 2, Dkt. 15–12, Ex. 13 at 2–3, Dkt. 15–13, Ex. 14 at 1, Dkt. 15–14.

Cheyne US has represented to California that Head is its Chief Compliance Officer. Cullerton Decl. Ex. 11 at 15, 23, Dkt. 15–11. Head testified before Washington D.C.'s Board of Ethics and Government Accountability that he was Cheyne US's "key contact." Cullerton Decl. Ex. 16, Dkt. 15–16.

Cheyne UK's ADV form filed with the Securities and Exchange Commission represents that Cheyne UK and Cheyne US are "affiliated" "Cheyne group entities." Cullerton Decl. Ex. 21 at 175, Dkt. 15–21. Further, the form describes the two as "related person[s]" under "common control," sharing "supervised persons." *Id.* at 24. Cheyne UK's audited financial statements state that Cheyne UK and Cheyne US are under "common control." Cullerton Decl. Ex. 22 at 20, Dkt. 15–22. Cheyne UK and Cheyne US share Cheyne Capital Management Ltd. ("Cheyne Ltd.") as a controlling parent. Cullerton Decl. Ex. 23 at 3, Dkt. 15–23. Cheyne Ltd.'s audited financial statements represent that its subsidiaries comprise "the Group" "as if they form a single entity." *Id.* at 16.

7

indicates data flows freely between the entities[11]; the entities share employees[12]; the entities share facilities[13]; and Cheyne publicly represents its organization as a unified whole[14]. This evidence, MPT asserts, contradicts Cheyne US's claim that it lacks the "practical ability" to obtain documents from Cheyne UK.

Cheyne US argues that MPT has painted a distorted view of the corporate relationship between Cheyne US and Cheyne UK that erases all operational, legal, and corporate distinctions. It disputes that Jonathan Lourie controls one unified entity; that Peter Head, Chief of Compliance, regularly works out of Cheyne US's New York office; and that Cheyne US markets the client fund named in the Viceroy Agreement. Cheyne US Reply at 7–8.

MPT has not met its burden of establishing that Cheyne US possesses responsive documents in order to overcome Cheyne US's unequivocal assertion that it "does *not* have the documents MPT seeks," Cheyne Reply at 2, and "[i]n the ordinary course of business . . . Cheyne [US] [does not] ha[ve] possession, custody, or control over the documents of Cheyne [UK]. Bordage Decl. ¶9, Dkt. 2; *Golden Trade S.r.L.*, 143 F.R.D. at 525 n. 7 ("In the face of a denial

---

[11]   Emails from Cheyne personnel direct readers to "read our Privacy Notice which explains how Cheyne Capital Management UK LLP uses and shares personal data of individuals with whom we interact." Cullerton Decl. Ex. 4 at 2, Dkt. 15–4. Cheyne's website states: "Cheyne Capital comprises of [sic] several different legal entities, including Cheyne Capital Management (UK) LLP . . . [and] Cheyne Capital US LP[.]" Cullerton Decl. Ex. 17, Dkt. 15–17.

The same email address suffix (@cheynecapital.com) is used for all global offices of Cheyne. Cullerton Decl. Ex. 25 at 1, Dkt. 15–25, Ex. 17, Dkt. 15–17, Ex. 4 at 1, Dkt. 15–4, Ex. 13 at 3, Dkt. 15–13.

[12]   Cheyne's website states that it has "170 employees worldwide." Cullerton Decl. Ex. 1 at 1, Dkt. 15–1. Cheyne US represented to Rhode Island that its principal contact person was an individual whose email was complianceuk@cheynecapital.com, and that individual was a compliance analyst in the London office. Cullerton Decl. Ex. 13 at 1, Dkt. 15–13, Ex. 15 at 2, Dkt. 15–15.

[13]   In regulatory filings, Cheyne US has given both its New York address and Cheyne UK's address in London. Cullerton Decl. Ex. 11 at 21–22, Dkt. 15–11, Ex. 16 at 1–3, Dkt. 15–16, Ex. 12 at 2, Dkt. 15–12, Ex. 13 at 2, Dkt. 15–13.

[14]   Cheyne has one corporate profile on LinkedIn. Cullerton Decl. Ex. 18, Dkt. 15–18. There is one corporate logo for all 12 global offices. Cullerton Decl. Ex. 1, Dkt. 15–1, Ex. 17, Dkt. 15–17.

by a party that it has possession, custody or control of documents, the discovering party must make an adequate showing to overcome this assertion."). MPT's primary argument that Cheyne US has responsive documents is that Peter Head serves as Chief of Compliance for both Cheyne UK and Cheyne US and is the "key contact" for the Viceroy Agreement. MPT Mem. at 11. MPT submitted copies of emails from Head to a contact at Viceroy, but, as Cheyne US noted, Head's signature block reflected his Cheyne UK title and address. Cheyne US Reply at 7–8. In his role as Chief of Compliance for Cheyne UK, Head oversees compliance work for all affiliated entities, which explains why he is listed as Chief of Compliance in regulatory filings of Cheyne US. *See id.*; Cullerton Decl. Ex. 10 at 2, Dkt. 15–10. MPT has not put forward any evidence that tends to show that Head is involved in the daily operations of Cheyne US. MPT also claims that Cheyne US markets the "Client" fund named in the Viceroy Agreement; it bases that argument on Cheyne UK's Form ADV filed with the Securities and Exchange Commission that states that Cheyne US markets the "Cheyne Global Equity Fund." MPT Mem. at 20; Cullerton Decl. Ex. 21 at 42, Dkt. 15–21. Aside from that regulatory filing, MPT has not demonstrated that any actual marketing has occurred. Cheyne UK provides a limited subset of marketing-related documents on a case-by-case basis to Cheyne US, Second Bordage Decl. ¶ 3, Dkt. 19, but that does not mean that Cheyne US has any documents arising from Cheyne UK's relationship with Viceroy or that, upon request and in the face of a confidentiality clause in the Viceroy Agreement,[15] Cheyne UK would share such documents with Cheyne US. *Id*. Cheyne US has four employees, none of whom is an employee of Cheyne UK.[16] *Id.* ¶ 2. The Viceroy

---

[15] The confidentiality provision in the Viceroy Agreement bars Cheyne UK from sharing any information pertaining to the agreement with any third party, which includes Cheyne US. Cheyne US Reply at 6.

[16] Stuart Fiertz is listed as President of both Cheyne US and Cheyne UK in regulatory filings. *See supra* n.10.

Agreement pertains to equity trading activity, in which Cheyne US is not permitted to engage. *Id.*

The remaining question for the Court is whether Cheyne US has the "practical ability" or a "legal right to obtain" documents responsive to the Subpoena from Cheyne UK. *See Strauss*, 2009 WL 3459204, at *7. To answer this question, the Court must analyze the corporate relationship between the two entities to determine whether Cheyne US can exercise custody and control over such documents. *See In re Vivendi Universal, S.A. Sec. Litig.*, No. 02-CV-5571, 2009 WL 8588405, at *3 (S.D.N.Y. July 10, 2009). MPT flounders to paint the picture that Cheyne US is a subsidiary of Cheyne UK; in reality, the corporate relationship is more attenuated. Cheyne US's grandparent entity, Cheyne Capital Management Ltd., is one of twenty-seven members of Cheyne UK. *See* Cheyne US Reply at 4. MPT argues that the Cheyne group operates as a single entity with Lourie as the principal, Fiertz as the President, and Head as Chief Compliance Officer. Although Lourie was listed as an "owner" of Cheyne US in its NFA filing, Cheyne US explained that was because, at the time, anyone with a beneficial interest exceeding a certain threshold was required to be listed as an "owner;" Lourie is the beneficiary of a Jersey discretionary trust, which is the indirect majority owner of Cheyne Capital Management Ltd.[17] Cheyne Reply at 7. The fact that Head serves as Chief of Compliance for both entities is not enough to show that Cheyne UK and Cheyne US operate under common control. The existence of a "close working relationship" between entities regarding specific matters does not demonstrate that one entity has the practical ability to obtain documents from the other. *See In re Application of Passport Special Opportunities Master Fund, LP for an*

---

[17] The requirement that anyone "who is the holder . . . of 10 percent of more of the outstanding shares of any class of stock" be listed as an "Owner" on NFA filings has since been repealed. *See* NFA, Proposed Amendments, https://www.nfa.futures.org/news/newsProposedRule.asp?ArticleID=461.

10

*Order Compelling Compliance with a Subpoena Issued to Deloitte Touche Tohmatsu Ltd. Pursuant to 28 U.S.C. § 1782*, No. 16-MC-33, 2016 WL 844833, at *8 (S.D.N.Y. Mar. 1, 2016) (holding that references to Deloitte's "International legal department" and "Global GC" do not imply access to documents but are reflective of Deloitte's "global reach"). *See also In re Mun*, No. 22-MC-163, 2022 WL 17718815, at *3 (S.D.N.Y. Dec. 15, 2022) ("A parent company's limited involvement with its subsidiary's operations . . . is insufficient to establish the necessary control.").

      Despite MPT's best efforts to marshal the facts to show that Cheyne UK has control over Cheyne US because "they share employees, facilities, office space, and utilize common practices," the overlap MPT has shown is insufficient to establish that Cheyne US controls Cheyne UK or vice versa. *Id.* at *2–3 (citation omitted). The reference to the privacy notice in emails from Cheyne employees, Cullerton Decl. Ex. 4 at 2, Dkt. 15–4, the website's acknowledgement that "Cheyne Capital" consists of different legal entities with employees worldwide, Cullerton Decl. Ex. 1 at 1, Dkt. 15–1, Ex. 17, Dkt. 15–17, Ex. 25, Dkt. 15–25, the use of the same email address suffix for all global Cheyne offices, Cullerton Decl. Ex. 25 at 1, Dkt. 15–25, Ex. 17, Dkt. 15–17, Ex. 4 at 1, Dkt. 15–4, Ex. 13 at 3, Dkt. 15–13, and having one corporate profile on LinkedIn and one corporate logo, Cullerton Decl. Ex. 18, Dkt. 15–18, Ex. 1, Dkt. 15–1, Ex. 17, Dkt. 15–17, do not persuade the Court that Cheyne US and Cheyne UK freely exchange documents in the regular course of their businesses. MPT's proffered evidence demonstrates that Cheyne has "global reach," but it does not demonstrate that Cheyne US can "unilaterally access the internal documents of member firms within the [Cheyne] umbrella." *See* 2016 WL 844833, at *8.

      MPT asserts that "if Cheyne US wanted documents from Cheyne UK, it could get them simply by asking," MPT Mem. at 14, but that assertion is based entirely on conjecture. Because

MPT has not shown that Cheyne UK exercises operational control over Cheyne US (let alone vice versa) or that the two operate as one entity that regularly shares documents, the Court cannot conclude that Cheyne US has the practical ability to obtain the requested materials. Accordingly, Cheyne US's Motion is GRANTED. That said, MPT maintains the ability to pursue the Hague Convention process to obtain the documents it seeks from Cheyne UK via the Letter Rogatory signed by Judge Proctor in Alabama. This litigation has not affected or impeded MPT's ability to do so.

### C. Cheyne US is Not Entitled to Attorneys' Fees

Cheyne US seeks an award of attorneys' fees pursuant to Federal Rule of Civil Procedure 45(d)(1), arguing that attorneys' fees should be awarded where "the party improperly issuing the subpoena refused to withdraw it, requiring the non-party to institute a motion to quash." Cheyne US Mem. at 18 (citing *Night Hawk Ltd.*, 2003 WL 23018833, at *8–9).

Under Rule 45(d)(1), when a party issues a subpoena without taking "reasonable steps to avoid imposing undue burden or expense" on a third party, the issuing court can impose an appropriate sanction, including reasonable attorneys' fees, on the party or attorney responsible for the failure to do so. Fed. R. Civ. P. 45(d)(1). Courts typically undertake a two-part inquiry to determine whether sanctions are warranted under Rule 45(d)(1): first, they determine whether the challenged subpoena imposes an undue burden and, second, if so, they consider whether the subpoenaing party took reasonable steps to avoid imposing such a burden. *Saint-Jean v. Emigrant Mortg. Co.*, No. 11-CV-2122, 2015 WL 13735434, at *3 (E.D.N.Y. Oct. 7, 2015) (citation omitted).

To satisfy the first prong, courts have recognized that the "undue burden" analysis is tied to the relevance of the material sought and is directly related to the court's decision to quash a

subpoena for imposing an undue burden. *See Molefi v. Oppenheimer Tr.*, No. 03-CV-5631, 2007 WL 538547, at *3 (E.D.N.Y. Feb. 15, 2007) (citation omitted) ("When a subpoena should not have been issued, literally everything done in response to it constitutes undue burden or expense within the meaning of Civil Rule 45(c)(1).").

Cheyne US is not entitled to attorney's fees. Cheyne US responded and objected to the Subpoena on May 9, 2024, Barday Decl. Ex. 7, Dkt. 3–7; MPT refused to withdraw the Subpoena, Barday Decl. Ex 8, Dkt. 3–9. Cheyne US provided more substantive objections on May 13, 2024, and agreed to schedule a meet and confer so long as MPT would explain the relevance of the documents to the Alabama Litigation. Barday Decl. Ex. 9, Dkt. 3–10. Two days later, before receiving a response from MPT, Cheyne US filed the instant motion. The parties then met and conferred on May 20, 2024, during which meeting MPT identified the core documents in which it is interested and asked whether Cheyne US maintains one or more email servers and, if so, the location of the servers. MPT Mem. at 9–10. On May 22, 2024, Cheyne US represented that it "does not have" the documents MPT is seeking; it did not respond to the question regarding its email server. Cullerton Decl. Ex. 24 at 7, Dkt. 23–1.

Cheyne US contends that MPT never established the relevance of the documents it is seeking to the Alabama Litigation. MPT argues that it has established the relevance of the documents; in the context of issuing the Letter Rogatory, the Alabama District Court held that the exact same requests are "directly material" to the Alabama Litigation. MPT Mem. at 24 (citing *Medical Properties Tr. v. Viceroy Research*, No. 23-CV-408, 2024 WL 150502, at *5 (N.D. Ala. Jan. 12, 2024)). Although the Court has granted Cheyne US's Motion to Quash, it cannot find that the Subpoena seeks material that is irrelevant. MPT erred in its conclusion that the corporate relationship between Cheyne US and Cheyne UK was such that Cheyne US had a

13

practical ability to obtain the requested documents, but the relevance of the requested material is not legitimately at issue.

Turning to the second prong, Cheyne US argues that MPT made no attempt to avoid imposing an undue burden on a non-party. Cheyne US Mem. at 19. MPT responds that Cheyne US moved to quash the Subpoena before the parties had the chance to meet and confer and that Cheyne refused to provide MPT with information from which to assess whether Cheyne US's refusal was appropriate. MPT Mem. at 24–25. The parties did eventually meet after the Motion had been filed. The Court cannot find that MPT failed to take reasonable steps to avoid imposing a burden, as Cheyne US denied it the opportunity to explain its position before commencing this action. As a result, sanctions are not warranted, and Cheyne US is not entitled to an award of attorney's fees and costs.

## CONCLUSION

For the foregoing reasons, the Motion to Quash is GRANTED, and each party must bear its own attorneys' fees and costs.

The Clerk of Court is respectfully directed to close the open motion at Docket entry 1.

**SO ORDERED.**

**Date:  July 31, 2024**
**New York, NY**

VALERIE CAPRONI
**United States District Judge**